UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BONNIE L. ROSS,

                                    Plaintiff,

v.                                                                        6:13-CV-00755

                                                                          (NAM/TWD)

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.
_____

APPEARANCES:                                      OF COUNSEL:

BONNIE L. ROSS
*Plaintiff Pro Se*

HON. RICHARD S. HARTUNIAN                 ROBERT R. SCHRIVER, ESQ.
United States Attorney for the            Special Assistant United States Attorney
  Northern District of New York
*Counsel for Defendant*
Room 218
James T. Foley U.S. Courthouse
Albany, New York 12207

OFFICE OF GENERAL COUNSEL                 STEPHEN P. CONTE, ESQ.
Social Security Administration            Chief Counsel, Region II
26 Federal Plaza, Room 3904
New York, New York 10278

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## REPORT AND RECOMMENDATION and ORDER

        This matter was referred to the undersigned for report and recommendation by the

Honorable Norman A. Mordue, United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Northern District of New York Local Rule 72.3.  This case has proceeded in accordance with

General Order 18 of this Court which sets forth the procedures to be followed when appealing a

denial of Social Security benefits.  However, Plaintiff did not file a brief despite the Court

providing her with extensions to do so.  (Dkt. Nos. 14 and 20.)  The Commissioner filed a brief

as directed by the Court.  (Dkt. Nos. 21 and 22.)  After service of the Commissioner's brief, the

Court gave Plaintiff a final opportunity to file a brief within forty-five days in support of her

position.  (Dkt. No. 21.)  The Court received no response from Plaintiff.  Oral argument was not

heard.  For the reasons discussed below, it is recommended that the decision of the

Commissioner be affirmed and the Complaint (Dkt. No. 1) be dismissed.

## I.      BACKGROUND AND ADMINISTRATIVE PROCEDURAL HISTORY

Plaintiff is presently forty-seven years old.  (T. at 71.[1])  She completed ninth grade and

holds a GED.  (T. at 73.)  She has worked as a medical assistant in a physician's office, as a

presser at a dry cleaner, and as a clerk in a convenience store.  (T. at 53, 73-74.)  Plaintiff alleges

disability due to bipolar disorder, post-traumatic stress disorder ("PTSD"), depression, mood

swings, involuntary movements, insomnia, cardiac symptoms, back pain, neck pain, and anxiety.

(T. at 75-80, 224, 235, 278-80.)

Plaintiff filed for disability insurance benefits and SSI benefits on August 31, 2006.  (T.

at 36, 204-206.)  The application was denied on March 16, 2007.  (T. at 120-23.)  Plaintiff

requested a hearing before an Administrative Law Judge ("ALJ").  (T. at 124.)  The initial

hearing was held on February 24, 2009, but Plaintiff did not appear for that hearing.  (T. at 96-

100.)  Another hearing was held on June 16, 2009.  (T. at 67.)  On August 26, 2009, the ALJ

issued a decision finding that Plaintiff was not disabled.  (T. at 102.)  Thereafter, the Appeals

---

[1]      Citations identified as "T" refer to the Administrative Transcript and the page
numbers set forth therein rather than the numbers assigned by the Court's electronic filing
system.  (Dkt. No. 12.)

Council remanded the case for further proceedings.  (T. at 113.)  On May 12, 2011, a further

hearing was held before the ALJ.  (T. at 42.)  On May 20, 2011, the ALJ issued a decision again

finding that Plaintiff was not disabled.  (T. at 36.)  The ALJ's decision became the final decision

of the Commissioner when the Appeals Council denied Plaintiff's request for review on June 11,

2012.  (T. at 1.)  Plaintiff commenced this action on June 27, 2013, after obtaining permission for

an extension from the Appeals Council.  (Dkt. No. 1; T. at 5.)

## II.     APPLICABLE LAW

### A.     Standard for Benefits

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI

disability benefits must establish that he or she is "unable to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A) (2006).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such
> severity that he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate
> area in which he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for work.

*Id.* § 1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. § 405(a) (2012)), the

Social Security Administration ("SSA") promulgated regulations establishing a five-step

sequential evaluation process to determine disability.  20 C.F.R. § 416.920(a)(4) (2014).  "If at

any step a finding of disability or non-disability can be made, the SSA will not review the claim

further." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

> At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [20 C.F.R.] §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [20 C.F.R.] §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. [20 C.F.R.] §§ 404.1520(f), 404.1560(c), 416.920(f), 416.9630(c).

*Id.*, 540 U.S. at 24-25 (footnotes omitted).

The plaintiff-claimant bears the burden of proof regarding the first four steps. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). If the plaintiff-claimant meets his or her burden of proof, the burden shifts to the defendant-Commissioner at the fifth step to prove that the plaintiff-claimant is capable of working. *Id.*

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Featherly v. Astrue*, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011) (citations omitted); *Rosado v.*

*Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing, *inter alia*, *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g) (2012); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." *Roat v. Barnhart*, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (citations omitted); *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

"Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. *Featherly*, 793 F. Supp. 2d at 630 (internal quotations omitted) (citation omitted); *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citations omitted). However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for

the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972); *see also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## III.    THE ALJ'S DECISION

Here, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since August 31, 2006.  (T. at 24.)  At step two, the ALJ found that Plaintiff's bipolar disorder, polysubstance abuse in remission, and degenerative disc disease of the cervical and lumbosacral spine were severe impairments.  *Id.*  At step three, the ALJ found that Plaintiff's impairments, although severe, did not individually, or in combination, meet or equal any of the criteria of a section of the Listing of Impairments ("Listings"), set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1.  (T. at 26-27.)  Prior to proceeding to step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC") and concluded that she retained the ability to "lift and/or carry 20 pounds on an occasional basis; lift and/or carry 10 pounds on a frequent basis; stand and/or walk for about six hours; and sit for about six hours."  (T. at 27.)  Additionally, the ALJ found Plaintiff "unable to interact with co-workers or the public on a frequent basis, but can do so on an occasional basis, meaning up to one-third of the workday."  *Id.*  At step four, the ALJ concluded that Plaintiff had no past relevant work.  (T. at 34.)  The ALJ obtained the testimony of a vocational expert (T. at 35) and, at step five, the ALJ concluded that Plaintiff was not disabled because jobs existed in significant numbers in the national economy that Plaintiff could perform.  (T. 34-36.)  Thus, the ALJ denied Plaintiff's claim for disability benefits.  (T. at 36.)

## IV.    THE PARTIES' CONTENTIONS

Plaintiff did not file a brief despite several opportunities to do so.  (Dkt. Nos. 14, 18, 20, and 21.)  Her form complaint does not provide details regarding any claimed errors in the ALJ's

decision. *See* Dkt. No. 1.

Defendant contends that the ALJ's decision applied the correct legal standards and is supported by substantial evidence and thus should be affirmed. (Dkt. No. 22.)

## V. DISCUSSION

### A. Plaintiff's Failure to File Papers in Response to Defendant's Motion for Judgment on the Pleadings

It is well settled that a plaintiff bears the burden of establishing disability. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999) ("The claimant generally bears the burden of proving that she is disabled under the statute. . . ."). *See also Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) ("The burden is on the claimant to prove that he is disabled within the meaning of the Act."). Plaintiff's *pro se* complaint consists of a fill-in-the-blank form, in which she complains "of a decision which adversely affects the plaintiff in whole or in part." (Dkt. No. 1.) Despite Orders of this Court on December 23, 2013, February 6, 2014, and March 11, 2014 (Dkt. Nos. 14, 20, and 21), providing Plaintiff with additional time, Plaintiff did not file any papers opposing Defendant's motion, nor has she filed any further extension request to enlarge the time within which to oppose Defendant's motion. As a result, it follows that Plaintiff has failed to set forth all errors which she contends entitle her to relief. (General Order No. 18 at 1.[2]) Thus Plaintiff's complaint, with nothing else, is conclusory and insufficient to defeat

---

[2] General Order No. 18 also contains the following "Notification of the Consequences of Failing to File a Brief as Required by Paragraph (1)(a-d)": "Plaintiff's brief is the only opportunity for Plaintiff to set forth the errors Plaintiff contends were made by the Commissioner of Social Security that entitle Plaintiff to relief. The failure to file a brief as required by this Order will result in the consideration of this appeal without the benefit of Plaintiff's arguments and may result in a decision heavily influenced by the Commissioner's version of the facts and subsequent dismissal of your appeal." (General Order No. 18 at 4.)

Defendant's motion for judgment on the pleadings. *See Feliciano v. Barnhart*, Civ. No. 04-9554 (KMW)(AJP), 2005 U.S. Dist. LEXIS 14578, at *36, 2005 WL 1693835, at *10 (S.D.N.Y. July 21, 2005); *Reyes v. Barnhart*, Civ. No. 01-4059 (LTS) (JCF), 2004 U.S. Dist. LEXIS 3689, at *6-7, 2004 WL 439495, at *3 (S.D.N.Y. Mar. 9, 2004); *Worthy v. Barnhart*, Civ. No. 01-7907 (JSH), 2002 U.S. Dist. LEXIS 24550, at *2, 2002 WL 31873463, at *1 (S.D.N.Y. Dec. 23, 2002).[3]

**B.    The ALJ's Decision Was Supported By Substantial Evidence**

For the reasons set forth above in Section V.A., it is not necessary for the Court to consider the ALJ's five step sequential evaluation of Plaintiff's claims. However, as set forth below, such consideration shows that the ALJ's decision is supported by substantial evidence.[4]

**(1)    Plaintiff Was Not Engaged in Substantial Gainful Activity**

As noted above at the first step of the sequential evaluation process, the agency will find non-disability unless the claimant shows that she is not working at a "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b), 416.920(a)(4)(i), 416.920(b).

Here, the ALJ found the that Plaintiff had "not engaged in substantial gainful activity since August 31, 2006, the application date." (T. at 24.) The record confirms that Plaintiff had not worked in any capacity since 2004. (T. at 51-54, 75, 208, 264.) Therefore, the Court finds

---

[3]    The Court will provide Plaintiff with a copy of all of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[4]    *See Feliciano*, 2005 WL 1693835 (where magistrate judge nonetheless analyzed the five step sequential evaluation even though pro se plaintiff never filed a brief); *Jiang v. Barnhart*, Civ. No. 03-0077, 2003 WL 21526937 (S.D.N.Y. July 8, 2003); and *Reynoso v. Apfel*, Civ. No. 97-2234, 1998 WL 61002 (S.D.N.Y. Feb. 11, 1998).

that the ALJ's determination at step one is supported by substantial evidence.

### (2) Plaintiff Had Severe Impairments

At the second step of the evaluation, the medical severity of a claimant's impairments is considered. 20 C.F.R. § 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Here, the ALJ determined that Plaintiff suffered from the severe impairments of bipolar disorder, polysubstance abuse in remission, and degenerative disc disease of the cervical and lumbosacral spine. (T. at 24.) The decision of the ALJ shows a reasoned and proper analysis in making this determination. *Id.* at 24-26. Defendant does not dispute these findings. (Dkt. No. 22.)

The ALJ did not find that Plaintiff's other alleged mental impairments or combination of impairments were severe impairments. (T. at 24.) This is supported by substantial evidence. Plaintiff was seen in consultation by David Stang, Psy.D., whose report of his examination on November 18, 2006, shows that she was only mildly limited in her activities of daily living. (T. at 277-282.) She could dress, bath, and groom herself; prepare some food; do house cleaning, shopping and laundry; manage money; and drive. (T. at 281.) In her testimony, she confirmed that she could do household chores, drive, and take care of her personal hygiene. (T. at 72, 77, 90-91.) She could go to appointments and meetings. (T. at 72, 83.)

The record shows Plaintiff's social functioning was likewise mildly limited. At the consultative visit with Dr. Stang, Plaintiff was animated and friendly, and she reported that she socialized with her boyfriend and family members and spoke to her neighbors. (T. at 281-82.) While she did not like to go out much, she had a friend that she visited once in a while. (T. at 88.)

The ALJ's finding that Plaintiff had moderate difficulties maintaining concentration,

persistence, or pace due to her mental impairments or combination of impairments is also supported by the record. Dr. Stang noted that she was fully oriented to person, place, and time and could adequately perform serial three exercises. (T. at 281.) However, she could only recall one out of three words after a five-minute interval. *Id.* He found her thought processes "coherent, organized, and goal directed." *Id.* She enjoyed reading and watching movies. (T. at 89, 282.) She was capable of handling her own funds. (T. at 281, 282.)

The record does not show any repeated episodes of decompensation of extended periods of time. While Plaintiff was psychiatrically hospitalized on three separate occasions, these were for short durations of time and were precipitated by a relapse into substance abuse. (T. at 401-409, 419-436.)

Additionally, the state agency psychiatric review record shows that Plaintiff had mild restrictions in her activities of daily living and social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (T. at 469-482.)

At the second step of the evaluation, the medical severity of a claimant's impairments is considered. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A "severe impairment" is defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* at §§ 404.1520(c), 404.1521, 416.920(c), 416.921. "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs." *Id.* at §§ 404.1521(b), 416.921(b). These include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out, remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a

routine work setting. *Id.*; *see also Ianni v. Barnhart*, 403 F. Supp. 2d 239, 252 (W.D.N.Y. 2005); *Camacho v. Apfel*, Civ. No. 97-6151 (JG), 1998 U.S. Dist. LEXIS 23866, at *17-18, 1998 WL 813409, at *6 (E.D.N.Y. July 22, 1998). The claimant bears the burden of presenting evidence to establish severity. 20 C.F.R. § 404.1512(c). The claimant must demonstrate "that the impairment has caused functional limitations that precluded him from engaging in any substantial gainful activity for one year or more." *Perez v. Astrue*, 907 F. Supp. 2d 266, 272 (N.D.N.Y. 2012).

"A finding of not severe should be made if the medical evidence establishes only a slight abnormality which would have no more than a minimal effect on an individual's ability to work." *Id*. at 271 (internal quotations omitted) (citations omitted); SSR 85-28, 1985 WL 56858, at * 2 (1985). Based upon the medical evidence and Plaintiff's testimony at her hearing as outlined above, the ALJ correctly found Plaintiff's other mental conditions — PTSD, depression, anxiety, mood swings, involuntary movements, and insomnia — were not severe impairments. (T. at 24.) Notably, during a psychiatric evaluation by her treating providers, Anandavalli Menon, M.D., and Sylvia Coleby, N.P.P., on October 31, 2006, Plaintiff appeared neat and clean; she was cooperative, calm, and relaxed; and her thoughts were logical and organized. (T. at 460.) Accordingly, there is substantial evidence to support the ALJ's finding that Plaintiff's only severe impairments were her bipolar disorder, polysubstance abuse in remission, and degenerative disc disease of the cervical and lumbosacral spine.

### (3)     Plaintiff's Impairments Did Not Meet or Equal a Listed Impairment

The inquiry at step three is whether, based solely on medical evidence, the claimant has an impairment noted in the Listings. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the

claimant has one of the listed impairments, the Secretary will consider the claimant disabled without looking at vocational factors, and the claimant will automatically be entitled to benefits. *Id.* §§ 404.1520(d), 416.920(d). The Secretary presumes that someone with a listed impairment is unable to perform substantial gainful activity. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). "Under the regulations, the ALJ's determination as to whether the claimant's impairment meets or equals the Listings must reflect a comparison of the symptoms, signs, and laboratory findings about the impairment, as shown in the medical evidence, with the medical criteria as shown with the listed impairment." *Kuleszo v. Barnhart*, 232 F. Supp. 2d 44, 52 (W.D.N.Y. 2002) (citing 20 C.F.R. § 404.1526). However, the burden is on the claimant to present medical findings that show his or her impairments match a listing or are equal in severity to a listed impairment. If a claimant's impairment manifests only some of the criteria in the listing, no matter how severely, the impairment does not qualify. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

An ALJ is required to provide an explanation as to why the claimant failed to meet or equal the Listings, "where the claimant's symptoms, as described by the medical evidence, appear to match those described in the Listings." *Kuleszo*, 232 F. Supp. 2d at 52. However, if an ALJ's decision lacks an express rationale for finding that a claimant does not meet a Listing, a Court may still uphold the ALJ's determination if it is supported by substantial evidence. *Berry*, 675 F.2d at 468; *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 273 (N.D.N.Y. 2009).

The ALJ found that Plaintiff's bipolar disorder, polysubstance abuse in remission, and degenerative disc disease of the cervical lumbosacral spine, status post laminectomy and fusion of November 2009, separately or in combination, did not meet or medically equal the severity of

any impairment set forth in any section of the Listings.  (T. at 26.)  There is substantial evidence to support the ALJ's finding.

Plaintiff's alleged mental impairments most closely correspond to Listing 12.04 (Affective Disorders), Listing 12.06 (Anxiety Related Disorders), and Listing 12.09 (Substance Addicting Disorders).  Plaintiff's alleged physical impairments of the cervical and lumbosacral spine most closely correspond to Listing 1.04 (Disorders of the Spine).  The medical evidence does not show that Plaintiff's symptoms meet or equal the requirements of any of these Listings.

### (a)    Listing 12.04

For example, Listing 12.04 states that "[t]he required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  These requirements are:

A.    Medically documented persistence, either continuous or intermittent, of one of the following:
    1.    Depressive syndrome characterized by at least four of the following:
        a.    Anhedonia or pervasive loss of interest in almost all activities; or
        b.    Appetite disturbance with change in weight; or
        c.    Sleep disturbance; or
        d.    Psychomotor agitation or retardation; or
        e.    Decreased energy; or
        f.    Feelings of guilt or worthlessness; or
        g.    Difficulty concentrating or thinking; or
        h.    Thoughts of suicide; or
        i.    Hallucinations, delusions, or paranoid thinking; or
    2.    Manic syndrome characterized by at least three of the following:
        a.    Hyperactivity; or
        b.    Pressure of speech; or
        c.    Flight of ideas; or
        d.    Inflated self-esteem; or
        e.    Decreased need for sleep; or
        f.    Easy distractability; or

g.     Involvement in activities that have a high probability of painful consequences which are not recognized; or

h.     Hallucinations, delusions, or paranoid thinking;

or

3.     Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B.     Resulting in at least two of the following:

1.     Marked restriction of activities of daily living; or

2.     Marked difficulties in maintaining social functioning; or

3.     Marked difficulties in maintaining concentration, persistence, or pace; or

4.     Repeated episodes of decompensation, each of extended duration;

OR

C.     Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.     Repeated episodes of decompensation, each of extended duration; or

2.     A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.     Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*Id.*

The medical evidence does not provide support that Plaintiff's bipolar disorder met or equaled Listing 12.04. As discussed above, Plaintiff's mental impairment or combination of impairments did not cause at least two "marked" limitations in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) or one "marked" limitation in the first three functional areas and "repeated" episodes of decompensation, each of extended duration. As such, the determination by the ALJ that

"paragraph B" criteria for Listing 12.04 was not met is supported by substantial evidence. *See id*.

The evidence also supports that "paragraph C" criteria was likewise not met in connection with Plaintiff's mental impairment or combination of impairments such that the ALJ's finding in this regard is appropriate. (T. at 27.) The Psychiatric Review Technique Form prepared by state agency examiner Dr. Kamin found that the evidence did not establish the presence of the "paragraph C" criteria. (T. at 472, 480.) As noted more fully above in discussing the ALJ's step two analysis, Dr. Kamin's opinion is consistent with the medical records of the treating providers.

Accordingly, the medical evidence does not provide support that Plaintiff's impairments met or equaled Listing 12.04.

### (b) Listing 12.06

Listing 12.06 states that "[t]he required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06 (2014). These requirements are:

A. Medically documented findings of at least one of the following:
    1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
        a. Motor tension; or
        b. Autonomic hyperactivity; or
        c. Apprehensive expectation; or
        d. Vigilance and scanning
    or
    2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
    3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

*Id.*

As outlined more fully above in Part V.B(2), Dr. Stang found Plaintiff was only mildly limited in her activities of daily living and social functioning. (T. at 277-282.) Her own testimony confirms she could function in these areas. (T. at 72, 77, 83, 90-91.) Dr. Stang also noted that she was fully oriented to person, place, and time and could adequately perform serial three exercises. (T. at 281.) However, she could only recall one out of three words after a five-minute interval. *Id.* He found her thought processes coherent, organized, and goal directed; and she was capable of handling her own funds. (T. at 281-82.)

Notably, the record does not show any repeated episodes of decompensation of extended periods of time. While she was psychiatrically hospitalized on three separate occasions, these were for short durations of time and were the result of a relapse into substance abuse. (T. at 401-409, 419-436.)

The treatment records of Plaintiff's providers, Nurse Practitioner Coleby and Dr. Menon, show Plaintiff had a Global Assessment of Functioning ("GAF") score of 61 after an initial

psychiatric evaluation of Plaintiff conducted on October 31, 2006.  (T. at 458-62.) The GAF score "rates overall psychological functioning on a scale of 0-100 that takes into account psychological, social, and occupational functioning."  *Zabala v. Astrue*, 595 F.3d 402, 405 n.1 (2d Cir. 2010).  A GAF score in the range of 61 to 70 indicates the presence of "some mild symptoms," such as a depressed mood or insomnia, or some difficulty in social or occupational functioning, but also indicates that the patient is "generally functioning pretty well" and has some meaningful interpersonal relationships.  *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 34 (4th ed. rev. 2000).  After another psychiatric examination, conducted on December 9, 2010, Nurse Practitioner Coleby and Dr. Menon assessed a GAF score of 90.  (T. at 803-05.)  A GAF score in the range of 81 to 90 indicates a patient with absent or minimal symptoms, with good functioning in all areas, who is interested and involved in a wide range of activities, socially effective, generally satisfied with life, and who has no more than everyday problems and concerns.  *See* DSM-IV at 34.

As stated above, Plaintiff must satisfy the requirements of parts A and B of Listing 12.06 or part C.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.  The medical evidence discussed above does not show that Plaintiff meets part B.  Thus in order to satisfy Listing 12.06, she must meet part C.  There is no evidence that Plaintiff is completely unable to function independently outside her home.  She testified she could drive and go to appointments and meetings.  (T. at 72, 83.)

Accordingly, the above evidence does not provide support that Plaintiff's impairments met or equaled Listing 12.06.

### (c)    Listing 12.09

The required level of severity for this listing is met when the requirements of, *inter alia*,

Listing 12.04 or Listing 12.06 are met.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.09.  As discussed above, Plaintiff does not meet the requirements for Listing 12.04 or 12.06.  Thus, she does not meet the requirements for this Listing and the ALJ's finding is supported by substantial evidence.

### (d)    Listing 1.04

Listing 1.04 concerns disorders of the spine resulting in compromise of a nerve root or the spinal cord.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.  There must be medical findings establishing evidence of nerve root compression, or spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication.  *Id.*

Here, while not specifically outlining Plaintiff's medical records concerning her cervical and lumbar impairments when determining that the conditions did not meet the Listings criteria, the ALJ later detailed Plaintiff's medical records of treatment and findings concerning her spinal condition when determining her RFC.  (T. at 26, 29-30.)  The objective medical evidence, including medical signs and laboratory findings, shows that on December 12, 2007, x-rays of Plaintiff's lumbosacral spine were negative, and x-rays of her cervical spine showed no acute findings.  (T. at 621.)  An April 10, 2008, a magnetic resonance imaging ("MRI") study of her lumbar spine was normal except for mild to moderate degenerative disc bulging at the L5-S1 level, mild compression of the left descending nerve root, and a mild degenerative disc change at the L4-L5 level.  (T. at 599.)  An MRI of the cervical spine, also performed on April 10, 2008, showed an asymmetric disc bulge at the C4-C5 level, possibly representing a small disc herniation; flattening of the spinal cord; no direct compression of the spinal corporal or ventral nerve roots; and mild to moderate degenerative disc change at the C5-C6 level, without evidence

of disc herniation or cord compression.  (T. at 596-97.)  October 9, 2008, x-rays of Plaintiff's lumbar spine were also negative.  (T. at 582.)  An MRI of the lumbar spine performed the same day showed internal disc disruption and herniation at the L5-S1 level.  (T. at 580-81.)  February 2, 2009, x-rays of Plaintiff's cervical spine showed mild degenerative changes at the C5-C6 level, with no fracture; x-rays of Plaintiff's lumbar spine were negative.  (T. at 715.)

The ALJ also noted that Plaintiff had undergone surgery on her lumbar spine, including a discectomy and instrumented fusion of the L5 and S1 vertebrae, on November 16, 2009.  (T. at 29, 748, 755-56.)  Post-operative x-rays of Plaintiff's lumbar spine showed no acute findings. (T. at 753.)  An October 4, 2010, CT scan of Plaintiff's lumbar spine showed only a questionable epidural scar.  (T. at 741.)  An MRI of Plaintiff's lumbar spine performed two months later showed no obvious compressive lesion in the low lumbar region; normal intensity to all intervertebral disc spaces near the fusion; an intact lordotic curve; no obvious spondylolysis or spondylolisthesis; mild facet disease at the L4-L5 level, but no acute findings; and no signs of any obvious nerve entrapment or spinal stenosis at the area of surgical intervention.  (T. at 735, 738.)  X-rays of Plaintiff's cervical spine taken on March 21, 2011, showed suspected Schmorl's nodes at the C4-C5 level, which were interpreted as being unchanged from the previous cervical spine x-rays done in December 2007.  (T. at 833.)  On March 24, 2011, an MRI of Plaintiff's cervical spine showed a small right paracentral disc herniation at the C5-C6 level that was also interpreted as being unchanged from the previous cervical-spine MRI done on April 9, 2008.  (T. at 830-31.)  As shown by the medical records and specifically the objective medical tests discussed above, Plaintiff has not met the requirements for Listing 1.04; therefore, the Court finds the ALJ's determination is supported by substantial evidence.

**(4)** **Plaintiff Retained the Residual Functional Capacity to Perform Certain Work as Defined by the ALJ**

**(a)** **Residual Functional Capacity**

A claimant's RFC is the most he can do despite his limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. "A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quotations omitted)).

It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion. 20 C.F.R. § 404.1546(c). In determining RFC, the ALJ can consider a variety of factors including a treating physician's or examining physician's observations of limitations, the claimant's subjective allegations of pain, physical and mental abilities, as well as the limiting effects of all impairments even those not deemed severe. *Id.* § 404.1545(a). Age, education, past work experience, and transferability of skills are vocational factors to be considered. *Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). Physical abilities are determined by evaluation of exertional and nonexertional limitations. Exertional limitations include claimant's ability to walk, stand, lift, carry, push, pull, reach, and handle. 20 C.F.R. § 404.1569a(b).

The ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the

other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2010). Once the ALJ has resolved a claimant's complaints of pain, he can then evaluate exertional and non-exertional limitations. *Lewis v. Apfel*, 62 F. Supp. 2d 648, 658 (N.D.N.Y. 1999).

The RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004) (citation omitted). " In assessing RFC, the ALJ's findings must specify the functions a plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." *Roat*, 717 F. Supp. 2d at 267 (citation omitted). "RFC is then used to determine the particular types of work a claimant may be able to perform." *Whittaker*, 307 F. Supp. 2d at 440.

### (b)  Treating Physician Rule

Part and parcel to the RFC determination is the ALJ's review of the medical opinion evidence and the credibility of Plaintiff. With regard to the medical opinion evidence, the Court finds that the ALJ properly weighed the medical opinions at issue in making the RFC determination and provided "good reasons" for assigning treating Psychiatric Nurse Practitioner Coleby's opinion little weight. The ALJ also properly addressed the factors set forth in 20 C.F.R. § 404.1527 and 20 C.F.R. § 416.927 in assessing what weight to give her opinion.

The medical opinions of a claimant's treating physician are generally given more weight than those of other medical professionals. "If . . . a treating source's opinion . . . is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with other substantial evidence . . . [it] will [be] give[n] controlling weight." 20 C.F.R. § 404.1527(c)(2). Medically acceptable techniques include consideration of a patient's report of

complaints and the patient's history as essential diagnostic tools. *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003). Generally, the longer a treating physician has treated the claimant and the more times the claimant has been seen by the treating source, the more weight the Commissioner will give to the physician's medical opinions. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (citing 20 C.F.R. § 404.1527(c)(2)(i)).

An opinion from a treating source that the claimant is disabled cannot itself be determinative. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). However, a lack of specific clinical findings in the treating physician's report is not, by itself, a reason to justify an ALJ's failure to credit the physician's opinion. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (citing *Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998)).

An ALJ who refuses to give "controlling weight to the medical opinion of a treating physician must consider various factors to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citation omitted). This analysis must be conducted to determine what weight to afford any medical opinion. 20 C.F.R. § 404.1527(c). This is necessary because the ALJ is required to evaluate every medical opinion received. *Id.*; *see also Zabala v. Astrue*, 595 F.3d 402 (2d Cir. 2010) (finding that the ALJ failed to satisfy the treating physician rule when he discounted a report because it was incomplete and unsigned). These factors include: (1) the length of the treatment relationship and frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the medical evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)-(6).

Generally, the opinion of the treating physician will not be afforded controlling weight when the treating physician issued opinions that were not consistent with those of other medical experts and the opinions are contradicted by other substantial evidence in the record. *Halloran*, 362 F.3d at 32; 20 C.F.R. § 404.1527(c)(2); *Snell*, 177 F.3d at 133 ("When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given."). Other findings, including the ultimate finding of whether the claimant is disabled, are reserved to the Commissioner. *Snell*, 177 F.3d at 133.

The Regulations require the Commissioner's notice of determination or decision to "give good reasons" for the weight given a treating source's opinion. 20 C.F.R. § 404.1527(c)(2). This is necessary to assist the court's review of the Commissioner's decision and it "let[s] claimants understand the disposition of their cases." *Halloran*, 362 F.3d at 33 (citing *Snell*, 177 F.3d at 134). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Snell*, 177 F.3d at 133; *Halloran*, 362 F.3d at 32-33. However, remand is unnecessary where application of the correct legal standard could lead to only one conclusion. *Schaal*, 134 F.3d at 504.

### (c)     Crediblity Assessments by the ALJ

"It is the function of the [Commissioner], not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citation omitted). In making a credibility determination, the hearing officer is required to take the claimant's reports of pain and other limitations into account. 20 C.F.R. § 404.1529(a); *Genier*, 606 F.3d at 49; SSR 96-7p,

1996 WL 374186, at *5 (S.S.A. 1996).[5] The ALJ is required to consider all of the evidence of record in making his credibility assessment. *Genier,* 606 F.3d at 50 (citing 20 C.F.R. §§ 404.1529, 404.1545(a)(3)).

First, the ALJ must consider "whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms." SSR 96-7p, 1996 WL 374186, at *2. This finding does not involve a determination as to the intensity, persistence, or functionally limiting effects of the claimant's pain or other symptoms. *Id.* If no impairment is found that could reasonably be expected to produce pain, the claimant's pain cannot be found to affect the claimant's ability to do basic work activities. *Id.* An individual's statements about his pain are not enough by themselves to establish the existence of a physical or mental impairment, or to establish that the individual is disabled. *See Grewen v. Colvin*, Civ. No. 1:11-829 (FJS), 2014 U.S. Dist. LEXIS 41260, at *10-11, 2014 WL 1289575, at *4 (N.D.N.Y. Mar. 27, 2014) (while a "claimant's subjective complaints are an important part of the RFC calculus . . . subjective symptomatology by itself cannot be the basis for a finding of disability . . ., [and] [a] claimant must present medical evidence or findings that the existence of an underlying condition could reasonably be expected to produce the symptoms alleged."); *see also* 42 U.S.C. §§ 423(d)(5)(A); 20 C.F.R. § 404.1529(b); SSR 96-7p.

Once an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms has been established, the second step of the analysis is for the ALJ to "consider the extent to which the claimant's symptoms can reasonably

---

[5]     There is no Lexis citation for this source.

be accepted as consistent with other objective medical evidence and other evidence." *Genier*, 606 F.3d at 49 (internal quotations omitted) (citation omitted); *see also Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (finding that claimant's subjective complaints of pain were insufficient to establish disability because they were unsupported by objective medical evidence tending to support a conclusion that he has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms); *see also* SSR 96-7p, at *5 ("One strong indicator of the credibility of [an individual's statements is their] consistency, both internally and with other information in the case record."). This includes evaluation of the intensity, persistence, and limiting effects of the pain or symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities. *Genier*, 606 F.3d at 50.

The ALJ must consider all evidence of record, including statements the claimant or others make about his impairments, his restrictions, daily activities, efforts to work, or any other relevant statements the claimant makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony during administrative proceedings. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1512(b)(3)). A claimant's symptoms can sometimes suggest a greater level of severity than can be shown by the objective medical evidence alone. SSR 96-7p, at *5. When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve pain or

symptoms; (5) other treatment received to relieve pain or symptoms; (6) any measures taken by the claimant to relieve pain or symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to pain or symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vii); 416.929(c)(3)(i)-(vii).

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'"  *Lewis*, 62 F. Supp. 2d at 651 (quoting *Gallardo v. Apfel*, Civ. No. 96-9435 (JSR), 1999 U.S. Dist. LEXIS 4085, at *16, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999) (citing *Aponte*, 728 F.2d at 591-92; *Ferraris v Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).  "A finding that a [claimant] is not credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record."  *Williams*, 859 F.2d at 260-61 (citation omitted) (finding that failure to make credibility findings regarding claimant's critical testimony undermines the Secretary's argument that there is substantial evidence adequate to support his conclusion that claimant is not disabled).  "Further, whatever findings the ALJ makes must be consistent with the medical and other evidence."  *Id*. at 261 (citation omitted) ("[A]n ALJ must assess subjective evidence in light of objective medical facts and diagnoses.").

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence."  *Genier*, 606 F.3d at 49 (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).  An ALJ's evaluation of a plaintiff's credibility is entitled to great

deference if it is supported by substantial evidence. *Murphy v. Barnhart*, Civ. No. 00-9621 (JSR) (FM), 2003 U.S. Dist. LEXIS 6988, at *29-30, 2003 WL 470572, at *10 (S.D.N.Y. Jan. 21, 2003) (citing *Bischof v. Apfel*, 65 F. Supp. 2d 140, 147 (E.D.N.Y. 1999)); *Bomeisl v. Apfel*, Civ. No. 96-9718 (MBM), 1998 U.S. Dist. LEXIS 11595, at *19, 1998 WL 430547, at *6 (S.D.N.Y. July 30, 1998) ("Furthermore, the ALJ has discretion to evaluate a claimant's credibility . . . and such findings are entitled to deference because the ALJ had the opportunity to observe the claimant's testimony and demeanor at the hearing.")).

### (d)  Substantial Evidence Supports the ALJ's RFC Determination

### (i)  Plaintiff's Physical RFC

To make the physical portion of the RFC finding (*i.e.*, that Plaintiff was exertionally limited to light work), the ALJ considered the objective medical evidence, including medical signs and laboratory findings. *See* T. at 29-30; *see also* 20 C.F.R. §§ 416.912(b)(1), 416.928 (b) - (c) (defining medical signs and laboratory findings). As set forth in detail in Part V.B(3)(d) above, the objective medical and diagnostic test results regarding Plaintiff's lumbosacral spine and cervical spine showed no acute findings, and essentially only mild to moderate degenerative findings. (T. at 580-82, 596-99, 621, and 715.) Even after Plaintiff's lumbar spine surgery, the diagnostic tests showed no acute findings and no signs of any obvious nerve entrapment or spinal stenosis at the area of surgical intervention. (T. at 735, 738.) On March 24, 2011, an MRI of Plaintiff's cervical spine showed a small right paracentral disc herniation at the C5-C6 level that was also interpreted as being unchanged from the previous cervical spine MRI done on April 9, 2008. (T. at 830-31.)

Finally, the ALJ also noted the absence in the record of any statement or opinion from

Plaintiff's treating physicians regarding limitations on her ability to work or perform physical activities. (T. at 34.) In making a decision, an ALJ is entitled to rely not only on what the record says, but also what it does not say. *See Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995); *Petell v. Comm'r of Soc. Sec.*, No. 12-CV-1596 (LEK/CFH), 2014 U.S. Dist. LEXIS 37955, at *27, 2014 WL 1123477, at *9 (N.D.N.Y. Feb. 28, 2014).

Based upon the records outlined above, the Court finds that the ALJ's physical RFC finding was clearly supported by substantial evidence.

### (ii)     Plaintiff's Mental RFC

The mental portion of the ALJ's RFC finding was supported by the opinion of Dr. E. Kamin, a state agency review psychologist, and the treatment records of Nurse Practitioner Coleby and Dr. Menon, a psychiatrist. On March 16, 2007, Dr. Kamin reviewed Plaintiff's psychiatric records and provided an opinion as to her mental RFC. (T. at 483-86.) According to Dr. Kamin, Plaintiff was not significantly limited or only moderately limited in the areas of understanding and memory, sustained concentration and persistence, social interaction, and adaption. (T. at 483-84.) She had demonstrated that she was able to function on her medications, and could do entry-level work in an environment where she would have limited interaction with others. (T. at 485.) Dr. Kamin, as a state agency review psychologist, was deemed a qualified expert in the field of social security disability, and his opinion may serve as substantial evidence in support of the ALJ's RFC finding. *See Diaz*, 59 F.3d at 313 n.5; *Santos-Sanchez v. Astrue*, 723 F. Supp. 2d 630, 638 (S.D.N.Y. 2010) (ALJ may rely on opinions of state agency medical consultants, who are experts in Social Security disability evaluations, to determine disability); 20 C.F.R. § 416.912(b)(6), 416.913(c), 416.927(e); SSR 96-6p, 1996 WL

374180, at *2.

The ALJ's mental RFC finding was also supported by the treatment records of Nurse Practitioner Coleby, who as noted more fully above in Part V.B(3)(b), assessed a GAF score of 61 after an initial psychiatric evaluation of Plaintiff conducted on October 31, 2006. (T. at 458-62.) After another psychiatric examination, conducted on December 9, 2010, Nurse Practitioner Coleby and Dr. Menon assessed a GAF score of 90, indicating that she had minimal symptoms and good functioning in all areas. (T. at 803-05.) *See also* DSM-IV at 34. The ALJ's RFC which limited Plaintiff to only occasional interaction with others, therefore, imposed restrictions greater than those suggested by her treatment records.

### (iii)     Opinion Of Nurse Practitioner Coleby

In making his RFC finding, the ALJ properly evaluated the opinion of Nurse Practitioner Coleby. (T. at 32-33.) Under the Commissioner's regulations, an opinion from a treating "acceptable medical source" can be given controlling weight. 20 C.F.R. §§ 416.913(a), 416.927(d)(2); SSR 96-2p, 1996 WL 374188, at *1, *3. Plaintiff's area of residence in the Mohawk Valley is not a rural area, and thus, as a nurse practitioner, Coleby is not an "acceptable medical source" but instead is an "other medical source;" therefore her opinion is not entitled to controlling weight. *See* 20 C.F.R. §§ 416.913(a) & (d). The Commissioner "may" use evidence from sources such as physician assistants to determine the severity of a claimant's impairments. *See id*. § 416.913(d). Under SSR 06-03p, an ALJ "generally should explain the weight given to opinions from" other medical sources who have a treating relationship with a claimant. SSR 06-03p, 2006 WL 2329939, at *6. Courts have held, however, that an ALJ is not required to weigh the assessment of an "other medical source" at all. *See Bulavinetz v. Astrue*, 663 F. Supp. 2d

29

208, 212 (W.D.N.Y. 2009); *Esteves v. Barnhart*, 492 F. Supp. 2d 275, 281-82 (W.D.N.Y. 2007).

In fact, the ALJ considered and correctly gave "little weight" to an April 7, 2011, form completed by Nurse Practitioner Coleby. (T. at 815-17.) In that report, Coleby stated that Plaintiff was moderately limited in her ability to understand, remember, and carry out simple instructions; to make judgments on simple work related decisions; and to interact appropriately with supervisors, coworkers, and the public. (T. at 815-16.) According to Coleby, Plaintiff was markedly limited in her ability to understand, remember, and carry out complex instructions; to make judgments on complex work related decisions; and to respond appropriately to usual work situations and to changes in a routine work setting. *Id.* Nurse Practitioner Coleby gave a diagnosis of bipolar disorder with psychotic features. (T. at 816.) Despite her medications, Plaintiff's mood was labile at best, and her speech continued to be rapid and pressured at times. *Id.* When stressed, she experienced aural and visual hallucinations. *Id.* Nurse Practitioner Coleby stated that these symptoms persisted even when Plaintiff abstained from drug and alcohol abuse. *Id.* According to Coleby, these mental limitations had existed since 2005. *Id.*

However, the ALJ correctly gave little weight to this opinion because it was unsupported by treatment notes, reports, or clinical and diagnostic findings that would establish the level of disability indicated by Nurse Practitioner Coleby. (T. at 32-33.) *See* 20 C.F.R. § 416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."). For example, the diagnosis given by Coleby (bipolar disorder with psychotic features) appears nowhere in her treatment notes or in Dr. Menon's notes. Instead, the diagnoses given during Plaintiff's treatment were bipolar disorder, most recent episode mixed; or bipolar disorder, most

recent episode mixed, moderate. (T. at 461, 804.) Nor is Nurse Practitioner Coleby's statement that Plaintiff's mental limitations have persisted despite her continued compliance with medication supported by the record; instead, both Nurse Practitioner Coleby and Dr. Menon noted on December 9, 2010, that Plaintiff continued to have difficulty complying with treatment. (T. at 803-05.) Furthermore, references in Plaintiff's treatment records to hallucinations are historical and relate to her active cocaine abuse. (T. at 32, 401, 460.) Treatment notes from the time period relevant to this case make no mention of hallucinations or psychotic behaviors. (T. at 32-33, 493-567, 783-814.) Since October 2010, only one mental status examination was anything other than completely normal. (T. at 33, 783-814.) As noted, Dr. Menon and Nurse Practitioner Coleby also assessed a GAF score of 90 on December 9, 2010, indicating only minimal or even absent symptoms and good mental functioning in all areas. (T. at 805.)

The ALJ also correctly found that Coleby's opinion was inconsistent with the medical evidence of record. (T. at 32-33.) *See also* 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). As the ALJ noted, Nurse Practitioner Coleby's treatment notes did not contain findings that would establish a level of total disability. (T. at 32-33, 783-814.) Furthermore, the ALJ also found that Coleby's assessment was inconsistent with the record as a whole, including the opinion of Dr. Kamin (T. at 483-86), as described above. Nurse Practitioner Coleby's opinion was entitled to lesser weight for this additional reason. *See* 20 C.F.R. § 416.927(d)(4).

For all of these reasons, the ALJ therefore properly gave little weight to the statements made by Nurse Practitioner Coleby in the April 7, 2011, form.

### (iv) Plaintiff's Credibility

31

As part of his RFC determination, the ALJ also evaluated Plaintiff's credibility. Under the Act, symptomatology cannot, by itself, be the basis for a finding of disability; there must be medical signs or other findings which show the existence of a medical condition that reasonably could be expected to produce the symptomatology alleged and, when considered with other evidence, demonstrates that a plaintiff is disabled. 42 U.S.C. § 423(d)(5)(A); *Hammond v. Colvin*, No. 12-CV-965, 2013 U.S. Dist. LEXIS 121911, at *19-20, 2013 WL 4542701, at *7 (N.D.N.Y. July 10, 2013); 20 C.F.R. § 416.929(b). If the symptoms suggest a greater restriction of function than can be demonstrated by objective evidence alone (medical signs and laboratory findings), the Commissioner considers other evidence, such as a plaintiff's statements, daily activities, duration and frequency of pain, medication, and treatment. 20 C.F.R. § 416.929(c)(3); SSR 96-7p, 1996 WL 374186, at *3. Where an ALJ's credibility finding is supported by substantial evidence in the record, it is entitled to deference on appeal. *See Calabrese v. Astrue*, 358 F. App'x 274, 277-78 (2d Cir. 2009).

In this case, Plaintiff's statements about the intensity and persistence of her symptoms were not supported by the medical evidence of record, as the ALJ explained. (T. at 30-32.) *See also* 20 C.F.R. § 416.929(c)(2). The ALJ was therefore "entitled to find [plaintiff] not credible." *Rutkowski v. Astrue*, 368 F. App'x 226, 230 (2d Cir. 2010). To do so, the ALJ correctly considered other factors, including Plaintiff's activities of daily living, her treatment history, her inconsistent statements and testimony, and evidence of drug-seeking behavior. (T. at 30-32.)

First, the ALJ considered Plaintiff's ability to engage in a wide range of activities of daily living. (T. at 30.) *See also* 20 C.F.R. § 416.929(c)(3)(i). Plaintiff testified that she was able to dress, bathe, and groom herself; that she could prepare meals, do laundry, shop, drive, do

household chores, clean the house, go to medical appointments, go to meetings, walk her dog, read for pleasure, and watch movies. (T. at 72, 77, 82-83, 87, 89, 281-82.) These activities belie Plaintiff's claims of totally disabling symptoms, and the ALJ properly considered them when making his credibility determination. *See Taylor v. Barnhart*, 83 F. App'x 347, 350 (2d Cir. 2003); *Pidkaminy v. Astrue*, 919 F. Supp. 2d 237, 250-51 (N.D.N.Y. 2013); 20 C.F.R. § 416.929(c)(3)(i).

Second, the ALJ considered Plaintiff's history of "extremely poor adherence to treatment recommendations." (T. at 31.) Nurse Practitioner Coleby and Dr. Menon noted during their treatment of her that she struggled with following treatment recommendations. (T. at 805.) Plaintiff also was resistant to treatment that might cause her to gain weight. (T. at 788 (Plaintiff would rather be "crazy than fat"), 803 (Plaintiff very resistant to any medication that would cause weight gain).) A claimant's treatment history is also a factor to be considered in the credibility analysis. *See Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012); 20 C.F.R. § 416.929(c)(3)(v); *see also* 20 C.F.R. § 416.930(b) (failure to follow prescribed treatment "without a good reason" precludes a finding of disability).

Third, the ALJ noted inconsistent statements and drug-seeking behavior. For example, Plaintiff testified that she had used a transcutaneous electrical nerve stimulation ("TENS") unit for her back pain (T. at 81), but previously had told her pain management physician, Dr. Nathaniel S. Gould, that she had never used a TENS unit when she was attempting to obtain a prescription for stronger narcotic pain relievers. (T. at 843.) Inconsistent statements also undermine a claimant's credibility. *See Campbell*, 465 F. App'x at 7; *Pidkaminy*, 919 F. Supp. 2d at 251 (holding that ALJ properly considered plaintiff's inconsistent statements and instances

of plaintiff being "untruthful in the past" in determining credibility); *Walker v. Colvin*, Civ. No. 5:12-CV-483, 2013 U.S. Dist. LEXIS 139747, at *26 n.17, 2013 WL 5434065, at *10 n.17 (N.D.N.Y. June 19, 2013). As the ALJ also observed, the record contained evidence that Plaintiff was engaging in drug-seeking behavior. (T. at 31.) Specifically, Dr. Gould twice noted that previous doctors considered her to be exhibiting drug-seeking behavior, and had her tested for drug use. (T. at 834-37 (drug testing positive for Tramadol, which Dr. Gould had not prescribed), 838 (Dr. Khan felt "that she was struck [sic] seeking"), 843 ("Previous doctors have felt that she was drug-seeking.").) Evidence of drug-seeking behavior is a valid factor to consider in the credibility analysis. *See Pidkaminy*, 919 F. Supp. 2d at 250; *Metz v. Astrue*, No. 1:06-CV-1509, 2010 WL 2243343, at *14 (N.D.N.Y. Apr. 21, 2010)

The ALJ therefore correctly found that Plaintiff's subjective complaints were not entirely credible. An ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment in light of the medical findings and other evidence. *See Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999). Because the ALJ heard Plaintiff's testimony and observed her demeanor, the ALJ's credibility determination concerning Plaintiff's pain symptoms is entitled to deference on appeal. *See Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) ("It is the function of the [Commissioner], not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." (internal brackets omitted)); *Metz*, 2010 WL 2243343, at *15. For these reasons, the Court finds the ALJ's credibility determination was proper.

### (5) Substantial Evidence Supports the ALJ's Step Five Finding

After determining Plaintiff's RFC, the ALJ found at step four of the sequential analysis that she had no past relevant work (T. at 34), and, therefore, proceeded to step five, where he found that Plaintiff was capable of performing jobs existing in significant numbers in the national economy. (T. at 34-35.) To make this finding, the ALJ considered Plaintiff's age on the application date, thirty-nine years, which made her a younger individual aged eighteen to forty-four under the Commissioner's regulations. (T. at 34.) *See also* 20 C.F.R. § 416.963(b). The ALJ also considered her high school education and ability to communicate in English; her lack of work experience; and her RFC. *Id.*; *see also* 20 C.F.R. §§ 416.920(f), 416.968. These factors corresponded to Rule 202.20 of the Medical-Vocational Guidelines at 20 C.F.R. Part 404, Subpart P, Appendix 2. The ALJ determined that under Medical-Vocational Rule 204.00, Plaintiff would be found not disabled based upon her exertional limitations. (T. at 34-35.) *See also* 20 C.F.R. Part 404, Subpart P, App. 2, § 204.00.

As the ALJ further found, however, the full range of what Plaintiff could do was compromised by her nonexertional limitations. (T. at 34-35.) The ALJ therefore considered the testimony of David A. Festa, the vocational expert. *See* 20 C.F.R. § 416.966(e) (ALJ may rely on vocational expert at step five). At the May 12, 2011, administrative hearing, the ALJ asked Mr. Festa to consider a hypothetical person with the same age, education, work experience, as Plaintiff. (T. at 59.) The hypothetical individual would be able to perform light work as defined in the regulations, but would be able to interact only occasionally with coworkers or the public. (T. at 60.) Mr. Festa testified that such an individual would be able to perform certain unskilled jobs, of which he identified three: checker I (DOT Code No. 222.687-010), consisting of 69,980 jobs nationally, 2,540 job in the state of New York, and 190 jobs in the Mohawk Valley region;

35

racker (DOT Code No. 524.687-018), consisting of 433,370 jobs nationally, 16,590 jobs in New York State, and 530 jobs regionally; and laundry worker, domestic (DOT Code No. 302.685-010), consisting of 887,980 jobs nationally, 47,940 jobs in New York State, and 1,830 jobs regionally.  (T. at 60-62.)  The ALJ found that these occupations constituted a significant number of jobs in the national economy.  (T. at 35.)  *See also* 20 C.F.R. § 416.920(g).  An ALJ may rely on a vocational expert to determine whether there is work which exists in significant numbers in the national economy that a claimant could perform given his vocational factors and RFC.  *See Dumas v. Schweiker*, 712 F.2d 1545, 1551 (2d Cir. 1983); 20 C.F.R. § 416.966(e).  Thus, the Court finds that the ALJ's finding at this step was supported by substantial evidence.  *See Dumas*, 712 F.2d at 1554.

**WHEREFORE,** it is hereby

**RECOMMENDED**, that the determination of the Commissioner be affirmed and the Complaint (Dkt. No. 1) be dismissed; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Feliciano v. Barnhart*, Civ. No. 04-9554 (KMW)(AJP), 2005 U.S. Dist. LEXIS 14578, 2005 WL 1693835 (S.D.N.Y. July 21, 2005); *Reyes v. Barnhart*, Civ. No. 01-4059 (LTS) (JCF), 2004 U.S. Dist. LEXIS 3689, 2004 WL 439495 (S.D.N.Y. Mar. 9, 2004); *Worthy v. Barnhart*, Civ. No. 01-7907 (JSH), 2002 U.S. Dist. LEXIS 24550, 2002 WL 31873463 (S.D.N.Y. Dec. 23, 2002); *Camacho v. Apfel*, Civ. No. 97-6151 (JG), 1998 U.S. Dist. LEXIS 23866, 1998 WL 813409 (E.D.N.Y. July 22, 1998); *Grewen v. Colvin*, Civ. No. 1:11-829 (FJS), 2014 U.S. Dist. LEXIS 41260, 2014 WL 1289575 (N.D.N.Y. Mar. 27, 2014); *Murphy v. Barnhart*, Civ. No. 00-9621 (JSR) (FM), 2003 U.S. Dist. LEXIS 6988, 2003 WL 470572 (S.D.N.Y. Jan. 21, 2003); *Bomeisl v. Apfel*, Civ. No. 96-9718

(MBM), 1998 U.S. Dist. LEXIS 11595, 1998 WL 430547 (S.D.N.Y. July 30, 1998); *Petell v. Comm'r of Soc. Sec.*, No. 12-CV-1596 (LEK/CFH), 2014 U.S. Dist. LEXIS 37955, 2014 WL 1123477 (N.D.N.Y. Feb. 28, 2014); *Hammond v. Colvin*, No. 12-CV-965, 2013 U.S. Dist. LEXIS 121911, 2013 WL 4542701 (N.D.N.Y. July 10, 2013); *Walker v. Colvin*, Civ. No. 5:12-CV-483, 2013 U.S. Dist. LEXIS 139747, 2013 WL 5434065 (N.D.N.Y. June 19, 2013); and *Metz v. Astrue*, No. 1:06-CV-1509, 2010 WL 2243343 (N.D.N.Y. Apr. 21, 2010).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


Dated: September 26, 2014
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

1998 WL 430547
United States District Court, S.D. New York.

John J. BOMEISL, Plaintiff,

v.

Kenneth S. APFEL, Commissioner
of Social Security, Defendant.

No. 96 Civ. 9718(MBM).  |  July 30, 1998.

**Attorneys and Law Firms**

Charles E. Binder, Binder and Binder, Jericho, NY, for
plaintiff.

Mary Jo White, United States Attorney for the Southern
District of New York, Susan D. Baird, Assistant United States
Attorney, New York City, for defendant.

**OPINION AND ORDER**

MUKASEY, J.

*\*1* John Bomeisl brings this appeal pursuant to § 205(g)
of the Social Security Act (the "Act"), 42 U.S.C. § 405(g)
(1994), claiming that the decision of the Commissioner of
Social Security (the "Commissioner") improperly denied
him disability insurance benefits. Bomeisl claims that the
administrative law judge ("ALJ") who heard his case erred
in concluding that neither his asthma nor his osteoarthritis
qualifies as a *per se* disability under the applicable regulations
and in failing to credit his own testimony regarding his
physical limitations. Bomeisl claims also that the Appeals
Council should have reversed the ALJ's decision in light
of the recent opinion of his treating physician that he is
unable to return to his past work. The Commissioner argues
that the ALJ properly evaluated the evidence of Bomeisl's
impairments, and that both his decision, and that of the
Appeals Council, are supported by substantial evidence and
should be affirmed. Both parties move for judgment on the
pleadings pursuant to Fed.R.Civ.P. 12(c). For the reasons set
forth below, the Commissioner's motion is granted, Bomeisl's
motion is denied, and the complaint is dismissed.

**I.**

The following facts are relevant to this appeal. Bomeisl was
born on September 20, 1939. (Tr. 27) [1] After being honorably
discharged from the United States Air Force in 1961, Bomeisl
held several jobs including mail room supervisor for a
publishing company, courier for a messenger service, and
film library assistant for a computer company. (Tr. 28–33)

However, Bomeisl's main work experience was as a pari-
mutuel clerk at Yonkers Raceway in Yonkers, New York. (Tr.
33) He worked at Yonkers Raceway for more than twenty
years, first as a part-time employee beginning in 1971, and
then as a full-time employee from 1987 to 1992. (Tr. 33)
Bomeisl worked primarily at the window selling tickets and
cashing winning ones. (Tr. 35–36) On occasion, he worked in
a room behind the ticket windows where he counted money
and made change for other clerks. (Tr. 37) Bomeisl's job
at Yonkers Raceway did not require him to do any heavy
lifting or carrying, although it did entail standing and walking
for long periods of time. (Tr. 89) Bomeisl left Yonkers
Raceway in 1992 because he was no longer willing to deal
with the racetrack's often querulous clientele, and not because
of health problems. (Tr. 36)

**A. Medical Evidence**

Bomeisl suffers from two impairments that he now
claims prevent him from resuming this work: asthma and
osteoarthritis. The ALJ considered evidence relating to each
condition.

**1. Asthma**

Bomeisl has suffered from asthma since at least 1990. (Tr.
112) Medical records reveal that he has been treated for this
condition periodically since that time (Tr. 112–30), and that
his doctors routinely prescribe steroids and bronchodilators to
control his asthma. [2] (See, e.g., Tr. 112, 115, 121, 130)

On May 21, 1992, Jeffrey Weisberg, M.D., a pulmonary
specialist, examined Bomeisl. (Tr. 136) On that day, Bomeisl
complained of wheezing and difficulty breathing, although
he stated that he had been "[f]eeling better" since having
been placed on medication. (Tr. 136) A pulmonary function
test ("PFT"), which measures both the one-second forced
expiratory volume ("FEV sub1") and forced vital capacity
("FVC") of a person's lungs, revealed a FEV sub1 of 2.15
liters and a FVC of 4.31 liters. (Tr. 136) Based on the PFT
results, which were below average for a person of Bomeisl's
height, Weisberg diagnosed him with extrinsic asthma. (Tr.

136) Weisberg noted further that because of his history of smoking, it was "probable" that Bomeisl also suffers from chronic obstructive bronchitis. (Tr. 136) Weisberg suggested that Bomeisl continue on his current regimen of medication, and did not express any opinion as to his ability to continue working at Yonkers Raceway. (Tr. 136)

 *2  On September 25, 1992, Bomeisl was admitted to the hospital in mild respiratory distress. (Tr. 203) At the hospital, he was examined by Paul Weinstein, M.D., another pulmonary specialist. (Tr. 211–13) Weinstein also diagnosed Bomeisl with obstructive lung disease and suggested that he continue on medication. (Tr. 212) Bomeisl was discharged on October 8, 1992, after he showed improvement on the medication. (Tr. 204) This was Bomeisl's only hospitalization for asthma during the relevant period. [3]

On March 7, 1994, Herbert Lachman, M.D., an internist, examined Bomeisl in connection with his application for disability benefits. (Tr. 188–89) Lachman found that Bomeisl was wheezing (Tr. 188), and PFT results again showed below average FEV sub1 and FVC results of 1 .66 and 2.76 liters, respectively. (Tr. 190) Lachman diagnosed Bomeisl with a "moderate to severe combined obstructive restrictive component in his lungs," but noted that it improved with bronchodilator use. (Tr. 189) Lachman, like Weisberg, expressed no opinion as to Bomeisl's ability to resume his past work.

Indeed, the only physician to express any such view is Richard DeLuca, M.D., Bomeisl's most recent treating physician. In a letter dated November 20, 1995, [4] DeLuca states that he has been treating Bomeisl since April 1994 and has diagnosed him with chronic obstructive lung disease. (Tr. 230) DeLuca states further that he has prescribed continued medication for Bomeisl to control this condition. (Tr. 230) DeLuca opines that because of his severe symptoms, Bomeisl cannot resume his past work as a clerk. (Tr. 230)

### 2. Osteoarthritis

Bomeisl also has osteoarthritis. Medical records indicate that he has been treated for this condition since 1993. (Tr. 162) On various occasions, Bomeisl reported pain and stiffness in his joints, hands and feet, and was treated with anti-inflammatories and pain medication. (*See, e.g.,* Tr. 165, 170) With the exception of Lachman, none of the physicians who examined Bomeisl, including DeLuca, mentioned his osteoarthritis. In his report, Lachman noted

Bomeisl's history of osteoarthritis and his complaints of pain in his back, shoulder, hands, ankles and feet. (Tr. 188) On examination, however, Lachman found that Bomeisl exhibited "no substantial rheumatoid arthritic or osteoarthritic changes,""[n]o limited range of motion in any muscle or joint," "[n]o joint deformities," and "[n]o muscular atrophy...." (Tr. 189)

### B. *Non-medical Evidence.*

A hearing before the ALJ was held on March 9, 1995. (Tr. 27–53) At that hearing, Bomeisl testified that his daily living activities include doing his own cooking, cleaning, shopping, and laundry. (Tr. 40–41) Bomeisl also drives himself to church, to friends' homes, and to the doctor's office. (Tr. 35) Bomeisl testified further that he plays golf on occasion, although he has to use a golf cart when he does so (Tr. 43), and sometimes takes walks, although he can walk for only a quarter of a mile before having difficulty breathing. (Tr. 41)

### C. *Procedural History*

 *3  Bomeisl applied for disability benefits on December 7, 1993. (Tr. 54) His claim was denied, as was his request for reconsideration. (Tr. 57, 73) Bomeisl requested a hearing before an ALJ (Tr. 78), which was held, as noted, on March 9, 1995. (Tr. 27–53) On June 27, 1995, the ALJ concluded that Bomeisl was not disabled under the Act. (Tr. 18) First, the ALJ noted that Bomeisl had not engaged in any substantial gainful activity since September 25, 1992, the date he was hospitalized for treatment of his asthma. (Tr. 17) Second, the ALJ determined that Bomeisl suffers from two severe impairments: asthma and osteoarthritis. (Tr. 18) Third, the ALJ found that neither impairment, considered alone or in combination, qualifies as a *per se* disability under the applicable regulations. (Tr. 18) Fourth, the ALJ found that despite these impairments, Bomeisl has the residual functional capacity to perform work activities that do not require lifting more than 20 pounds or tolerating exposure to high levels of environmental irritants. (Tr. 18) Because Bomeisl's past work as a pari-mutuel clerk does not violate either prohibition, the ALJ found that he could resume that work, and consequently is not disabled within the meaning of the Act. (Tr. 18) That decision became final on October 30, 1996, when the Appeals Council denied Bomeisl's request for review. (Tr. 3–4)

### II.

A court reviewing a decision denying benefits under the Act must accept the Commissioner's factual determinations if they are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990). Substantial evidence is defined as evidence that a "reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "[T]he court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991) (quotation omitted); *accord Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

A person is considered disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (1994). As the Second Circuit recently noted in *Diaz v. Shalala,* 59 F.3d 307, 311 n. 2 (2d Cir.1995), an ALJ follows a five-step procedure when assessing a claimant's application for disability benefits:

> First, the [ALJ] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [ALJ] next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations or is equal to any impairment listed there. If the claimant has such an impairment, the [ALJ] will consider him disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [ALJ] then determines whether there is other work which the claimant could perform.

**\*4** (citations omitted). A claimant bears the burden of proof at the first four steps; the Commissioner bears it at the last one. *See Rivera v. Schweiker,* 717 F.2d 719, 722–23 (2d Cir.1983).

Here, Bomeisl argues that the ALJ erred at step three by failing to find that his asthma and osteoarthritis qualify as listed impairments, and in step four by concluding that he has the residual functional capacity to perform his past work despite Bomeisl's own testimony describing the physical limitations caused by his asthma.[5] Bomeisl claims also that the Appeals Council erred in failing to reverse the ALJ's decision in light of his treating physician's opinion that he is unable to return to his past work.

### A. *Bomeisl Does Not Suffer From a Listed Impairment*

"The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability." *DeChirico v. Callahan,* 134 F.3d 1177, 1180 (2d Cir.1998); *see Mitchell.v. Washingtonville Cent. Sch. Dist.,* 992 F.Supp. 395, 406 (S.D.N.Y.1998). However, "[f]or a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley,* 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Here, the ALJ found that neither Bomeisl's asthma nor his osteoarthritis meets the medical criteria for a finding of disability *per se.* Two groups of listings are relevant to this determination.

### 1. *Listings 3.02 and 3.03: Chronic Pulmonary Insufficiency and Asthma*

Under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02 (1998) ("Listing 3.02"), a person who is 66# tall, such as Bomeisl, must have a FEV $sub_1$ result less than or equal to 1.35 liters, or a FVC result less than or equal to 1.55 liters, to qualify as disabled. *See* Listing 3.02(A) & (B). For each PFT administered, the highest FEV $sub_1$ and FVC results obtained during that test are the ones used, whether they were achieved pre- or post-bronchodilator. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1 § 3.00(E); *Davis v. Callahan,* No. 96 Civ. 9367, 1997 WL 438772 at *6 n. 21 (S.D.N.Y. Aug.4, 1997), *aff'd,* No. 97 Civ. 6243, 1998 WL 397344, at *1 (2d Cir. July 16, 1998) (per curiam); *English v. Sullivan,* No. 88 Civ. 1322, 1989 WL 270104 at *8 (S.D.N.Y. Apr.10, 1989).

Because Bomeisl's performance on the PFTs given by both Weisberg—FEV sub1 of 2.15 liters and FVC of 4.31 liters—and Lachman—FEV sub1 of 1.66 liters and FVC of 2.76 liters—far exceeded these values, he does not meet the criteria for Listing 3.02. [6] *See Cordero v. Apfel,* No. 96 Civ. 9363, 1998 WL 55368, at *2–4 (S.D.N.Y. Feb.10, 1998) (holding that FVC values of 2.66 and 2.00 liters did not meet Listing 3.02(B)); *Davis,* 1997 WL 438772 at *6 (holding that FEV sub1 values of 2.37 and 1.88 liters and FVC values of 5.10 and 3.27 liters did not meet Listing 3.02(A) or (B)); *see also Caceres v. Chater,* No. 94 Civ. 4669, 1996 WL 432470, at *5 (S.D.N.Y. Aug.1, 1996) (holding that for shorter individual, FEV sub1 values of 1.2, 1.94, and 1.7 liters did not meet Listing 3.02(A)); *cf. English,* 1989 WL 270104, at *9 (holding that FEV sub1 of 0.86 liters met Listing 3.02(A)).

**\*5** An asthmatic claimant may also qualify as disabled under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.03 ("Listing 3.03"). Pursuant to that listing, a person must either satisfy the criteria for Listing 3.02(A), which, as noted, Bomeisl does not, or have experienced:

> Attacks (as defined in 3.00C) in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.

Listing 3.03(B). "[A]ttacks" are defined as "prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalation bronchodilator therapy in a hospital, emergency room or equivalent setting."20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.00(C).

Bomeisl does not meet the criteria for Listing 3.03 because there is no evidence that he has suffered either one asthma attack every two months or six asthma attacks in any consecutive twelve-month period. As noted, Bomeisl's only hospitalization for asthma occurred on September 25, 1992. Although that episode counts as two attacks, there is no evidence of any other attacks in the 12 months before, or after, that date. To be sure, Bomeisl's medical records reflect that

he visited the hospital on several occasions during this period to receive treatment for his asthma. However, these visits were brief and there is no evidence that any was prompted by an "attack" as that concept is defined by the regulations. (*See, e.g.,* Tr. 100–02, 112) Indeed, most of Bomeisl's hospital visits were for the purpose of renewing prescriptions for his asthma medication. (*See, e.g.,* Tr. 131, 132, 145–160) Thus, Bomeisl does not meet the criteria for disability based on asthma under Listing 3.03. *See Davis,* 1997 WL 438772, at *7;*cf. Caceres,* 1996 WL 432470, at *5 (holding that plaintiff's history of hospitalizations for asthma and frequent emergency room visits met Listing 3.03).

Finally, there is no medical evidence that Bomeisl's asthma, although it does not meet the criteria for a finding of disability under Listings 3.02 –3.03, nonetheless equals in severity any of the impairments listed there. None of the physicians who examined Bomeisl has opined that his condition is severe enough to equal a listed impairment. Indeed, even DeLuca, who has diagnosed Bomeisl with chronic obstructive lung disease, does not assert that his condition is severe enough to equal any of these impairments despite Bomeisl's consistently high FEV sub1 and FVC results. (Tr. 230) Moreover, to the extent that DeLuca's diagnosis suggests that Bomeisl suffers from a disabling pulmonary impairment, that opinion is entitled to little weight because it is not well-supported by objective clinical findings and is inconsistent with the other substantial evidence in the medical record. *See* discussion *infra* at part II.C. As a result, Bomeisl's asthma, although severe, does not meet or equal any impairment in Listings 3.02 – 3.03.

**2. *Listings 1.02 – 1.04: Arthritis***

**\*6** To qualify as disabled under any of the listings for arthritis, a person must exhibit a reduced range of motion in the affected joints. *See*20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02(A) ("Listing 1.02") (requiring "significant restriction of function of the affected joints...."); *id.* § 1.03 ("Listing 1.03") (requiring "marked limitation of motion or abnormal motion of the affected joint...."); *id.* § 1.04 ("Listing 1.04") (same). Here, the only evidence of Bomeisl's osteoarthritis—medical or otherwise—comes from Lachman's examination of him in March 1994. As noted, Lachman found that Bomeisl exhibited "no substantial rheumatoid arthritic or osteoarthritic changes,""[n]o limited range of motion in any muscle or joint," "[n]o joint deformities," and "[n]o muscular atrophy...." (Tr. 189) These clinical findings, which are uncontroverted, demonstrate both that Bomeisl does not qualify for a finding of *per se* disability under Listings

1.02 – 1.04, and that his condition does not meet or equal any impairment listed there. *See Fernandez v. Bowen,* No. 87 Civ. 3305, 1990 WL 160882, at *4 (S.D.N.Y. Oct.16, 1990) (holding that "minimal" decrease in range of motion due to osteoarthritis did not warrant a finding of disability). Accordingly, I reject Bomeisl's first argument that the ALJ erred in finding that neither his asthma nor his osteoarthritis meets or equals a listed impairment.

**B. *The ALJ Properly Evaluated Bomeisl's Own Testimony***

Bomeisl argues next that the ALJ erred at step four by improperly disregarding his own testimony about the physical limitations caused by his asthma. Before denying a claim for benefits, an ALJ must consider the claimant's own statements regarding his daily living activities and any limitations placed on those activities by his impairments. *See* 20 C.F.R. § 404.1512(b)(3) (1998). However, a claimant's own testimony concerning such limitations cannot by itself support a finding of disability; rather, there must be medical signs and laboratory findings demonstrating that the claimant has a "medical impairment(s) that could reasonably be expected to produce the pain or other symptoms alleged...." 20 C .F.R. § 404.1529(a) (1998); *see Ramos v. Chater,* No. 96 Civ. 0099, 1997 WL 599560, at *5 (S.D.N.Y. Sept.25, 1997). Furthermore, the ALJ has discretion to evaluate a claimant's credibility, *see Mimms v. Heckler,* 750 F.2d 180, 186 (2d Cir.1984), and such findings are entitled to deference because the ALJ had the opportunity to observe the claimant's testimony and demeanor at the hearing. *See Ramos,* 1997 WL 599560, at *4; *Gernavage v. Shalala,* 882 F.Supp. 1413, 1419 (S.D.N.Y.1995).

Here, the ALJ did consider Bomeisl's testimony about the severity of his condition. Indeed, the ALJ found Bomeisl's allegations regarding his symptoms "credible." However, the ALJ ultimately concluded that Bomeisl's testimony, including his stated ability to do household chores, drive a car, and play golf on occasion, belied his claim he that could not resume his past work as a pari-mutuel clerk. *See Rufino v. Apfel,* No. 97 Civ. 0859, 1998 WL 191779, at *5 (S.D.N.Y. Apr.17, 1998) (holding that claimant's testimony that she cooks, cleans, shops, visits friends and family, and uses public transportation supported ALJ's conclusion that she could perform work activities not requiring her to lift or carry more than 25 pounds); *cf. Tillery v. Callahan,* No. 97 Civ. 0438, 1997 WL 767561, at *5 (S.D.N.Y. Dec.11, 1997) (holding that claimant's testimony that she cooks, cleans, shops, and takes walks supported ALJ's finding that although she could not resume past job, she could still perform sedentary work).

**\*7** Of course, Bomeisl's own testimony is not the only evidence supporting the ALJ's finding that he can resume his past work. Neither Weisberg, the pulmonary specialist, nor Lachman, the consulting internist, opined that Bomeisl was unable to work because of his asthma, or that his condition could not be controlled with medication. Indeed, both physicians prescribed continued drug therapy for him, and there is substantial evidence in the record that Bomeisl's asthma responded to the medication. (Tr. 118, 131, 136, 141) In fact, Bomeisl told Lachman in March 1994, that the medication has allowed him to "to avoid Emergency Room or emergency medical treatment for uncontrolled asthma."(Tr. 188) The medical evidence, combined with Bomeisl's own testimony of his daily living activities, provides substantial evidence for the ALJ's conclusion that Bomeisl has the residual functional capacity to resume his past work. *See Lindo v. Chater,* No. 96 Civ. 5064, 1998 WL 199853, at *2 (E.D.N.Y. Mar.25, 1998) (affirming ALJ's finding that claimant could resume past work as office clerk despite asthma and arthritis); *Ramos,* 1997 WL 599560, at *3 (affirming ALJ's decision that claimant could resume past work as office clerk and travel agent despite asthma).

Contrary to Bomeisl's argument, the ALJ was not required to consider testimony from a vocational expert before rejecting his claim that he could not resume his past work. There is nothing in the regulations or the case law that requires an ALJ to consider vocational testimony at the fourth step of disability inquiry. *See McCalip v. Shalala,* No. 93–CV–4758, 1994 WL 774037, at *7 (E.D.N.Y. Aug.29, 1994). Indeed, the case law suggests that vocational evidence is not required until the fifth step of the inquiry—at which the Commissioner has the burden of proving that there is other work that the claimant can perform—and even then such evidence is necessary only when the claimant suffers from a non-exertional impairment which significantly diminishes his ability to work. *See Bapp v. Bowen,* 802 F.2d 601, 603 (2d Cir.1980); *Santiago v. Apfel,* No. 96 Civ. 6521, 1998 WL 247504, at *6–7 (S.D.N.Y. May 15, 1998).

Here, by contrast, the ALJ found that Bomeisl had failed to carry his burden of proving—at the fourth step—that he could not return to his past work as a pari-mutuel clerk. The ALJ concluded, based on the medical evidence and Bomeisl's own testimony, including the telling admission that he left this job for reasons unrelated to his health problems (Tr. 36), that Bomeisl could resume this work despite being unable to lift more than 20 pounds or tolerate exposure to high levels of

environmental irritants. Because this conclusion is supported by substantial evidence, I reject Bomeisl's second argument. *See Bush v. Shalala,* 94 F.3d 40, 46 (2d Cir.1996) (affirming ALJ's finding that claimant could resume past work as bank teller despite environmental restrictions due to asthma).

### C. *The Appeals Council Properly Declined to Reverse the ALJ's Decision Despite the Opinion of Bomeisl's Treating Physician*

 **\*8** Finally, Bomeisl argues that the Appeals Council should have reversed the ALJ's decision that he is able to resume his past work in light of his treating physician's opinion to the contrary. As noted, Bomeisl's attorneys presented this evidence to the Appeals Council after the ALJ's decision was issued. In assessing a disability claim, the Commissioner must give the opinion of a claimant's treating physician "controlling weight" only if that opinion satisfies two criteria. *See Schisler v. Sullivan,* 3 F.3d 563, 568 (2d Cir.1993). First, it must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques ...."20 C.F.R. § 404.1527(d)(2) (1998). Second, it must not be "inconsistent with the other substantial evidence in [the claimant's] case record...."*Id.*Moreover, "while the opinions of a treating physician deserve special respect, genuine conflicts in the medical evidence are for the [Commissioner] to resolve."*Aponte v. Secretary, Dep't of Health and Human Serv.,* 728 F.2d 588, 591 (2d Cir.1984) (citations omitted); *see Pena v. Chater,* No. 95 Civ. 8457, 1997 WL 26280, at \*3 (S.D.N.Y. Jan.23, 1997).

Here, DeLuca's opinion is not binding on the Commissioner because it does not satisfy either criterion. First, medical records from the VAMC, which is where DeLuca treated Bomeisl, fail to establish that his opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques."20 C.F.R. § 416.1527(d)(2). As do Bomeisl's other medical records, the VAMC records reflect that, although Bomeisl has been treated periodically for asthma, he has been able to control this condition with medication. For example, in March 1996, DeLuca diagnosed Bomeisl with "moderate COPD [chronic obstructive pulmonary disease]" but noted that it was "under pxd [prescription drug] control." (Tr. 241) Other doctors at the VAMC who also treated Bomeisl expressed the same view. (*See, e.g.,* Tr. 262 ("Imp [Impression]—Stable Asthma"); 269 ("Well controlled on current medical regimen")) Moreover, Bomeisl himself confirmed on several occasions that he was responding to the medication. (*See, e.g.,* Tr. 241 ("Pt [patient] currently feels

fine"); 250 ("[Bomeisl] is feeling fine"); 254 ("Feeling much better"); 262 ("Feeling better")) It is also worth noting that many of the VAMC records reflect that Bomeisl was being treated there for conditions unrelated to his asthma, including diverticulitis and hemorrhoids. (*See, e.g.,* Tr. 234–240; 243; 253; 265–266; 270–77) As such, these records do not support DeLuca's broad conclusion that Bomeisl cannot resume his past work because of his asthma.

Second, DeLuca's opinion is "inconsistent with the other substantial evidence in [Bomeisl's] case record ..."20 C.F.R. § 416.1527(d)(2). The evidence inconsistent with DeLuca's opinion includes, *inter alia,* Bomeisl's own testimony regarding his daily living activities and the opinions of both Weisberg and Lachman, neither of whom found Bomeisl's asthma to be disabling. DeLuca's view is also inconsistent with the PFT results obtained by these doctors, and with more recent PFTs reflected in the VAMC records which show FEV sub1 results of 2.35 and 2.40 liters, and FVC results of 3.99 and 4.05 liters. (Tr. 268, 280) As noted, these results far exceed the thresholds for a finding of *per se* disability under the applicable regulations. *See* Listing 3.02. Accordingly, the Commissioner was not bound by DeLuca's opinion, and the Appeals Council did not err in declining to reverse the ALJ's decision on that basis. *See Pena,* 1997 WL 26280, at \*5;*cf. Hidalgo v. Bowen,* 822 F.2d 294, 298 (2d Cir.1987) (holding that Commissioner was bound by treating physician's opinion that claimant could not resume past work due to asthma and arthritis where that opinion was consistent with other substantial evidence in the record).

 **\*9** Nor was the Appeals Council required to reverse the ALJ on the ground that DeLuca's opinion outweighs the opinions of the other physicians who examined Bomeisl. Where, as here, a treating physician's opinion is not controlling, the weight to be given that opinion in the disability determination depends on the following six criteria: 1) the nature of the examining relationship; 2) the nature of the treating relationship; 3) supportability of the opinion; 4) consistency of the opinion with other evidence; 5) specialization of the person giving the opinion; and 6) any other factors which tend to support or contradict the opinion. *See*20 C.F.R. §§ 404.1527(d)(1)–(6) (1998); *Mendoza v. Apfel,* 1998 WL 35138, at \*8 (S.D.N.Y. Jan.29, 1998).

Here, each of these factors is either neutral or serves to discount DeLuca's conclusions. First, the nature of DeLuca's treating relationship with Bomeisl is unclear from the record. *See*20 C.F.R. § 404.1527(d)(2). Although DeLuca states in

his letter that he has been treating Bomeisl since April 1994, he does not indicate how regularly he examined him during this period. Indeed, it appears from the VAMC records that in the two years between April 1994 and April 1996, DeLuca treated Bomeisl on only six occasions (Tr. 241–42, 249, 251–252, 263–64, 278–79, 281–82), and that the remainder of his visits were with other doctors, often for unrelated problems. Second, and as noted above, DeLuca's opinion lacks clinical support and is inconsistent with other evidence in Bomeisl's medical records. *See* 20 C.F.R. §§ 404.1527(d)(3), (4). Finally, in contrast to Weisberg, there is no evidence that DeLuca is a pulmonary specialist. *See* 20

C.F.R. § 404.1527(d)(5). Accordingly, I reject Bomeisl's third argument as well.

For the above reasons, the Commissioner's motion for judgment on the pleadings is granted, Bomeisl's motion is denied, and the complaint is dismissed.

SO ORDERED.

**Parallel Citations**

57 Soc.Sec.Rep.Serv. 399

Footnotes

| 1 | "Tr." refers to the administrative transcript submitted by the Commissioner pursuant to 42 U.S.C. § 405(g). |
|---|---|
| 2 | Bronchodilators facilitate breathing by causing the air passages of the lungs to expand. *See* Dorland's Illus. Medical Dictionary 222 (24th ed.1965). |
| 3 | It appears that Bomeisl may have been hospitalized for asthma in November 1990, although there are no hospital records of any such visit. Bomeisl also visited the emergency room on February 26, 1993, complaining of shortness of breath, but was not admitted on that day. (Tr. 100) |
| 4 | DeLuca's letter post-dates the ALJ's decision in this case. However, Bomeisl's attorneys submitted this letter, along with medical records from the Veteran's Administration Medical Center ("VAMC") where DeLuca has treated Bomeisl, to the Appeals Council on February 11, 1996. (Tr. 227–29) |
| 5 | Bomeisl did not testify as to any limitations on his ability to work due to his osteoarthritis. |
| 6 | Listing 3.02 also describes a condition known as chronic impairment of gas exchange due to clinically documented pulmonary disease. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1 § 3.02(C). Bomeisl does not contend that he qualifies as disabled under this aspect of the listing. |

**End of Document**　　　　　　　　　　　　　　　　　　© 2014 Thomson Reuters. No claim to original U.S. Government Works.

1998 WL 813409 (E.D.N.Y.)
United States District Court, E.D. New York.

Leonicia CAMACHO, Plaintiff,

v.

Kenneth S. APFEL, Commissioner
of Social Security, Defendant.

No. 97–CV–6151 (JG). | July 22, 1998.

**Attorneys and Law Firms**

Richard Nager, Charles E. Binder, Binder and Binder, Jericho, for Plaintiff.

Zachary W. Carter, United States Attorney, Eastern District of New York, Brooklyn, By Richard Molot, Assistant United States Attorney, Of Counsel.

**MEMORANDUM AND ORDER**

GLEESON, District J.

 *1 Plaintiff Leonicia Camacho seeks review pursuant to 42 U.S.C. § 405(g), challenging the final determination of the Commissioner of Social Security Administration ("the Commissioner"), denying her Supplemental Security Income ("SSI") and widows' insurance benefits under the Social Security Act ("the Act"). The Commissioner determined that plaintiff was not disabled and consequently was not entitled to benefits under the Act. Both sides have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Oral argument was held on July 10, 1998. For the reasons set forth below, the case is remanded to the Commissioner.

**FACTS**

Plaintiff was born in Puerto Rico on May 25, 1938, and is now sixty years old. She finished the fourth grade and understands very little English. Plaintiff moved to New York in 1959. From 1971 to 1974, she worked in a factory. Her duties included using scissors to cut threads, occasionally using machines to make buttonholes, and lifting bundles of material weighing ten to twenty pounds. Depending on the particular job assignment, she would spend most of the day either sitting or standing. Plaintiff stopped work at the factory in 1974 due to back pain and high blood pressure. Plaintiff lives with and is supported by her daughter, Elizabeth Camacho.

**PROCEDURAL HISTORY**

Plaintiff applied for SSI benefits on April 19, 1993, alleging that she had been disabled due to high blood pressure, severe headaches with vision loss, and back and leg problems, since January 1, 1974. This application was denied initially and on reconsideration. On January 21, 1994, plaintiff filed an application for widows' insurance benefits, also alleging an onset of disability as of 1974. A hearing was held with respect to both applications on November 29, 1994, before Administrative Law Judge ("ALJ") Seymour Fier. In a decision dated May 8, 1996, the ALJ found that plaintiff was not disabled for purposes of either application. The Appeals Council denied plaintiff's request for review on August 28, 1997.

**DISCUSSION**

**A.** *The Scope of Review*

In reviewing the ALJ's decision, a court must decide whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole and whether they are based on an erroneous legal standard." *Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir.1990) (citing 42 U.S.C. § 405(g)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Where substantial evidence supports the Commissioner's conclusions, this Court may not substitute its own judgment as to the facts, even if a different result could have been justifiably reached upon a *de novo* review. Where evidence is susceptible of more than one rational interpretation, it is the Commissioner's conclusion which must be upheld. *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982), *cert. denied,* 459 U.S. 1212, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983).

**B.** *Statutory And Regulatory Standard For Widows' Insurance Benefits and SSI Benefits*

 *2 In order to be found disabled under the Act, a claimant must be unable to do any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d)(1); 20 C.F.R. § 404.1527. [1] The Second Circuit has summarized the Commissioner's five-step sequential evaluation process for evaluating disability claims as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform ... [T]he claimant bears the burden of proof as to the first four steps, while the [Commissioner] must prove the final one.

*DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998) (quoting *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982)); *see also* 20 C.F.R. § 404.1520.

In addition, in order to qualify for benefits as a disabled widow, plaintiff must establish that she was at least fifty, but less than sixty years of age; that she was the widow of a wage earner who died fully insured; that she was not married; and that she was disabled within the meaning of the Act. 42 U.S.C. § 402(e). Additionally, the disability must have commenced not more than seven years after the insured wage earner died, or seven years after the widow was last entitled to mothers' or widows' benefits based on disability, whichever is later. 20 C.F.R. § 404.335(c). Plaintiff's husband died on January 11, 1981, and therefore plaintiff must prove that the disability began before January 11, 1988. [2]

**C.** *Summary Of Evidence In The Record*

**1.** *Medical Evidence*

For the period through January 31, 1988, the medical records show that plaintiff was treated primarily for hypertension, generalized arthritis, and a fractured ankle in 1985. Dr. Kishore B. Shulka and his associate, Dr. S. Dey, have been the plaintiff's treating internists since April 12, 1984. The evidence in the record concerning their treatment during this period includes the following:

 **\*3**  • In several notes between July 1984 and December 1984, Dr. Shulka wrote that plaintiff had been under his care for high blood pressure and generalized arthritis, knee pain, and chronic sinusitis. Twice Dr. Shulka opined that plaintiff was unable to work;

• In progress notes, dated November 1987, Dr. Dey made a diagnostic impression of lumbosacral derangement;

• Forms completed in August, November and December 1988 indicate that plaintiff had been treated since April 1985 for hypertension, arthritis, unstable angina, a renal cyst, chronic kidney infection, anemia, and anxiety. Those reports contain at least two opinions of Dr. Dey and Shulka indicating that plaintiff is unable to work;

• In an undated report, Dr. Dey made a diagnostic impression of pain, backache, hypertension, a urinary tract infection, and dizziness.

From April 2 to April 4, 1985, plaintiff was hospitalized in order to remove a right medial malleolar screw from her ankle, which had been inserted in order to repair an ankle fracture. Plaintiff stated that she felt better and did not have much pain in her ankle following surgery.

While plaintiff was under the care of Drs. Shulka and Dey, she also sought treatment from Dr. Cherie Galler. Dr. Galler wrote a note dated July 30, 1986, indicating that since 1985, plaintiff has suffered from a broken right ankle, that she still experiences pain in the ankle due to post-traumatic arthritis, and that walking was very difficult.

Beginning September 18, 1988, plaintiff was treated by Dr. Rudolfo Byrne at the Centro Medico Hispanco. The record contains notes from his treatment, including the following:

• In an undated report, addressing activity through June 5, 1993, Dr. Byrne noted that he was treating plaintiff

for arterial hypertension, obesity, coronary insufficiency, chest pain and dyspnea. He also noted abnormalities in an electrocardiogram ("EKG");

• In an attached residual functional capacity form, Dr. Byrne found that plaintiff could sit less than six hours a day, stand less than two, and lift only five pounds;

• He noted that her blood pressure was 150/100 and that she had arthritis of the major joints, and she had difficulty walking;

• Her symptoms were headache, palpitation, anxiety, chest pain, dizziness, insomnia, and chronic arthritic pain of the major joints.

In February 1994, plaintiff began going to the Doctors' Officenter Medical Group. Dr. Minal Shah, managing physician, completed a narrative of plaintiff's treatment, through September 1994, which reveals:

• As of her first visit, plaintiff had not taken medication for the past three days, and did not have any complaints;

• Her blood pressure was elevated, but was subsequently reduced by treatment;

• A heart murmur was detected and an EKG and a 2D–Echo were performed, both of which were normal;

• Plaintiff had worsening back pain, and upon examination there were no signs of motor or sensory deficits and her range of motion was full. She was treated with pain medication;

**\*4** • A description of her medical history on her last visit, September 16, 1994, indicates (1) hypertension, controlled on Verelan and Lasix; (2) peptic ulcer controlled on Axid; (3) angina, stable on Nitroglycerine; (4) high cholesterol, controlled on diet; and (5) chronic lower back pain, with pain medication.

Handwritten office notes from Woodhull Hospital cover plaintiff's outpatient treatment there from September 19, 1988 through November 3, 1995.

• Plaintiff was found to have otitis, anxiety, hypertensive coronary vascular disease and coronary insufficiency, osteoarthritis, conductivities and obesity;

• Plaintiff was treated with medication for hypertension and conjunctivitis;

• There were abnormal findings in an EKG performed in June 1993;

• Plaintiff complained repeatedly of headaches, chest discomfort, anxiety, chronic arthritis pain, and difficulty walking, with a worsening of symptoms in September 1993;

Plaintiff was examined by two consulting physicians. The first exam was performed by Dr. Peter E. Graham on June 29, 1993. [3]

• He found evidence of a thyroidectomy scar, decreased anterior flexion of the spine, and positive straight leg raising;

• He administered a treadmill test, which was curtailed after 4 minutes, 13 seconds, because of fatigue; however, plaintiff was able to achieve 77% of her maximal heart rate;

• His impression was that there were no significant ST–T wave changes, no significant arrhythmia, and that the treadmill test was submaximal;

• Joints exhibited full ranges of motion, with no pain, swelling or tenderness, and muscles were normal;

• Plaintiff was able to get on and off the examining table with no problems, hand grasp was normal, she stood on her toes normally, and was able to perform a full squat;

• Neurologically, plaintiff was alert and oriented with gross memory in tact;

• His final assessment was that plaintiff has hypertension by history, presently controlled; chest pain by history and the treadmill examination; back pain by history with minimal functional deficit and joint pain by history, with no functional deficit;

• He opined that she is able to perform physical activities such as, sitting, standing, walking, carrying and handling of objects, speaking, hearing and traveling, except possibly lifting due to back pain.

At plaintiff's hearing on November 29, 1994, Dr. Ralph Slaussman testified as a medical expert. After reviewing plaintiff's file and hearing her testimony, the doctor opined that plaintiff did not meet or equal the criteria of any impairment contained in the Listing of Impairments. When

the ALJ pointed out that plaintiff had gained weight, contrary to her doctor's orders, Dr. Slaussman indicated that this might have been due to an undiagnosed thyroid condition, based on the thyroidectomy scar. He confirmed that plaintiff's history of a broken right ankle and two foot operations was consistent with the diagnosis of arthritis and that high blood pressure can yield visual disturbances. He noted that the EKG test in June 1993 was within normal limits, but that the test performed in April 1993 had yielded abnormal results. Because of the discrepancy in the results, the ALJ determined that plaintiff should undergo another EKG to resolve the disparity.

 **\*5** Dr. Lorenzo Fitzig, a government consultant, performed a cardiac examination on April 11, 1995, post-hearing. His findings included the following:

 • Plaintiff had long-standing hypertension;

 • She denied history of myocardial infarction, congestive heart failure, syncope, or significant ankle edema. She reported that she obtained some chest pain relief with Nitroglycerin;

 • She was morbidly obese, and her blood pressure was 156/94;

 • Head, eyes, ears, nose, and throat were unremarkable;

 • A systolic ejection murmur was heard at the left sternal border, S1 and S2 sounds were normal, and there was no gallop;

 • The lower extremities revealed no edema and peripheral pulses were intact;

 • An EKG revealed no abnormalities;

 • Plaintiff had essential hypertension (hypertension without a discoverable organic cause), which appeared controlled at present by her medical regime;

 • He was unable to make a certain diagnosis of coronary heart disease, but there was no organic heart disease to render plaintiff disabled;

 • Based solely on her cardiovascular status, plaintiff's abilities to lift/carry, sit, stand, and walk were not affected by her impairment;

Dr. Fitzig's report and assessment were sent to Dr. Schlossman, who indicated that they would not alter his testimony. Plaintiff's counsel was given an opportunity to respond to the report, but did not.

**2. *Plaintiff's Testimony***

Plaintiff testified through a Spanish interpreter. She testified that she has been unable to return to work because her legs hurt when she walks, her back and hands hurt, and she has pain in her right leg, knee, and ankles. Since 1974, she has suffered from dizziness, which has gotten progressively worse, especially in the past six or seven years. She gets dizzy to the point where she feels as if she is going to fall, and must grab something to support herself. The dizziness occurs every day, for about an hour, sometimes longer. She suffers from hypertension, for which she takes medication, which sometimes helps. She alleged that when her blood pressure "shoots up," Tr. 37, she cannot see, even with her glasses. Plaintiff testified that at her most recent examination, her blood pressure was normal. *Id.* Plaintiff had been examined by her doctor three months earlier and was given back pain medication, which helps sometimes. She also takes medication for migraine headaches which disappear with two Tylenol. Plaintiff takes Nitroglycerine daily for chest pain, which sometimes helps. She feels residual pain in her right leg due to knee and ankle surgery. Sometimes Daypro alleviates her knee pain completely. She also takes pills and Mylanta, which are effective in treating her stomach discomfort. When asked whether there were any side effects from her medications, plaintiff stated that they make nervous and upset her stomach.

Plaintiff maintained that she could not walk more than three blocks without having to sit down, and that she could not remain seated for more than fifteen minutes. While plaintiff's daughter often cooked, plaintiff sometimes does her own cooking. During the day, she watches television, listens to music, walks a "little bit," Tr. 40, and lies down when she becomes tired.

**D. *The ALJ's Findings***

 **\*6** In his May 8, 1996, decision, the ALJ made several findings. First, he found that plaintiff was the widow of a wage earner who died fully insured on January 11, 1981, and that the period during which she had to establish disability for widow's insurance benefits extended through January 1988. Second, he found that the plaintiff had not engaged in substantial gainful activity since 1974. Third, the ALJ found that, although the plaintiff has a history of multiple conditions, she did not have an impairment or combination

of impairments that "limit her ability to function." Tr. 25. Fourth, the ALJ found that the plaintiff does not have a severe impairment and is therefore not disabled. This finding is based on two others: (1) that the plaintiff does not have any impairment or combination of impairments that significantly limit her ability to perform basic work-related activities; and (2) that the plaintiff's statements concerning her impairment and its impact on her ability to work were disproportionate to the objective evidence and substantial medical findings.

The plaintiff asserts that the ALJ (1) improperly applied the "non-severe" standard, as interpreted by the Second Circuit; (2) incorrectly failed to consider the effect of a mental impairment; (3) failed adequately to address the treating physicians' opinions that plaintiff was unable to work; and (4) improperly disregarded the plaintiff's subjective complaints.

### E. *Review of the Evidence*

ALJ Fier found that plaintiff was treated for multiple conditions, including hypertension, coronary insufficiency, angina, arthritis, left renal cyst, anemia, anxiety, conjunctivitis, sinusitis and rhinitis. However, the ALJ determined that the evidence did not establish that these impairments, singly or in combination, significantly limited plaintiff's ability to function or perform basic work-related activities, and, therefore, she was not severely impaired.

In order to have a severe impairment, the impairment must significantly limit plaintiff's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). The ability to do basic work activities is defined as "the abilities and activities necessary to do most jobs." 20 C.F.R. § 404.1521(b). "Basic work activities" include, "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling ... seeing, hearing, and speaking ... [u]understanding, carrying out, remembering simple instructions ... [u]se of judgment ... [r]esponding appropriately to supervision, co-workers and usual work situations." 20 C.F.R. §§ 404.1521(b)(1)-(5); *see also Pickering v. Chater,* 951 F.Supp. 418, 424 (S.D.N.Y.1996).

Where an individual does not have a severe impairment, a finding shall be made that the individual is not under a disability, without consideration of the individual's age, education and work experience. 20 C.F.R. §§ 404.1520(c), 416.920(c). The Second Circuit has warned, however, that this step of the analysis may do no more than "screen out de minimis claims." *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995); *accord, Vega v. Commissioner of Social Security,*

97 CIV 6438, 1998 WL 255411, at *9 (May 20, 1998); *see also Meashaw v. Chater,* 94 CIV 1154, 1997 WL 16345, at *4 n. 6 (N.D.N.Y. Jan.7, 1997) (stating that it is "rare that a claim will end at step two of the analysis").

**\*7** The plaintiff first argues that, even assuming that the ALJ was correct to discount the opinions of the treating source[4]s and plaintiff's testimony, the ALJ erred in finding that plaintiff's condition was not severe, based solely on the testimony of the government consultant, Dr. Graham. Dr. Graham stated that plaintiff might have problems with lifting due to back pain.[5] Tr. 161. Since lifting is itself a basic work activity, 20 C.F.R. §§ 1521(a) and (b)(1), a limitation in that regard requires a finding of a severe impairment. *See, e.g., Pickering,* 951 F.Supp. at 424 (plaintiff's inability to lift in excess of twenty pounds maximum on an occasional basis, and ten pounds frequently, due to asthma constitutes severe impairment); *Tejada v. Callahan,* 993 F.Supp. 193, 201 (S.D.N.Y.1998) (finding severe impairment where plaintiff could not lift more than twenty pounds due to hypertension, diabetes, cataracts, hemorrhoids and arthralgia).[6]

Furthermore, plaintiff argues, while Dr. Graham made an assessment that plaintiff "is able to perform physical activities such as sitting, standing, walking, carrying, and handling of objects ...," Tr. 161, the information was insufficient for the ALJ to conclude that plaintiff can perform these activities within the meaning of 20 C.F.R. § 404.1521(a). Since Dr. Graham did not indicate how long, or to what extent plaintiff can perform these activities, his opinion does not contradict her contention that she is significantlylimited in these activities. *See* Tr. 186 (Dr. Bryne's assessment that plaintiff could sit less than six hours a day, stand less than two, and lift only five pounds); Tr. 45 (plaintiff's testimony that she could not walk more than three blocks due to ankle pain); Tr. 42 (plaintiff's testimony that dizziness from hypertension causes her to feel as if she is going to fall down).

I agree with the plaintiff that, in light of the evidence from the consulting physician, it was improper for the ALJ to end his analysis where he did. Rather, as the Commissioner has admonished, "[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued ...." Social Security Ruling 85–28 (quoted in *Bowen v. Yuckert,* 482 U.S. 137, 158, 107 S.Ct. 2287, 96

L.Ed.2d 119 (1987) (upholding "severity regulation" as valid on its face) (O'Connor, J., concurring)).

## CONCLUSION

The government's motion for judgment on the pleadings is denied. For the reasons set forth above, the cross-motion is granted to the extent that the case is remanded to the Commissioner for further proceedings consistent with this memorandum.

So Ordered.

**Parallel Citations**

58 Soc.Sec.Rep.Serv. 927

## Footnotes

1    Prior to November 5, 1990, section 223 of the Act provided that a widow was under a disability only if her mental or physical impairment(s) was of a level of severity deemed to be sufficient to preclude any gainful activity. As amended, by Pub.L. 101–508, section 223 now permits a widow to be found disabled if her impairments are of such severity as to prevent the widow from engaging in his or her previous work, and considering her age, education and work experience, any other kind of substantial gainful work that exists in the national economy. The amended definition is effective for entitlement to monthly benefits beginning January 1991 or later, for which applications are filed or pending January 1, 1991, or filed later. The parties disagree as to which standard applies in this case. The ALJ did not reach this issue, in light of the fact that he found the plaintiff not to suffer from a severe impairment. I defer to the ALJ to determine the appropriate standard on remand.

2    The SSI application has no such time requirement, and she must merely prove disability from the date of her application (April 19, 1993).

3    Plaintiff alleges that Dr. Graham's discussion of plaintiff's medical history is "largely inconsistent with the substantial medical evidence." Brief at 11. The examples given include that he wrote that she "denied having a history of eye problems secondary to hypertension, that she has never had a CT scan or MRI and that she denied difficulty walking, and denied having a history of heart problems." *Id.* In fact, the report states that she "describes difficulty walking." Tr. 158. Moreover, the fact that he reports her denial of certain conditions to him does not necessarily contradict findings that she complained of (or suffered from) those symptoms or conditions at earlier dates when she saw different doctors.

4    There is no dispute that Drs. Dey and Shulka were treating sources, both of whom opined that plaintiff was unable to work. When an ALJ does not give the treating physician's opinion sufficient weight, he is required to give "good reasons" for failing to do so in his notice of determination or written decision. 20 C.F.R. § 404.1527(d)(2). In addition, the ALJ must determine what deference should be granted to the treating physicians on the basis of certain factors listed in 20 C.F.R. § 404.1527(d). In his decision, the ALJ stated that he was discounting the opinions of plaintiff's treating sources because they "were not supported by the clinical and laboratory findings." Tr. 20. While remand would not be appropriate on this basis alone, I respectfully request that the ALJ more fully explain his treatment of the treating physicians' opinions in light of the factors listed in the regulations.

5    When asked whether or not the plaintiff would be able to "lift 20 pounds on a frequent basis," Dr. Slaussman stated that he couldn't give a weight of what she would be able to lift based on his examination of her. Tr. 55.

6    When asked at oral argument whether Dr. Graham's statement about plaintiff's lifting abilities required the ALJ to continue beyond the second step of the five-step process, counsel for the government candidly responded that it was "a close case."

**End of Document**                                                                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 1693835
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ethel FELICIANO, Plaintiff,
v.
Jo Anne B. BARNHART, Commissioner
of Social Security, Defendant.

No. 04 Civ.9554 KMW AJP.    |    July 21, 2005.

**Attorneys and Law Firms**

Ethel Feliciano (Regular & Certified Mail), Susan D. Baird,
Judge Kimba M. Wood, pro se.

### REPORT AND RECOMMENDATION

PECK, Chief Magistrate J.

**\*1**  Pro se plaintiff Ethel Feliciano brings this action pursuant
to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C.
§ 405(g), challenging the final decision of the Commissioner
of Social Security (the "Commissioner") to deny Feliciano
Supplemental Social Security ("SSI") benefits. (Dkt. No. 2:
Complaint.) The Commissioner has moved for judgment on
the pleadings pursuant to Fed.R.Civ.P. 12(c). (Dkt. No. 10:
Notice of Motion.)

For the reasons set forth below, the Commissioner's motion
for judgment on the pleadings should be GRANTED.

### PROCEDURAL BACKGROUND

On February 28, 2002, plaintiff Ethel Feliciano applied for
SSI benefits alleging that she had a disability since September
1, 1997, alleging an inability to engage in substantial gainful
activity. (*See* Dkt. No. 9: Administrative Record filed by the
Commissioner ["R."] at 101-04.) Feliciano's application was
denied initially (R. 64-67), and Feliciano requested a hearing
before an Administrative Law Judge ("ALJ") (R. 68-71). The
ALJ held a hearing on June 17, 2004, at which Feliciano
appeared and testified. (R. 31-63.) On July 9, 2004, the ALJ
issued his decision, finding that Feliciano was not disabled.
(R. 9-19.) The ALJ's decision became the final decision when

the Appeals Council denied Feliciano's request for review on
September 3, 2004. (R. 5-7.)

The issue before the Court is whether the Commissioner's
decision that Feliciano was not disabled is supported by
substantial evidence. The Court finds that it was.

### FACTS

#### Hearings Before the ALJ

At the start of the June 17, 2004 hearing before ALJ Michael
I. Gewirtz, [1] Feliciano confirmed that the ALJ was not
missing any medical records. (R. 36-37.) She confirmed the
ALJ's conclusion from his review of the medical records that
she has "allegations and diagnosis of dysthymia, borderline
personality, substance abuse in remission, carpal tunnel
syndrome, myofascial pain, being overweight, degenerative
disk disease, osteoarthritis, and scoliosis, gastroesophageal
reflux, and Hepatitis C." (R. 37; *see also* R. 57.) The ALJ
explained to Feliciano that although she claimed a disability
onset date of September 1997, SSI benefits only are available
from the date of application, in Feliciano's case February 28,
2002. (R. 38.)

Feliciano testified that she was born on December 31, 1949,
was fifty-four years old at the time of the hearing and
forty-seven years old in September 1997, her claimed date
of disability. (R. 37.) Feliciano is a United States citizen
(*see* R. 105), who has a GED and an Associate's degree in
Liberal Arts (R. 38, 43). While enrolled in Hostos Community
College, she worked from September 2003 to April 2004
in a Federal Work Study program, working four hours per
day and twenty hours per week, earning $400 per month.
(R. 38-41, 210.) Feliciano "delivered mail," "made phone
calls to other students to participate in activities," and "[m]ost
of the time [she] was moving or walking around because
[she] couldn't stay to[o] long sitting."(R. 41.) During the
four hour workday, Feliciano would spend "two hours sitting
and two hours walking."(*Id.*) She did not lift anything heavy
while employed in this program, and would use a push cart
to transport office supplies. (R. 41-42.) Before that, she
worked at "Wildcat" in 1995, where she received "on-the-job
training." (R. 43.) Feliciano also worked while incarcerated, [2]
receiving industrial training with the Department of Motor
Vehicles, as well as working as a law clerk in prison, where
she answered phones, performed research and did "clerical
type work." (R. 57.) Feliciano testified that she planned to
return to college to receive a four-year Bachelor's degree, if

accepted, in order to become a social worker or counselor. (R. 44, 58.) [3]

 **\*2** Feliciano testified that she has back and neck pain, and as a result is unable to lift twenty pounds, although she is able to pick up a gallon of milk with her left hand. (R. 51-53, 58.) She testified that she can only sit for two hours at a time because she has "to keep getting up to stretch [her] legs or they'll fall asleep."(R. 58.) Feliciano can only stand for a half-hour at a time before she has to sit down due to pain in her legs. (R. 59.) Injections and leg raise exercises have helped relieve the pressure on her lower back and neck. (R. 52.) Feliciano has pain going down her neck, and carpal tunnel syndrome in her right arm with numbness in her right thumb. (R. 53-54.) She has received injections in her right wrist which have increased mobility in her fingers. (R. 54.)

Feliciano has been on and off various medications for various periods of time. (*See generally* R. 47-54.) She currently controls her hepatitis C through her diet and not with medication. (R. 45, 49.) She used to be on medication to relieve pain in her liver, but the pain ceased in June 2003 once she discontinued use of the pain medication Neurontin. (R. 46-47, 49.) Feliciano also takes Prilosec for gastroesophageal reflux disease ("GERD"). (R. 50.) The medication has reduced her GERD symptoms, without side effects. (R. 50-51.) Feliciano feels stress, but is no longer on stress medication. (R. 49-50.) Feliciano said she was "trying to" do something about her weight, by trying to diet, but that was all. (R. 51.)

Feliciano had problems with substance abuse in the past, specifically with "cocaine, crack, marijuana." (R. 54.) She stopped using drugs when she went to prison in 1995 (R. 55), and went to drug counseling until 2002 (R. 55-56). She has not had a drug problem since. (R. 55.) As part of her drug counseling, Feliciano was diagnosed with "dysthyemia and a borderline personality disorder."(R. 55.) As noted above, she was taking Neurontin for that but discontinued it in 2003 because of liver pain. (R. 56.)

The ALJ summed up all the medical and psychological issues that they had discussed and asked Feliciano if he had missed anything. (R. 57.) Feliciano responded:

> No. I think that my only problem, it's my criminal record that holds me back, you know, because I've tried to get jobs ... And, you know, you can't escape the past so my criminal record, when it comes up

it's like they look at me and it's like don't worry, we'll call you. Don't call us. And they never call me. That's why I decided to go back to school.

(R. 57.)

To attend her ALJ hearing, Feliciano traveled on her own using public transportation, as she normally does. (R. 42, 59.) Feliciano does her own grocery shopping (*id.*), and knits as a hobby (*id.*). Feliciano attends church and social activities regularly (R. 60), dresses and feeds herself (R. 60-61), takes care of her own hygiene (R. 60-61), takes her medication on her own (R. 61), and manages her own money (*id.*). Feliciano filled out all the paperwork for her work-study and college courses on her own (*id.*), and has been applying for jobs since her release from prison in September 2001, and the "only problem" preventing her from working was her "criminal record" (R. 57).

### The Medical Evidence Prior to February 28, 2002

 **\*3** The medical evidence before the ALJ for the period before February 28, 2002 consisted of records from Feliciano's treating physicians at H.S. Systems (R. 147), North Central Bronx Hospital (R. 115, 152, 163, 207), Wyckoff Heights Medical Center (R. 205), and a counselor for her prior substance abuse (R. 154).

### Physical Health

On October 4, 2001, Dr. Liebman reviewed an x-ray of Feliciano's lumbosacral spine which showed "minimal degenerative changes." (R. 147.) December 1997 medical records showed mild scoliosis of the lumbar spine associated with osteoarthritis and narrowing of the L5-S1 disks. (R. 145; *see also* R. 146.)

Dr. Sylvia Fernandes and Dr. Uma Tejwani treated Feliciano beginning in November 2001 at the North Central Bronx Hospital. (R. 115-16, 152, 163, 207.) On December 24, 2001, Dr. Tejwani reported that Feliciano had diabetes mellitus, hyperlipidemia, GERD (gastroesophageal reflux disease), hepatitis C and low back pain. (R. 152, 207.) At her next visit on February 6, 2002, Feliciano received an injection in the right upper trapezius. (R. 163.) Feliciano was 4#10# tall and 183 pounds, and was considered "morbid[ly] obes [e]." (R. 163.) The physicians prescribed Vioxx and physical therapy

once or twice a week for four weeks, and recommended general weight loss.(*Id.*)

Feliciano was seen at the Wyckoff Heights Medical Center on January 13, 2002. (R. 205.) X-rays of the neck showed "arthritis in C4-C6 with joint space narrowing and compression of nerve, causing numbness and tingling in [the right] arm."(*Id.*) Nevertheless, a CT scan of the neck was normal, and showed no compressed nerves and normal discs without herniation. (R. 205.) Cervical radiculopathy and carpal tunnel syndrome were diagnosed.(*Id.*)

### Substance Abuse

Prior to the period at issue, Feliciano had a history of drug addiction, incarcerations for possession and sale of controlled substances, and treatment for substance abuse. (R. 153-60.) Feliciano was released from prison in September 2001 and was in a substance abuse rehabilitation program from October 27, 2001 to February 28, 2002, where she saw a counselor three to five times a week. (R. 153-55.) She was diagnosed with a borderline personality disorder. (R. 155.)

### The Medical Evidence After February 28, 2002

The medical evidence before the ALJ for the period after February 28, 2002 consisted of a consultative physician's report (R. 176-77), Feliciano's treating physicians at North Bronx Healthcare Network (R. 169-72, 211-21), and treating and consultative psychiatrists (R. 154-60, 173-93).

### Physical Health

On March 19, 2002, Dr. Mohammad Khattak performed a consultative orthopedic examination of Feliciano for the Social Security Administration. (R. 176-77.) Dr. Khattak observed that Feliciano ambulated without assistance, her gait was steady, she sat and stood normally, and she got on and off the examining table without assistance. (R. 176.) Feliciano's cervical and lumbar spine were found to be normal, as were her upper and lower extremities. (*Id.*)X-rays of the lumbosacral spine were negative, and Dr. Khattak diagnosed Feliciano with obesity and lumbosacral derangement. (R. 177.) Dr. Khattak concluded that Feliciano's "ability to bend and lift may be 'mildly' limited, but there are no limitations in sitting, standing, walking or reaching with gross and fine manipulations in her hands."(*Id.*)

**\*4** Feliciano was treated by the North Central Bronx Healthcare Network from November 2002 through May

2004. (R. 169-70, 211-21.) On November 19, 2002, the physical therapy outpatient department noted that Feliciano was obese and in need of abdominal strengthening. (R. 169-70.)

On April 30, 2004. Dr. Fernandes and Dr. Tejwani at the North Central Bronx Healthcare Network completed "Medical Assessment" forms sent by the Commissioner. (R. 211-21.) They diagnosed Feliciano's carpal tunnel syndrome as "mild," and stated that she had "no cervical radiculopathy." (R. 211.) X-rays and an MRI reflected degenerative joint disease of the knee(*id.*), and myofascial pain syndrome was diagnosed (R. 212). The physicians concluded that Feliciano could occasionally lift and carry up to twenty pounds, and could frequently carry up to ten pounds. (R. 214, 219.) They concluded that she had no problems in grasping, pushing, pulling, reaching, fingering, or fine manipulation with either hand. (R. 213-14.) According to the doctors, Feliciano could sit and stand for two hours at a time before needing to sit down or walk around, could sit and stand and walk for at least six hours per day, and could walk four city blocks without stopping. (R. 214, 217-18.) They opined that Feliciano did not need a cane or other assistive device (R. 219), but that she would need to change positions at will and would sometimes need to take one or two ten to twenty minute unscheduled breaks during a workday (R. 217-19). The physicians noted that Feliciano could travel by bus or subway. (R. 214.) According to the physicians, Feliciano's symptoms did not interfere with her attention and concentration, and she could tolerate moderate work stress. (R. 217.) They further reported that Feliciano should avoid concentrated exposure to aggravating environmental factors such as temperature extremes, chemical irritants, fumes, dust, and high humidity. (R. 220.) Although Dr. Tejwani reported that Feliciano could rarely stoop or climb ladders, never crouch, and only occasionally twist (R. 219), Dr. Fernandes noted that Feliciano had no postural limitations (R. 213.).

Dr. Ballard completed a "Physical Residual Functional Capacity Assessment" of Feliciano on May 15, 2002, based on her back disorder. (R. 196-202.) He concluded that she could: occasionally lift or carry fifty pounds and frequently lift or carry twenty-five pounds; sit, stand or walk six hours in an eight hour day; and was unlimited as to push and pull activities. (R. 197.) He found no postural, manipulative, communicative, or environmental limitations. (R. 198-200.)

### Mental Health

On March 13, 2002, treating psychiatrist Dr. Bruce Phariss reported that Feliciano was diagnosed with substance dependence in remission, and a personality disorder. (R. 154-60.) Dr. Phariss is a board certified psychiatrist and specialist in addiction, and was the medical director for Exponents Treatment Exchange, the drug rehabilitation program Feliciano attended. (*Id.;see also*Dkt. No. 11: Gov't Br. at 7.) Dr. Phariss examined Feliciano and reported that she was euthymic, had good hygiene and grooming, was cooperative, answered questions easily, and was logical and goal-oriented. (R. 155-57.) Feliciano told Dr. Phariss that she had interests and hobbies, shopped and cooked, and commuted by subway. (R. 157.) Dr. Phariss noted no limitation in understanding and memory, sustained concentration and persistence, social interaction, or adaption. (R. 158-59.) Dr. Phariss noted that she had back pain and arthritis but that those are not conditions he treated. (R. 159.)

 **\*5** Dr. Herbert Meadow performed a psychiatric consultative examination on Feliciano for the Social Security Administration on March 19, 2002. (R. 174-75.) Dr. Meadow reported that Feliciano has a history of three drug-related incarcerations for a total of approximately 10 years in jail. (R. 174.) Dr. Meadow noted that Feliciano has a history of cocaine abuse and stopped in 1992. (*Id.*) Feliciano takes Vioxx for her back problems and Lansoprazole for acid reflux. (*Id.*) Feliciano has a GED, and can read and write. (*Id.*) Dr. Meadow observed that Feliciano was in a rehabilitation program and lived in a shelter at the time of his report. (*Id.*) Further, he stated that "she has a poor appetite and her sleeping pattern is variable. She has no history of auditory or visual hallucinations, no history of homicidal/ suicidal ideation."(*Id.*) Dr. Meadow observed that Feliciano's "speech was logical, coherent, [and] goal directed. There was no loosening of associations, circumstantial or tangential thinking. No thought disorder was evident.... Her mood was mildly depressed. Her affect was appropriate."(*Id.*) Dr. Meadow noted that Feliciano reportedly spent her afternoons in the library and at the shelter, watches television, listens to music, and reads.(*Id.*) Her intelligence level was in the "average range" with unimpaired insight and judgment. (*Id.*) Dr. Meadow concluded that Feliciano's mental impairment (dysthymia) would not prevent her from working. (R. 175.)

In contrast, in May 2004, when asked to describe any limitations that would affect her ability to work at a regular job on a sustained basis, Dr. Tejwani reported that Feliciano's history of anxiety may affect her ability to work. (R. 221.) Dr.

Tejwani did not explain in detail to what extent he felt that Feliciano's ability to work would be affected by her anxiety.

In April 2002, Dr. Allan Hochberg completed a "Mental Residual Functional Capacity Assessment" of Feliciano. (R. 178-93.) He found no significant limitations in understanding and memory, sustained concentration and persistence, social interaction and adaptation. (R. 178-79.) Dr. Hochberg made his decision based on categories 12.04 (affective disorders), 12.08 (personality disorders), and 12.09 (substance addiction disorders). (R. 182.) He concluded that Feliciano had "mild to moderate" dysthymia (R. 185) and borderline personality disorder (R. 189). In terms of functional limitations, he found mild limitations in activities of daily living and social functioning, and a moderate degree of limitation in maintaining concentration, persistence or pace. (R. 192.)

### The ALJ's Decision

Th ALJ denied Feliciano's application for SSI benefits in a written decision dated July 9, 2004. (R. 9-19.) The ALJ applied the appropriate five step legal standard and reviewed all exhibits in the record, including all medical evidence, as well as the hearing testimony and the arguments presented. (R. 13.) The ALJ noted that Feliciano did not have any past relevant work experience at any time in the last fifteen years other than her participation in the work study program, which he found did not rise to the level of substantial gainful activity. (*Id.*) The ALJ concluded that "there is no indication that [Feliciano] has engaged in any substantial gainful activity at any time since her alleged onset date, September 1, 1997."(*Id.*)

 **\*6** The ALJ found that Feliciano had dysthymia, borderline personality disorder and substance abuse which is in remission, all constituting "nonsevere impairments because they do not cause more than a minimal effect on [Feliciano's] ability to perform basic work activities."(*Id.*) Thus, these are non-severe impairments. (R. 14.) The ALJ found that Feliciano had hepatitis C, GERD, obesity, degenerative disc disease (osteoarthritis/scoliosis), carpal tunnel syndrome, and myofascial pain syndrome, all severe impairments that had more than a minimal impact on her functioning. (R. 13.)

The ALJ found at the third step that Feliciano did not have an impairment that met the criteria of any of the listed impairments in Appendix 1 to subpart P of the Regulations Part 404 (the Listing of Impairments), and that "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment."(R. 14.)

The ALJ concluded that Feliciano had the ability to lift and carry twenty pounds occasionally and ten pounds frequently, to stand and/or walk for six hours during the course of an eight hour workday, and no limitation on her ability to sit. (R. 17.) The ALJ stated that Feliciano "does not have any nonexertional limitations. She has only mild restrictions on her activities of daily living, on her ability to function socially and on her concentration, persistence and pace."(*Id.*) Hence, Feliciano "has a residual functional capacity to perform light work."(*Id.*)

The ALJ concluded that Feliciano "is not disabled within the meaning of the Social Security Act and Regulations," and that "[s]ince [Feliciano] has not been under a disability at any time from September 1, 1997 through the date of this decision, she is not eligible for supplemental security income."(R. 18.)

### ANALYSIS

### I. THE APPLICABLE LAW [4]

#### A. Definition of Disability

A person is considered disabled for Social Security benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see,e.g.,Barnhart v. Thomas,* 540 U.S. 20, 23, 124 S.Ct. 376, 379 (2003); *Barnhart v. Walton,* 535 U.S. 212, 214, 122 S.Ct. 1265, 1268 (2002); *Butts v. Barnhart,* 388 F.3d 377, 383 (2d Cir.2004); *Green-Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003); *Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir.2002); *Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir.2002); [5]

The combined effect of all impairments must be of such severity that the person

> is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job

vacancy exists for him, or whether he would be hired if he applied for work.

*\*7* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see,e.g.,Barnhart v. Thomas,* 540 U.S. at 23, 124 S.Ct. at 379; *Barnhart v. Walton,* 535 U.S. at 218, 122 S.Ct. at 1270; *Butts v. Barnhart,* 388 F.3d at 383; *Draegert v. Barnhart,* 311 F.3d at 472. [6]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."*Mongeur v. Heckler,* 722 F.2d 1033, 1037 (2d Cir.1983) (per curiam); *see,e.g.,Brunson v. Callahan,* No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at \*1 (2d Cir. Oct. 14, 1999); *Brown v. Apfel,* 174 F.3d at 62; *Carroll v. Secretary of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983). [7]

#### B. Standard of Review

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record to support such determination. *E.g.,Green-Younger v. Apfel,* 335 F.3d 99, 105-06 (2d Cir.2003); *Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir.2002); *Vapne v. Apfel,* No. 01-6247, 36 Fed. Appx. 670, 672, 2002 WL 1275339 at \*2 (2d Cir. June 10, 2002), *cert. denied,*537 U.S. 961, 123 S.Ct. 394 (2002); *Horowitz v. Barnhart,* No. 01-6092, 29 Fed. Appx. 749, 752, 2002 WL 337951 at \*2 (2d Cir. Mar. 4, 2002); *Machadio v. Apfel,* 276 F.3d 103, 108 (2d Cir.2002); 42 U.S.C. § 405(g). [8] " 'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision." ' *Morris v. Barnhart,* 02 Civ. 0377, 2002 WL 1733804 at \*4 (S.D.N.Y. July 26, 2002). [9]

The Supreme Court has defined "substantial evidence" as " 'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ' *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); *accord,e.g.,Veino v. Barnhart,* 312 F.3d at 586; *Shaw v. Chater,* 221 F.3d at 131; *Curry v. Apfel,* 209 F.3d at 122; *Brown v. Apfel,* 174 F.3d at 61; *Rosa v. Callahan,* 168 F.3d at 77; *Tejada v. Apfel,* 167 F.3d at 773-74;

*Perez v. Chater,* 77 F.3d at 46. [10] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982), *cert. denied,* 459 U.S. 1212, 103 S.Ct. 1207 (1983). The Court must be careful not to " 'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." ' *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991); *see also, e.g., Veino v. Barnhart,* 312 F .3d at 586; *Toles v. Chater,* No. 96-6065, 104 F.3d 351 (table), 1996 WL 545591 at *1 (2d Cir. Sept. 26, 1996); *Rodriguez v. Barnhart,* 2004 WL 1970141 at *9; *Garcia v. Barnhart,* 2003 WL 68040 at *3; *Morales v. Barnhart,* 2002 WL 31729526 at *6. However, the Court will not defer to the Commissioner's determination if it is " 'the product of legal error." ' *E.g., Duvergel v. Apfel,* 2000 WL 328593 at *7; *see also, e.g., Tejada v. Apfel,* 167 F.3d at 773 (citing cases); *Butts v. Barnhart,* 388 F.3d 377, 384 (2d Cir.2004).

**\*8** The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; *see, e.g., Barnhart v. Thomas,* 540 U.S. 20, 24-25, 124 S.Ct. 376, 379-80 (2003); *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 2291 (1987). The Supreme Court has articulated the five steps as follows:

Acting pursuant to its statutory rulemaking authority, 42 U.S.C. §§ 405(a) (Title II), 1383(d)(1) (Title XVI), the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability. See 20 CFR § 404.1520 (2003) (governing claims for disability insurance benefits); § 416.920 (parallel regulation governing claims for Supplemental Security Income). If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. [1] At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." §§ 404.1520(b), 416.920(b). [2] At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant

can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas,* 540 U.S. at 24-25, 124 S.Ct. at 379-80 (fns.omitted); [11] *accord, e.g., Green-Younger v. Barnhart,* 335 F.3d at 106; *Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir.2002); *Shaw v. Chater,* 221 F.3d at 132; *Curry v. Apfel,* 209 F.3d at 122; *Brown v. Apfel,* 174 F.3d at 62; *Rosa v. Callahan,* 168 F.3d at 77; *Tejada v. Apfel,* 167 F.3d at 774. [12]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training. *See, e.g., Barnhart v. Thomas,* 540 U.S. at 25, 124 S.Ct. at 379-80; *Green-Younger v. Barnhart,* 335 F.3d at 106; *Draegert v. Barnhart,* 311 F.3d at 472; *Curry v. Apfel,* 209 F .3d at 122; *Rosa v. Callahan,* 168 F.3d at 80; *Perez v. Chater,* 77 F.3d at 46; *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *Rodriguez v. Barnhart,* 2004 WL 1970141 at *10.

**\*9** Where a claimant has multiple impairments, as the Second Circuit "has long recognized, the combined effect of a claimant's impairments must be considered in determining disability [and] the SSA must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe." *Dixon v. Shalala,* 54 F.3d at 1031; *see, e.g., DeLeon v. Secretary of Health & Human Servs.,* 734 F.2d 930, 937 (2d Cir.1984). [13]

**C.** *The Treating Physician Rule*

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported

by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); *see,e.g.,Green-Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003); *Kamerling v. Massanari,* 295 F.3d 206, 209 n.5 (2d Cir.2002); *Jordan v. Barnhart,* No. 01-6181, 29 Fed. Appx. 790, 792, 2002 WL 448643 at *2 (2d Cir. Mar. 22, 2002); *Bond v. Social Sec. Admin.,* No. 00-6333, 20 Fed. Appx. 20, 21, 2001 WL 1168333 at *1 (2d Cir. Sept. 27, 2001); *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir.2000). [14]

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well supported" by other medical evidence), the Court should consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(d) (2); *see also,e.g.,Shaw v. Chater,* 221 F.3d at 134; *Clark v. Commissioner,* 143 F.3d at 118; *Schaal v. Apfel,* 134 F.3d at 503; *Martinez v. Massanari,* 242 F.Supp.2d at 376; *Garcia v. Barnhart,* 2003 WL 68040 at *6; *Rebull v. Massanari,* 240 F.Supp.2d 265, 268 (S.D.N.Y.2002).

The Commissioner's current "treating physician" regulations were approved by the Second Circuit in *Schisler v. Sullivan,* 3 F .3d 563, 568 (2d Cir.1993).

## II. *THE GOVERNMENT'S MOTION SHOULD BE GRANTED, WITHOUT THE NEED TO APPLY THE FIVE STEP SEQUENCE TO FELICIANO'S CLAIM, BECAUSE FELICIANO'S COMPLAINT IS CONCLUSORY AND SHE DID NOT FILE PAPERS OPPOSING THE GOVERNMENT'S MOTION* [15]

In a proceeding to judicially review a final decision of the Commissioner, the plaintiff bears the burden of establishing the existence of a disability. *See,e.g.,Curry v. Apfel,* 209 F.3d 117, 122 (2d Cir.2000); *Melville v. Apfel,* 198 F.3d 45, 51

(2d Cir.1999) ("The claimant generally bears the burden of proving that she is disabled under the statute ..."); *Aubeuf v. Schweiker,* 649 F.2d 107, 111 (2d Cir.1981) ("It is well established that the burden of proving disability is on the claimant ."); *Dousewicz v. Harris,* 646 F.2d 771, 772 (2d Cir.1981); *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980); *Adams v. Flemming,* 276 F.2d 901, 903 (2d Cir.1960) ("The controlling principles of law upon [judicial] review [of a Social Security denial] are well established ..., namely, 'the burden of sustaining the claim for benefits is on the claimant' and The findings of the Social Security Agency are final and binding if there is a substantial basis for them.' "). [16]

**\*10** Here, Feliciano's pro se complaint states only that she should receive Social Security SSI benefits because of her psychiatric disorder. (Dkt. No. 2: Compl. ¶ 4.) Feliciano has not filed any brief or affidavit opposing the Commissioner's motion for judgment on the pleadings, and the filing deadline for doing so has passed. (*See*Dkt. No. 6: 2/9/05 Stip. & Order, setting a deadline of 5/20/05 for Feliciano's opposition papers.) Thus, Feliciano does not point to any specific testimony or evidence which she believes the ALJ overlooked or unjustly weighed. [17] Feliciano's complaint is conclusory, and without more, insufficient to defeat the Commissioner's motion for judgment on the pleadings. *See* cases cited in n. 15; *see also*Reyes v. Barnhart, 01 Civ. 4059, 2004 WL 439495 at *3 (S.D.N.Y. Mar. 9, 2004) (following my decisions in *Jiang, Alvarez* and *Morel* ); *Counterman v. Chater,* 923 F.Supp. 408, 414 (W.D.N.Y.1996) (Court rejects plaintiff's allegations that the ALJ "failed to consider [minor claimant's] parent's testimony as medical evidence, failed to consider all the medical evidence, failed to consider [child's] mother's testimony with respect to the IFA analysis, and failed to render his decision based upon the record as a whole," on the ground that they are "broad and conclusory. She offers no specific testimony or evidence which she believes that the ALJ overlooked and should have considered."); *Steiner v. Dowling,* 914 F.Supp. 25, 28 n.1 (N.D .N.Y.1995) (rejecting plaintiffs' argument that the State's social security regulations are too restrictive as "neither sufficiently explained nor seriously advanced by plaintiffs-providing only a single conclusory paragraph in their Statement of Undisputed Facts ..., and in their Attorney's Affirmation ...."), *aff'd,*76 F.3d 498 (2d Cir.1996); *see generally* S.D.N.Y. Local Civil Rule 7.1 ("all motions and all oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon in support of or in opposition to the motion.... Willful failure to comply with this rule may be

deemed sufficient cause for the denial of a motion or for the granting of a motion by default.").

### III. *APPLICATION OF THE FIVE STEP SEQUENCE TO FELICIANO'S CLAIMS*

For the reasons set forth in Point II above, the Court need not apply the five-step sequence to Feliciano's claims. Even if the Court were to do so, however, the Commissioner's decision that Feliciano was not disabled should be affirmed since it is supported by substantial evidence.

### A. *Feliciano Was Not Engaged in Substantial Gainful Activity*

The first inquiry is whether Feliciano was engaged in substantial gainful activity after her application for SSI benefits. "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit."20 C.F.R. § 404.1510. [18] The ALJ's conclusion that Feliciano was not engaged in substantial gainful activity during the applicable time period is not disputed.

### B. *Feliciano Had Demonstrated Severe Physical Impairments That Significantly Limited Her Ability To Do Basic Work Activities*

**\*11** The next step of the analysis is to determine whether Feliciano proved that she had a severe physical or mental impairment or combination of impairments that "significantly limit[ed][her] physical or mental ability to do basic work activities."20 C.F.R. § 404.1521(a). The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."20 C.F.R. § 404.1521(b). "Basic work activities" include:

> ... walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling ... seeing, hearing, and speaking ....[u]nderstanding, carrying out, and remembering simple instructions ....[u]se of judgment .... [r]esponding appropriately to supervision, co-workers and usual work situations.

20 C.F.R. § 404.1521(b)(1)-(5). [19] The Second Circuit has warned that the step two analysis may not do more than

"screen out *deminimis* claims." *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995). [20]

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process."*Rosario v. Apfel,* No. 97 CV 5759, 1999 WL 294727 at \*5 (E.D.N.Y. Mar. 13, 1999) (citing 20 C.F.R. § 404.1520(C)); *accord,e.g.,Rodriguez v. Barnhart,* 2005 WL 643190 at \*10; *Jiang v. Barnhart,* 2003 WL 21526937 at \*10. On the other hand, if the disability claim rises above the *deminimis* level, then the further analysis of step three and beyond must be undertaken. *See,e.g.,Dixon v. Shalala,* 54 F.3d at 1030. [21]

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.' ' *Rosario v. Apfel,* 1999 WL 294727 at \*5 (quoting *Bowen v. Yuckert,* 482 U.S. 137, 154 n.12, 107 S.Ct. 2287, 2298 n.12 (1987)).

The ALJ found Feliciano "has Hepatitis C, GERD, obesity, degenerative disc disease (osteoarthritis/scoliosis), carpal tunnel syndrome and myofascial pain syndrome. These are impairments that cause more than minimal restrictions in the ability to perform basic work acitvity and therefore, they are severe impairments."(R. 13.) This finding is not disputed. [22]

### C. *Feliciano Did Not Have A Disability Listed in Appendix 1 of the Regulations*

The third step of the five-part test requires a determination of whether Feliciano had an impairment listed in Appendix 1 of the Regulations. 20 C.F.R., Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."*Dixon v. Shalala,* 54 F.3d 1019, 1022 (2d Cir.1995). [23]

The ALJ found that although Feliciano's physical impairments were "severe," her impairments did not "meet or equal the specific requirements established for a listed impairment in the listings of impairments in Appendix 1, Subpart P...." (R. 14.)

**\*12** Appendix 1 provides a categorization of physical (and mental) impairments, including the musculoskeletal, respiratory, cardiovascular, digestive, and multiple body, systems. 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 1.00, 3.00, 4.00, 5.00, 10.00. Feliciano's physical impairment diagnoses from treating physicians were hepatitis C, GERD, obesity, degenerative disc disease (osteoarthritis/scoliosis), carpal tunnel syndrome, and myofascial pain syndrome. (*See* R. 13-15.)

Feliciano's hepatitis C does not satisfy the Appendix 1 requirement. Section 5.05 provides for chronic liver disease, including "chronic active hepatitis," and outlines certain conditions for these specific diseases. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 5.05. Feliciano's hepatitis C does not satisfy any of the conditions set forth in § 5.05. Indeed, Feliciano is able to control her hepatitis through her diet without needing medication. (R. 45, 49.) While she used to be on medication to relieve pain in her liver, the pain ceased once she discontinued use of the pain medication Neurontin. (R. 46-47, 49.)

The diagnosis of obesity is addressed generally throughout the Listing of Impairments in multiple sections, in the same language:

*Effects of obesity.*Obesity is a medically determinable impairment that is often associated with disturbance of the [cardiovascular] system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with [cardiovascular] impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 1.00(Q), 3.00(I), 4.00(F).Obesity thus must be considered in light of the effects it causes on the body. The ALJ found that Feliciano's obesity did not rise to the level of severity outlined in the Listings, noting that none of the physicians reported "findings equivalent in severity to the criteria of any listed impairment."(R. 14.)

The ALJ found that Dr. Tejwani's and Dr. Fernandes' diagnosis of osetoarthritis and scoliosis constituted a severe

impairment but not one in the Listings. Sections 1.00(L) and 101.00(L) provide in pertinent part that "[a]bnormal curvatures of the spine (specifically, scoliosis... ) can result in impaired ambulation, but may also adversely affect functioning in body systems other than the musculoskeletal system."20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1 .00(L), 101.00(L). Further, §§ 14.00(B)(6) and 14.09 address arthritis, stating "inflammation of major joints may ... caus[e] difficulties with ambulation or fine and gross movements, or the arthritis may involve other joints or cause less restriction of ambulation or other movements but be complicated by extra-articular features that cumulatively result in serious functional deficit," and further explains that "[t]he terms inability to ambulate effectively and inability to perform fine and gross movements effectively in 14.09A have the same meaning as in 1.00B2b and 1.00B2c and must have lasted, or be expected to last, for at least 12 months." [24] 20 C.F.R., Pt. 404. Subpt. P, App. 1, § 14.00(B)(6). Additionally, § 14.00(b)(6)(D) provides that "extra-articular features of an inflammatory arthritis may satisfy the criteria," and that radiculopathy is a commonly occurring extra-articular impairment. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.00(B)(6)(d).

**\*13** The treating and consultative physicians' reports found that Feliciano did not have difficulty ambulating, nor did she have radiculopathy. On March 19, 2002, Dr. Khattak observed that Feliciano ambulated without assistance, her gait was steady, she sat and stood normally, and got on and off the examining table without assistance. (R. 176). Moreover, on April 30, 2004, treating physician Dr. Fernandes found that Feliciano had "no cervical radiculopathy." (R. 211.) The ALJ therefore found that Feliciano's osetoarthritis and scoliosis did not rise to the level of severity outlined in the Listings of Impairments, noting that none of the physicians reported "findings equivalent in severity to the criteria of any listed impairment."(R. 14.)

Dr. Tejwani's diagnosis of gastroesophageal reflux disease ("GERD") is not specifically listed anywhere in the Listing of Impairments. Therefore, as the regulation provides, "in any case in which an individual has a medically determinable impairment that is not listed, an impairment that does not meet the requirements of a listing, or a combination of impairments no one of which meets the requirements of a listing, we will consider medical equivalence."20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(H)(4). Looking to the digestive system categories of impairments under § 5.00 and beyond, Feliciano's GERD does not constitute an impairment. [25] As

both physicians and the ALJ observed, Feliciano successfully curbs the pain of her gastroesophageal reflux by taking Prilosec. (*See* page 4 above.)

Likewise, carpal tunnel syndrome does not specifically appear in the Listing of Impairments. § 1.02 outlines the musculoskeletal categories of impairments and addresses the major dysfunction of joints due to any cause, and provides that such dysfunction be characterized by:
[G]ross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With: ...

B. *Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively...*

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02 (emphasis added).

On April 30, 2004. Dr. Fernandes found that Feliciano's carpal tunnel syndrome was "mild." (R. 211.) Additionally, Dr. Khattak observed on March 19, 2002 that Feliciano's "ability to bend and lift may be 'mildly' limited, but there are no limitations in sitting, standing, walking or reaching with gross and fine manipulations in her hands."(R. 177.) Finally, treating physicians Dr. Fernandes and Dr. Tejwani found that Feliciano had no significant limitation in grasping, pushing, pulling, reaching, fingering, or fine manipulation with either hand. (R. 214, 219.) The ALJ found that Feliciano's carpal tunnel syndrome did not rise to the level of severity outlined in 20 C.F.R., Pt. 404, noting that none of the physicians reported "findings equivalent in severity to the criteria of any listed impairment."(R. 14.)

 **\*14**  The ALJ found that Dr. Tejwani's and Dr. Fernandes' diagnosis of general myofascial pain syndrome constituted a severe impairment but not one listed in 20 C.F.R., Pt. 404. On April 30, 2004, the physicians diagnosed Feliciano with myofascial pain syndrome after examining X-rays and an MRI. (R. 211-12.) As seen above, the listing of musculoskeletal impairments does not include general myofascial pain, and provides that the pain be coupled with limitation in motion. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02. Given the multiple physicians' reports that found no limitations in Feliciano's overall mobility and ambulation (*see*

pages 4, 7 & 31 above), the ALJ's finding that Feliciano's general myofascial pain syndrome did not rise to the level of severity outlined in the Listings is supported by substantial evidence. (R. 14.)

Since none of Feliciano's treating or consulting physicians found that Feliciano was disabled due to physical impairment, the ALJ was entitled to rely on that absence of evidence of disability. *See, e.g., Salvaggio v. Apfel,* No. 01-6062, 23 Fed. Appx. 49, 51, 2001 WL 1388521 at \*1 (2d Cir. Nov. 6, 2001) (lack of medical evidence supports the ALJ's determination that plaintiff was not disabled); *O'Connor v. Shalala,* No. 96-6215, 111 F.3d 123 (table), 1997 WL 165381 at \*1 (2d Cir. Mar. 31, 1997) ("the Commissioner is also entitled to rely on the absence of contemporaneous evidence of the disability"); *Diaz v. Shalala,* 59 F.3d 307, 315 (2d Cir.1995); *Dumas v. Schweiker,* 712 F.2d 1545, 1553 (2d Cir.1983) (Commissioner is "entitled to rely not only on what the [medical] record says, but also on what it does not say"); *Rodriguez v. Barnhart,* 04 Civ. 4514, 2005 WL 643190 at \*12; *Catrain v. Barnhart,* 325 F.Supp.2d 183, 192 (E.D.N.Y.2004) ("[T]he ALJ is entitled to rely on the absence of opinions...."); *Jiang v. Barnhart,* 2003 WL 21526937 at \*13; *De Roman v. Barnhart,* 2003 WL 21511160 at \*13; *Alvarez v. Barnhart,* 2002 WL 31663570 at \*10; *De La Cruz v. Chater,* 937 F.Supp. 194, 197 (E.D.N.Y.1996).

The Court finds that the ALJ's decision that Feliciano did not satisfy any Appendix 1 Listing is supported by substantial evidence.

### D. *Feliciano Has the Ability to Perform Light Work*
The fourth prong of the five part analysis is whether Feliciano retains the residual functional capacity to return to her past relevant work. As the ALJ correctly notes, Feliciano has no past relevant work experience at any time in the past fifteen years, other than non-qualifying part-time work in a work study program (R. 17), so this prong is inapplicable. The ALJ therefore turned to the fifth prong, on which the SSA has the burden of proof, to determine if Feliciano has the residual functional capacity to perform other jobs in the national economy. (R. 15-17.)

The ALJ found that Feliciano can perform light work despite her impairments. (R. 17.) In addition to her mobility not being limited (*see* pages 4, 7 & 31 above), both the physicians and the ALJ acknowledged that Feliciano is relatively active despite her reported impairments; she lives alone and is independent in self care, doing her own shopping and

household chores, and using public transportation. (*See* pages 5 & 10 above.) She also has been going to college and received an Associate's degree, attended a drug rehabilitation program on a daily basis, and plans to get her Bachelor's degree. (*See* pages 3-5 above.)

**\*15** Dr. Tejwani reported that Feliciano's history of anxiety may affect her ability to work. (R. 221.) Yet, in light of the "treating physician's rule," the Court gives more weight to the treating psychiatrist's opinion as to Feliciano's mental health than Dr. Tejwani, who is an internal medicine practitioner. *See* 20 C.F.R. §§ 404.1527(d)(2)(ii), 416.927(d) (2)(ii); *Taveras v. Callahan,* 96 Civ. 8014, 1997 WL 441905 *5* n.3 (S.D.N.Y. August 6, 1997) ("[A] doctor's opinion in an area of non-expertise will be considered but will be given less weight than that of a doctor who treated Plaintiff in his or her area of expertise.") [26] Feliciano's treating psychiatrist, Dr. Phariss, reported on March 13, 2002 that Feliciano was euthymic, had good hygiene and grooming, was cooperative, answered questions easily, and was logical and goal-oriented. (R. 154-60.) Further, Dr. Phariss noted that Feliciano had no limitation in understanding and memory, sustained concentration and persistence, social interaction, or adaption. [27] (R. 157-58.) In light of Dr. Phariss's established expertise in psychiatry and his decisive report on Feliciano's mental state, the Court finds that substantial evidence supports the ALJ's ruling that Feliciano can perform light work despite her mental impairments. (R. 15.)

The ALJ's finding that Feliciano retained the residual functional capacity for light work despite her physical impairments also is supported by substantial evidence. Treating physicians Dr. Tejwani and Dr. Fernandes reported that Feliciano could sit or stand for six hours in an eight hour workday, carry twenty pounds occasionally and ten pounds frequently, and had no other restrictions that would prevent light work. (R. 16-17; *see also* pages 8, 9, 12 & 33 above.) Feliciano's daily activities-including attending school-further support the ALJ's conclusion. (R. 16-17; *see also* pages 5-6 & 35 above.) The consulting doctor concurred. (*See* page 10 above.) Based on Feliciano's age and education, and her limitations or lack thereof, the ALJ correctly found that she was not disabled. *See* 20 C.F.R. Part 404, Subpt. P, App. 2, § 202.13 (a person of "advanced" age who is a high school graduate or more, with unskilled or no prior work experience, is not disabled for light work); *see,e.g.,Brown v. Barnhart,* 04 Civ. 2450, 2005 WL 991769 at *4* (S.D.N.Y. Apr. 27, 2005) (affirming the ALJ's ruling that petitioner was not disabled in light of substantial evidence showing that "an individual of [petitioner's] age, education, and work experience ... was capable of performing the exertional requirement of sedentary, light, and medium work"); *Davila v. Barnhart,* 03 Civ. 3981, 2004 WL 2914073 at *8-9* (S.D.N.Y. Dec. 15, 2004) (upholding the ALJ's use of the Medical Vocational Guidelines to determine that plaintiff could perform light work); *Loftin v. Barnhart,* 01 Civ. 1118, 2002 WL 31202760 at *12-14* (S.D.N.Y. Sept. 3, 2002) (upholding ALJ's determination that plaintiff could perform light work, based on the Medical Vocational Guidelines and plaintiff's own testimony, residual functional capacity assessment and medical testimony); *Elias v. Apfel,* 54 F.Supp.2d 172, 178-79 (E.D.N.Y.1999) (affirming the ALJ's use of the Medical Vocational guidelines in ruling that petitioner was not disabled because there was substantial evidence that petitioner, a high school graduate approaching advanced age, retained a residual functional capacity to perform light work).

## CONCLUSION

**\*16** For the reasons set forth above, the Commissioner's determination that Feliciano was not disabled within the meaning of the Social Security Act is supported by substantial evidence. The Commissioner's motion for judgment on the pleadings (Dkt. No. 10) should be granted.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Kimba M. Wood, 500 Pearl Street, Room 1610, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Wood. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Secretary of Health & Human Servs.,* 892

F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

## Footnotes

1    On April 6, 2004, a hearing was held before ALJ Michael I. Gewirtz (R. 20-30), who gave Feliciano leave to find legal counsel. (*Id.*) On June 17, 2004, the hearing continued with Feliciano appearing without legal representation. (R. 31-63.) The ALJ reminded Feliciano of her right to have an attorney or other representative, and Feliciano elected to proceed without a representative, since she had been unable to obtain one. (R. 33-35.)

2    Feliciano has a history of three drug-related incarcerations for a total of approximately 10 years in jail. (R. 174.)

3    Records submitted to the Court show that Feliciano enrolled in Lehman College. (*See* Compl. Atts.)

4    For additional decisions by this Judge discussing, *inter alia,* the standard of review in Social Security cases in language substantially similar to that in this entire section of this Report and Recommendation, *see,e.g.,Rodriguez v. Barnhart,* 04 Civ. 4514, 2005 WL 643190 at *5-8 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); *Serrano v. Barnhart,* 02 Civ. 6372, 2003 WL 22683342 at *9-12 (S.D.N.Y. Nov. 14, 2003) (Peck, M.J.); *Jiang v. Barnhart,* 03 Civ. 0077, 2003 WL 21526937 at *6-10 (S.D.N.Y. July 8, 2003) (Peck, M.J.), *report & rec. adopted,* 2003 WL 21755932 (S.D.N.Y. July 30, 2003) (Kaplan, D.J.); *De Roman v. Barnhart,* 03 Civ. 0075, 2003 WL 21511160 at *6-10 (S.D.N.Y. July 2, 2003) (Peck, M.J.); *Acosta v. Barnhart,* 99 Civ. 1355, 2003 WL 1877228 at *7-11 (S.D.N.Y. Apr. 10, 2003) (Peck, M.J.); *Alvarez v. Barnhart,* 02 Civ. 3121, 2002 WL 31663570 at *5-7 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.), *report & rec. adopted,* 2003 WL 272063 (S .D.N.Y. Jan. 16, 2003) (Martin, D.J.); *Jimenez v. Massanari,* 00 Civ. 8957, 2001 WL 935521 at *6, 8 (S.D.N.Y. Aug. 16, 2001) (Peck, M .J.); *Morel v. Massanari,* 01 Civ. 0186, 2001 WL 776950 at *4-6 (S .D.N.Y. July 11, 2001) (Peck, M.J.); *Duvergel v. Apfel,* 99 Civ. 4614, 2000 WL 328593 at *6-8 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); *Jones v. Apfel,* 66 F.Supp.2d 518, 535-37 (S.D.N.Y.1999) (Pauley, D.J. & Peck, M.J.); *Craven v. Apfel,* 58 F.Supp.2d 172, 180-82 (S.D.N.Y.1999) (Preska, D.J. & Peck, M.J.);*Vega v. Commissioner of Soc. Sec.,* 97 Civ. 6438, 1998 WL 255411 at *5-8 (S .D.N.Y. May 20, 1998) (Peck, M.J.); *Pickering v. Chater,* 951 F.Supp. 418, 422-23 (S.D.N.Y.1996) (Batts, D.J. & Peck, M.J.); *Walzer v. Chater,* 93 Civ. 6240, 1995 WL 791963 at *6-7 (S.D.N.Y. Sept. 26, 1995) (Kaplan, D.J. & Peck, M.J.).

5    *See also,e.g.,Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir.2000); *Curry v. Apfel,* 209 F.3d 117, 122 (2d Cir.2000); *Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir.1999); *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999); *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999); *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998); *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996); *Martinez v. Massanari,* 242 F.Supp.2d 372, 375 (S.D.N.Y.2003); *Garcia v. Barnhart,* 01 Civ. 8300, 2003 WL 68040 at *4 (S.D.N.Y. Jan. 7, 2003); *Rebull v. Massanari,* 240 F.Supp.2d 265, 268 (S.D.N.Y.2002); *Worthy v. Barnhart,* 01 Civ. 7907, 2002 WL 31873463 at *4 (S.D.N.Y. Dec. 23, 2002); *Perez v. Barnhart,* 234 F.Supp.2d 336, 339 (S.D.N.Y.2002).

6    *See also,e.g.,Shaw v. Chater,* 221 F.3d at 131-32; *Rosa v. Callahan,* 168 F.3d at 77; *Balsamo v. Chater,* 142 F.3d at 79; *Garcia v. Barnhart,* 2003 WL 68040 at *4; *Soto v. Barnhart,* 01 Civ. 7905, 2002 WL 31729500 at *4 (S.D.N.Y. Dec. 4, 2002).

7    *See also,e.g.,Rivas v. Barnhart,* 01 Civ. 3672, 2005 WL 183139 at *16 (S.D.N.Y. Jan. 27, 2005); *Batista v. Commissioner of Soc. Sec.,* 03 Civ. 10121, 2004 WL 2700104 at *7 (S .D.N.Y. Nov. 23, 2004); *Rebull v. Massanari,* 240 F.Supp.2d at 268; *Worthy v. Barnhart,* 2002 WL 31873463 at *4.

8    *See also,e.g.,Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir.2000); *Curry v. Apfel,* 209 F.3d 117, 122 (2d Cir.2000); *Brown v. Apfel,* 174 F.3d 59, 61 (2d Cir.1999); *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999); *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999); *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998); *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991); *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983); *Dumas v. Schweiker,* 712 F.2d 1545, 1550 (2d Cir.1983); *Rodriguez v. Barnhart,* 04 Civ. 4514, 2005 WL 643190 at *6 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); *Rodriguez v. Barnhart,* 03 Civ. 7272, 2004 WL 1970141 at *8 (S.D.N.Y. Aug. 23, 2004); *Martinez v. Massanari,* 242 F.Supp.2d 372, 375 (S.D.N.Y.2003); *Duran v. Barnhart,* 01 Civ. 8307, 2003 WL 103003 at *7 (S.D.N.Y. Jan. 13, 2003); *Garcia v. Barnhart,* 01 Civ. 8300, 2003 WL 68040 at *3 (S.D.N.Y. Jan. 7, 2003); *Rebull v. Massanari,* 240 F.Supp.2d 265, 268-69 (S.D.N.Y.2002); *Worthy v. Barnhart,* 01 Civ. 7907, 2002 WL 31873463 at *3 (S.D.N.Y. Dec. 23, 2002); *Norris v. Barnhart,* 01 Civ. 0902, 2002 WL 31778794 at *3 (S.D.N.Y. Dec. 12, 2002); *Morales v. Barnhart,* 01 Civ. 4057, 2002 WL 31729526 at *6 (S.D.N.Y. Dec. 5, 2002)

9    *See also,e.g.,Duran v. Barnhart,* 2003 WL 103003 at *9; *Florencio v. Apfel,* 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review.") (internal quotations & alterations omitted).

10   *See also,e.g.,Green-Younger v. Barnhart,* 335 F.3d at 106 (2d Cir.2003); *Batitsta v. Commissioner of Soc. Sec.,* 03 Civ. 10121, 2004 WL 2700104 at *5 (S.D.N.Y. Nov. 23, 2004); *Rodriguez v. Barnhart,* 2004 WL 1970141 at *9; *Martinez v. Massanari,* 242

F.Supp.2d at 375; *Duran v. Barnhart,* 2003 WL 103003 at \*9; *Garcia v. Barnhart,* 2003 WL 68040 at \*3; *Worthy v. Barnhart,* 2002 WL 31873463 at \*3; *Norris v. Barnhart,* 2002 WL 31778794 at \*3; *Morales v. Barnhart,* 2002 WL 31729526 at \*6; *Soto v. Barnhart,* 01 Civ. 7905, 2002 WL 31729500 at \*4 (S.D.N.Y. Dec. 4, 2002).

**11** Amendments to 20 C.F.R. 404.1520 became effective September 25, 2003. *See* 68 Fed.Reg. 51153, 2003 WL 22001943 (Aug. 26, 2003); *see also Barnhart v. Thomas,* 540 U.S. at 25 n.2, 124 S.Ct. at 380 n.2. The amendments, *inter alia,* added a new § 404.1520(e) and redesignated previous §§ 404.1520(e) and (f) as §§ 404.1520(f) and (g), respectively. 20 C.F.R. § 404.1520; *see* 68 Fed.Reg. 51156.The new § 404.1520(e) explains that if the claimant has an impairment that does not meet or equal a listed impairments, the SSA will assess the claimant's residual functional capacity. 20 C.F.R. § 404.1520(e). The SSA uses the residual functional capacity assessment at step four to determine whether the claimant can perform past relevant work and, if necessary, at step five to determine whether the claimant can do any work. *See* 68 Fed.Reg. 51156.The ALJ appropriately utilized the residual functional capacity assessment amendments in this case. (*See* R. 15-17.)

**12** *See also,e.g.,Balsamo v. Chater,* 142 F.3d at 79-80; *Schaal v. Apfel,* 134 F.3d at 501; *Perez v. Chater,* 77 F.3d at 46; *Dixon v. Shalala,* 54 F.3d 1019, 1022 (2d Cir.1995); *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *Batistta v. Commissionerr of Soc. Sec.,* 2004 WL 2700104 at \*6; *Rodriguez v. Barnhart,* 2004 WL 1970141 at \*9-10; *Martinez v. Massanari,* 242 F.Supp.2d at 375-76; *Garcia v. Barnhart,* 2003 WL 68040 at \*4; *Worthy v. Barnhart,* 2002 WL 31873463 at \*4; *Norris v. Barnhart,* 2002 WL 31778794 at \*3-4; *Perez v. Barnhart,* 234 F.Supp.2d 336, 339 (S.D.N.Y.2002); *Soto v. Barnhart,* 2002 WL 31729500 at \*4-5.

**13** *See also,e.g.,Miles v. Apfel,* 51 F.Supp.2d 266, 269 (E.D.N.Y.1999); *Nivar v. Apfel,* 98 Civ. 3930, 1999 WL 163397 at \*4-5 & n.8 (S.D.N.Y. Mar. 23, 1999); *Vitale v. Apfel,* 49 F.Supp.2d 137, 142 (E.D.N.Y.1999); *Irvin v. Heckler,* 592 F.Supp. 531, 540 (S.D.N.Y.1984).

**14** *See also,e.g.,Rosa v. Callahan,* 168 F.3d 72, 78-79 (2d Cir.1999); *Clark v. Commissioner of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir.1998); *Schaal v. Apfel,* 134 F.3d 496, 503 (2d Cir.1998); *Martinez v. Massanari,* 242 F.Supp.2d 372, 376 (S.D.N.Y.2003); *Garcia v. Barnhart,* 01 Civ. 8300, 2003 WL 68040 at \*5 & n.4-5 (S.D.N.Y. Jan. 7, 2003).

**15** For additional decisions by this Judge discussing the grant of judgment on the pleadings to the Government in Social Security cases where the plaintiff has filed no opposing papers (or only conclusory papers) in language substantially similar to that in this entire section of this Report and Recommendation, *see Morgan v. Barnhart,* 04 Civ. 6024, 2005 WL 925594 at \*9-10 (S.D.N.Y. Apr. 21, 2005) (Peck, M.J.); *Rodriguez v. Barnhart,* 04 Civ. 4514, 2005 WL 643190 at \*8-9 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); *Jiang v. Barnhart,* 03 Civ. 0077, 2003 WL 21526937 at \*9 (S.D.N.Y. July 8, 2003) (Peck, M.J.); *De Roman v. Barnhart,* 03 Civ. 0075, 2003 WL 21511160 at \*10 (S.D.N.Y. July 2, 2003) (Peck, M.J.); *Alvarez v. Barnhardt,* 02 Civ. 3121, 2002 WL 31663570 at \*6-8 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.), *report & rec. adopted,* 2003 WL 272063 (S . D.N.Y. Jan. 16, 2003) (Martin, D.J.); *Morrison v. Massanari,* 01 Civ. 0186, 2001 WL 776050 at \*7 (S.D.N.Y. July 11, 2001) (Peck, M.J.); *Casiano v. Apfel,* 39 F.Supp.2d 326, 327-28 (S.D.N.Y.1999) (Stein, D.J. & Peck, M.J.), *aff'd mem.,* No. 99-6058, 205 F.3d 1322 (table), 2000 WL 225436 (2d Cir. Jan. 14, 2000).

**16** *See also,e.g.,Pena v. Barnhart,* 01 Civ 502, 2002 WL 31487903 at \*8 (S.D.N.Y. Oct. 29, 2002); *Reyes v. Barnhart,* 01 Civ 1724, 2002 WL 31385825 at \*5 (S.D.N.Y. Oct. 21, 2002); *Ortiz v. Shalala,* 93 Civ. 3561, 1994 WL 673630 at \*1 (S.D.N.Y. Dec. 1, 1994); *Morton v. Heckler,* 586 F.Supp. 110, 111 (W.D.N.Y.1984); Harvey L. McCormick, *Social Sec. Claims & Proc.* § 14:16 (5th ed. 1998) ("In a proceeding to review judicially a final decision of the Commissioner, the plaintiff has the burden of establishing the correctness of his or her contention. The procedure is akin to that in a regular civil appeal under the Federal Rules of Civil Procedure....").

**17** Attached to Feliciano's complaint are medical reports from a time in late 1994 after the ALJ and Appeals Council's decisions. (Compl.: Atts.) They are contradictory. There is a 9/16/04 report from North Central Bronx Hospital that states that Feliciano "is now medically cleared and can return to work/school on full duty on 9/17/04" (apparently related to vertigo from diabetes), and a 10/7/04 note from Dr. Fernandes that her back was "injected with lidocaine ... with beneficial results," but also two mental health reports (8/27/04 and 10/19/04) that Feliciano is unable to work based on "serious and persistent mental illness."

Evidence not contained in the administrative record may not be considered when reviewing the findings of the Commissioner. *See,e.g.,* 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security...."); *Carnevale v. Gardner,* 393 F.2d 889, 891 n.1 (2d Cir.1968) (district court correctly refused to consider materials not properly in administrative record); *Morel v.. Massanari,* 01 Civ. 0186, 2001 WL 776050 at \*8-9 & n.20 (S.D.N.Y. July 11, 2001) (Peck, M.J.) ( & cases cited therein); *Duvergel v. Apfel,* 99 Civ. 4614, 2000 WL 328593 at \*2 n.6 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); *Casiano v. Apfel,* 39 F.Supp.2d 326, 330 (S . D.N.Y.1999) (Stein, D.J. & Peck, M.J.), *aff'd mem.,* 205 F.3d 1322 (2d Cir.2000).

Although the Court cannot consider new evidence, this Court may remand to the Commissioner to consider new evidence, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). The Second Circuit has summarized the three-part showing required by this provision as follows:

"[A]n appellant must show that the proffered evidence is (1) " 'new' and not merely cumulative of what is already in the record," and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative. The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently. Finally, claimant must show (3) good cause for her failure to present the evidence earlier."

*Jones v. Sullivan,* 949 F.2d 57, 60 (2d Cir.1991) (citations omitted) (quoting *Tirado v. Bowen,* 842 F.2d 595, 597 (2d Cir.1988)); *accord,e. g.,Morel v. Massanari,* 2001 WL 776950 at *8 & n.21 ( & cases cited therein).

In this case, the new doctors' evaluations are not material to Feliciano's claim because they are contradictory, and cover a period after the ALJ (and Appeals Council's) decision in this action, and thus are "not probative of plaintiff's condition during the period covered by the claim."*Casiano v. Apfel,* 39 F.Supp.2d at 331-32;*accord,Morel v. Massanari,* 2001 WL 776950 at *8 ( & cases cited therein). Accordingly, the Court need not remand to the Commissioner to consider this additional evidence. Feliciano may, however, file a new application for SSI benefits with the Social Security Administration based upon the new medical evidence that purports to show she is currently unable to work.

**18** *See,e.g.,Rodriguez v. Barnhart,* 04 Civ. 4514, 2005 WL 643190 at *9-12 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); *Jiang v. Barnhart,* 03 Civ. 0077, 2003 WL 21526937 at *10 (S.D.N.Y. July 8, 2003) (Peck, M.J.); *De Roman v. Barnhart,* 03 Civ. 0075, 2003 WL 21511160 at *11 (S.D.N.Y. July 2, 2003) (Peck, M.J.); *Acosta v. Barnhart,* 99 Civ. 1355, 2003 WL 1877228 at *11 (S.D.N.Y. Apr. 10, 2003) (Peck, M.J.); *Alvarez v. Barnhardt,* 02 Civ. 3121, 2002 WL 31663570 at *9 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.) (citing my prior cases), *report & rec. adopted,* 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003) (Martin, D.J.).

**19** *See also,e.g.,Rodriguez v. Barnhart,* 04 Civ. 4514, 2005 WL 643190 at *10 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); *De Roman v. Barnhart,* 03 Civ. 6372, 2003 WL 21511160 at *11 (S.D .N.Y. Nov. 14, 2003) (Peck, M.J.); *Acosta v. Barnhart,* 99 Civ. 1355, 2003 WL 1877228 at *11 (S.D.N.Y. Apr. 10, 2002) (Peck, M.J.) (citing my prior cases), *report and rec. adopted,*2003 WL 272063 (S.D.N.Y. Jan. 16, 2003) (Martin, D.J.).

**20** *Accord,e.g.,Rodriguez v. Barnhart,* 2005 WL 643190 at *10; *Jiang v. Barnhart,* 03 Civ. 0077, 2003 WL 21526937 at *10 (S.D.N.Y. July 8, 2003) (Peck, M.J.); *De Roman v. Barnhart,* 2003 WL 21511160 at *11; *Acosta v. Barnhart,* 2003 WL 1877228 at *11; *Alvarez v. Barnhart,* 2002 WL 31663570 at *9.

**21** *See also,e.g.,Rodriguez v. Barnhart,* 2005 WL 643190 at *10; *Jiang v. Barnhart,* 2003 WL 21526937 at *10; *De Roman v. Barnhart,* 2003 WL 21511160 at *11; *Acosta v. Barnhart,* 2003 WL 1877228 at *12; *Alvarez v. Barnhardt,* 2002 WL 31663570 at *9.

**22** The ALJ also found that Feliciano's dysthymia, borderline personality disorder and substance abuse in remission are non-severe impairments. (R. 13-14.) The Court will review this at the later stages of the five step sequence.

**23** *Accord,e.g.,Rodriguez v. Barnhart,* 04 Civ. 4514, 2005 WL 643190 at *10 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); *Jiang v. Barnhart,* 03 Civ. 0077, 2003 WL 21526937 at *11 (S.D.N.Y. July 8, 2003) (Peck, M.J.); *De Roman v. Barnhart,* 03 Civ. 0075, 2003 WL 21511160 at *12 (S.D.N.Y. July 2, 2003) (Peck, M.J.); *Acosta v. Barnhart,* 99 Civ. 1355, 2003 WL 1877228 at *13 (S.D.N.Y. Apr. 10, 2003) (Peck, M.J.); *Alvarez v. Barnhart,* 02 Civ. 3121, 2002 WL 31663570 at *9 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.) (citing my prior cases), *report & rec. adopted,* 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003) (Martin, D.J.).

**24** § 1.00(B)(2)(b) defines "ambulate" as:

Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities....

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1). § 1.00(B)(2)(b)(2) notes that:

To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to or from a place of employment or school.

Inability to perform fine and gross movements as defined as mobility to reach, push, pull, grasp and finger to be able to carry out activities of daily living. § 1.00(B)(2)(c).

**25** The appropriate sections provide:

§ 5.02 Recurrent upper gastrointestinal hemorrhage from undetermined cause with anemia manifested by hematocrit of 30 percent or less on repeated examinations.

§ 5.03 Stricture, stenosis, or obstruction of the esophagus (demonstrated by endoscopy or other appropriate medically acceptable imaging) with weight loss as described under listing 5.08.

§ 5.04 Peptic ulcer disease (demonstrated by endoscopy or other appropriate medically acceptable imaging). With:

A. Recurrent ulceration after definitive surgery persistent despite therapy; or

B. Inoperable fistula formation; or

C. Recurrent obstruction demonstrated by endoscopy or other appropriate medically acceptable imaging; or,

D. Weight loss as described under § 5.08.

26   20 C.F.R. §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii) both provide that:

Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.

27   In addition, Dr. Meadow, the consultative psychiatrist, concluded on March 19, 2002, that any mental impairment Feliciano may have would not prevent her from working. (R. 175.) The Court finds Dr. Meadow's report to be helpful, despite him being a consultative, and not a treating, physician. In light of the "treating physician's rule" and 20 C.F.R. 416.927(f)(2)(i), which states "administrative law judges must consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence ...," the Court accords the appropriate deference to the treating and consultative psychiatrists here.

---

**End of Document**                                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1289575
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Betty Jo GREWEN, Plaintiff,
v.
Carolyn W. COLVIN, Acting Commissioner
of Social Security, Defendant.

No. 1:11–CV–829 (FJS).
|
Signed March 27, 2014.

**Attorneys and Law Firms**

Legal Aid Society of Northeastern New York, Mary Martha
Withington, Esq., of Counsel, Saratoga Springs, NY, for
Plaintiff.

Social Security Administration, Office of Regional General,
Counsel—Region II, Andreea L. Lechleitner, Esq., of
Counsel, New York, NY, for Defendant.

**MEMORANDUM–DECISION AND ORDER**

SCULLIN, Senior District Judge.

### I. INTRODUCTION

**\*1** Currently before the Court are the parties' cross-motions
for judgment on the pleadings. *See* Dkt. Nos. 12–13.

### II. BACKGROUND

Plaintiff filed an application for Supplemental Security
Income benefits under Title XVI of the Social Security Act
and was given a protective filing date of October 17, 2007.
*See* Dkt. No. 9, Administrative Record ("AR") at 14, 52,
127–33, 141, 184, 218. Plaintiff also filed an application
for a period of disability and disability insurance benefits
under Title II of the Social Security Act and was given a
protective filing date of November 13, 2007. *See id.* at 14,
53, 124–26. The Social Security Administration denied these
applications by Notice of Disapproved Claim dated February
27, 2008. *See id.* at 55–60. On March 17, 2008, Plaintiff filed
a timely request for a hearing before an Administrative Law
Judge ("ALJ") to challenge the denial. *See id.* at 61.

On March 17, 2010, Plaintiff had a hearing before ALJ
Robert Ringler in Albany, New York. *See id.* at 14, 23,
25, 112–23. By decision dated March 26, 2010, the ALJ
denied Plaintiff's applications for a period of disability,
disability insurance benefits, and Supplemental Security
Income benefits. *See id.* at 11–22. In reaching his decision, the
ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Social
Security Act through December 31, 2011.

2. Plaintiff had engaged in substantial gainful activity at
certain times since May 27, 2007, the alleged onset date.

3. Plaintiff had the following severe impairments: vertigo,
obesity, headaches, and diplopia.

4. Plaintiff did not have an impairment or combination of
impairments that met or medically equaled one of the listed
impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff had the residual functional capacity ("RFC")
to perform medium work as defined by 20 C.F.R. §§
404.1567(c), 416.967(c), but, due to infrequent episodes
of dizziness, she would be unable to drive or work around
heights or heavy machinery. In addition, she could not
perform employment activities requiring strong visual
acuity.

6. Plaintiff was capable of performing past relevant work
as a retail sales/clerk because this work did not require the
performance of work-related activities precluded by her
RFC.

Based on these findings, the ALJ concluded that Plaintiff
had not been under a disability, as defined in the Social
Security Act, from May 27, 2007, through the date of the
ALJ's decision, March 26, 2010.

By letter dated May 18, 2010, Plaintiff made a timely request,
by certified mail, to the Appeals Council of the Social
Security Administration to review the ALJ's decision. *See* AR
at 8–10. By Notice of Appeals Council Action dated May 12,
2011, which Plaintiff's counsel received on May 19, 2011, the
Appeals Council denied Plaintiff's request for review. *See id.*
at 1–5. In support of her appeal, Plaintiff submitted additional
treatment records that she obtained from Neurological and
Stroke Care covering office visits between December 2, 2009,
and April 2, 2010. *See id* . at 2, 450–73. The Appeals Council
considered relevant evidence through the date of the ALJ

hearing, March 26, 2010. *See id.* at 2. However, information after the ALJ's decision did not affect the Appeals Council's decision regarding whether Plaintiff was disabled beginning on or before March 26, 2010. *See id.*

**\*2** Having exhausted her administrative remedies, Plaintiff commenced this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3), seeking review of Defendant's final decision. In support of her motion for judgment on the pleadings, Plaintiff argued that the ALJ erred in assessing her credibility and in finding that she could return to her past relevant work as a retail/sales clerk.

### III. DISCUSSION

**A. Standard of review**

*1. Correct legal principles and substantial evidence*
A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec 'y of Health & Human Servs.,* 906 F.2d 856, 860 (2d Cir.1990). In reviewing an ALJ's decision, the court employs a two-prong test. First, the court must decide if the ALJ applied the correct legal principles. *See Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir.2000) (citations omitted); *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979) (citations omitted); *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998) (quotation and other citation omitted).

The court must determine whether the ALJ applied the correct legal standards because

> [w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.

*Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987).

Accordingly, the court will not uphold an ALJ's decision if it is based on an erroneous view of the law. *See Grey v. Heckler,* 721 F.2d 41, 44 (2d Cir.1983). If the court determines that the ALJ applied the correct legal principles, the court must then decide whether "substantial evidence" supports the ALJ's findings. *See Johnson,* 817 F.2d at 985 (citation omitted); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "Substantial evidence" is evidence that amounts to " 'more than a mere scintilla,' " defined as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). Where evidence is deemed susceptible to more than one rational interpretation, the court must uphold the ALJ's conclusion. *See Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982) (citations omitted). If there is substantial evidence to support the ALJ's findings, the court must sustain those findings "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992) (citations omitted); *see also Schauer v. Schweiker,* 675 F.2d 55, 57 (2d Cir.1982) (citations omitted). In other words, the court must afford the ALJ's determination considerable deference and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec 'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984) (citation omitted).

*2. Five-step determination of disability*
**\*3** To be eligible for benefits, a claimant must show that he suffers from a disability within the meaning of the Act. The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A). In addition, a claimant's

> [p]hysical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other

kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work....

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In evaluating disability claims, the ALJ follows a five-step sequential evaluation process:

First, the [ALJ] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [ALJ] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [ALJ] will consider him disabled without considering vocational factors such as age, education, and work experience[.] ... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [ALJ] then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *see also* 20 C.F.R. §§ 404.1520, 416.920. "[T]he claimant bears the burden of proving disability at the first four steps." *Berry,* 675 F.2d at 467. If the claimant meets her burden, then the Commissioner has the burden of proof at the fifth step. *See id.*

## B. Whether the ALJ erred in assessing Plaintiff's credibility

It is the function of the ALJ, and not the court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec 'y of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983) (citing *Richardson v. Perales,* 402 U.S. at 399, 91 S.Ct. at 1426) (other citations omitted). Although the ALJ need not resolve every conflict in the record, " 'the crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence.'" *Calzada v. Astrue,* 753 F.Supp.2d 250, 269 (S.D.N.Y.2010) (quoting *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984) (citing *Treadwell v. Schweiker,* 698 F.2d 137, 142 (2d Cir.1983))) (other citations omitted).

**\*4** In determining the credibility of the claimant's statements, the ALJ must consider the entire record, including the objective medical evidence, the claimant's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the claimant, and any other relevant evidence in the record. *See* SSR 96–7p, 1996 WL 374186, *1 (July 2, 1996). However, it is not "require[d] that [the ALJ] have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Mongeur v. Heckler,* 722 F.2d 1033, 1040 (2d Cir.1983) (*per curiam* ) (citation omitted); *see also Miles v. Harris,* 645 F.2d 122, 124 (2d Cir.1981) (rejecting argument that the ALJ must explicitly reconcile every shred of conflicting testimony); *Barringer v. Comm'r of Soc. Sec.,* 358 F.Supp.2d 67, 79 (N.D.N.Y.2005) (stating that " 'an ALJ is not required to discuss all the evidence submitted, and [his] failure to cite specific evidence does not indicate that it was not considered' " (quoting *Craig v. Apfel,* 212 F.3d 433, 436 (8th Cir.2000))).

"The claimant's subjective complaints are an important element of the RFC calculus[.]" *Cornell v. Astrue,* 764 F.Supp.2d 381, 399 (N.D.N.Y.2010) (citing *Lewis v. Apfel,* 62 F.Supp. 648, 657–58 (N.D.N.Y.1999)); *Mimms v. Heckler,* 750 F.2d 180, 185 (2d Cir.1984) (citation omitted). However, "[s]ubjective symptomatology by itself cannot be the basis for a finding of disability." *Knighton v. Astrue,* 861 F.Supp.2d 59, 68 (N.D.N.Y.2012). A claimant must present medical evidence or findings that the existence of an underlying

condition could reasonably be expected to produce the symptoms alleged. *See* 42 U.S.C. §§ 423(d)(5)(A); 20 C.F.R. §§ 404.1529(b), 416.929; SSR 96–7p, 1996 WL 374186 (July 2, 1996); *Gernavage v. Shalala,* 882 F.Supp. 1413, 1420 n. 7 (S.D.N.Y.1995).

Although an ALJ "is required to take the claimant's reports of pain and other limitations into account," he is "not required to accept the claimant's subjective complaints without question[.]"*Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir.2010) (citations omitted). Rather, the ALJ "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record."*Id.* (citing *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979)); *Mimms,* 750 F.2d at 186 (quotation omitted). If the ALJ decides to reject subjective testimony concerning pain and other symptoms, he must do so explicitly and with sufficient specificity to enable the reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief and whether there is substantial evidence to support his determination. *See Tome v. Schweiker,* 724 F.2d 711, 713 (8th Cir.1984); *Valente,* 733 F.2d at 1045 (citations omitted). The ALJ may also find a claimant's statements, such as statements about the extent of functional limitations or restrictions due to pain or other symptoms, to be credible to a certain degree. *See*SSR 96–7p, 1996 WL 374186, at \*1.

**\*5** One strong indicator of the claimant's credibility is its consistency, both internally and with other information in the record. *See id.*The ALJ must consider such factors as the degree to which the claimant's statements are consistent with the objective medical evidence, the consistency of the claimant's own statements, and the consistency of the claimant's statements with other information in the record. *See id.*However, lack of consistency between a claimant's statements and other statements that she has made at other times does not necessarily mean that the claimant's statements are not credible. *See id.*

Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the claimant does not always assert the same intensity, persistence, or functional effects of his symptoms. *See id.*Therefore, the ALJ must review the record to determine if there are any explanations for any variations in the claimant's statements about her symptoms and their effects. *See id.*

The regulations establish a two-step procedure for evaluating a claimant's contentions of disability symptoms. *See*20 C.F.R. § 404.1529(c). First, the ALJ must determine whether the claimant suffers from a "medically determinable impairment [ ] that could reasonably be expected to produce" the level of pain or symptoms alleged. *Id.; see also*SSR 96–7p, 1996 WL 374186, at \* 1. Second, the ALJ must evaluate the intensity and persistence of the symptoms experienced, considering all of the available evidence and, in the event that the claimant's testimony about her pain is not substantiated by objective medical evidence, must engage in a credibility analysis. *See*20 C.F.R. § 404.1529(c)(3); *Meadors v. Astrue,* 370 F. App'x 179, 183–84 (2d Cir.2010). In making that assessment, the ALJ must consider seven factors: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness and side effects of any medication the claimant takes or has taken to alleviate her pain or other symptoms; (5) other treatment that the claimant receives or has received for relief of her pain or other symptoms; (6) other measures the claimant uses or has used to relieve her pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions resulting from her pain or other symptoms. *See*20 C .F.R. § 404.1529(c)(3)(i)-(vii); *Meadors,* 370 F. App'x at 186 n. 1.

In this case, Plaintiff contends that the ALJ committed reversible legal error by failing to apply the two-prong test outlined in SSR 96–7p, by failing to gather and consider highly probative evidence, and by improperly assessing Plaintiff's credibility. *See* Plaintiff's Brief at 14, 19, 25. In his decision, the ALJ explicitly noted that he was required to follow the two-step process outlined in SSR 96–7p. *See* AR at 70. Furthermore, contrary to Plaintiff's assertion, the ALJ undertook the appropriate two-prong analysis. In his decision, the ALJ relied on the objective medical evidence and Plaintiff's testimony about her headaches, dizziness, double vision, and fainting spells. *See id.* at 17–21, 31–44.When the ALJ reviewed Plaintiff's subjective complaints and her history of treatment, he noted that the totality of the medical evidence did not corroborate her complaints of limitation. *See id.* at 18–19.The ALJ also concluded that Plaintiff's wide range of activities described in her activities of daily living report undercut her credibility. *See id.* at 21.Furthermore, at the hearing, Plaintiff testified that she used a computer to socialize on Facebook, spent time with her daughters, and did household chores. *See id.* at 40, 43.

**\*6** Drawing on the extensive medical record and Plaintiff's testimony, the ALJ considered a battery of diagnostic tests that returned normal results in assessing the location, duration, and intensity of Plaintiff's symptoms. *See id.* at 17–19.The ALJ also gave substantial weight to the opinion evidence of Drs. Puri and Parmar. *See id.* at 21.Although Dr. Puri was a medical consultant, his opinion can constitute substantial evidence. *See Mongeur,* 722 F.3d at 1039.Plaintiff also testified about the alleged onset date of her symptoms, the eleven-month remission period following her gastric bypass surgery, and the alleged recurrence of her symptoms. *See* AR at 31–34.

The ALJ also considered the medications, treatments, and other measures Plaintiff used to alleviate her symptoms. The ALJ noted that Dr. Kaplan prescribed Darvocet. *See id.* at 17.At the administrative hearing, Plaintiff testified that she had been prescribed Topamax and Toprol to no effect. *See id.* at 42.Moreover, the ALJ noted that Plaintiff had undergone gastric bypass surgery in May 2008 and a steroid block of the right zygomaticotemporal nerve on October 1 and October 22, 2009. *See id.* at 17, 19, 39.Plaintiff also testified that her double vision was under control due to her prescription glasses, which were outfitted with prisms. *See id.* at 36–38.

Assessing all this evidence, the ALJ evaluated Plaintiff's credibility and concluded she was less than credible due to improbabilities and inconsistencies in her testimony at the administrative hearing. *See id.* at 21.In his decision, the ALJ was explicit and specific in identifying his rationale regarding his credibility assessment. *See id.*At the hearing, Plaintiff testified that she had fainted one to three times a day for approximately the last year, with each episode of unconsciousness lasting fifteen to twenty minutes. *See id.* at 20, 34.Plaintiff further testified that she only fainted at home and never injured herself. *See id.* at 20–21, 35.The ALJ noted that this statement was directly in tension with Plaintiff's statement to Dr. Parmar that she fainted one to three times monthly. *See id.* at 21.Although Plaintiff claims that her symptoms exacerbated in the period leading up to the administrative hearing, *see* Plaintiff's Brief at 22–23, there is still temporal overlap in Plaintiff's inconsistent statements. However, despite finding Plaintiff not fully credible, the ALJ did take into consideration Plaintiff's complaints about headaches, dizziness, and diplopia. *See id.* at 15.The ALJ also limited Plaintiff to work that did not entail driving, working around heights or heavy machinery and activities involving strong visual acuity. *See id.*

Finally, Plaintiff contends that, due to her good work history, she is entitled to substantial credibility. *See id.* at 21.To be sure, "a good work history may be deemed probative of credibility[.]"*Schaal v. Apfel,* 134 F.3d 496, 502 (2d Cir.1998); *see also Rivera,* 717 F.2d at 725 (noting that evidence of a good work record is evidence of credibility (citation omitted)). Work history, however, is "just one of many factors" that an ALJ considers in assessing credibility. *Schaal,* 134 F.3d at 502.

**\*7** Reviewing the record as a whole, it is clear that there is substantial evidence in the record to support the ALJ's assessment of Plaintiff's credibility.

## C. Whether the ALJ erred in finding that Plaintiff could return to her past relevant work as a retail/sales clerk

If a claimant's impairment or combination of impairments fails to meet or medically equal the criteria of an impairment listed in 20 C .F.R. Part 404, Subpart P, Appendix 1, *see*20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(c), 416.925, the ALJ must determine whether the claimant has the RFC to perform the requirements of her past relevant work. *See*20 C.F.R. §§ 404.1520(f), 416.920(f). Individuals retain the capacity to perform their past relevant work when they can perform the functional demands and duties of the job as they actually performed it or as generally performed throughout the national economy. *See Halloran v. Barnhart,* 362 F.3d 28, 33 (2d Cir.2004) (stating that "[t]he inquiry in Social Security benefit cases is not whether the claimant is able to perform the duties of her previous job, but whether the claimant is able to perform the duties associated with her previous 'type' of work" (citation omitted)); *Jasinski v. Barnhart,* 341 F.3d 182, 185 (2d Cir.2003); *Jock v. Harris,* 651 F.2d 133, 135 (2d Cir.1981)."[W]ork exists in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country."20 C .F.R. §§ 404.1566(a), 416.966(a). Even if a claimant cannot work the equivalent of eight hours a day for five days a week, "[p]art-time work that was of substantial gainful activity, performed within the past 15 years, and lasted long enough for the person to learn to do it constitutes past relevant work...."SSR 96–8p, 1996 WL 374184, \*8 n. 2 (July 2, 1996). The claimant has the burden to show that she cannot perform past relevant work. *See Ferraris,* 728 F.2d at 584.

Prior to step four, an ALJ must assess a claimant's RFC. *See*20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's RFC is defined as what an individual can still do despite

her limitations after taking into account all of her medically determinable impairments that limit her ability to perform work-related tasks. *See* 20 C.F.R. §§ 404.1545(a)(1)-(2), 416.945(a)(1)-(2). In making the RFC determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptoms, including pain, and other limitations that could interfere with work activities on a regular and continuing basis. *See Martone v. Apfel,* 70 F.Supp.2d 145, 150 (N.D.N.Y.1999) (citing [20 C.F.R.] §§ 404.1545, 416.945). The ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and the claimant's subjective evidence of symptoms. *See* 20 C.F.R. § 404.1545(b); 20 C.F.R. Pt. 404, Subpart P, Appendix 2, § 200.00(e)." 'It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of Social Security disability.'" *Williams v. Astrue,* No. 3:06–CV–1355, 2011 WL 831426, *11 (N.D.N.Y. Mar.3, 2011) (quoting *Dunn v. Comm'r of Soc. Sec.,* 2010 U.S. Dist. LEXIS 136484, 2010 WL 5437250 (N.D.N .Y. November 18, 2010)) (citing 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(f)(2), 416.912(b)(6), 416.913(c) and 416.927(f)(2)). If an ALJ relies on a nonexamining reviewer's opinion, that opinion must be supported by the other evidence in the record. *See* SSR 96–6p, 1996 WL 374180 (July 2, 1996); *Rocchio v. Astrue,* No. 08 Civ. 3796, 2010 WL 5563842, *14 (S.D.N.Y. Nov.10, 2010).

**\*8** In this case, the ALJ concluded that Plaintiff had the RFC to perform medium work, *see* AR at 18, defined as "involvi[ing] lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c). In considering the evidence in the light most favorable to Plaintiff, the ALJ found Plaintiff's obesity and other issues prevented her from performing work activities above the medium exertional level. *See* AR at 18 n. 2. The ALJ further limited Plaintiff's RFC; due to infrequent episodes of dizziness, she would be unable to drive, work around heights or heavy machinery, or perform employment activities requiring strong visual acuity. *See id.* at 18.After reviewing the medical evidence, the expert opinion evidence, and Plaintiff's testimony, the ALJ concluded that Plaintiff was capable of performing her past relevant work as a retail/sales clerk as actually and generally performed. *See id.* at 21.

Plaintiff contends that a position as a retail/sales clerk would expose her to bright lights and loud noises that are triggers

for her symptoms. *See* Plaintiff's Brief at 23–24. Therefore, she argues that resuming work as a retail/sales clerk would be far from the comfort that is required to alleviate her symptoms. *See id.* at 24.To support her position, Plaintiff points to a note that her primary provider, Dr. Hickey, wrote in which she concluded that Plaintiff must be out of work indefinitely for evaluation of headaches. *See id.* at 22; AR at 395. However, a physician's statement that an individual is or is not disabled or that she can or cannot work is a statement on an issue reserved for the ALJ. *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); *Snell,* 177 F.3d at 133 (quotation omitted). Moreover, the opinion of a treating physician as to the nature and severity of an impairment is entitled to controlling weight only if it is "well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record[.]" 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96–2p, 1996 WL 374188, * 1 (July 2, 1996). This note merely stated that Plaintiff should be out of work while she underwent examination for headaches, not that Plaintiff had functional limitations that precluded all work. Moreover, Dr. Hickey's note was neither supported by treatment notes nor clinical findings, nor consistent with the administrative record, including the examination findings of other physicians and diagnostic tests. Therefore, the ALJ did not err in not affording Dr. Hickey's opinion controlling weight.

Plaintiff also testified that her position at Walmart entailed standing rather than sitting and lifting a maximum of thirty pounds. *See* AR at 29. Moreover, Plaintiff did not mention that the job entailed using machinery, working around heights, or requiring significant visual acuity. Furthermore, the Department of Labor describes a salesperson of cosmetics and toiletries as being quiet, light work that neither involves moving machinery or heights. In light of Plaintiff's medical record, medical opinion evidence, and Plaintiff's testimony, the Court finds that there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff was capable of performing her past relevant work as a retail/sales clerk. Furthermore, the Court concludes that, based on the entire record, the ALJ properly assessed Plaintiff's RFC.

## IV. CONCLUSION

**\*9** After reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion for judgment on the pleadings is **DENIED,** and Defendant's motion for judgment on the pleadings is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendant and close this case.

**IT IS SO ORDERED.**

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 4542701
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Valerie L. HAMMOND, Plaintiff,

v.

Carolyn W. COLVIN, Acting Commissioner
of Social Security, [1] Defendant.

No. 1:12–CV–965.   |   Aug. 26, 2013.

**Attorneys and Law Firms**

Peter M. Margolius, Office of Peter M. Margolius, Catskill,
NY, for Plaintiff.

Sandra M. Grossfeld, Social Security Administration, Office
of Regional General Counsel, New York, NY, for Defendant.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

 **\*1** This matter was referred to the Hon. Victor E.
Bianchini, United States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and Rule
72.3(d) of the Local Rules of the Northern District of New
York. In a Report and Recommendation dated July 10, 2013
[dkt. # 15], Magistrate Judge Bianchini recommended that
the Defendant's Motion for Judgment on the Pleadings be
GRANTED and that Plaintiff's Motion for Judgment on the
Pleadings be DENIED. No objections to the Report and
Recommendation have been lodged and the time for filing
objections has expired.

After examining the record, this Court has determined that the
Report and Recommendation is not subject to attack for plain
error or manifest injustice. Accordingly, this Court adopts the
Report and Recommendation for the reasons stated therein.

Therefore, Defendant's Motion for Judgment on the Pleadings
is **GRANTED** and Plaintiff's Motion for Judgment on the
Pleadings is **DENIED.** The Commissioner's decision denying
disability benefits is **AFFIRMED** for the reasons stated in
Magistrate Judge Bianchini's recommendation.

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION

VICTOR E. BIANCHINI, United States Magistrate Judge.

### I. INTRODUCTION

In July of 2010, Plaintiff Valerie Hammond applied for
Supplemental Security Income ("SSI") benefits and disability
insurance benefits ("DIB") under the Social Security Act.
Plaintiff alleges that she has been unable to work since
May of 2010 due to physical and emotional impairments.
The Commissioner of Social Security denied Plaintiff's
applications.

Plaintiff, by and through her attorney, Peter M. Margolius,
Esq., commenced this action seeking judicial review of the
Commissioner's denial of benefits pursuant to 42 U.S.C. §§
405(g) and 1383(c)(3).

On March 22, 2013, the Honorable Gary L. Sharpe, Chief
United States District Judge, referred this case to the
undersigned for a Report and Recommendation pursuant to
28 U.S.C. § 636(b)(1)(A) and (B). (Docket No. 14).

### II. BACKGROUND

The relevant procedural history may be summarized as
follows: Plaintiff applied for SSI benefits and DIB on July
27, 2010, alleging disability beginning on May 6, 2010. (T at
106–109, 110–116). [1] The applications were denied initially
and Plaintiff requested a hearing before an Administrative
Law Judge ("ALJ"). A hearing was held on August 29, 2011,
in Albany, New York before ALJ Dale Black–Pennington.
(T at 30). Plaintiff, represented by counsel, appeared and
testified. (T at 34–52). On September 23, 2011, ALJ Black–
Pennington issued a written decision denying Plaintiff's
applications. (T at 16–29). The ALJ's decision became the
Commissioner's final decision on May 4, 2012, when the
Appeals Council denied Plaintiff's request for review. (T at
1–6).

Plaintiff, through counsel, timely commenced this action on
June 14, 2012. (Docket No. 1). The Commissioner interposed
an Answer on October 1, 2012. (Docket No. 7). Plaintiff filed
a supporting Brief on November 14, 2012. (Docket No. 10).

The Commissioner filed a Brief in opposition on February 21, 2013. (Docket No. 13).

**\*2** Pursuant to General Order No. 18, issued by the Chief District Judge of the Northern District of New York on September 12, 2003, this Court will proceed as if both parties had accompanied their briefs with a motion for judgment on the pleadings. [2]

For the reasons that follow, it is recommended that Plaintiff's motion be denied, the Commissioner's motion be granted, and that this case be dismissed.

### III. DISCUSSION

#### A. Legal Standard

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.,* 906 F.2d 856, 860 (2d Cir.1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *see Grey v. Heckler,* 721 F.2d 41, 46 (2d Cir.1983); *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford

the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984).

The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act. *See* 20 C.F.R. §§ 416.920, 404.1520. The United States Supreme Court recognized the validity of this analysis in *Bowen v. Yuckert,* 482 U.S. 137, 140–142, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled. [3]

While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step. *See Bowen,* 482 U.S. at 146 n. 5; *Ferraris v. Heckler,* 728 F.2d 582 (2d Cir.1984).

**\*3** The final step of the inquiry is, in turn, divided into two parts. First, the Commissioner must assess the claimant's job qualifications by considering his or her physical ability, age, education, and work experience. Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 416.920(g); 404.1520(g); *Heckler v. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).

#### B. Analysis

#### 1. Commissioner's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date (May 6, 2010) and met the insured status requirements of the Social Security Act through December 31, 2014. (T at 21). The ALJ found that Plaintiff's degenerative disc disease of the lumbar spine was a severe impairment. (T at 21). However, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments found in 20 CFR Part 404, Subpart P, Appendix 1 (the "Listings"). (T at 22).

The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform the full range of sedentary work, as defined in 20 CFR § 404.1567(a) and 416.967(a). (T at 22–24). The ALJ concluded that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. (T at 23).

The ALJ found that Plaintiff was unable to perform her past relevant work as a certified nursing assistant. (T at 24).

Considering Plaintiff's age (39 years old on the alleged onset date), education (high school), work experience, and RFC, the ALJ concluded that there were jobs that exist in significant numbers in the national economy that Plaintiff can perform. (T at 25). As such, the ALJ found that Plaintiff had not been under a disability, as defined under the Social Security Act, from the alleged onset date (May 6, 2010) to the date of her decision (September 23, 2011). (T at 25–26).

As noted above, the ALJ's decision became the Commissioner's final decision on May 4, 2012, when the Appeals Council denied Plaintiff's request for review. (T at 1–6).

**2. Plaintiff's Claims**

Plaintiff contends that the Commissioner's decision should be reversed. She offers three (3) principal arguments in support of this position. First, Plaintiff contends that the Appeals Council should have remanded based on new evidence. Second, she argues that the ALJ's RFC determination is not supported by substantial evidence. Third, Plaintiff argues that the ALJ did not give adequate consideration to medication side effects. This Court will address each argument in turn.

**a. Appeals Council**

Under the Social Security Act, a claimant may "submit new and material evidence to the Appeals Council when requesting review of an ALJ's decision." 20 C.F.R. §§ 404.970, 416.1470; *see also Perez v. Chater,* 77 F.3d 41, 44 (2d Cir.1996). To obtain a review of the additional evidence, the claimant must establish that "the proffered evidence is (1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative." *Sergenton v. Barnhart,* 470 F.Supp.2d 194, 204 (E.D.N.Y.2007) (citing *Lisa v. Sec'y of Health & Human Servs.,* 940 F.2d 40, 43 (2d Cir.1991)).

**\*4** Evidence is "material" if there is "a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently." *Id.* If the Appeals Council fails to consider new, material evidence, "the proper course for the reviewing court is to remand the case for

reconsideration in light of the new evidence." *Shrack v. Astrue,* 608 F.Supp.2d 297, 302 (D.Conn.2009).

Plaintiff submitted evidence from Northeast Orthopaedics to the Appeals Council. According to the additional medical records, Plaintiff presented to Dr. John Whalen, her treating physician, in October of 2011 with complaints of neck pain, which she reported began following a motor vehicle accident in July of 2005. (T at 355). Plaintiff had noticed an increase in neck pain since August of 2011, as she increased her activity level following previous back surgery.[4] (T at 355). Her symptoms were described as "tingling pain as well as an ache and burning sensation," with some periods of dizziness and lightheadedness. (T at 355). Dr. Whalen diagnosed cervical spondylosis and recommended physical therapy and an MRI. (T at 356). Following an MRI and flexion and extension cervical radiographs, Dr. Whalen confirmed advanced spondylosis at C5–6 and small central disk bulge or protrusion at C6–7. (T at 351). He recommended surgery and Plaintiff consented. (T at 352).

On November 2, 2011, Dr. Whalen performed an anterior cervical discectomy and decompression C5–6, an anterior cervical fusion C5–6, anterior instrumentation C5–6; and vein repair. (T at 343). In a December 2011 post-operative treatment note, Dr. Whalen described Plaintiff as "doing reasonably well," with "some pain" in the posterior aspect of her shoulder and "some cramping" in the hand with writing, but no "shooting pain" in her arm. (T at 340).

The Appeals Council indicated that had considered this new evidence, but found it did not provide a basis for changing the ALJ's decision. (T at 1–2, 4). Plaintiff challenges the Appeals Council's finding, arguing that the new evidence concerning Plaintiff's neck pain provided a basis for revisiting the ALJ's decision.

This Court finds no reversible error in the Appeals Council's conclusion. Plaintiff did not allege a neck impairment in her application for benefits. (T at 141). During the administrative hearing, Plaintiff testified that she had been having problems with her neck "for the last few weeks." (T at 40). Dr. Whalen reported that Plaintiff had been treated only once in five (5) years for neck pain. (T at 355). Although Plaintiff reported increased neck pain in August of 2011 and was examined by Dr. Whalen in October of that year, there is no evidence that Plaintiff's neck pain was disabling (either alone or in combination with Plaintiff's other impairments) during the

period prior to the ALJ's decision, which was rendered on September 23, 2011.

It is also not clear that Plaintiff's neck condition would satisfy the Social Security Regulations' durational requirement even with respect to the period after the ALJ's decision. Dr. Whalen reported that Plaintiff was "doing reasonably well postoperatively" and indicated that he would keep her "out of work until her next visit in a couple of months ...." (T at 340).*See* 20 C.F.R. §§ 404.1509, 416.909 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Accordingly, the Appeals Council reasonably concluded that the additional evidence did not provide a basis for changing the ALJ's decision.

**b. RFC**

**\*5** Residual functional capacity ("RFC") is defined as: "what an individual can still do despite his or her limitations." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.*

When making a residual functional capacity determination, the ALJ considers a claimant's physical abilities, mental abilities, symptomatology, including pain and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a). An RFC finding will be upheld when there is substantial evidence in the record to support each requirement listed in the regulations. *LaPorta v. Bowen,* 737 F.Supp. 180, 183 (N.D.N.Y.1990).

The ALJ determined that Plaintiff retained the RFC to lift/carry 20 pounds occasionally and 5 to 10 pounds frequently; occasionally push/pull no more than 10 pounds; walk in 1–hour intervals up to a total of 2 hours in an 8–hour workday; stand with the ability to move about for intervals up to 1 hour for a maximum of 2 hours in an 8–hour workday, and sit in 45 minute intervals with the ability to move about for up to 6 hours in an 8–hour workday. (T at 22–23). The ALJ found that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, or crawl. (T at 23).

The ALJ afforded controlling weight to an opinion provided Dr. Whalen, Plaintiff's treating physician. (T at 23). Plaintiff agrees with the ALJ that Dr. Whalen's opinion was entitled to controlling weight,[5] but contends that Dr. Whalen's opinion was actually more restrictive that the ALJ's RFC assessment. For example, in May of 2011, Dr. Whalen opined that Plaintiff was restricted to lifting no more than 10 pounds. (T at 305). The ALJ concluded that Plaintiff could lift/carry 20 pounds occasionally. (T at 305). Dr. Whalen found that Plaintiff could not sit without changing positions for more than 30 to 45 minutes. (T at 305). The ALJ determined that Plaintiff could sit for 45 minute intervals. (T at 22). Dr. Whalen opined that Plaintiff had a "total temporary disability" (T at 305), while the ALJ concluded that Plaintiff could perform the full range of sedentary work. (T at 22).

This Court finds Plaintiff's argument unavailing. The ALJ afforded Dr. Whalen's opinion "controlling weight" and incorporated his limitations into the RFC determination. (T at 23). This does not mean the ALJ was obliged to adopt Dr. Whalen's opinion in each and every one of its particulars. The RFC determination is supported by and generally consistent with Dr. Whalen's opinion and the other evidence of record. This is sufficient to sustain the ALJ's assessment under the deferential standard of review applicable here. *See Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir.2008) ("On appeal, we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.") (quoting *Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir.2000)).

**\*6** The ALJ's conclusion that Plaintiff could lift 20 pounds occasionally was supported by Plaintiff's own testimony, wherein she testified that she can lift that much weight. (T at 39). Moreover, sedentary work only requires lifting 10 pounds. *See* 20 CFR § 404.1567(a). As such, the RFC determination could still be sustained even if the ALJ adopted Dr. Whalen's more restrictive finding. Dr. Amelita Balagtas, an orthopedic consultative examiner, assessed "moderate limitations" with regard to lifting, which is consistent with the ALJ's conclusion and provides further support for the RFC determination.[6] (T at 250).

The ALJ's conclusion that Plaintiff could sit for 45 minute intervals without changing positions is generally consistent with Dr. Whalen's 30–45 minute assessment (T at 305). It is also supported by Dr. Balagtas's conclusion that Plaintiff had a "moderate" limitation as to prolonged sitting (T at

250). Plaintiff's testimony regarding her activities of daily living, which included car rides and other activities (e.g. church attendance) involving prolonged sitting, provides further support for the ALJ's determination. (T at 40, 46, 49).*See* *Proper v. Astrue,* 10–CV–1221, 2012 WL 1085812, at *14 (N.D.N.Y. Feb.28, 2012) ("The regulations do not mandate the presumption that all sedentary jobs in the United States require the worker to sit without moving for six hours, trapped like a seat-belted passenger in the center seat on a transcontinental flight.") (quoting *Halloran v. Barnhart,* 362 F.3d 28, 33 (2d Cir.2008)).

With regard to Dr. Whalen's assessment of "total temporary disability" (T at 305), that opinion was rendered in the worker's compensation context, which relies on different standards than those applied to applications for Social Security benefits. *See* *Rosado v. Shalala,* 868 F.Supp. 471, 473 (N.D.N.Y.1994); *see also* *Crow v. Comm'r of Soc. Sec.,* No.01–CV–1579, 2004 WL 1689758, at *3 (N.D.N.Y. July 20, 2004) (the ALJ was not required to adopt a treating physician's opinion that Plaintiff was "totally" disabled, in part, because "the opinions were rendered in the context of [claimant's] W[orkers'] C [ompensation] claim, which is governed by standards different from the disability standards under the Social Security Act"). Moreover, the disability determination is ultimately reserved to the Commissioner. 20 C.F.R. § 404.1527(e); SSR 96–5p.

In sum, this Court does not find any material conflict between Dr. Whalen's assessment and the RFC determination. To the extent the ALJ's RFC finding is arguably less restrictive than Dr. Whalen's opinion, the assessment made by the ALJ after weighing the medical evidence is supported by substantial evidence and must therefore be sustained. *See* *White v. Comm'r of Social Security,* No. 06–CV–0564, 2008 WL 3884355, at *11 (N.D.N.Y. Aug. 18, 2008) ("Conflicts in evidence ... are for the Commissioner to resolve.") (citing *Fiorello v. Heckler,* 725 F.2d 174, 176 (2d Cir.1983)). Where the Commissioner's decision "rests on adequate findings supported by evidence having rational probative force, [the Court] will not substitute [its] judgment for that of the Commissioner."*Id.*

### c. Credibility

**\*7** A claimant's subjective complaints are an important element in disability claims, and must be thoroughly considered. *See* *See* *Ber v. Celebrezze,* 332 F.2d 293, 298, 300 (2d Cir.1964). Further, if claimant's testimony regarding pain and limitations is rejected or discounted, the ALJ must

be explicit in the reasons for rejecting the testimony. *See* *Brandon v. Bowen,* 666 F.Supp. 604, 609 (S.D.N.Y.1997).

However, subjective symptomatology by itself cannot be the basis for a finding of disability. A claimant must present medical evidence or findings that the existence of an underlying condition could reasonably be expected to produce the symptomatology alleged. *See*42 U.S.C. §§ 423(d)(5)(A), 1382c (a)(3)(A); 20 C.F.R. §§ 404.1529(b), 416.929; SSR 96–7p; *Gernavage v. Shalala,* 882 F.Supp. 1413, 1419 (S.D.N.Y.1995).

"An administrative law judge may properly reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence."*Lewis v. Apfel,* 62 F.Supp.2d 648, 651 (N.D.N.Y.1999) (internal citations omitted).

To this end, the ALJ must follow a two-step process to evaluate the plaintiff's contention of pain, set forth in SSR 96–7p:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) ... that could reasonably be expected to produce the individual's pain or other symptoms ....

> Second, ... the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities ....

According to 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii), if the plaintiff's pain contentions are not supported by objective medical evidence, the ALJ must consider the following factors in order to make a determination regarding the plaintiff's credibility:

1. [Plaintiff's] daily activities;

2. The location, duration, frequency and intensity of [Plaintiff's] pain or other symptoms;

3. Precipitating and aggravating factors;

4. The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate ... pain or other symptoms;

5. Treatment, other than medication [Plaintiff] receive[s] or ha[s] received for relief of ... pain or other symptoms;

6. Any measure [Plaintiff] use[s] or ha[s] used to relieve ... pain or other symptoms;

7. Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

If the ALJ finds that the plaintiff's pain contentions are not credible, he or she must state his reasons "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Young v. Astrue,* No. 7:05–CV–1027, 2008 WL 4518992, at *11 (N.D.N.Y. Sept.30, 2008) (quoting *Brandon v. Bowen,* 666 F.Supp. 604, 608 (S.D.N.Y.1987)).

**\*8** In this case, Plaintiff testified that her pain medication (Flexeril) causes side effects, including drowsiness and "fogginess," which makes it difficult to concentrate, and blurred vision. (T at 40, 41–42).

The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that her statements regarding the intensity, persistence, and limiting effects of those symptoms were not fully credible. (T at 24). Plaintiff challenges the ALJ's credibility determination, arguing that greater consideration should have been given to her medication side effects.

However, "[i]t is the function of the [Commissioner], not [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Secretary of Health and Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983) (citations omitted). If there is substantial evidence in the record to support the Commissioner's findings, "the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Aponte v. Sec'y, Dep't of Health & Human Servs.,* 728 F.2d 588, 591 (2d Cir.1984) (citations omitted). Further, the ALJ has the benefit of directly observing a claimant's demeanor and other indicia of credibility, which thus entitles the ALJ's credibility assessment to deference. *See Tejada v. Apfel,* 167 F.3d 770, 776 (2d Cir.1999) (citing *Pascariello v. Heckler,* 621 F.Supp. 1032, 1036 (S.D.N.Y.1985)); *see also Snell v. Apfel,* 177 F.3d 128, 135 (2d Cir.1999).

The Court finds that the ALJ properly exercised his discretion to evaluate the credibility of Plaintiff's testimony and rendered an independent judgment regarding the extent of Plaintiff's subjective complaints based on the objective medical and other evidence. *See e.g. Mimms v. Sec'y of Health and Human Servs.,* 750 F.2d 180, 196 (2d Cir.1984). As discussed above, the ALJ's RFC determination was supported by the opinions of Plaintiff's treating physician, the orthopedic consultative examiner, and Plaintiff's activities of daily living. Plaintiff has not pointed to any evidence (other than her subjective complaints) to substantiate her claim of significant side effects. The contemporaneous treatment notes do not document any complaints or treatment regarding such side effects. In fact, following her back surgery in 2010, Plaintiff was described as taking Flexeril "occasionally" and "doing reasonably well" albeit with ongoing complaints of back pain. (T at 315, 317, 322). Plaintiff reported using Flexeril to Dr. Balagtas, the consultative examiner, but did not complain of side effects. (T at 248).

There is no question that Plaintiff lives with pain, as the record documents frequent complaints and treatment. However, "disability requires more than mere inability to work without pain. To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment. Otherwise, eligibility for disability benefits would take on new meaning." *Dumas v. Schweiker,* 712 F.2d 1545, 1552 (2d Cir.1983). Moreover, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence [of disability]." 42 U.S.C. § 423(d)(5)(A). For the foregoing reasons, this Court finds that the ALJ's credibility assessment is supported by substantial evidence and should be sustained.

## IV. CONCLUSION

**\*9** After carefully reviewing the administrative record, this Court finds substantial evidence supports the Commissioner's decision, including the objective medical evidence and supported medical opinions. The ALJ examined the record, afforded appropriate weight to the medical evidence, including the assessments of Plaintiff's treating provider and the consultative examiner and afforded the subjective claims of symptoms and limitations an appropriate weight when rendering her decision that Plaintiff is not disabled. This Court finds no reversible error and because substantial evidence supports the Commissioner's decision, this Court recommends that the Commissioner be GRANTED judgment

on the pleadings and that Plaintiff's motion for judgment on the pleadings be DENIED.

### V. ORDERS

Pursuant to 28 USC § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as NDNY Local Rule 72.1(c).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *F.D.I.C. v. Hillcrest Associates,* 66 F.3d 566 (2d. Cir.1995); *Wesolak v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/ or evidentiary material *which could have been, but were not,* presented to the Magistrate Judge in the first instance. *See Patterson–Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

SO ORDERED.

### Footnotes

1    On February 14, 2013, Carolyn W. Colvin took office as Acting Social Security Commissioner. The Clerk of the Court is directed to substitute Acting Commissioner Colvin as the named defendant in this matter pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure

1    Citations to "T" refer to the Administrative Transcript. (Docket No. 8).

2    General Order No. 18 provides, in pertinent part, that "[t]he Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings."

3    This five-step process is detailed as follows:

    First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.

    If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

    If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.

    If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

    Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

    Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

    *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam); *see also Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999); 20 C.F.R. §§ 416.920, 404.1520.

4    Plaintiff's back pain was the result of a 2005 lifting injury at work. (T at 248). She had surgery to address low back pain in November of 2010. (T at 355). The alleged neck pain appears to arise from an unrelated 2005 motor vehicle accident. (T at 355).

5    Under the "treating physician's rule," the ALJ must give controlling weight to the treating physician's opinion when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); *Halloran v. Barnhart,* 362 F.3d 28, 31–32 (2d Cir.2004); *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir.2000).

Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it "extra weight" under certain circumstances. In this regard, the ALJ should consider the following factors when determining the proper weight to afford the opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the court.C.F.R. § 404.1527(d) (1)-(6); see also *Shaw,* 221 F.3d at 134; *Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir.1998); *Schaal v. Apfel,* 134 F.3d 496, 503 (2d Cir.1998).

6    An ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability. *See* 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(f)(2), 416.912(b)(6), 416.913(c), and 416.927(f)(2); *see also Leach ex. Rel. Murray v. Barnhart,* No. 02 Civ. 3561, 2004 WL 99935, at 9 (S.D.N.Y. Jan.22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.").

---

2010 WL 2243343
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Lee R. METZ, Plaintiff,

v.

Michael J. ASTRUE, Commissioner
of Social Security,[1] Defendant.

No. 1:06–CV–1509 (FJS/
DRH). | April 21, 2010.

West KeySummary

**1** **Social Security**

👉 Credibility of claimant

ALJ's credibility assessment in proceeding
denying supplemental security income (SSI)
and disability insurance benefits (DIB) under
the Social Security Act to a claimant alleging
disability due to a learning disability, a slipped
disc in his back, and depression was supported
by substantial evidence. In determining that
the degree of pain alleged by claimant was
suspect, the ALJ noted that claimant was able
to work despite his pain, that he lacked the
motivation to work, as was confirmed by his
job coach, and that his medications and wide array
of daily activities were inconsistent with his
subjective complaints of pain. Moreover, none of
the physicians found significant pathology with
respect to his musculoskeletal complaints and
claimant had a history of abusing pain killers and
had engaged in drug-seeking behaviors.

6 Cases that cite this headnote

**Attorneys and Law Firms**

Tobin & Dempf LLP, R. Christopher Dempf, Esq., of
Counsel, Albany, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney for the
Northern District of New York, Andreea L. Lechleitner,

Esq., Special Assistant United States Attorney, of Counsel,
Syracuse, NY, for Defendant.

**REPORT AND RECOMMENDATION**[2]

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff Lee R. Metz ("Metz") brought this action
pursuant to 42 U.S.C. § 405(g) seeking review of a decision
by the Commissioner of Social Security ("Commissioner")
denying his application for Social Security disability
insurance benefits ("DIB") and supplemental security income
("SSI") under the Social Security Act ("Act"), 42. U.S.C. §
401 et seq. Docket No. 1. Metz moves for a finding that he is
entitled to DIB and SSI under the Act or, in the alternative,
for a remand. Metz also seeks an award of attorney's fees
under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)
alleging that the Commissioner's action in this case was not
substantially justified.Docket No. 1. The Commissioner filed
an answer asserting that substantial evidence supported his
findings and determination that Metz was not disabled during
the relevant period.[3] Docket No. 6. The Commissioner cross-
moves for a judgment on the pleadings. Docket No. 15.For
the reasons which follow below, the Court recommends that
the Commissioner's decision be affirmed.

**I. Procedural History**

On May 16, 2002, Metz filed concurrent applications for
DIB and SSI pursuant to the Act. *See* T. 82.[4] On August 19,
2002, the Social Security Administration ("Administration")
notified Metz that they had reviewed his application and
determined that he did not qualify for benefits on either claim.
T. 36–40. On October 20, 2002, Metz requested a hearing
before an administrative law judge ("ALJ"). T. 41. On May
17, 2003, the Administration notified Metz that they had
received his request for a hearing before an ALJ. T. 43–44. On
February 25, 2004, Metz appeared with counsel at the hearing
and testified before the ALJ. T. 64. On May 24, 2004, the ALJ
notified Metz that he had reached an unfavorable decision
with respect to his application for disability benefits. T. 61–
63.

On May 27, 2004, Metz requested a review of the ALJ's
decision. T. 77–78. On October 29, 2004, the Appeals
Council vacated the ALJ's decision and remanded the case to
the ALJ pursuant to 20 C.F.R. §§ 404.977 and 416.1477 to (1)

address Metz's concurrent application for SSI, which the ALJ did not consider in his initial decision; (2) further develop the record with respect to any medically determinable physical impairments; and (3) reassess the severity of his physical and mental impairments under Social Security Ruling ("S.S.R.") 85–28 as well as the limiting effects of his physical and mental impairments under S.S.R. 85–16 and S.S.R. 96–8p. The Appeals Council also directed the ALJ to issue a new decision consolidating Metz's associated claims. T. 81–84.

On September 27, 2005, the ALJ held a supplemental hearing. T. 18. On November 18, 2005, the ALJ again denied Metz's applications. T. 15–17. On January 18, 2006, Metz filed a request for review of the ALJ's decision. T. 14. On September 1, 2006, the Appeals Council denied Metz's request for review of the ALJ's decision, thus making the ALJ's findings the final decision of the Commissioner. *See* T. 6–8. This action followed.

## II. Contentions

**\*2** Metz contends that: (1) the ALJ did not properly evaluate his subjective complaints of pain and the combined effect of his impairments; (2) the ALJ erred in concluding that he could perform light work; and (3) the ALJ erred in failing to give controlling weight to the opinions of his treating physicians. *See* Docket No. 12.

## III. Facts

Metz is thirty-eight years old, has no children and has an eleventh-grade education. T. 35, 936. During the tenth and eleventh grades, he received vocational training in automobile body repair through the Board of Cooperative Education Services. T. 944. Metz alleges that he became disabled on December 1, 2000,[5] due to a learning disability, a slipped disc in his back and depression. *See* T. 135.

Metz testified that he had a learning disability and difficulty reading and writing. T. 947–48. In the fourth grade, the State of New York Office of Mental Retardation and Developmental Disabilities ("OMRDD") conducted a learning disabilities evaluation of Metz and diagnosed him with developmental dyslexia with neurological impairment suspect. T. 657–61. OMRDD also conducted a psychological evaluation of Metz and diagnosed him as having low average intelligence with potential for higher functioning;

language and motor processing delays, probably the result of neurological impairment; and adjustment reaction to childhood. T. 671–73. Metz asserts that his learning disabilities persisted into adulthood as demonstrated by the State of New York Department of Civil Service having considered him eligible for an appointment pursuant to Section 55–b of New York State Civil Service Law.[6]

Metz has worked as a cleaner/janitor, as an order processor for a wireless communications company, as school bus driver, in the maintenance department of a tour bus company and as a stock handler for a flatware manufacturer. T. 172, 937–40. Beginning in 2002, Metz obtained work through the Wildwood Programs–Learning Disabilities Association of the Capital Region-which classified him as "most severely disabled." T. 270. In July of 2003, the State of New York Office of Mental Health ("OMH") characterized Metz's quality of work, his industriousness and resourcefulness as "below average" and his attendance at work as "unacceptable." T. 174–75. OMH observed that Metz was not conscientious or thorough with respect to his assignments, lacked initiative to complete tasks and needed to be constantly reminded to complete his work. T. 174. OMH found that due to Metz's attendance and behavior, he failed to successfully complete his probation and they terminated his employment. T. 176.

Metz had lower back pain radiating down his left leg to his foot. T. 261. In addition, he had cervical pain radiating down his right side. Metz also has claimed tingling and numbness in his right hand, particularly in the webbing between his thumb and index finger, stemming from a childhood injury in which a fish tank heater electrocuted him and burned his hand. T. 617–20. Metz reported chronic back and neck pain. T. 628. Metz suffered a motorcycle accident at age nineteen and an automobile accident at age twenty-one. T. 626. Metz had a severe visual perception problem with deficiencies in laterality, directionality, ocular motilities, visual discrimination and visual memory. T. 648–50.

**\*3** Metz has had reclusive episodes when he isolates himself in his room or in his residence. T. 168, 738 and 769. Metz presented a bizarre affect often accompanied by contextually inappropriate laughter. T. 176, 212, 769. The record also includes evidence of bulimia, *see* T. 211, 826, major depressive disorder-moderate-with possible psychotic features, T. 27 and 810, and personality disorder schizotypal features. T. 213.

## IV. Standard of Review

### A. Disability Criteria

A claimant seeking disability benefits must establish that "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A) (2003). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* at §§ 423(d)(2)(A) & 1382c(a)(3)(B) (2003).

The Commissioner uses a five step process, set forth in 20 C.F.R. §§ 404.1520 & 416.920, to evaluate DIB and SSI claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider

> him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *see* 20 C.F.R. §§ 404.1520 & 416.920 (2003).

A plaintiff has the burden of establishing disability at the first four steps. *Shaw v. Chater,* 221 F.3d 126, 132 (2d Cir.2000). However, if the plaintiff establishes that an impairment prevents him from performing past work, the burden then shifts to the Commissioner to determine if there is other work which the claimant could perform. *Shaw,* 221 F.3d 132.

### B. Scope of Review

**\*4** In reviewing a final decision of the Commissioner, a court must determine whether the Commissioner applied the correct legal standards and whether substantial evidence supports the decision. *Machadio v. Apfel,* 276 F.3d 103, 108 (2d Cir.2002). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Shaw,* 221 F.3d at 131 (citations omitted). It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see Curry v. Apfel,* 209 F.3d 117, 122 (2d Cir.2000).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." *Prentice v. Apfel,* 1998 WL 166849, at \*3

(N.D.N.Y. Apr.8, 1998) (citing *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984)). A court, however, cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Yancey v. Apfel,* 145 F.3d 106, 111 (2d Cir.1998). If substantial evidence supports the Commissioner's finding, then it is conclusive. *Bush v. Shalala,* 94 F.3d 40, 45 (2d Cir.1996).

## V. Discussion

### A. Medical Evidence

#### 1. Physical Impairments

The Albany Medical Center treated Metz on March 20, 2001 for low back pain. The attending physician recommended that Metz not perform any repetitive bending or lifting and further recommended that he not lift anything greater than fifty pounds. T. 194–95. On April 2, 2001, Dr. Joseph J. Fay, an orthopaedist, examined Metz and noted strong quadriceps and extensor hallucis longus muscles, normal range of motion in his hips, "some pain with firm pressure in the lower aspect of the 1–s spine."T. 207, 502. Dr. Fay reported that X-rays taken in four views were normal. His impression was that Metz had chronic low back strain and his treatment recommendation was that Metz should "get back to his exercises." T. 207, 502.

On May 2, 2001, Dr. James Alfandre examined Metz and noted Metz's previous treatment with Dr. Fay and that Metz had not performed physical therapy exercises as Dr. Fay had recommended. Dr. Alfandre noted midline tenderness in Metz's lumbar spine but normal range of motion in both hips. Dr. Alfandre's impression was low back pain. He recommended physical therapy and anti-inflammatory medications but specifically noted that he did "not believe Darvocet [7] or Lortab [8] would be recommended...." T. 499. Dr. John H. Kavanaugh evaluated Metz for complaints of pain in his neck and right knee on December 3, 2001. Dr. Kavanaugh reported that Metz was hurt at work on November 21, 2001, when he fell down stairs. Dr. Kavanaugh's diagnosis was that Metz had a cervical strain and contusion of the right knee. Dr. Kavanaugh noted that Metz was "not disabled for work...." T. 203.

**\*5** On July 25, 2002, Dr. Pesho S. Kotval took a lumbar sacral spine X-ray of Metz. The X-ray did not reveal any

spondylolithesis, spondylolysis or osteophytosis. [9] He noted that the lordotic curvature was preserved and that the X-ray did not identify any bony or disc space pathology. T. 223. Dr. Aryunder Singh evaluated Metz for neck, back and knee pain in May and June of 2002. T. 333, 335, 461.

Dr. Neil Colman examined Metz numerous times for his complaints of left knee pain. On July 16, 2002, Dr. Colman assessed a cervical strain and chondromalacia patella [10] for Metz's left knee. Dr. Colman recommended that Metz use an anti-inflammatory medication and prescribed physical therapy. T. 416–17. On February 25, 2003, Dr. Colman diagnosed Metz with a torn left lateral meniscus. T. 522, 547. On March 24, 2003, Dr. Colman examined Metz's left knee and noted no effusion or warmth, a full range of motion and mild crepitation. Dr. Colman opined that Metz's left knee may suffer from internal derangement, and he recommended that he undergo an MRI. T. 420. On May 6, 2003, Dr. Colman saw Metz for treatment of his left knee, neck and back. Dr. Colman noted that following Metz's previous evaluation in March, Metz had an MRI on his knee. [11] Dr. Colman noted that despite a "rather normal MRI, [Metz] continues to complain of ongoing pain in his left knee."T. 418.

Upon examination of Metz's knee, Dr. Colman detected no abnormalities. *Id.* Similarly, Dr. Colman's examination of Metz's back revealed a full range of motion but with tenderness with percussion at the mid-lumbar area. Dr. Colman took X-rays of Metz's neck and his lumbosacral spine, which revealed no abnormalities. Dr. Colman noted that he advised Metz that he had no objective findings of disease and noted that Metz asked for hydrocodone but that he declined to prescribe it. Dr. Colman expressed concern regarding the amount of hydrocodone that Metz took and suspected that his "complaints of pain may be related simply to developing a physiologic dependence upon the hydrocodone."T. 421; *see also* T. 550. On June 16, 2003, Dr. Colman again examined Metz's left knee, noted only slight crepitation in the patellofemoral joint and assessed a post sprain of the left knee. T. 419. On September 4, 2003, Dr. Colman could not identify any pathologic entities for his left knee. Metz asked Dr. Colman to list his neck and back as part of his work-related injury, but aside from noting Metz's request, Dr. Colman made no further comment on the issue. T. 415.

Dr. Amelita Balagtas twice examined Metz at the Commissioner's request. On July 25, 2002, Dr. Balagtas provided a medical source statement in which she opined that

Metz would have some limitations with respect to activities requiring bending, lifting, prolonged sitting and standing as well as activities that require kneeling and squatting. T. 220–22. On October 12, 2004, Dr. Balagtas provided a medical source statement in which she opined that Metz would have some limitations in activities that require bending, lifting and prolonged sitting and standing. She also found some limitation in activities that require lifting, carrying, and possible motor activities involving the right hand. With respect to fine motor activities, she noted that Metz's hand and finger dexterity were intact and that his grip strength was four-and-a-half out of five on the right hand and five out of five on the left hand. T. 812–14.

 **\*6** Dr. Arvinder Singh examined Metz for Dr. Natarajan Ravi on December 13, 2002. Dr. Singh diagnosed Metz as having cervical facet arthropathy and cervicogenic headaches. T. 345–47. Dr. Richard Goodman, an orthopaedist, conducted an independent medical evaluation of Metz on February 27, 2003. He noted that Metz walked with a normal gait and had full range of motion of his cervical spine. He also noted that patellofemoral compression produced pain in Metz's left knee. He further noted that flexion and extension of the fingers, wrists, elbows and shoulders were symmetrical and within normal limits. Dr. Goodman opined that Metz suffered a left knee strain, but that he had "no disability" and "could return to work ... without restrictions."T 540–41.

The medical record also includes treatment of Metz by Dr. Ike Boka on three dates between September and November of 2003 for pain management consultation. Metz presented with complaints of shoulder, mid and lower back, cervical, neck and knee pain. T. 259–63. Dr. Boka found that there was "not much knee crepitus." T. 260. After Metz's initial visit, Dr. Boka noted that he was hesitant to start him on hydrocodone without confirmation that he already had a prescription to take the medication. T. 263. Dr. Boka noted after Metz's second visit that "If we are not going to write meds he will go elsewhere."T. 260. Dr. Boka prescribed Lortab for Metz at his third visit. T. 259.

Dr. James Dolph diagnosed Metz with ulnar digital neuroma in his right hand. Dr. Dolph treated Metz's episodic pain at the base of his right thumb May 27, 2004. T. 752–54. Dr. Dominic Belmonte, an occupational medicine specialist, evaluated Metz's left knee on February 11, 2004. Dr. Belmonte noted neither any effusion nor muscle atrophy. He noted some crepitus, however, with range of motion

testing. T. 481. Dr. Belmonte opined that Metz "sustained a traumatic injury to he left anterior knee .... [,] received prudent medical treatment and has ... reached maximum medical improvement."T 482. He further noted that Metz's then current examination was consistent with some post traumatic patellar chondromalacia. T. 482.

On February 24, 2004, Dr. Mindy Sanders neurologically evaluated Metz. Her impression was that Metz suffered from chronic low back and neck pain, an orthopedic problem with his left knee and headaches. T. 626–27. On March 24, 2004, Dr. Sanders noted chronic low back and neck pain and that Metz had decided against attending physical therapy as was previously prescribed. Dr. Sanders noted habituation with respect to Metz's use of Lortab and that she had discussed the matter with Dr. Steven Scheiner who that same day had discussed detoxifying Metz from his "chronic use of Lortab." T. 621–23.

Dr. Scheiner examined Metz's cervical spine, lumbar spine and brain via MRI on February 26, 2004. The MRI of Metz's cervical spine revealed "some straightening of the normal cervical lordosis" but "no evidence of spondylolisthesis" and "no disc bulge or herniation." T. 329. The MRI of Metz's lumbar spine revealed normal alignment of the vertebral bodies, no evidence of fracture and preservation of intervertebral disc height and signal. Dr. Scheiner noted mild degenerative disc disease at T11–12 with mild broad disc bulging in the lower thoracic spine. Dr. Scheiner opined that it did not appear to cause significant stenosis [12] or nerve root compression. T. 330. The MRI of Metz's brain revealed only mild mucoperiosteal thickening in the right maxillary sinus. Dr. Scheiner's impression was that there was no evidence of intracranial abnormality. T. 331. On July 2, 2004, Dr. Scheiner wrote a prescription in which he noted that Metz remained unable to lift more than ten pounds and advised that he should continue to limit periods of prolonged standing, but that he should otherwise continue to work. T. 640.

 **\*7** On April 8, 2004, Dr. Mark Price, a treating physician, discussed Metz's desire to lose weight, his use of Lortab and his cessation of smoking. T. 802. On April 14, 2004, Dr. Price diagnosed an exacerbation of a muscle pull or possibly a bulging disc. T. 801. On May 17, 2004, Dr. Price noted that Metz made progress in his efforts to discontinue smoking and that he appeared less nervous and anxious. T. 800. On July 7, 2004, Dr. Price noted that Metz wanted to increase his dosage of methadone, but he explained that he did not feel comfortable with that course of treatment. T. 797. On July 19,

2004, Dr. Price opined that Metz was restricted to light duty and was capable of performing desk work. T. 796.

Dr. Goodman reviewed the medical evidence of record and provided a medical opinion on June 19–20, 2005. T. 597–607. He was unable to find any evidence of a medical impairment from an orthopedic perspective including back and hand pain. Dr. Goodman opined that none of Metz's impairments established by the medical evidence in combination or separately met or equaled any impairment described in the Listing of Impairments. He explained that there was no evidence of a herniated disc or spinal arachnoiditis, spinal stenosis or previous surgery. Dr. Goodman explained that Metz's hand surgery was "not equal to upper extremities and, therefore, [did] not meet a listing...." T. 600. He noted that Metz's back pain was subjective and well documented. Dr. Goodman found that Metz's impairment affected his ability to lift and/or carry and opined that he could occasionally lift fifty pounds and frequently lift twenty-five pounds. He found that Metz's impairment affected his ability to stand and/or walk and opined that he could stand or walk for six hours in an eight hour workday. Dr. Goodman found that Metz's impairment affected his ability to sit such that he could sit for about six hours in an eight hour workday. He found that Metz could push and/or pull up to seventy-five pounds. Dr. Goodman found occasional postural limitations with respect to Metz's ability to climb, balance, kneel, crouch, crawl and stoop. He found that Metz's manipulative and visual/communicative functions were unlimited. In addition, Dr. Goodman found no environmental limitations with respect to Metz's impairment. T. 597–607.

### 2. Mental Impairments

On September 27, 2001, Metz underwent testing for a comprehensive vocational evaluation report by Drs. Alayne Grand and Sheldon Grand, both psychologists and certified rehabilitative counselors at Forensic Rehabilitative Services. They found that Metz's verbal intelligence quotient ("I.Q.") was 74, his performance I.Q. was 95, and his full scale I.Q. was 82. The report noted that Metz's overall functioning was at the low-average range, but at the average range for nonverbal problem-solving tasks while his memory was in the borderline range and his process was almost average. The report concluded that the testing data supported a learning disability diagnosis and stable intellectual status. The report found that Metz had vocational potential, and that his manual and visual-perceptual skills supported a variety of unskilled to semiskilled jobs with job coaching. The report expected that as Metz's vocational adjustment improved, so too would his emotional status. T. 196–99.

**\*8** The Albany County Mental Health Center treated Metz in June 2002. Metz was found stable and his depression, obsessive compulsive disorder and eating disorder had subsided. T. 565. Dr. Annette Payne, Ph.D., examined Metz on July 25, 2002, at the Commissioner's request. Dr. Payne provided a medical source statement in which she opined that Metz could follow and understand simple directions and instructions and perform simple, rote tasks under supervision. She further opined that he had problems with attention and concentration and learning new tasks. She noted that he had difficulty performing complex tasks and making appropriate decisions. She further noted that he had difficulties relating to others and dealing with stress. She characterized his psychiatric difficulties as moderately limiting. T. 210–14.

Dr. Mark Tatar, a state agency psychologist reviewed the medical evidence of record and provided a mental residual functional capacity assessment on August 15, 2002. Dr. Tatar found moderate limitations with respect to Metz's ability: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; and to make simple work-related decisions. Dr. Tatar found also found moderate limitations with respect to Metz's ability: to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. T. 235–37. Dr. Tatar noted dysthymic disorder and personality disorder as medically determinable impairments that do not precisely satisfy the diagnostic criteria under 20 C.F.R. Part 404, Subpt, P, App. 1, §§ 12.04 and 12.08, respectively. T. 244, 248. An additional state agency medical consultant affirmed Dr. Tatar's opinion on what appears to be September 30, 2002. T 255.

Dr. Abdul W. Arain performed a psychological examination of Metz on January 29, 2003, as part of a comprehensive review and concluded that his mental status, higher functions, mood and affect were normal. T. 512. On September 3, 2004, Metz treated at an outpatient mental health clinic stating that he needed to take medications. An assessment update summarized Metz's visit and noted no serious medical issues but diagnosed him as having schizoaffective disorder 295.70. [13] Karen Welthy, a certified social worker and,

apparently, a psychiatrist signed the assessment update; the psychiatrist's signature is illegible. T. 769.

Dr. Brett Hartman consultatively evaluated Metz on October 12, 2004, at the Commissioner's request. Dr. Hartman found that Metz was functioning within the borderline range of intelligence overall, with verbal and nonverbal abilities in the borderline range: verbal I.Q. 79; performance I.Q. 79; and full scale I.Q. 77. T. 809. Dr. Hartman provided a medical source statement in which he opined that Metz was able to follow and understand simple directions and instructions with a fair ability to maintain a regular schedule and make appropriate decisions. Dr. Hartman noted obvious learning deficits, that Metz would have difficulty performing complex tasks independently, mild attention and concentration problems, mild-to-moderate difficulty relating adequately with others, and mild-to-moderate difficulty in dealing appropriately with normal life stressors. T. 810.

 **\*9** Dr. Aaron Satloff, a board-certified psychiatrist and state agency physician, reviewed the medical evidence of record on June 20, 2005. Dr. Satloff noted that Metz's impairment affected his ability to understand, remember and carry out instructions. He noted no restrictions with respect to Metz's ability to understand and remember short, simple instructions, carry out short, simple instructions or with his ability to make judgments on simple work-related decisions but noted moderate restrictions with respect to Metz's ability to understand, remember and carry out detailed instructions. Dr. Satloff opined that Metz's impairment affected his ability to respond appropriately to supervision, co-workers and work pressures in a work setting. Dr. Satloff noted moderate restrictions with respect to Metz's ability to interact appropriately with the public and supervisors and his ability to respond appropriately to changes in a routine work setting. Dr. Satloff noted slight restrictions with respect to Metz's ability to interact appropriately with his co-workers and in his ability to respond appropriately to work pressures. Dr. Satloff diagnosed major depressive disorder, social phobia, learning disorder-not otherwise specified, polysubstance abuse by history and borderline intellectual functioning as Metz's medical impairments as established by the medical evidence. Dr. Satloff considered Metz's impairments separately and in combination and opined that they were of inadequate severity to meet or equal any impairment described in the Listing of Impairments. T. 590–96.

### 3. Other Evidence

Katie Clark, [14] an employment specialist with Wildwood Programs, noted that Metz was "classified as most severely disabled" and opined that Metz need a structured job that had as little change in duty or schedule as possible. T. 270.

### 4. Administrative Hearing Testimony

At the supplemental hearing on September 27, 2005, Metz testified that he worked twenty hours a week as a cleaner and earned $8 an hour. T. 941. Metz testified that he could not work longer than part-time hours because when he was standing on concrete floors for long periods of time, which hurt his mid and lower back and caused pain to shoot down to his left knee. Metz further testified that by sitting down for fifteen minutes, he could continue working. He testified that pain prevented him from working more than four hours a day. T. 942. He testified that he suffered an injury to his right hand as a child, which later required the removal of scar tissue. T. 943. Metz testified that he took methadone, Zanaflex [15] and Nexium [16] and that they helped him "a little bit." T. 945. Metz testified that when he felt depressed, he did not want to leave the house, go to work or talk to anybody. He testified that once a week he cleaned the floor, sink and toilet in the upstairs bathroom of the house in which he lived. T. 949–50. Metz testified that he vacuumed sometimes. T. 952. He testified that he dressed himself and tended to his personal hygiene. T. 953. He testified that his roommate cooked his meals, emptied the garbage, maintained the lawn, shopped for the household, and did the household laundry. T. 950, 952. Metz testified that as a cleaner he emptied trash cans with bags weighing between thirty and sixty pounds six to seven times during the course of the workday. T. 951.

 **\*10** At the conclusion of Metz's testimony, the ALJ called Dr. Peter Manzi, a vocational expert, to testify. T. 108, 955. The vocational expert classified Metz's work history according to the Dictionary of Occupational Titles (4th Ed., rev.1991) ("DOT"). He testified that Metz's work history imparted only driving as a transferable skill. The vocational expert further testified that such an individual such as Metz could work as a cleaner at a commercial institution and as a material handler/laborer. T. 957–58. The vocational expert testified that such an individual could work as a laundry worker II, DOT occupational code 361.685–018.

The vocational expert testified that laundry worker II had a specific vocational preparation ("SVP") level of two and that there were 41,490 such positions in the national economy and 220 in the Capital Region of New York. The vocational expert also testified that such an individual could work as a hand packager, DOT occupational code 920.587–018. The vocational expert testified that hand packager had an SVP level of two and that there were 106,000 and 400 such positions in the national economy and Capital Region economies, respectively. T. 958.

The vocational expert also testified that an individual with Metz's characteristics could neither work as a laundry worker nor as a hand packager and that there were no jobs available at the medium level but that such an individual could work at the light level as a laundry sorter, a light, unskilled position, DOT occupational code 361.687–014. The vocational expert testified that the laundry sorter position had an SVP of two and that there were 133,174 and 350 such positions in the national economy and the Capital Region, respectively. The vocational expert also identified housekeeper, DOT occupational code 323.687–014, as another position such an individual could perform. The vocational expert testified that the housekeeper position had an SVP of two and that there were 387,059 and 1,800 positions available in the national economy and Capital Region, respectively. T. 958–59. The vocational expert further testified that such an individual could perform his past work "as he performed it, he performed all of his medium work as light work."T. 959–60. The vocational expert testified that without the fine manipulation restriction and with a light work level, the laundry sorter and housekeeper positions would be available in addition to other examples as well. T. 960.

### B. Severity of Impairments

In his brief, Metz argued that the ALJ failed properly to assess the severity of his impairments. In particular, Metz argued that the ALJ did not properly consider the combined effect of his impairments. Docket No. 12.In his brief, the Commissioner does not address this argument, which may owe to the fact that Metz included it under his argument pertaining to issues of pain and credibility and essentially stated the argument without any elaboration. *Cf. Graham v. United States,* 753 F.Supp. 994, 1000 (D.Me.1990) ("It is settled beyond peradventure that issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived.") (citation and internal quotation marks omitted). Nevertheless, step two of the sequential evaluation process requires a determination as to whether the claimant has a severe impairment which significantly limits his physical or mental ability to perform basic work activities. *See* subsection IV(A) *supra;* 20 C.F.R. § 404.1521(a) (2003). Where a claimant alleged multiple impairments, a court will consider "the combined effect of all [ ] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."*Id.* § 404.1523; *Dixon v. Shalala,* 54 F.3d 1019, 1031 (2d Cir.1995) ("[T]he combined effect of a claimant's impairments must be considered in determining disability; the SSA must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe.").

 *11 An impairment, or combination of impairments, is not severe if it does not impinge on one's "abilities and aptitudes necessary to do most jobs."*Id.* § 404.1521. Basic work activities which are relevant for evaluating the severity of a physical impairment include:

(1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b) (2005)

"The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability."*DeChirico v. Callahan,* 134 F.3d 1177, 1180 (2d Cir.1998); *see also* 20 C.F.R. § 404.1520(d) (2003); *Id.* at pt. 404, subpt. P.App. 1 (2003) (listing of per se disabling ailments). Additionally, the regulations state that "if an individual has an impairment that is 'equal to' a listed impairment," that individual is disabled regardless of his or her age, education, or work experience. *DeChirico,* 134 F.3d at 1180 (quoting 20 C.F.R. § 404.1520(d) (2003)).

Here, the ALJ found that Metz had a severe impairment secondary to a chronic back strain; a severe impairment secondary to a status post injury of the right dominant hand; severe impairments secondary to depression and a learning disability, anxiety, and borderline intellectual functioning. The ALJ noted that while these impairments were severe within the meaning of the regulations, they did not "meet or medically equal, either singly *or in combination*... one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." T. 20 (emphasis added).

The record contains substantial evidence to support the ALJ's findings that Metz did not suffer from a listed impairment. The list of impairments for back injuries requires either nerve compression or stenosis. The ALJ, however, found that Metz's back injuries had "not produced reflex, motor, or sensory loss in any extremity and have not resulted in marked functional loss of use of the spine or any extremity."T. 20. The record illustrated that diagnostic testing and medical opinions confirmed that there existed neither significant nerve root compression nor stenosis. T. 329–30, 600. Dr. Goodman opined that none of Metz's impairments established by the medical evidence in combination or separately met or equaled any impairment described in the Listing of Impairments. T. 600. The medical evidence indicated that Metz maintained a full range of motion in his back, T. 421, and further indicated that Metz did not suffer from any herniation in his back. T. 223, 329, 600. The medical record revealed that Metz partook in a wide variety of daily activities including self-care and personal hygiene, clothing himself, cleaning the bathroom, floor, toilet and sink, occasional vacuuming, watching television, playing checkers on the computer and listening to music. Metz testified that he cleaned the floor, sink and toilet in the upstairs bathroom of the house in which he lived once a week. T. 949–50, 952–53. Moreover, Metz decided against attending physical therapy as was prescribed by Dr. Fay and Dr. Sanders. T. 499, 623.

**\*12** With respect to Metz's depression, anxiety and borderline intellectual functioning, the ALJ found that his I.Q. was in the average to borderline range and did not qualify as mild mental retardation. The ALJ found that Metz's affective disorder had not resulted in "significant, ongoing symptoms" and had "not resulted in significant functional limitations."T. 20. In support of his finding that Metz's mental impairments were not severe, the ALJ cited Metz's ability to care for himself, his activities of daily living, and the lack of any episodes of deterioration or decompensation. T. 20.

The medical record supported the ALJ's findings. One series of tests administered to Metz indicated that his verbal I.Q. was 74 (borderline), his performance I.Q. was 95 (average), and his full scale I.Q. was 82 (low average), T. 197, while another indicated that his verbal I.Q. was 79, his performance I.Q. was 79, and his full scale I.Q. was 77. T. 809. The listing for mental retardation at 20 C.F.R. Part 404, Subpt, P, App. 1, § 12.05(D) requires, *inter alia,* a verbal, performance or full scale I.Q. of 60 through 70. Dr. Satloff considered Metz's impairments separately and in combination and opined that they were of inadequate severity to meet or equal any impairment described in the Listing of Impairments. T. 593. Therefore, there exists no basis to remand this case for further findings regarding whether the combination of Metz's impairments render him disabled.

### C. Subjective Complaints of Pain

Metz contends that the ALJ's decision to discredit his subjective complaints of pain was in error. Docket No. 12.The Commissioner argues that the ALJ properly considered Metz's allegations of pain and functional limitations in reaching his RFC determination. Docket No. 15.

The ALJ determines whether an ailment is an impairment based on a two-part test. First, the ALJ must decide, based upon objective medical evidence, whether "there [are] medical signs and laboratory findings which show ... medical impairment(s) which could reasonably be expected to produce [such] pain ...." *Barringer v. Comm'r of Soc. Sec.,* 358 F.Supp.2d 67, 81 (N.D.N.Y.2005); 20 C .F.R. § 404.1529 (2003). This primary evaluation includes subjective complaints of pain. 20 C.F.R. § 404.1529 (2003). " 'Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.' " *Barringer,* 358 F.Supp.2d at 81 (quoting *Crouch v. Comm'r of Soc. Sec. Admin.,* 2003 WL 22145644, at *10 (N.D.N.Y. Sept.11, 2003).

An ALJ must consider all symptoms, including pain, and the extent to which these symptoms are consistent with the medical and other evidence. 20 C.F.R. § 404.1529 (2003)."Pain itself may be so great as to merit a conclusion of disability where a medically ascertained impairment is found, even if the pain is not corroborated by objective medical findings."*Rivera v. Schweiker,* 717 F.2d 719, 724 (2d

Cir.1983) (citing *Gallagher v. Schweiker,* 697 F.2d 82, 84 (2d Cir.1983)). However, "disability requires more than mere inability to work without pain."*Dumas v. Schweiker,* 712 F.2d 1545, 1552 (2d Cir.1983). Pain is a subjective concept "difficult to prove, yet equally difficult to disprove" and courts should be reluctant to constrain the Commissioner's ability to evaluate pain. *Id.* In the event there is "conflicting evidence about a [claimant's] pain, the ALJ must make credibility findings."*Snell v. Apfel,* 177 F.3d 128, 135 (2d Cir.1999) (citing *Donato v. Sec'y of HHS,* 721 F.2d 414, 418–19 (2d Cir.1983)). Thus, the ALJ may reject the claims of disabling pain so long as the ALJ's decision is supported by substantial evidence.*Aponte v. Sec'y of HHS,* 728 F.2d 588, 591 (2d Cir.1984).

**\*13** The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment. *See Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1978). The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

(I) [The claimant's] daily activities;

(ii) The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate ... pain or other symptoms;

(v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of ... pain or other symptoms;

(vi) Any measures [the claimant] use[s] or ha[s] used to relieve ... pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

In this case, the ALJ found suspect the degree of pain and functional loss alleged by Metz. In support of his finding, the ALJ noted that none of the multiple physicians from

multiple specialities who have treated Metz have found significant pathology with respect to his musculoskeletal complaints. The ALJ also noted that Metz was able to work despite his long-standing complaints. The ALJ noted that Metz had worked on a part-time basis without "reason shown as to why he could not work on a full time basis."T. 31. Furthermore, the ALJ cited the notes of Metz's job coach, which revealed that Metz lacked the motivation to work. Thus, the ALJ concluded that Metz was not credible in reporting his subjective complaints. *Id.*

In reaching his conclusion, the ALJ noted Metz's testimony with respect to his alleged debilitating impairments and his medications. T. 30. Metz testified that he was totally disabled due to mid-to-low back pain that shot down to his left knee and claimed that walking more than four hours per day would be painful. Metz stated sitting down relieved his pain. He testified that he experienced some difficulty with his right hand and thumb such that he could not type. He also testified that he suffered from depression and did not want to leave the house, go to work or to talk to anyone. He further testified that his then current medications included methadone, Zanaflex and Nexium from which he alleged no side effects. T. 942–46. Metz testified that his medications helped him "a little bit." T. 945.

The ALJ considered Metz's daily activities, including self-care and personal hygiene, cleaning the bathroom, floor, toilet and sink, occasional vacuuming, watching television, playing checkers on the computer and listening to music. T. 20, 23 and 28. The ALJ discussed Metz's medications, including a daily 80 milligram dose of methadone, Zanaflex once per day, Xanax once per day, Topamax once per day; Nexium once per day, Zyrtec once per day, Atenolol once per day, Atarax once per day, and Risperdal once per day. T. 23. The ALJ also noted Metz's use of Nexium and that he did not allege any side effects from taking these medications. T. 30–31.

**\*14** That Metz was able to engage in such a wide array of activities despite allegations of severe pain supports the ALJ's conclusion that his pain was not disabling. *See Rivera v. Harris,* 623 F.2d 212, 216 (2d Cir.1980) (explaining that appellant's testimony that despite her pains and shortness of breath she could cook, sew, wash and shop, albeit at a slow pace and with an afternoon break, did not preclude the possibility that she could perform gainful activity of a light sedentary nature); *Berger v. Astrue,* 516 F.3d 539, 545–46 (7th Cir.2008) (finding claimant's allegations of debilitating pain less worthy of belief in light of his work as a carpenter,

the performance of household chores, fishing and driving). The ALJ noted that after the date of alleged onset of disability, Metz continued to work on a part-time basis but that his work was not at the substantial gainful level of work activity. T. 19. Moreover, when Metz was unemployed, he sought employment opportunities, T. 279–318, which fairly suggests that he believed that he was capable of working. *See Gittens v. Astrue,* No. 04–CV–4386 (DLJ), 2008 WL 3852179, at *6 (E.D.N.Y. Aug.16, 2008) (claimants testimony that he "actively sought desk jobs and believed himself capable of holding a job that didn't require heavy lifting" supported ALJ's decision that claimant's "allegations regarding his inability to work were not entirely credible"); *Osorio v. Barnhart,* No. 04–Civ. 7515(DLC), 2006 WL 1464193, at *7 (S.D.N.Y. May 30, 2006) (citing ALJ's observation that it " 'ma[de] no sense ... that [claimant] would have been seeking such work if he did not feel he would be capable of doing it' " as supporting ALJ's finding that claimant's allegations were not totally credible).

The ALJ noted Metz's history of abusing pain killers, T. 26, and the record reflects that Metz engaged in drug-seeking behavior. Metz asked for hydrocodone from Dr. Colman, whom in May of 2003, suspected that Metz's "complaints of pain may be related simply to developing a physiologic dependence upon the Hydrocodone."T. 415 and 421. Similarly, in April 2004, Dr. Scheiner discussed with Metz the possibility of inpatient detoxification to help him overcome his need for pain narcotics. T. 764. Dr. Scheiner explained to Metz that "the purpose of pain management is not to write narcotic prescriptions that were started by another practitioner," T. 765, yet during his next visit on May 7, 2004, Metz again asked Dr. Scheiner whether he had spoken to Dr. Price regarding an increase in his Methadone. T. 762.

A claimant's misuse of medications is a valid factor in an ALJ's credibility determinations. *See Anderson v. Barnhart,* 344 F.3d 809, 815 (8th Cir.2003) (finding nothing improper in ALJ's reference to treating psychologist's observation that claimant was " 'somewhat manipulative' in his efforts to 'convince' him of his pain"); *Berger,* 516 F.3d at 545–56 (finding claimant's credibility undermined where he received a regimen of pain medication, including hydrocodone, from two different doctors); *Edlund v. Massanari,* 253 F.3d 1152, 1157–58 (9th Cir.2001) (explaining that claimant's exaggeration of physical pain in order to receive prescription pain medication to feed his Valium addiction allowed the ALJ to conclude that " 'the claimant's complaints are not credible or supported by the substantial evidence.'"); *Anderson v.*

*Shalala,* 51 F.3d 777, 780 (8th Cir.1995) (observing that claimant's "drug-seeking behavior further discredits her allegations of disabling pain").

**\*15** The ALJ also noted Metz's lack of motivation to work. T. 31. The record reveals that on October 1, 2002, Metz informed his job coach that he no longer wanted to work at his current job, although Metz's supervisor said that he was "doing a great job." T. 285. Metz began employment at a hospital in December of 2003, but by January 6, 2003, he had called-in three absences. T. 288–92.

Metz testified that at his most recent employer allowed him to sit and rest when his back pain bothered him, as when after he had emptied trash cans, so that he could resume his work. Thus, there appears to be substantial evidence to support a finding that Metz had developed appropriate coping methods to overcome the pain he may have experienced in the workplace.

It is within the Commissioner's discretion to evaluate the credibility of a claimant's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of his symptomatology. *Mimms. v. Sec'y of HHS,* 750 F.2d 180, 185–86 (2d Cir.1984); *Gernavage v. Shalala,* 882 F.Supp. 1413, 1419 (S.D.N.Y.1995). Courts should accord deference to the ALJ's determination regarding a claimant's credibility "because he heard plaintiff's testimony and observed his demeanor."*Gernavage,* 882 F.Supp. at 1419 n. 6. While the ALJ's recitation of the factors leading him to reject, in part, plaintiff's subjective claims is less than comprehensive, it nonetheless sets forth the basis for his determination, which was supported by substantial evidence. Accordingly, the ALJ's findings are entitled to deference, and the Court recommends that the Commissioner's determination on this ground be affirmed.

### D. Treating Physician

Metz contends that the ALJ did not accord proper weight to the opinions of Metz's treating physicians and vocational counselor. Metz, however, did not identify whom among his treating physicians offered an opinion that was inconsistent with the ALJ's RFC finding. Docket No. 12.The Commissioner asserts that the ALJ properly determined the weight to be given to Metz's treating sources. Docket No. 15.

When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability and pain related by the claimant.*Harris v. R.R. Ret. Bd.,* 948 F.2d 123, 126 (2d Cir.1991). Ordinarily, the opinion of a treating physician is entitled to considerable deference and is given controlling weight provided that it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir.2002). Such opinions are not controlling, however, if contrary to other substantial evidence in the record, including the opinions of other medical experts. *Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004); *Veino,* 312 F.3d at 588.The ALJ, however, "cannot arbitrarily substitute his or her own judgment for competent medical opinion,"*McBrayer v. Sec'y of HHS,* 712 F.2d 795, 799 (2d Cir.1983), and must provide "good reasons" before discounting a treating physician's opinion. *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998).

**\*16** The regulations require the ALJ to assess the following factors in determining how much weight to accord the physician's opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."*Schaal,* 134 F.3d at 503.If other evidence in the record conflicts with the opinion of the treating physician, then the opinion will not receive controlling weight. Moreover, the less consistent the opinion when compared against the record as a whole, the less weight the ALJ will accord to it. *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999). Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner. *Id.* at 133–34;*see*20 C.F.R. § 404.1527(e).

At one point during his treatment of Metz, Dr. Scheiner wrote a prescription noting that Metz remained unable to lift more than ten pounds and admonishing that he "should continue to limit prolonged standing," and needed to "get up from sitting" twice per hour. T. 640. Dr. Scheiner concluded that "with these restrictions, he should continue to work."T. 640. While Dr. Scheiner's opinion regarding Metz's limitations is somewhat more restrictive than the balance of the record, he nonetheless concluded that Metz could work. The ALJ must weigh the evidence of record and resolve genuine conflicts and inconsistencies therein. *Veino,* 312 F.3d at 588.The ALJ credited more weight to the opinions of Dr. Goodman, T. 21–

22, *see*T. 597–607, Dr. Balagtas, T. 22, *see*T. 222 and 814, Dr. Kavanaugh, T. 25, *see* T. 203, and Dr. Price, T. 22, *see* T. 796, as more consistent with each other and with the record as a whole.

Metz also argues that the ALJ should have given controlling weight to the vocational counselor's opinion. Docket No. 12.The court infers that Metz is referring to the opinion of Katie Clark, an employment specialist, who in summarizing his work history, aptitudes and limitations noted that he was classified as "most severely disabled." T. 270. Clark does not indicate who classified Metz in this manner. Moreover, as an employment specialist, Clark is not an acceptable medical source. 20 C.F.R. § 404.1513(a) and 416.913(a) (limiting acceptable medical sources to licensed physicians (medical or osteopathic doctors), licensed or certified psychologists and licensed optometrists, for purposes of establishing visual disorders only, licensed podiatrists, for purposes of establishing impairment of the foot and ankle only and qualified speech-language pathologists, for purposes of establishing speech or language impairments only). Even assuming *arguendo* that Clark were an acceptable medical source under the regulations, the regulations reserve the issue of whether a claimant is disabled to the ALJ. 20 C.F.R. §§ 404.1527(e) and 416.927(e); *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999) ("A treating physician's statement that a claimant is disabled cannot itself be determinative .").

**\*17** Accordingly, it is recommended that the Commissioner's determination on this ground be affirmed.

### E. Residual Functional Capacity–Light Work

Metz contends that substantial evidence does not support the ALJ's finding that he retained the residual functional capacity (RFC) to perform light work existing in significant numbers in the national economy. Docket No. 12.In his brief, the Commissioner qualifies Metz's characterization noting that the ALJ found that he could perform only a limited range of light work and not the full range of light work suggested by his argument. The Commissioner asserts that the ALJ properly evaluated the evidence with respect to Metz's physical and mental impairments and set forth substantial evidence to support his finding. Docket No. 15.

RFC describes what a claimant is capable of doing despite his impairments considering all relevant evidence, including physical limitations, symptoms and other non-symptomatic

limitations. *Martone v. Apfel,* 70 F.Supp.2d 145,150 (N.D.N.Y.1999); 20 C.F.R. §§ 404.1545, 416.945 (2003)."In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient."*Martone,* 70 F.Supp.2d at 150. A claimant's RFC then determines whether he can perform his past relevant work in the national economy. *New York v. Sullivan,* 906 F.2d 910, 913 (2d Cir.1990); 20 C.F.R. §§ 404.1545, 416.960 (2003).

Here, the ALJ concluded that Metz's impairments prevent him from performing his past relevant work and that his past relevant work provided no transferable skills. T. 32. The ALJ found that Metz was a "younger individual between the ages of 18 and 44," and that he had a "limited education." T. 32. The ALJ specified that Metz retained an RFC enabling him to perform:

> light work that does not require more than occasional climbing, stooping, crouching, crawling, balancing[,] kneeling, no more than occasional fine manipulations with the right dominant hand; and that allows for occasional difficulty with attention and concentration and dealing with work stresses; allows occasional difficulties with respect to his ability to understand remember and carry out detailed instructions as well as get along with others.

T. 21; *see also* T 32. The regulations define light work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."20 C.F.R. § 416.967(b) (2005).

The record supports the ALJ's findings. There have been two administrative hearings and multiple medical evaluations and treatments in this matter. The record is fully developed and the conclusions of most of the medical professionals echo the ALJ's findings. The ALJ reached this determination based upon his evaluation of Metz's physical and mental impairments. *See* T. 20–31. With respect to Metz's physical impairments, the ALJ explained that he relied upon the opinions of Drs. Goodman, Balagtas, Price, Kavanaugh, Colman, and Singh.

*18 Dr. Goodman opined that Metz could occasionally lift fifty pounds, frequently lift twenty five pounds, push and/or pull up to seventy five pounds and sit, stand and/or walk for six hours in an eight hour workday. Dr. Goodman also found only occasional postural limitations with respect to Metz's ability to climb, balance, kneel, crouch, crawl and stoop. He found that Metz's manipulative and visual/ communicative functions were unlimited. Dr. Goodman further found no environmental limitations with respect to Metz's impairment.T. 597–607. Dr. Goodman's opinion is consistent with an ability to perform medium work, [17] and thus exceeds, and supports, the limitations of light work as specified by the ALJ: the regulations, of course, state that "[i]f someone can do medium work, we determine that he or she can also do sedentary and light work."20 C.F.R. §§ 404.1567(c), 416.967(c).

Dr. Balagtas opined that Metz would have some limitations with respect to activities requiring bending, lifting, prolonged sitting and standing as well as activities that require kneeling and squatting. T. 220–22. She also opined that Metz would have some limitations in activities that require carrying and possible grasping involving the right hand. With respect to fine motor activities, she noted that Metz's hand and finger dexterity were intact and that his grip strength was four-and-a-half out of five on the right hand and five out of five on the left hand. T. 812–14. Dr. Balagtas did not indicate the extent of Metz's limitations with respect to sitting and standing, but her opinion is otherwise generally consistent with the ALJ's RFC determination, which incorporated her assessment that Metz had limitations bending and kneeling as well as possible grasp/grip limitations in his right dominant hand.

Dr. Price's opinion that Metz was restricted to light duty and was capable of performing desk work supports the ALJ's RFC determination. T. 796. Dr. Kavanaugh's finding that Metz suffered only minimal loss of range of motion of the cervical spine and his opinion that Metz "was not disabled for work," T. 203, also supports the ALJ's RFC determination. An attending physician at the Albany Medical Center opined that Metz should neither lift more than fifty pounds nor perform any repetitive bending or lifting. T. 194–95. Again, this opinion offered during the course of treatment suggests limitations which exceed those set forth in the ALJ's RFC determination. Dr. Colman's treatment notes, which state that he could not identify any pathologic entities for Metz's left knee nor any objective findings of disease, T. 415, 421, also lend support to the ALJ's RFC determination. Dr.

Singh's treatment notes, which consistently indicated that Metz was stable and that his reflexes and sensory and motor systems were normal, also lend support to the ALJ's RFC determination. T. 333, 335, 347, 461.

Additional clinical findings buttress the ALJ's decision. An MRI scan of Metz's brain revealed no abnormalities, while an MRI of his cervical spine showed no evidence of stenosis or nerve root compression. T. 621. An MRI of his lumbar spine showed only mild degenerative disease, while an X-ray of his lumbar spine revealed no pathology. T. 222–23, 621.

**\*19** With respect to Metz' mental impairments, the ALJ explained that he relied upon the reports of Drs. Hartman, Payne and Satloff. Dr. Hartman opined that Metz was able to follow and understand simple directions and instructions with a fair ability to maintain a regular schedule and make appropriate decisions. Dr. Hartman noted obvious learning deficits and that Metz would have difficulty performing complex tasks independently. He noted mild attention and concentration problems. Dr. Hartman noted mild to moderate difficulty relating adequately with others and mild to moderate difficulty in dealing appropriately with normal life stressors. T. 810. The ALJ incorporated into Metz's RFC the limitations that Dr. Hartman assessed including "occasional difficulty dealing with work stresses, problems with attention/concentration understanding and carrying out detailed instructions and dealing with others." T. 32.

Consistent with the ALJ's RFC assessment, Dr. Payne opined that Metz could follow and understand simple directions and instructions and perform simple, rote tasks under supervision. She further opined that he had problems with attention and concentration and learning new tasks. She noted that he had difficulty performing complex tasks and making appropriate decisions. She further noted that he had difficulties relating to others and dealing with stress. She characterized his psychiatric difficulties as moderately limiting. T. 210–14.

Dr. Satloff noted that Metz's impairment affected his ability to understand, remember and carry out instructions. He noted no restrictions with respect to Metz's ability to understand and remember short, simple instructions, carry out short, simple instructions or his ability to make judgments on simple work-related decisions but noted moderate restrictions with respect to Metz's ability to understand, remember and carry out detailed instructions. Dr. Satloff noted moderate restrictions with respect to Metz's ability to interact appropriately with the public and supervisors and his ability to respond appropriately

to changes in a routine work setting. Dr. Satloff noted slight restrictions with respect to Metz's ability to interact appropriately with his co-workers and in his ability to respond appropriately to work pressures. The medical source statement that Dr. Satloff completed defined the rating "slight" limitation as a mild limitation allowing the individual to "function well" while it defined a "moderate" limitation as allowing "the individual ... to function satisfactorily." T. 590.

The ALJ also cited Metz's comprehensive vocational evaluation in support of his determination. T. 28. The report found that Metz had vocational potential, and that his manual and visual-perceptual skills supported a variety of unskilled to semiskilled jobs with job coaching. T. 199.

The outpatient mental health clinic's schizoaffective disorder 295.70 diagnosis is the only such diagnosis to appear in the record. *Compare* T. 769 *with* T. 568 (social phobia and obsessive compulsive disorder), 595 (major depressive disorder, social phobia, learning disorder-not otherwise specified, polysubstance abuse by history and borderline intellectual functioning), 821 (major depressive disorder-moderate with possible psychotic features, social phobia, learning disorder-not otherwise specified, polysubstance abuse by history, borderline intellectual functioning). As the Commissioner points out, however, even assuming *arguendo* that the schizoaffective disorder diagnosis were correct, the mere presence of a disease or impairment is not enough to trigger a disability; considering the claimant's age, education and work experience, he must also not be able to engage in any other kind of substantial gainful work in national economy. *Rivera v. Harris,* 623 F.2d 212, 215–16 (2d Cir.1980).

**\*20** The ALJ found that Metz demonstrated that his impairments prevented a return to his past relevant work. Accordingly, the burden then shifted to the Commissioner to prove that a job exists in the national economy which he was capable of performing. *See Curry v. Apfel,* 209 F.3d 117, 122 (2d Cir.2000); 20 C.F.R. § 404.1560(c) (2005). "[W]ork exists in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions in the country." 20 C .F.R. § 404.1566(a) (2005). The ALJ may apply the Grids or consult a vocational expert. *See Heckler v. Campbell,* 461 U.S. 458, 462, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983); *Rosa v. Callahan,* 168 F.3d 72, 78 (2d Cir.1999); 20 C.F.R. pt. 404, subpt. P, App. 2 (2003). If the claimant's characteristics match the criteria of a particular grid

rule, the rule directs a conclusion as to whether he or she is disabled. *Pratts v. Chater,* 94 F.3d 34, 38–39 (2d Cir.1996).

The ALJ solicited the testimony of a vocational expert regarding jobs suitable for a hypothetical person with of Metz's age and with his education, past work experience, and RFC. The ALJ posed a hypothetical question to the vocational expert incorporating Metz's RFC limitations as described above. *See Juleszo v. Barnhart,* 232 F.Supp.2d 44, 57 (W.D.N.Y.2002) (quoting *Totz v. Sullivan,* 961 F.2d 727, 730 (8th Cir.1992) (holding that "the hypothetical question posed to a vocational expert must fully set forth a claimant's impairments") (further citation omitted). Based upon the vocational expert's testimony, *see* Part V(A)(3) *supra,* and relying upon Medical–Vocational Rule 202.21 as a framework, the ALJ found that there were a significant number of jobs in the national economy that Metz could perform as a laundry sorter, DOT occupational code 361.687–014, and housekeeper, DOT occupational code 323.687–014. T. 32.

Accordingly, it is recommended that the Commissioner's determination in this regard be affirmed.

## VI. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that the decision denying disability benefits be **AFFIRMED,** Metz's motion for a finding of disability be **DENIED,** and the Commissioner's cross-motion be **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989)); 28 U .S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a).

### Footnotes

1    The complaint named as the only defendant Jo Anne B. Barnhart, then the Commissioner of Social Security, as the defendant, in her official capacity. On February 12, 2007, Michael J. Astrue replaced Barnhart as Commissioner. Therefore, pursuant to Fed.R.Civ.P. 25(d)(1), Astrue is substituted as the named defendant. *See* 42 U.S.C. § 405(g).

2    The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

3    The relevant period with respect to SSI is from May 16, 2002, the date of Metz's SSI application, until November 18, 2005, the date of the ALJ's decision. The relevant period with respect to DIB is from December 1, 2000, Metz's alleged onset date of disability, until November 18, 2005, the date of the ALJ's decision. *See* Docket No. 15; T. 82.

4    "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. Docket No. 5.

5    Over the course of Metz's interaction with the Administration, he has alleged various dates for the alleged onset of his disability. In his application for DIB dated June 13, 2002, he alleged that his disability began on December 1, 2000. T. 130; *see also* T. 715. In his application for SSI, signed on May 20, 2002, he stated that his disability began on November 12, 2001. T. 702–03. In his subsequently filed application, which the Appeals Council directed the ALJ to consolidate with his related claims, he alleged that his disability began April 14, 2004. T. 722, 726. As noted by the Commissioner in his brief, while the ALJ referenced plaintiff as having become disabled in 2004, he evaluated the medical evidence of record in its entirety. Docket No. 15.

6    Section 55–b provides that "[t]he commission may determine up to twelve hundred positions with duties such as can be performed by persons with a physical or mental disability who are found otherwise qualified to perform satisfactorily the duties of any such position." N.Y. CIV. SERV. § 55–b (McKinney 1999).

7    Darvocet is a combination preparation of propoxyphene napsylate and acetaminophen. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 479, 1551 (31st ed.2007) [hereinafter "DORLAND'S"].

8    Lortab is a combination preparation of hydrocodone barbiturate, a semisynthetic opioid analgesic derived from codeine, and acetaminophen. DORLAND'S 890, 1090.

9    Spondylolisthesis is the forward displacement of one vertebra over another, spondylolysis is the dissolution of a vertebra and osteophytosis is a condition characterized by the formation of a bony excrescence. DORLAND'S 1369, 1777–78.

10   Chondromalacia is a softening of the articular cartilage, most frequently in the patella. DORLAND'S 358.

11   On April 24, 2003, an MRI revealed that Metz suffered from a mild grade II signal posterior horn medial meniscus without meniscal or ligament tears. T. 520–21.

12    Stenosis is an abnormal narrowing of a canal. DORLAND'S, 1795.

13    The diagnostic criteria for schizoaffective disorder are:

(A) An uninterrupted period of illness during which, at some time, there is either a Major Depressive Episode, a Manic Episode, or a Mixed Episode concurrent with symptoms that meet Criterion A for Schizophrenia ....; (B) during the same period of illness, there have been delusions or hallucinations for at least 2 weeks in the absence of prominent mood symptoms; (C) symptoms that meet criteria for a mood episode are present for a substantial portion of the total duration of the active and residual periods of the illness; (D) the disturbance is not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a general condition.

DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 323 (Am. Psychiatric Ass'n, 4th ed.2000).

14    Metz includes Clark's opinion in his arguments. *See* subsection V(D) *infra.*However, as an employment specialist, Clark does not qualify as an acceptable medical source under the regulations. *See*20 C.F.R. § 404.1513(a) & 416.913(a).

15    Zanaflex is a preparation of tizandine hydrochloride, which is an adrenergic agonist used as a short-acting agent to manage the increased muscle tone associated with spasticity. DORLAND'S 1958, 2119.

16    Nexium is a preparation of esomeprazole magnesium, which is a proton pump inhibitor used as a gastric acid secretion inhibitor in the treatment of symptomatic gastroesophageal reflux disease. DORLAND'S 654, 1293.

17    Medium work involves lifting no more than ifty pounds at a time with frequent lifting or carrying of objects weighing up to twenty-five pounds. 20 C.F.R. §§ 404.1567(c), 416.967(c).

---

**End of Document**                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 470572

United States District Court,
S.D. New York.

Carol MURPHY, Plaintiff,

v.

Jo Anne B. BARNHART, [1] Commissioner
of Social Security, Defendant.

No. 00Civ.9621(JSR)(FM). | Jan. 21, 2003.

Former teacher, suffering from right side pain, sought judicial review of denial of social security disability benefits. On cross-motions for summary judgment, the District Court, Frank Maas, United States Magistrate Judge, recommended that administrative law judge (ALJ) improperly failed to detail reasons for denying claim.

Recommendation reported.

West Headnotes (1)

[1]  **Social Security**
      👉 **Nature and Severity of Condition or Impairment**

      Administrative law judge (ALJ), denying disability benefits claim of former teacher suffering from right side pain, improperly failed to detail reasons for not according controlling weight to treating physician's opinion, to consider evidence of claimant's functional limitations, or to consider all factors relevant to determining credibility of claimant's pain complaints. Social Security Act, § 223(d)(1)(A), as amended, 42 U.S.C.A. § 423(d)(1)(A).

      68 Cases that cite this headnote

***REPORT AND RECOMMENDATION
TO THE HONORABLE JED S. RAKOFF***

MAAS, Magistrate J.

**I. *Introduction***

**\*1** Pursuant to Section 205(g) of the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g), plaintiff Carol Murphy ("Murphy") seeks review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance and Supplemental Security Income ("SSI") benefits. The case comes before the Court on cross-motions for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). For the reasons set forth below, I recommend that Murphy's motion be granted insofar as it seeks a remand of this case for further proceedings, and that the Commissioner's cross-motion be denied. Additionally, if this report and recommendation is accepted, the case should be closed.

**II. *Background***

**A. *Procedural History***

On or about July 7, 1995, Murphy filed applications for disability insurance and SSI benefits which alleged that she had been disabled since June 15, 1994. [2] (Tr. 91). [3] These applications both were denied initially on August 15, and upon reconsideration on December 5, 1995. (*Id.* at 94–96, 98–100). In late December 1995, Murphy requested a *de novo* hearing before an administrative law judge ("ALJ"), which was held on November 22, 1996. (*Id.* at 40–89, 102). Following that hearing, on June 24, 1997, the ALJ issued a written decision in which he concluded that Murphy was ineligible for benefits. (*Id.* at 31–35). The ALJ's decision became the Commissioner's final decision after the Appeals Council denied further review on October 26, 2000. [4] (*Id.* at 4–5).

On or about December 19, 2000, Murphy filed a timely action in this Court seeking review of the Commissioner's decision. (Docket No. 1).

**B. *Relevant Facts***

**1. *Non–Medical Evidence***

**a. *Murphy's Testimony***

Murphy was born on March 9, 1946. (Tr. 45). She has a bachelor's degree in psychology and has completed an additional thirty credits of graduate work. (*Id.* at 48, 111). Over the fifteen-year period prior to the hearing, Murphy worked in the education field, both as a teacher of children and adults and as an administrative assistant. (*Id.* at 49–55, 111). Murphy testified that she began to experience pain on

her right side after an incident in 1991 during which a student assaulted her and caused her to fall. (*Id.* at 58). She explained that she resigned from teaching in June 1994 because the pain had increased to the point that she "couldn't do it anymore." (*Id.* at 55).

Murphy stated that she had constant pain on her right side, particularly in her right hand and neck, and in her lower back. (*Id.* at 57). She testified that the pain would often radiate into her right leg, and that her fingers, feet, and toes would tingle. (*Id.*). Murphy said that the pain in her right side and lower back was constant and "excruciating," and that the radiating pain in her leg occurred "four or five times a day." (*Id.* at 58, 59). She indicated that she was hospitalized for approximately ten days in September 1995 for the pain in her right side, headaches, and nausea. (*Id.* at 60).

**\*2** Murphy testified that she was no longer taking medication to relieve her pain because it had elevated her blood pressure. (*Id.* at 60, 81). She stated that she wore a cervical collar for about 75 percent of the day and used a cane to help her walk. (*Id.* at 62). She testified that she also wore a brace on her right hand to support her wrist, on which two surgeries had been performed in an attempt to address her symptoms of carpal tunnel syndrome and ulnar entrapment. (*Id.* at 61, 63).

Murphy testified that she resided with her children in a two-story house. (*Id.* at 45–46). She stated that she occasionally would drive no longer than five to ten minutes to visit her doctors. (*Id.* at 76). She also stated that she went shopping once a week with the assistance of a daughter and cooked a few times a week using a microwave oven. (*Id.* at 77, 83). Murphy indicated that she had occasional difficulty washing and dressing, and that she sometimes needed her daughter's help to tie her shoes. (*Id.* at 78). She also stated that, because she was unable to grasp objects with her dominant right hand, she was unable to type or write for any extended period. (*Id.* at 82). When asked to assess her work-related abilities, Murphy indicated that she would be able to sit and stand for twenty minutes at a time and would be able to walk approximately one and one-half blocks before having to stop. (*Id.* at 86). She also stated that she could lift about five pounds. (*Id.*).

**b. *Chiropractor's Report***

In an undated report to the New York State Department of Social Services ("NYSDOSS"), Dr. Vito Guarino, a chiropractor who treated Murphy between August and November 1995, indicated that she complained of weakness

in her right arm, cervical pain, arm to hand paresthesia, [5] right thigh to buttock pain, and an inability to walk without a cane. (*Id.* at 125). He reported that Murphy experienced grip weakness in her right hand. (*Id.* at 126). Dr. Guarino further noted that Murphy had a limited range of motion in her right shoulder, neck, and back, and a significant abnormality in her gait. (*Id.* at 127–33). He diagnosed Murphy as suffering from right "sciatic neu[ro]pathy" [6] and right "brachial neu[ro]pathy," (*id.* at 125), indicating that she could not lift any weight, could stand or walk "less than 2 hours per day," and could sit "less than 6 hours per day." (*Id.* at 133). He also noted that weakness in Murphy's right arm limited her ability to push or pull and that she had "postural" difficulties as a consequence of a "malposition[ed] lumbar spine." (*Id.*).

### 2. *Medical Evidence*

**a. *Hospitalization and MRI Results***

On September 19, 1995, Murphy was admitted to New Rochelle Hospital, where she remained for ten days after complaining about high blood pressure and pain on the right side of her body. (*Id.* at 146–69). The admitting diagnosis was "cervical spondilitis [sic] ." [7] (*Id.* at 146).

**\*3** Dr. Jerome Gristina, a consultant in physical medicine and rehabilitation, examined Murphy during her hospital stay, noting that her reflexes were equal and active and her nerve conduction studies were "within normal limits," although her sensation to pinprick was reduced in the right upper and lower extremities. (*Id* . at 154). His report indicated that her motor power in these extremities was 4/5, although there was no evidence of muscle wasting. (*Id.*). Dr. Gristina also observed that Murphy had difficulty raising her right leg because of back pain and that there was tenderness in the "midline lumbosacral area and cervical area." (*Id.*). He prescribed physical therapy for her complaints. (*Id.*).

While Murphy was hospitalized, an MRI examination on September 21, 1995 revealed a "mild right paracentral L5–S1 disc bulge" which "mildly displace[d] the right S1 root." (*Id.* at 136). The MRI also disclosed a "C5–C6 right lateral protrusion of bone and osteophyte material, mildly deforming the ventral right lateral cord and moderately narrowing the foramen." [8] (*Id.* at 138). However, the examination did not show any disc herniation, spinal stenosis, or "intrinsic signal abnormalities of the cord." (*Id.* at 137–38).

Murphy's hospital discharge summary was consistent with the results of the MRI study, but also noted that she suffered from a Vitamin B12 deficiency which was being addressed. (*Id.* at 147). The discharge summary stated that she was discharged from the hospital on September 25 "in stable condition" and was to be followed on an outpatient basis by her private physician. (*Id.*). _____

**b. *Dr. Essien***

On September 30, 1995, Dr. Ralph Essien, Murphy's personal physician, prepared a "to whom it may concern" letter which indicated that Murphy was "suffering from a disabling neurological condition." (*Id.* at 145). The letter also noted that Murphy was "unable to put to full use her extremities for labor." (*Id.*).

Following an examination on October 23, 1995, Dr. Essien diagnosed Murphy as having cervical spondylitis, hypertension, hypercholesterolemia, and a Vitamin B12 deficiency. (*Id.* at 141; *see also* Pl.'s Mem. at 8). He reported to NYSDOSS that Murphy demonstrated weakness on her right side and complained of pain associated with that weakness. (*Id.* at 141–42). He also noted that she had decreased muscle tone on her right side and was unable to walk without a cane. (*Id.* at 142). Dr. Essien indicated that Murphy could lift five to ten pounds and could "stand and/or walk" for up to six hours per day. (*Id.* at 143). He also reported that she was limited in her ability to push and pull, but he did not provide any further specifics. (*Id.* at 144). Finally, he observed that Murphy's ability to perform work was also limited by a "gait problem." (*Id.*).

**c. *Dr. Klass***

The record before the ALJ also included several letters written by Dr. Stephen C. Klass, a doctor retained by the workers compensation insurance carrier for Murphy's employer. (*Id.* at 170–74). In a June 28, 1995 letter, Dr. Klass reported that, during examinations on May 1 and June 16, 1995, Murphy complained of numbness in her right arm and pain in her right side. (*Id.* at 173). He noted further that Murphy appeared to move about "without any degree of discomfort" and that he was uncertain as to whether her condition was "real" or "unreal." (*Id.*). Thereafter, in letters to NYSDOSS dated October 19 and November 10, 1995, Dr. Klass reported the results of the scans previously done at New Rochelle Hospital, but did not comment on them. (*Id.* at 170–72).

**d. *Dr. Barone***

 **\*4** Dr. Richard P. Barone began treating Murphy for carpal tunnel syndrome in 1991 after the accident at her school. (*Id.* at 189, 194). In a letter dated October 28, 1996 to Meir Freund, Esq., Murphy's attorney, Dr. Barone reported that Murphy's right hand was "missing a lot of function" and that she suffered from "ongoing symptoms of the right [u]lnar nerve entrapment." (*Id.* at 194). He also reported that Murphy was continuing to complain about neck and back pain. (*Id.*). He noted the results of the New Rochelle Hospital tests, concluding that she could not "function at any job under any circumstances" because she experiences pain in all positions. (*Id.*). Finally, he observed that Murphy's distal nerve entrapments did "not allow for reasonable hand activity of any kind." (*Id.*). He stated that Murphy could no longer take pain medication because of her elevated blood pressure. (*Id.*).

Subsequently, on September 19, 1997, Dr. Barone completed a medical assessment of Murphy's ability to perform work-related physical activities, in which he reported that she could lift less than one to two pounds due to her weakened grip, muscle spasms, and tingling in her neck, arm, hand, and cervical spine.[9] (*Id.* at 196). He also indicated that Murphy was limited in reaching, handling, and pushing/pulling, and that she was sensitive to temperature extremes and vibration. (*Id.* at 197). Dr. Barone concluded that because of the problems with her right neck, back, and side, Murphy could not "sit, stand, push, pull, read, write or do any activity without pain." (*Id.* at 198). He indicated that she could sit, stand, and walk for one hour at a time and for a maximum of one hour per work day. (*Id.* at 195).

**e. *Dr. Kuiper***

On June 19, 1997, Dr. Willem T. Kuiper, a specialist in physical medicine and rehabilitation, examined Murphy. (*Id.* at 199). He observed that Murphy's cervical paraspinal muscles, as well as her dorsal and lumbrosacral paraspinal muscles, were tight and tender, and that she had a decreased range of motion.[10] (*Id.*). He also noted that her right wrist was tender. (*Id.*). Dr. Kuiper's diagnosis was that Murphy suffered from:

> Derangement of the cervical spine with clinically right sided radiculopathy. Derangement of the lumbrosacral spine with clinically right sided radiculopathy. Traumatic arthritis of the right wrist with carpal tunnel syndrome.

(*Id.* at 200). He noted that she complained of recurrent headaches, blurred vision on the right, ringing in her ears, light-headedness when turning her head, "phobias for people behind her," twitching in the right side of her face, pain in her neck radiating into both arms, numbness and tingling in both hands, and pain in her upper and lower back radiating into her right leg. (*Id* . at 199). He also reported that Murphy had difficulty sitting, standing, or walking, could not lift anything heavier than ten pounds, and walked with a cane. (*Id.*). Dr. Kuiper concluded that Murphy had a permanent partial disability. (*Id.* at 200).

### 3. *ALJ's Findings*

**\*5** After hearing Murphy's testimony and reviewing the medical evidence, the ALJ found that Murphy had not engaged in any substantial gainful activity since June 15, 1994, at which time she met the disability insured status requirements of the Act. (*Id.* at 34). However, the ALJ further determined that Murphy's impairment did not meet the standards of any impairment listed 20 C.F.R. § 404, Appendix 1, Subpart P, and that her allegations regarding her pain and functional limitations were "not credible." (*Id.*). He also found that while Murphy was limited in her ability to lift or carry more than ten pounds or to stand or walk for an extended period, her past relevant work as a teacher and administrative assistant did not require that she perform such activities. (*Id.*). The ALJ therefore determined that Murphy was not disabled. (*Id.* at 35).

### III. *Applicable Law*

#### A. *Disability Determination*

"Disability" is defined in the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In making a determination as to a claimant's disability, the Commissioner is required to apply the familiar five-step sequential process set forth in 20 C.F.R. §§ 404.1520 and 416.920. The Second Circuit has described that process as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which

significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999)(quoting *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982)). *Accord Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir.2002).

The claimant bears the burden of proof with respect to the first four steps of this process. *DeChirico v. Callahan,* 134 F.3d 1177, 1180 (2d Cir.1998). If the Commissioner finds that a claimant is disabled or not disabled at an early step in the process, she is not required to proceed with any further analysis. *Williams v. Apfel,* 204 F.3d 48, 49 (2d Cir.2000). However, if the analysis reaches the fifth step of the process, the burden shifts to the Commissioner to show that the claimant is capable of performing other work. *DeChirico,* 134 F.3d at 1180.

#### B. *Standard of Review*

**\*6** Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment on the pleadings if it establishes that no material facts are in dispute and that it is entitled to judgment as a matter of law. *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988); *Caraballo ex rel. Cortes v. Apfel,* 34 F.Supp.2d 208, 213 (S.D.N.Y.1999)(Sweet, J.)(internal citations omitted).

The Act, in turn, provides that the "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *see Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir.2002); *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996). The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson,* 402 U.S. at 401, 91 S.Ct. at 1427 (quoting *Consol. Edison Co. of N.Y. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938))(internal quotation marks omitted).

A reviewing court is not permitted to review the Commissioner's decision *de novo. Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998); *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991); *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980). Rather, where the Commissioner's determination is supported by substantial evidence, the decision must be upheld. *See Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990); *Ortiz v. Barnhart,* 2002 WL 449858, at *4 (S.D.N.Y. Mar.22, 2002)(Sweet, J.). Although one would expect the deferential "substantial evidence" standard to result in frequent judicial affirmances of the Commissioner's decisions, disability determinations have in fact proved to be "surprisingly vulnerable to judicial reversal." *Thomas v. Barnhart,* 2002 WL 31433606, at *4 (S.D.N.Y. Oct.30, 2002). As Judge Lynch explained in *Thomas:*

> This vulnerability results primarily from the creation by the Commissioner, and the enforcement by the courts, of a variety of procedural obligations to which ALJs must scrupulously adhere. Failure to do so is treated as "legal error" permitting reversal of the ALJ's decision. For example, the substantial evidence standard might lead one to expect that a district court must affirm the decision of an ALJ who accepts the medical judgment of a consultative physician who unequivocally finds a claimant fit for work. Yet, the Commissioner has adopted regulations that give greater, and under some circumstances controlling, weight to the opinion of a claimant's treating physician, and set forth a particular methodology that must be followed in deciding whether to accept or reject such an opinion....
>
> In light of rules such as these, a district court reviewing a benefits denial may not simply accept the administrative determination because a cursory review of the record reveals plausible testimony or documentary

evidence or expert opinion that supports the administrative determination. Rather, the record must be carefully evaluated to determine whether the Commissioner fully complied with all the relevant regulations.

**\*7** *Id.*

## IV. *Discussion*

### A. *Residual Functional Capacity ("RFC") Assessment*

Murphy contends that the Commissioner's finding that she is able to engage in sedentary work of the type that she previously performed is not supported by substantial evidence. Specifically she argues that the ALJ failed to (1) accord proper weight to the opinions of her treating physicians, (2) consider the reports of her chiropractor, (3) consider her inability to walk without the assistance of a cane, or (4) properly weigh the credibility of her testimony regarding her pain. (Pl.'s Mem. at 7–22). She urges the Court to remand solely for the purpose of calculating benefits. (*Id.* at 22–24).

### 1. *Opinions of Treating Physicians*

With respect to her treating physicians, Murphy contends that the ALJ mischaracterized Dr. Essien's opinion and "failed to articulate any reasons for failing to fully credit the opinion as [it] exists in the record." (*Id.* at 9–10). She also maintains that the ALJ's reasons for discrediting Dr. Barone's opinions were insufficient. (*Id.* at 12–13).

An ALJ is required to give a treating physician's medical opinion controlling weight if it is well-supported by medical findings and not inconsistent with the other substantial evidence in the administrative record. *See Rosa,* 168 F.3d at 78–79; *Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir.1998); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). An ALJ who does not give the treating physician's medical opinion controlling weight must provide "good reasons" for that decision and explain the factors that were applied to determine the amount of weight given to the opinion. 20 C .F.R. §§ 404. 1527(d)(2), 416.927(d)(2). Among the factors the ALJ must consider are the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, the extent to which the opinion is supported by medical and laboratory findings, the physician's consistency with the record as a whole, and whether the physician is a specialist. *Id.* §§ 404.1527(d)(2)(i) & (ii), (3)-(6), 416.927(d)(2)(i) & (ii), (3)-(6). However, the

ALJ is not required to give controlling weight to a treating physician's opinions as to the ultimate issue of whether the claimant meets the statutory definition of disability. *Id.* §§ 404.1527(e)(1) & (3), 416.927(e)(1) & (3). *See also Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999)(quoting 20 C.F.R. § 404.1527(e)(1)). If the ALJ fails to apply the correct standard in weighing a treating physician's opinion and fails to give good reasons for rejecting the opinion, a remand for further fact finding is the appropriate remedy. *Schaal,* 134 F.3d at 506.

The ALJ's decision indicated that he accorded little weight to Dr. Barone's opinion that Murphy could not function "at any job under any circumstances." (Tr. 33). Among other things, he found it "unusual," and therefore not credible, that "Dr. Barone wrote that [Murphy] could [undertake these activities] for one hour each at a time *and* for one hour each during an entire 8 hour work day ." (*Id.*)(emphasis in original). The ALJ also stated that Dr. Barone's opinion was not supported by "objective clinical findings." (*Id.*). Assuming that there was some inconsistency in these findings, the ALJ nevertheless failed to indicate the weight, if any, that he accorded to the other aspects of Dr. Barone's opinion, including the findings that Murphy suffered from back and neck pain due to a bulging disc that impinged her spinal cord and had difficulty grasping, pushing/pulling, and reaching. (*See id.* at 194–95). Additionally, the ALJ failed to apply the factors set forth in 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6) to explain the weight he did accord Dr. Barone's opinion. This was error.

**\*8** The ALJ's reluctance to accept Dr. Barone's findings also stems, at least in part, from Dr. Essien's observation that Murphy could "lift/carry up to 10 pounds occasionally, stand/walk for up to 6 hours in an 8 hour work day, and sit without limitation." (*Id.* at 33). However, the ALJ failed to address Dr. Essien's other findings indicating that Murphy had cervical spondylitis, had decreased muscle tone on her right side, was unable to walk without a cane, and was limited in her ability to push or pull. (*See id.* at 141–44). The ALJ also failed to set forth any reasons for not crediting these findings. This, too, was error. *See, e.g., Ferraris v. Heckler,* 728 F.2d 582, 586–87 (2d Cir.1984)(case remanded because ALJ failed to consider treating physician's opinion as to claimant's ability to sit for more than one or two hours at a time).

On remand, the ALJ should take care to detail his reasons for not according controlling weight to the opinions of Murphy's treating physicians as to all of the physical activities relevant to her former sedentary work.

### 2. *Chiropractor's Report*

Murphy contends that the ALJ also failed to consider—or even mention the report of her chiropractor, Dr. Guarino, in the course of determining her RFC. (Pl.'s Mem. at 13–14).

The applicable regulations state that a chiropractor is not an "acceptable medical source" who can provide evidence of the existence of a "medically determinable impairment." *See* 20 C.F.R. §§ 404.1513(a) & (d)(1), 416.913(a) & (d)(1). Rather a chiropractor falls into the category of "other sources" that the Commissioner may use to determine the severity of a claimant's impairment and how it affects the claimant's ability to work. *Id.* Other such sources include school teachers, relatives, and social welfare agency personnel. *Id.* §§ 404.1513(d)(2)-(4), 416.913(d)(2)-(4). Although the opinion of a treating chiropractor consequently is not entitled to controlling weight, *Diaz v. Shalala,* 59 F.3d 307, 313 (2d Cir.1995), "chiropractic reports may assist an ALJ in determining a claimant's disability status, and therefore should not be disregarded arbitrarily." *Ienuso v. Apfel,* 1998 WL 336641, at \*6 (S.D.N.Y. June 23, 1998)(Mukasey, J.). Indeed, the regulations require that the Commissioner consider all the relevant evidence, including observations made by persons other than the claimant's treating physicians. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a).

In his decision, the ALJ failed to mention Dr. Guarino's report, which indicated, among other things, that Murphy suffered from pain and weakness in her right side, had difficulty grasping objects with her right hand, could not stand for more than two hours per day, could not sit more than six hours per day, was limited in her ability to push and pull, and required the use of a cane to help her walk. (*See* Tr. 125–26, 133). This evidence, although not entitled to controlling weight, certainly was relevant to the ALJ's determination of Murphy's RFC and, as such, should have been considered. The failure to do so constitutes error.

### 3. *Analysis of Functional Limitations*

**\*9** Murphy also argues that the ALJ improperly failed to consider Murphy's manipulative limitations and need to use a cane in the course of analyzing her RFC. (Pl.'s Mem. at 17).

The regulations require an ALJ to consider all relevant evidence in the record, including the "nature and extent of [the claimant's] physical limitations," in the course of determining a claimant's RFC. 20 C.F.R. §§ 404.1545(a) & (b), 416.945(a)

& (b). The physical limitations that can have an impact on a claimant's ability to perform past work include limits in walking and other "manipulative or postural functions, such as reaching, handling, stooping or crouching." *Id.* §§ 404.1545(b), 416.945(b).

Under the regulations, the ALJ also must analyze a claimant's RFC on a function-by-function basis. *See Brown v. Barnhart,* 2002 WL 603044, at *5 & n. 5 (E.D.N.Y. Apr.15, 2002)(Gleeson, J.)(remand required by ALJ's failure to perform function-by-function analysis); *Alwashie v. Apfel,* 2001 WL 135768, at *4 (S.D.N.Y. Feb.16, 2001)(Mukasey, J.)("The RFC should be a function-by-function determination of the claimant's ability to do work-related physical activities such as sitting, standing, walking, carrying, lifting, or pulling...."); Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *3 (July 2, 1996)("The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. At step 4 of the sequential evaluation process, the RFC must not be expressed initially in terms of the exertional categories of 'sedentary,' 'light,' 'medium,' 'heavy,' and 'very heavy' work because the first consideration at this step is whether the individual can do past relevant work as he or she actually performed it.").

The record indicates that Drs. Barone and Guarino both found that Murphy was experiencing weakness in her right hand. In 1996, Dr. Barone reported that Murphy's right hand "is missing a lot of function" and that "[s]imple activities [such] as cleaning, brushing teeth, toilet activities, [and] bathing are severely impaired." (Tr. 194). In a subsequent report, Dr. Barone similarly indicated that Murphy had little grip strength in her right hand. (*Id.* at 196). Dr. Guarino also found that Murphy was experiencing grip weakness in her right hand when he examined her. (*Id.* at 126). In keeping with these findings, Murphy herself testified that she had difficulty grasping objects with her right hand and could not write for any extended period of time. (*Id.* at 82). Drs. Essien and Guarino further noted that Murphy had difficulty walking and that she utilized a cane as an aid. (*Id.* at 125, 142).

Despite this evidence, the ALJ gave no indication that he considered Murphy's limited ability to manipulate her right hand or her use of a cane in the course of determining that she was not limited in her performance of sedentary work. Sedentary work is defined by the regulations as work which "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket

files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a). *See also* SSR 96–9p, 1996 WL 374185, at *8 (July 2, 1996) ("Most unskilled sedentary jobs require good use of hands and the fingers."). The regulations further note that a sedentary job typically requires occasional walking and standing. 20 C.F.R. §§ 404.1567(a), 416.967(a). Murphy's manipulative limitations and use of a cane therefore were relevant to the ALJ's determination that she could perform sedentary work. The ALJ's failure to consider all of the relevant evidence regarding Murphy's functional limitations and to perform a function-by-function analysis of her limitations in the course of determining her RFC therefore also compels a remand to the Commissioner for further proceedings.

### 4. *Credibility Determination*

**\*10** Murphy's final contention is that the ALJ improperly analyzed the credibility of her testimony regarding her pain and symptoms. (Pl.'s Mem. at 17).

The regulations set forth a two-step process to evaluate a claimant's testimony regarding her symptoms. First, the ALJ must consider whether the claimant has a medically determinable impairment which could reasonably be expected to produce the pain or symptoms alleged by the claimant. *Sarchese v. Barnhart,* 2002 WL 1732802, at *7 (E.D.N.Y. July 19, 2002)(Gleeson, J.) (citing SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996)); 20 C.F.R. §§ 404.1529(b), 416.929(b). Second, if the ALJ determines that the claimant is impaired, he then must evaluate the "intensity, persistence, and limiting effects" of the claimant's symptoms. *Id* . (internal quotation marks omitted); 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). If the claimant's statements about her symptoms are not substantiated by objective medical evidence, the ALJ must make a finding as to the claimant's credibility. *Sarchese,* 2002 WL 1732802, at *7; SSR 96–7p, 1996 WL 374186, at *2. Such an evaluation of a claimant's credibility is entitled to great deference if it is supported by substantial evidence. *Bischof v. Apfel,* 65 F.Supp.2d 140, 147 (E.D.N.Y.1999). *See also Bomeisl v. Apfel,* 1998 WL 430547, at *6 (S.D.N.Y. July 30, 1998)(Mukasey, J.)("findings [as to claimant's credibility] are entitled to deference because the ALJ had the opportunity to observe the claimant's testimony and demeanor at the hearing").

In assessing the claimant's credibility, the ALJ must consider all of the evidence in the record and give specific reasons for the weight accorded to the claimant's testimony. *See*

*Rivera v. Apfel,* 1999 WL 138920, at *8 (S.D.N.Y. Mar.15, 1999) (Mukasey, J.)(ALJ must state specific reasons for rejecting claimant's statements as not credible); *Lugo v. Apfel,* 20 F.Supp.2d 662, 663 (S.D.N.Y.1998)(Rakoff, J.)(same); SSR 96–7p, 1996 WL 374186, at *4 ("When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements ."). The regulations require the ALJ to consider not only the objective medical evidence, but also:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms ...; and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

**\*11** SSR 96–7p, 1996 WL 374186, at *3 (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)). *See Sarchese,* 2002 WL 1732802, at *7 (listing factors); *Lewis v. Apfel,* 62 F.Supp.2d 648, 658 (N.D.N.Y.1999)(same).

Here, the ALJ found that the conditions described by Murphy did not constitute "an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1...." (Tr. 34). In keeping with the regulations, the ALJ also considered Murphy's allegations of pain and functional limitations, concluding that they were "not credible to the incapacitating extent alleged." (*Id.* at 33). In reaching this determination, the ALJ relied on Dr. Klass's report stating that Murphy's symptoms were out of proportion to his "objective neurological findings," as well as a portion of Dr. Essien's report stating that there was no evidence of muscle atrophy or sensory deficits. (*Id.*). However, the ALJ evidently failed to consider other required factors, such as the

record evidence regarding the impact of Murphy's impairment on her daily activities and the location and frequency of her pain. This, too, requires a remand so that they ALJ can consider whether the objective medical evidence and the other factors listed in the regulations support Murphy's testimony as to her pain, symptoms, and functional limitations. *See, e.g., Lewis,* 62 F.Supp.2d at 658 (remanding case to Commissioner where ALJ failed to discuss the additional factors in analyzing the claimant's statements as to pain and failed to "provide a 'narrative discussion' of the weight that he accorded to [the claimant] statements").

**B. *Proper Relief***

Notwithstanding the flaws in the ALJ's decision, Murphy contends that the case should be remanded "solely for the purpose of calculating benefits." (Pl.'s Mem. at 22). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's final decision has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for rehearing." A remand solely for the calculation of benefits is warranted only when a rehearing would serve no purpose. *See Curry v. Apfel,* 209 F.3d 117, 124 (2d Cir.2000)(quoting *Balsamo v. Chater,* 142 F.3d 75, 82 (2d Cir.1998)). However, if the record is incomplete or the ALJ has applied the wrong legal standard, the case should be remanded for a rehearing. *See Curry,* 209 F.3d at 124; *Zimmerman v. Massanari,* 212 F.Supp.2d 127, 133–34 (W.D.N.Y.2002).

In this case, the ALJ's decision failed to comply with the Commissioner's regulations in several respects. Nevertheless, on the present record, the Court cannot say that the ALJ will necessarily find, after a more searching analysis, that Murphy is disabled and entitled to benefits. Accordingly, the case should be remanded to the Commissioner for a further hearing, not simply for the calculation of benefits.

**\*12** In making this recommendation, I am mindful of the extensive delays endured by Murphy during the disability determination process, her subsequent appeals, and the pendency of this case. However, delay alone is not a sufficient basis for the Court to remand a Social Security appeal solely for the calculation of benefits. *Bischof,* 65 F.Supp.2d at 148 (citing *Bush v. Shalala,* 94 F.3d 40, 46 (2d Cir.1996)). Nonetheless, because of the prior delays, the Commissioner should be instructed to make every effort to expedite the rehearing process upon remand.

## V. *Conclusion*

Plaintiff Carol Murphy's motion for judgment on the pleadings should be granted inso far as it seeks remand to the Commissioner for further proceedings in accordance with this Report and Recommendation, and the Commissioner's cross-motion should be denied. Additionally, the Commissioner should be directed to expedite the hearing process following the remand. Finally, if these recommendations are accepted, the case should be closed.

## VI. *Notice of Procedure for Filing of Objections to this Report and Recommendation*

The parties are hereby directed that if they have objections to this Report and Recommendation, they must, within ten days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Jed S. Rakoff and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Rakoff. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b).

### Parallel Citations

85 Soc.Sec.Rep.Serv. 491

### Footnotes

| 1 | Jo Anne B. Barnhart, the current Commissioner of Social Security, has been substituted as the defendant in this action pursuant to Fed.R.Civ.P. 25(d)(1). |
|---|---|
| 2 | The administrative record furnished to the Court contains several gaps. For example, Murphy's application for SSI benefits is missing. Nonetheless, the List of Exhibits in the record indicates that the SSI application was submitted on the same day as the application for disability benefits. |
| 3 | Citations to "Tr. ___" refer to the certified copy of the administrative record filed by the Commissioner as part of the Answer. |
| 4 | The Appeals Board initially denied review on June 23, 1999. Thereafter, the Board vacated that decision and issued a new decision on October 26, 2000 because it had failed to consider and make part of the record certain additional evidence submitted by Murphy. (*See id.* at 4–15). |
| 5 | "Paresthesia" is an abnormal sensation, such as a feeling of burning or prickling. Sloane–Dorland Annotated Medical–Legal Dictionary ("Sloane–Dorland Dictionary") 533 (1987). |
| 6 | The term "neuropathy" refers to "functional disturbances and/or pathological changes in the peripheral nervous system." *Id* . at 496. |
| 7 | "Spondylitis" is an inflammation of the vertabrae. *Id.* at 661. |
| 8 | An intervertebral foramen is a passage through which nerves travel to reach soft tissue. *See* Sloane–Dorland Dictionary at 295. |
| 9 | This report was submitted as additional medical evidence when Murphy appealed the ALJ's June 24, 1997 decision to the Appeals Board. |
| 10 | Dr. Kuiper's report also was submitted as additional evidence when Murphy sought review of the ALJ's decision by the Appeals Board. |

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1123477
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Frederick Paul PETELL, Jr., Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY, Defendant.

No. 7:12–CV–1596 (LEK/
CFH). | Signed March 21, 2014.

**Attorneys and Law Firms**

Conboy, McKay Law Firm—Carthage Office, Lawrence D. Hasseler, Esq., of Counsel, Carthage, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney for the Northern District of New York, Vernon Norwood, Esq., Special Assistant United States Attorney, of Counsel, Syracuse, NY, for Defendant.

### *ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** This is an action for judicial review of the Social Security Administration's ("SSA") decision denying Plaintiff Frederick Paul Petell, Jr. ("Plaintiff") disability benefits. The matter comes before the Court following a Report–Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3 filed on February 28, 2014, by the Honorable Christian F. Hummel, U.S. Magistrate Judge, affirming the SSA's decision. Dkt. No. 26 ("Report–Recommendation").

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." FED. R. CIV. P. 72(b); L.R. 72.1(c). "If no objections are filed ... reviewing courts should review a report and recommendation for clear error." *Edwards v. Fischer,* 414 F.Supp.2d 342, 346–47 (S.D.N.Y.2006); *see also Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003) ("As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."); *Farid v. Bouey,* 554 F.Supp.2d 301, 306 (N.D.N.Y.2008).

No objections to the Report–Recommendation were filed within the allotted time period. *See generally* Docket. The Court has conducted a thorough review of the record and the Report–Recommendation and finds no clear error.

Accordingly, it is hereby:

**ORDERED,** that the Report–Recommendation (Dkt. No. 26) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED,** that the Social Security Administration's decision is **AFFIRMED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### **REPORT–RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff Frederick Paul Petell, Jr. ("Petell") brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for benefits under the Social Security Act. Compl. (Dkt. No. 1). Petell moves for a finding of disability and the Commissioner cross-moves for a judgment on the pleadings. Dkt. Nos. 12, 15.For the following reasons, it is recommended that the Commissioner's decision be affirmed.

### **I. Background**

### **A. Facts**

Born May 18, 1971, Petell was thirty-seven years old when he applied for disability benefits. Tr. at 128. [2] Petell attended special education classes but was expelled from ninth grade. Tr. at 39–40, 138. Petell can read and write English. Tr. at 132. Petell was previously employed as a herdsman, linesman, and a construction worker. Tr. at 40, 200. Petell alleges disability from dyslexia, migraines stemming from a brain injury, and mental health issues. Tr. at 133.

**B. Procedural History**

**\*2** Petell protectively filed an application for supplemental security income ("SSI") benefits on January 28, 2009 and social security disability insurance ("SSDI") benefits on February 1, 2009 pursuant to the Social Security Act, 42 U.S.C. § 401 *et seq.* claiming an alleged onset date of September 1, 2008. Tr. at 16, 128. That application was denied on June 5, 2009. Tr. at 16, 62–68. Petell requested a hearing before an administrative law judge ("ALJ"), Marie Greener, which was held on July 27, 2010. Tr. at 69–70, 34–60 (transcript of the administrative hearing). In a decision dated September 14, 2010, the ALJ found that Petell was not entitled to disability benefits. Tr. at 16–27. Petell's counsel filed a timely request for review with the Appeals Council and on August 24, 2012, the request was denied, thus making the ALJ's findings the final decision of the Commissioner. Tr. at 1–9. This action followed.

**II. Discussion**

**A. Standard of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam). Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004) (citing *Richardson v. Perales,* 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." *Barringer v. Comm'r of Soc. Sec.,* 358 F.Supp.2d 67, 72 (N.D.N.Y.2005) (citing *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Yancey v. Apfel,* 145 F.3d 106, 111 (2d Cir.1998). If the Commissioner's finding is supported by substantial evidence, it is conclusive. 42 U.S.C. § 405(g) (2006); *Halloran,* 362 F.3d at 31.

**B. Determination of Disability** [3]

"Every individual who is under a disability shall be entitled to a disability ... benefit...."42 U.S.C. § 423(a)(1) (2004). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment... which has lasted or can be expected to last for a continuous period of not less than 12 months."*Id.* § 423(d)(1)(A). A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. *Id.* § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."*Id.* § 423(d)(3). Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience."*Ventura v. Barnhart,* No. 04–CV–9018(NRB), 2006 WL 399458, at \*3 (S.D.N.Y. Feb. 21, 2006) [4] (citing *Mongeurv. Heckler,* 722 F.2d 1033, 1037 (2d Cir.1983)).

**\*3** The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience;

the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work. Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Berry,* 675 F.2d at 467. The plaintiff bears the initial burden of proof to establish each of the first four steps. *DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998) (citing *Berry,* 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.*Id.* at 1180 (citing *Berry,* 675 F.2d at 467).

### C. ALJ Greener's Findings

Petell, represented by counsel, testified at a hearing held on July 27, 2010. Tr. at 16–27. In addition, Petell's wife, Eva Petell, also testified. *Id.* Using the five-step disability sequential evaluation, the ALJ found that Petell: (1) had not engaged in substantial gainful activity since September 1, 2008, the alleged onset date; (2) had severe medically determinable impairments of gastroesophageal reflux disease ("GERD")[5] and intermittent explosive disorder ("IED");[6] (3) did not have an impairment, alone or in combination, sufficient to meet the listed impairments in Appendix 1, Subpart P of Social Security Regulation Part 404; (4) maintains "the residual functional capacity [ ("RFC") ] to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c)[7] except no more than occasional contact with supervisors, co-workers, or the public"; (5) could not perform past relevant work; and (6) given his age, education, work experience, and RFC, was capable of engaging in employment which exists in significant numbers in the national economy. Tr. at 18–27. Therefore, a determination of not disabled was made.

### D. Petell's Contentions

**\*4** Petell first contends that the ALJ failed to assess the severity of his migraine headaches and lower back pain. Petell next contends that the ALJ's RFC assessment was erroneous because she improperly applied the treating physician's rule, failed to recontact a treating source, failed to afford weight to the opinions of Petell's social worker, and failed to support it with substantial evidence. Petell then asserts that the ALJ improperly evaluated Petell's credibility. Petell next contends that the ALJ failed to apply the psychiatric review technique ("PRT") required for evaluating mental impairments. Lastly, Petell claims that the ALJ failed to support the Step 5 conclusion with substantial evidence.

### 1. Severity

As mentioned above, step two of the sequential evaluation process requires a determination as to whether the claimant has a severe impairment which significantly limits the physical or mental ability to do basic work activities for a continuous period of time of not less than one year. *See* subsection II(B) *supra.*Thus, a diagnosis alone is insufficient to establish a severe impairment as instead, the plaintiff must show that the medically determinable impairments significantly limit the ability to engage in basic work activities. 20 C.F.R. § 404.1521(b). The ability to do basic work activities is defined as "the abilities and activities necessary to do most jobs."*Id.* Basic work activities which are relevant for evaluating the severity of an impairment include:

(1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

*Id.; see also Pickering v. Chater,* 951 F.Supp. 418, 424 (S.D.N.Y.1996); *see also* Social Security Ruling ("SSR") 85–28, 1985 WL 56856, at *3–4 (S.S.A.1985).

### i. Migraine Headaches

Petell argues substantial evidence shows that his migraine headaches impose at least more than a minimal limitation. Pl.'s Mem. of Law (Dkt. No. 12) at 12.Since a syncopal episode [8] in November 2007, Petell asserts he has consistently sought treatment for headaches. *Id.* Petell notes that in April 2009, he was referred to a consultative examiner ("C E") and neurologist, Dr. Harbinder Toor ("Toor"), M.D., who opined that Petell's "headaches can interfere with [Petell's] daily routine."Tr. at 289. However, Dr. Toor does not specify how such migraine headaches significantly limit Petell's ability to do basic work activities. 20 C.F.R. § 404.1521(b). Further, Dr. Toor's opinion is not based on any medical exams but solely on Petell's statements, which contradict other treatment notes of record. Tr. at 287, 289. Petell next notes that, in August 2008, Petell advised his treating source Richard Edwards ("Edwards"), RPA–C, a registered physician assistant, that he was having approximately two headaches each week. Tr. at 264. Additionally, Petell points to treatment notes dated December 2011 where Edwards noted Petell's continued headaches despite modification to his medication. Tr. at 443–44.

**\*5** Despite the above record evidence indicating that Petell has had migraines since November 2007, the ALJ's finding that Petell's migraines were non-severe are supported by substantial evidence. Tr. at 18. The ALJ expanded on this conclusion at length. The ALJ noted that objective medical evidence, namely CT scans, revealed Petell's syncopal episode was likely caused by migraines without aura. Tr. at 212–13, 219, 222. The ALJ considered contrary evidence, namely that Petell advised Neurologist Dr. Edward J. Mazdzer, M.D. ("Mazdzer") in October 2008 that he had no headaches since November 2007 but reported to Dr. Toor in April 2009 that he had daily headaches. Tr. at 258, 287. In December 2007, Edwards noted that Petell has a history of prior migraines but they had been dormant and placed Petell on Nadolol to treat the headaches. [9] Tr. at 238.

The ALJ cited 2008 treatment notes indicating that Petell's headaches were stable and under control. Tr. at 18–19. In April 2008, Petell reported to Edwards that he had "no headaches whatsoever." Tr. at 241. On July 22, 2008, Petell reported to Edwards having no headaches since November 2007 and Petell was advised to avoid driving and climbing until seen by a neurologist. Tr. at 239. As Petell noted, the ALJ also considered that on August 20, 2008, Petell claimed he had approximately two headaches each week though that were "very mild," "not associated with weakness, dizziness, faintness, loss of consciousness, numbness, tingling, or any visual disturbances," and "usually respond[ed] to Tylenol." Tr. at 243, 264. Petell claimed a "little dizziness" when he stood up from a chair, although the dizziness was transient, mild, and dissipated after a few seconds. Tr. at 243. Edwards concluded that Petell's migraines were stable. Tr. at 244. The ALJ further noted that in October 2008, Dr. Mazdzer concluded that Petell "could safely operate a motor vehicle and return to work without restrictions."Tr. at 258.

The ALJ next cited 2009 treatment notes also indicating that Petell's migraine headaches were controlled. In February 2009, Petell reported to Edwards that he had no syncopal episodes, severe headaches, or other problems. Tr. at 247. In May 2009, Petell reported to Edwards that he was having several headaches per week and was prescribed Topamax. [10] Tr. at 249–50. In June 2009, Petell advised Edwards that the Topamax gave him some morning drowsiness but had no headaches. Tr. at 251. In July 2009, Petell reported fainting and vomiting while lifting weights. Tr. at 253. As a result, Petell's Nadolol dosage was decreased and was advised to refrain from exercising over the weekend only. Tr. at 253. Petell was also diagnosed with symptomatic bradycardia [11] that was likely induced in part by valsalva maneuver [12] and the Topamax dosage was increased. Tr. at 253–54. In August 2009, Petell continued to have syncopal symptoms and vomiting when lifting heavy weights during his workouts but had no headaches. Tr. at 255. These symptoms were absent when conducting other activities. *Id.* Thus, Petell was advised to find another exercise method, take Nadolol and Topamax, and avoid heavy lifting. *Id.*

**\*6** Lastly, the ALJ noted that recent treatment notes, ranging from December 5, 2007 through January 13, 2010, reveal that Petell's migraines were under control. Tr. at 19, 238–55, 259–70, 293–95, 345–50, 373–80. The ALJ concluded no record evidence shows that Petell's migraines imposed significant-related restrictions and no such evidence was provided from Petell's treating source. Tr. at 19. Additionally, in January 2012, Petell reported to Edwards that his headaches were "adequately controlled with current medications." Tr. at 445.

Given the above relevant record evidence dated November 2007 through December 2011 where there were only two changes to Petell's medications, a reasonable mind could accept as adequate to support the ALJ's conclusion that

Petell's migraine headaches were not sufficiently severe to significantly limit Petell's ability to engage in basic work activities. *Halloran,* 362 F.3d at 31. Further, the Second Circuit has found that an ALJ's error at step two is not reversible error if the ALJ found other severe impairments and proceeded beyond step two. *Stanton v. Astrue,* 370 F. App'x 231, 233 n. 1 (2d Cir.2010). Here, the ALJ found Petell had severe medically determinable impairments of GERD and IED. Furthermore, the ALJ expressly considered the "combination of impairments" in making her determination of not disabled. *Stanton,* 370 F. App'x at 233 n. 1. Moreover, the ALJ discussed Petell's headaches at length in her RFC assessment. Tr. at 25. *Spina v. Colvin,* No. 11–CV–1496, 2014 WL 502503, at *4 (N.D.N.Y. Feb. 7, 2014) ("[B]ecause the ALJ found that plaintiff had the severe impairment of neurocardiogenic syncope, he continued to consider plaintiff's disability under Steps Three through Five of the disability analysis. Even if it had been error to find plaintiff's migraines to be a nonsevere impairment, the error would have been harmless."). Thus, any error in finding Petell's migraine headaches to be non-severe would be merely harmless.

Accordingly, the Commissioner's decision on this issue should be affirmed.

### ii. Lower Back Pain

Petell next contends that substantial evidence shows his lower back pain imposes at least more than a minimal limitation. Pl.'s Mem. of Law at 13. In December 2010, Petell was referred for physical therapy where his reduced lumbar flexion and extension were noted. Tr. at 420–21. In March 2011, Dr. John Savage, M.D., an orthopedic surgeon, noted that a compression examination caused pain and tenderness in the lower back and an x-ray showed wedging of T11, suggesting a compression fracture. Tr. at 437–38. In April 2011, Petell was diagnosed with a "fairly high-grade foraminal narrowing at L4–5 and L5–SI due to combination of disk bulging and facet hypertrophy."Tr. at 440. Readings of a MRI dated April 2012 showed "broad-based disk bulges at all lumbar levels L1 through L5–S1," with "the most significant foraminal narrowing ... at L4–L5."Tr. at 450. Petell was referred to a specialist Dr. Craig T. Montgomery, M.D. who noted that steroid injections, aggressive physical therapy, pain management, and nonsteroidal anti-inflammatories failed to control the condition. Tr. at 450.

*7 Defendant did not address this issue with good reason. As the Appeals Council noted, the ALJ could not have addressed Petell's medical records relating to lower back pain because that condition, and any relevant medical records concerning the condition, was raised for the first time after the ALJ issued her decision on September 14, 2010. *See* Tr. at 420 (noting that in December 2010, while at work, a bull struck Petell's lower back, causing him lower back pain). The Appeals Council is only obligated to consider new and material evidence that relates to the period on or before the date of the ALJ hearing decision. *Shrack v. Astrue,* 608 F.Supp.2d 297, 302 (D.Conn.2009) (citing *Perez v. Chater,* 77 F.3d 41, 45 (2d Cir.1996); 20 C.F.R. § 404.970(b)). Thus, the Appeals Council correctly explained, "[w]e found that some of the evidence was after the [ALJ's] decision.... If you want us to consider whether you were disabled after September 14, 2010, you need to apply again. We are returning the evidence to you to use in your new claim."Tr. at 2.

Accordingly, the Commissioner's decision on this issue should be affirmed and any arguments pertaining to Petell's purported lower back condition will not be further addressed in this Report–Recommendation.

### 2. RFC

The ALJ determined that Petell retained the RFC "to perform medium work ... except no more than occasional contact with supervisors, co-workers, or the public."Tr. at 21. Petell contends that the ALJ erred when she failed to: (1) apply the treating physician's rule to the opinions of psychiatrist Dr. M.U. Saleem, M.D. and recontact Dr. Saleem for further development of the record; (2) afford proper weight to social worker Bob Bower's opinions; and (3) support her RFC assessment with substantial evidence. Defendant did not specifically address the first two issues in her motion papers.

### i. Treating Physician's Rule and Recontact

When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant. *Harris v. R.R. Ret. Bd.,* 948 F.2d 123, 126 (2d Cir.1991). Generally, more weight is given to a treating source. Under the regulations, a treating source's opinion is entitled to controlling weight if it is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2005); *Shaw,* 221 F.3d at 134. "This rule applies equally to retrospective opinions given by treating physicians."*Campbell v.. Astrue,* 596 F.Supp.2d 445, 452 (D.Conn.2009) (citations omitted). Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons." *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."*Schaal,* 134 F.3d at 503. If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given. *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999). Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner. *Id.* at 133–34;*see*20 C.F .R. § 404.1527(e) (2005).

**\*8** Petell contends that Dr. Saleem's opinions should have been given controlling weight. Dr. Saleem saw Petell in January 2009 and noted that Petell had IED and a history of anger management problems; however, Petell did not receive any mental health treatment for it since 1997. Tr. at 259. Petell was appropriately dressed with good hygiene, cooperative, coherent, and in a positive mood. Tr. at 250. Petell's memory was intact, attention and concentration were fair, insight and judgment were fair, and denied suicidal/homicidal ideations and hallucinations. *Id.* Dr. Saleem evaluated Petell with a Global Assessment of Functioning ("GAF") 65. [13] Tr. at 260.

In August 2009, Dr. Saleem and Bob Bowser ("Bowser"), a licensed social worker, provided a medical source statement ("MSS") for Petell based on sessions between January 14, 2009 and August 26, 2009. Tr. at 334. Dr. Saleem concluded that Petell's IED slightly affected Petell's ability to understand, remember, or carry out short and simple instructions. *Id.* Petell's ability to make judgments on simple work-related decisions was moderately affected.*Id.* Petell's ability to understand, remember, and carry out detailed instructions was severely impaired. *Id.* The MSS continued, noting that Petell's ability to interact appropriately with the

public, supervisors, and co-workers was slightly affected. Tr. at 335. Petell's ability to respond appropriately to work pressures and changes in a routine work setting was markedly affected. *Id.*

Petell contends that Dr. Saleem's opinions are uncontradicted. To the extent that this argument references Dr. Saleem's diagnoses of IED, this is true. This is recognized by the ALJ who found the impairment to be severe in her analysis. Tr. at 18. There is no question that the psychiatric and neurological consultations and psychological review indicated Petell's complaints of IED. Tr. at 287. Rather, the ALJ disagreed with Dr. Saleem's ultimate opinion regarding Petell's ability to work. This is well within the ALJ's province.SSR 96–5P, 1996 WL 374183, at \*1 (S.S.A.1996) (explaining that determinations of disability are reserved for the Commissioner and to the extent a treating source comments on that issue, such commentary is "never entitled to controlling weight or special significance."); *see also Taylor v. Barnhart,* 83 F. App'x 347, 349 (2d Cir.2003) (explaining that a treating physician's opinion about disability "is not entitled to any weight, since the ultimate issue of disability is reserved for the Commissioner.") (citing 20 C.F.R. § 404.1527(d)(1) & *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999)).

To be entitled to controlling weight, the treating physician's opinion must be well supported by medically acceptable evidence and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2005); *Shaw,* 221 F.3d at 134. The ALJ first stated that "[w]hile [Petell] claims a history of treatment for [IED], he was seen in January 2009 for the first time [by Dr. Saleem] since his prior treatment in 1997."Tr. at 25. The ALJ noted Petell had a GAF 65, which is mild. *Id.* The ALJ found Dr. Saleem's opinion of extreme and marked limitations were unpersuasive because that opinion was not substantially supported by other evidence of record, and in a less persuasive manner, only supported by Dr. Saleem and Bowser's treatment notes. Tr. at 25. The ALJ further noted that despite Petell's allegation that he had always had difficulty getting along with others, he held jobs for fairly long periods of time, one of which for at least two years. Tr. at 25, 43, 200.

**\*9** During the psychiatric consultation dated April 18, 2009, CE and Psychiatrist Dr. Dennis M. Noia, Ph.D., noted that Petell was responsive and cooperative to questions and was calm, relaxed, and comfortable. Tr. at 282–83. Dr. Noia further noted that Petell's attention and concentration

was intact. Tr. at 282. Petell's recent and remote memory skills were mildly impaired as he could recall three objects immediately and two after five minutes and restate four digits forward and three digits backward. Tr. at 283. Petell reported that he had no history of psychiatric hospitalizations and got along with friends and family. Tr. at 281, 283. Petell could regularly dress, bathe, groom himself, prepare food, do general cleaning, laundry, shopping, manage money, and take public transportation. Tr. at 283. Dr. Noia gave Petell a fair prognosis. Tr. at 284.

During the neurological consultation dated April 18, 2009, CE and Neurologist Dr. Harbinder Toor, M.D. noted that Petell had no indication of impairment in recent or remote memory, insight, or judgment and Petell's mood and affect were appropriate. Tr. at 288. Petell reported that he showers, bathes, dresses, cooks, cleans, and does laundry on a daily basis. *Id.*

On May 12, 2009, medical consultant and reviewing psychologist Dr. H. Ferrin concluded that there was no evidence that Petell was limited in his ability to understand, remember, and carry out detailed instructions. Tr. at 312. Petell's ability to work with others without being distracted was not significantly limited. *Id* . Petell's ability to respond appropriately to changes in the work setting was moderately limited. Tr. at 313.

Drs. Noia, Toor, and Ferrin are specialists and medical consults. The opinions of medical consults like Drs. Noia, Toor, and Ferrin may constitute substantial evidence.

> It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consults, since such consultants are deemed to be qualified experts in the field of social security disability. Such reliance is particularly appropriate where ... the opinions of these ... State agency medical consultants are supported by the weight of the evidence.

See *Fiozzo v. Barnhart,* No. 05–CV–561 (LEK/VEB), 2011 WL 677297, at *8 (N.D.N.Y. Jan. 19, 2011)* (citations omitted); *see also Diaz v. Shalala,* 59 F.3d 307, 313 n. 5 (2d Cir.1995)* (explaining that "the opinions of nonexamining sources [can] override treating sources' opinions provided they are supported by evidence in the record.") (citations

omitted); *McEaney v. Comm. of Soc. Sec.,* 536 F.Supp.2d 252, 256 (N.D.N.Y.2008)* ("the evaluations of non-examining State agency medical and psychological consultants may constitute substantial evidence ... An ALJ must treat such evaluations as expert opinion evidence of non-examining sources ... This treatment extends to ... RFC assessments [because] ... [s]tate agency consultants are experts in evaluating the medical issues of disability claims.") (citations omitted). The record does show that Petell received medical and therapeutic treatment for IED from Dr. Saleem and Bowser. Tr. at 167, 334. But the record also shows that despite Petell's continued claim that he had always had anger management problems, he never exhibited outbursts at any visit with a medical personnel from as early as November 2007. The ALJ "is entitled to rely not only on what the record says, but also on what it does not say." *Dumas v.. Schweiker,* 712 F.2d 1545, 1553 (2d Cir.1983)* (citations omitted). The record fails to support such sweeping and broad restrictions as Dr. Saleem has proffered. As such, given Dr. Saleem's opinions were inconsistent with other substantial record evidence, the ALJ did not err in declining to apply the treating physician's rule to the opinions of Dr. Saleem.

**\*10** Accordingly, the Commissioner's decision on this issue should be affirmed.

### b. Failure to Develop the Record

An ALJ has an affirmative duty to develop the administrative record during Social Security hearings, even when the claimant is, as in this case, represented by counsel. *See Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996)* (citations omitted); *see also* 20 C .F.R. § 404.1512(d)* (describing Commissioner's duty to develop a "complete medical history for at least the [twelve] months preceding the month in which [claimant] file[s an] application...."); 20 C.F.R. § 404.1512(e)* (explaining how the Commissioner will attempt to retrieve the entire medical history from claimant's treating sources as opposed to always seeking consultative examinations). Accordingly, "[t]he ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's own finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous." *Webb v. Barnhart,* 433 F.3d 683, 687 (9th Cir.2005)* (citation omitted); *see also Rosa v. Callahan,* 168 F.3d 72, 79 n. 5 (2d Cir.1999)* ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to

seek additional information in advance of rejecting a benefits claim.") (citation omitted); *Roat v. Barnhart*, 717 F.Supp.2d 241, 264 (N.D.N.Y.2010) (holding that where a "medical record paints an incomplete picture of [claimant's] overall health during the relevant period, as it includes evidence of the problems, the ALJ had an affirmative duty to supplement the medical record, to the extent it was incomplete, before rejecting [claimant's] petition.") (internal quotation marks, altercations, and citation omitted).

Petell argues that to the extent Dr. Saleem's opinion was unsupported or inconsistent with the record, the ALJ was required to recontact Dr. Saleem for further development of the medical opinion. An ALJ is required to recontact a treating source only if the records received were inadequate to determine whether the claimant was disabled. *Perez*, 77 F.3d at 47. That is not the case here. "The mere fact that medical evidence is conflicting ... does not mean that an ALJ is required to re-contact a treating physician." *Micheli v. Astrue*, 501 F. App'x 26, 29 (2d Cir.2012). It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such. *Id.* at 29–30. The ALJ weighs all evidence to determine whether a claimant is disabled based on the evidence before her. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict.").

In this case, despite the conflicting opinions, the ALJ properly determined that she could render a decision on the 245–page medical record. The ALJ found inconsistency among the opinions Dr. Saleem and other medical evidence of record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir.1983) ("Where, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he ... have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion on disability") (citations omitted); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir.1981) ("Notwithstanding the apparent inconsistency between [two medical] reports ... we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony.").

**\*11** Accordingly, the Commissioner's decision on this issue should be affirmed.

### c. Weight Accorded to "Other Source"

Petell concedes that Bowser is not "an acceptable medical source" but argues that the ALJ had a duty to evaluate his opinion pursuant to SSR 06–03P. *Saxon v. Astrue*, 781 F.Supp.2d 92, 103 (N.D.N.Y.2011) (citation omitted). Social Security Ruling 06–03P provides, "[i]n addition to evidence from 'acceptable medical sources,' we may use evidence from "other sources,' ... to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06–03P, 2006 WL 2329939, at *2 (S.S.A.2006). A social worker is defined as "other sources." *Id.* While information from an "other source" cannot be employed to establish a medically determinable impairment, it may provide insight into the severity of an impairment and how it affects a claimant's ability to work. *Id.* In weighing such opinions, the ALJ uses the same factors as those of "acceptable medical sources." *Saxon*, 781 F.Supp.2d at 104 (citing *inter alia* 20 C.F.R. § 404.1527(d)). The ALJ may conclude that a licensed social worker's opinion is not entitled to any weight but must provide an explanation for that decision. *Id.*

The ALJ did not fail to consider Bowser's opinions. Although the Social Security Regulation provides that the ALJ should explain the weight given to an "other source," the ALJ need only "ensure[ ] that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." SSR 06–03P, 2006 WL 2329939, at *6. Here, the ALJ referred to Bowser's opinions in the RFC assessment. The ALJ first noted an April 2009 report of contact where Bowser indicated that Petell began counseling treatments with him in January 2009 for depressive order and anger management. Tr. at 23, 167, 342–44. Bowser reported that he was not qualified to evaluate the extent of Petell's issues with memory. Tr. at 23, 167. The ALJ proceeded to discuss the MSS that Bowser had co-signed. Tr. at 24. As discussed *supra,* the ALJ took issue solely with the severe and marked limitations given in the MSS because they are not supported by other evidence of record. "Courts conducting judicial review in social security cases do not require perfect opinions or rigid, mechanical, formulaic applications of governing legal principles." *Abdulsalam v. Comm'r of Soc. Sec.,* No. 12–CV–1631 (MAD), 2014 WL 420465, at *5 (N.D.N.Y. Feb. 4, 2014) (citation omitted). As such, "despite the lack of specific weight assigned to the opinions, the Court is able to discern with ease the ALJ's

reasoning, and [her] treatment of the evidence will not be disturbed ."*Id.* (citation omitted).

Accordingly, the Commissioner's decision on this issue should be affirmed.

### d. Substantial Evidence

Petell contends that the ALJ's RFC determination was not supported by substantial evidence. RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations beyond the symptoms.*Martone v. Apfel,* 70 F.Supp.2d 145,150 (N.D.N.Y.1999); 20 C.F.R. §§ 404.1545, 416.945. "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient."*Martone,* 70 F.Supp.2d at 150. RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy. *New York v. Sullivan,* 906 F.2d 910, 913 (2d Cir.1990); 20 C.F.R. §§ 404.1545, 416.960 (2003). The Second Circuit has clarified that, in Step 5 of the Commissioner's analysis, once RFC has been determined "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's [RFC]."*Pourpre v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009).

> **\*12** Each finding as to the plaintiff's functional abilities must be supported by substantial evidence because conclusory statements regarding plaintiff's capacities are not sufficient ... Only after the ALJ has described the plaintiff's capabilities on a function-by-function basis supported by substantial evidence may RFC then be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

*DiVetro v. Comm'r of Soc. Sec.,* No. 05–CV–830 (GLS/DEP), 2008 WL 3930032, at \*2 (N.D.N.Y. Aug. 21, 2008) (internal quotation marks and citations omitted).

Petell first contends that the ALJ erred by failing to ascribe work-related limitations based on Petell's IED. However, the ALJ did incorporate IED limitations into Petell's RFC

assessment. Namely, the ALJ concluded that Petell is limited to medium work that cannot have more than occasional contact with supervisors, co-workers, or the public. This is supported by substantial evidence. Dr. Saleem and Bowser opined that Petell had only slight limitations in interacting appropriately with the public, supervisors, and co-workers. Tr. at 335. Dr. Noia observed that Petell was responsive, cooperative, and his manner of relating, social skills, and overall presentation was adequate, and he appeared to be able to relate to and interact moderately well with others. Tr. at 282, 284. Further, Dr. Ferrin opined that Petell had no significant limitations in working in coordination with or proximity to other people, interacting appropriately with the general public, getting along with co-workers, and maintaining socially appropriate behavior. Tr. at 312–13. Thus, this contention is without merit.

Petell next contends that the RFC does not incorporate limitations imposed by Petell's GERD and migraine headaches. This is inaccurate. The RFC assessment discussed Petell's GERD. Tr. at 24. The ALJ noted that Petell was diagnosed with GERD, esophageal stricture, and gastritis. Tr. at 24, 367, 380–81. The ALJ noted that Edwards had treated Petell's GERD and limited him to no heavy lifting or weightlifting. Tr. at 25, 253. There is no other record evidence indicating limitations imposed by the GERD. The ALJ's RFC assessment also discussed Petell's migraine headaches, noting Petell's claim that he was having migraines more frequently. Tr. at 22. The ALJ stated that Petell received treatment for migraines, which became stable with medication. Tr. at 23. Petell saw Dr. Mazdzer in October 2008, who opined that Petell's neurological and cerebellar examinations were normal; thus, he could safely drive and return to work without restrictions. Tr. at 23, 245. A neurological consultative examination in April 2009 showed that Petell was having daily headaches. Tr. at 24, 323. In August 2009 and April 2010, Petell reported to Edwards that his headaches were controlled. Tr. at 24, 255, 375. As previously discussed, the relevant medical records largely indicate that Petell's headaches are controlled with medication. Ultimately, the ALJ found that "the medical records [relevant to migraine headaches] do not corroborate the frequency or intensity" as alleged. Tr. at 25. Accordingly, the ALJ did incorporate GERD and migraine headaches conditions into the RFC where appropriate and, where she disagreed, namely with respect to the frequency and intensity of the migraine headaches, she identified and outlined why.

**\*13** The ALJ found that Petell could perform medium work with occasional contact with supervisors, co-workers, and the public. Medium work consists of lifting no more than fifty pounds at a time with frequent lifting or carrying objects weighing up to twenty-five pounds. 20 C.F.R § 416.967(b). The record does not show that Petell has any exertional limitations. There is no record evidence indicating that Petell was ever in acute distress at any doctor's appointment. In July 2009, Petell reported to Edwards that he was lifting weights with Bowflex, specifically doing curls and bench presses. Tr. at 253. In October 2008, Dr. Mazdzer reported that Petell's motor exam and gait were normal and that Petell could safely operate a motor vehicle. Tr. at 257. In April 2009, Dr. Toor observed that Petell's gait and station were normal and a tandem walk from heel to toe was normal. Tr. at 288. Petell required no assistance to change for the exam, could rise from a chair without difficulty, had intact hand and finger dexterity, and had a grip strength of 5/5 bilaterally. *Id.* Further, Petell's range of motion throughout the body was normal. *Id.* Given the above relevant evidence, a reasonable mind might accept is adequate to support the ALJ's RFC assessment. *Halloran, 362 F.3d at 31.*

Accordingly, the Commissioner's decision on this issue should be affirmed.

### 3. Petell's Credibility

The ALJ determines whether an ailment is an impairment based on a two-part test. First, the ALJ must decide, based upon objective medical evidence, whether "there [are] medical signs and laboratory findings which show ... medical impairment(s) which could reasonably be expected to produce [such] pain...."*Barringer v. Comm'r of Soc. Sec.,* 358 F.Supp.2d 67, 81 (N.D.N.Y.2005); 20 C.F.R § 404.1529 (2003). This primary evaluation includes subjective complaints of pain. 20 C.F.R § 404.1529 (2003)." 'Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.' " *Barringer,* 358 F.Supp.2d at 81 (quoting *Crouch v. Comm'r of Soc. Sec. Admin.,* No. 01–CV–0899 (LEK/GJD), 2003 WL 22145644, at \*10 (N.D.N.Y. Sept. 11, 2003).

An ALJ must consider all symptoms, including pain, and the extent to which these symptoms are consistent with the medical and other evidence. 20 C.F.R § 404.1529

(2003)."Pain itself may be so great as to merit a conclusion of disability where a medically ascertained impairment is found, even if the pain is not corroborated by objective medical findings."*Rivera v. Schweiker,* 717 F.2d 719, 724 (2d Cir.1983) (citing *Gallagher v. Schweiker,* 697 F.2d 82, 84 (2d Cir.1983)). However, "disability requires more than mere inability to work without pain."*Dumas v.. Schweiker,* 712 F.2d 1545, 1552 (2d Cir.1983). Pain is a subjective concept "difficult to prove, yet equally difficult to disprove" and courts should be reluctant to constrain the Commissioner's ability to evaluate pain. *Dumas v. Schweiker,* 712 F.2d 1545, 1552 (2d Cir.1983). In the event there is "conflicting evidence about a [claimant's] pain, the ALJ must make credibility findings."*Snell v. Apfel,* 177 F.3d 128, 135 (2d Cir.1999) (citing *Donato v. Sec'y of HHS,* 721 F.2d 414, 418–19 (2d Cir.1983)). Thus, the ALJ may reject the claims of disabling pain so long as the ALJ's decision is supported by substantial evidence. *Aponte v. Sec'y of HHS,* 728 F.2d 588, 591 (2d Cir.1984).

**\*14** The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment. *See Marcus v.. Califano,* 615 F.2d 23, 27 (2d Cir.1978). The ALJ must consider several factors pursuant to 20 C.F.R §§ 404.1529(c)(3) and 416.929(c)(3):

(i) [The claimant's] daily activities;

(ii) The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate ... pain or other symptoms;

(v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of ... pain or other symptoms;

(vi) Any measures [the claimant] use[s] or ha[s] used to relieve ... pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

Petell contends that the ALJ's credibility determination is unsupported by substantial evidence. In this case, the ALJ found that while Petell had severe impairments, Petell's allegations of disability were not credible. Tr. at 24–25.

Petell contends that Dr. Toor indicated his migraines could interfere with his daily routine. However, as the ALJ noted and the records reflect, Petell is able to substantially perform activities of daily living. Tr. at 20, 25. The ALJ repeatedly noted that Petell's medical records show his migraine headaches are well controlled by medication. Tr. at 18–19, 25. *Dumas v. Schweiker,* 712 F.2d 1545, 1552–53 (2d Cir.1983) ("Although [plaintiff] now complains of severe debilitating headaches, headaches did not factor significantly into any of the medical opinions concluding that [plaintiff] was unable to return to his prior employment .... Moreover, there is evidence ... that Bufferin helped to relieve the pain.").

Petell also contends that Dr. Saleem's opinion with respect to extreme and marked limitations constitutes substantial evidence of IED's limitations on Petell's work abilities. However, substantial evidence consisting of the opinions of Drs. Noia, Toor, and Ferrin, as previously discussed, support the ALJ's determination that Petell's IED is not as disabling as Petell alleged. Further, the ALJ noted that Petell was seen for the first time in January 2009 for IED since 1997. Tr. at 25. Furthermore, the ALJ found that, despite Petell's assertion that he did not get along with other people and did not like taking orders, Petell was able to work for extended periods of time. Tr. at 25, 43. Petell also testified that he got along with his family. Tr. at 25, 50. Moreover, the ALJ recognized that not once did Petell had an outburst at a doctor's exam or appointment. Tr. at 25. Rather, the records show that Petell was always cooperative and responsive. Additionally, Petell testified that his temper tantrums consists of swearing at times and throwing a hammer but was never violent. Tr. at 52. As discussed *supra,* Dr. Saleem's opinions of severe and marked limitations were not substantially supported by other evidence of record.

**\*15** As for Petell's credibility with respect to GERD, the ALJ noted that Petell experienced faintness and vomiting after exercising and lifting heavy weights. Tr. at 25, 253. The ALJ did not dismiss this impairment; rather, there is an absence of medical records indicating that the affects of Petell's GERD was disabling or severe. Given the above relevant evidence, a reasonable mind might accept that the ALJ's credibility finding is adequately supported. *Halloran,* 362 F.3d at 31.

Accordingly, the Commissioner's decision on this issue should be affirmed.

### 4. Psychological Review Technique ("PRT")

As previously stated, in order to be considered disabled, a claimant must suffer from either a medically determinable physical or mental impairment. 42 U.S.C. § 1382(a)(3) (A). When evaluating a mental impairment, there is a "special technique" outlined in 20 C.F.R. § 404.1520a which requires consideration of four areas of potential limitation: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Id.* § 1520a(c)(3). Where evidence of a colorable mental impairment has been proffered, failure to engage in the "special technique" generally requires remand. *Kohler v. Astrue,* 546 F.3d 260, 266–69 (2d Cir.2008); *see also Moore v. Barnhart,* 405 F.3d 1208, 1214 (11th Cir.2005) ( "holding that where a claimant has presented a colorable claim of mental impairment, the social security regulations require the ALJ to complete ... [the special technique]. Failure to do so requires remand.") (citations omitted).

In the written decision, an ALJ:

> must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4)."Current regulations do not require completion of the Psychiatric Review Technique Form ... by the ALJ, but do require that his or her decision document application of the special technique." *Echandy– Caraballo v. Astrue,* No. CA 06–97M, 2008 WL 910059, at \*3 (D.R.I. Mar. 31, 2008) (citing 20 C.F.R. § 404.1520a(e) (2)).

As an initial matter, Petell first contends that the ALJ should have considered that Petell suffers from IED. In this case, the ALJ concluded that Petell's IED constituted a severe medically determinable impairment though it did not meet or equal one of the impairments listed in the regulations. Thus, the record belies this contention.

Petell argues that the ALJ failed to properly apply PRT for evaluating Petell's IED by assigning him only modest limitations based on a limited review of the evidence. Here, the ALJ included in her decision specific findings as to the degree of limitation in each of the four functional areas. The ALJ stated that Petell had mild restriction in activities of daily living ("ADL") for Petell had no problems with ADL and enjoyed fishing. Tr. at 20. The ALJ cited to Petell's ADL report, which indicates that Petell fed and walked two dogs, had no difficulties with handling personal hygiene, performed light lawn work, and occasionally handled laundry and household chores. Tr. at 153–54. Furthermore, the ALJ accurately noted in her RFC assessment that Petell testified he "goes into his shed and putters" and "helps around the house." Tr. at 22, 50–51. The ALJ next stated that Petell had moderate difficulties in social functioning. Tr. at 20. The ALJ noted that while Petell alleged he had more explosive episodes, the record showed that he was cooperative at all his examinations. *See, e.g.,* Tr. at 238–55. Petell was calm, relaxed, and comfortable at the CE examination. Tr. at 314–15. The ALJ took this into consideration in Petell's RFC, concluding that Petell should be limited to occasional contact with supervisors, co-workers, or the public. Tr. at 20. The ALJ next stated that Petell had mild difficulties in concentration, persistence, or pace. Tr. at 21. The ALJ noted that Petell did not shop but could handle money. Tr. at 21, 283. The ALJ noted while Petell alleged difficulties with memory, attention, and concentration, an April 2009 neurologic examination was unremarkable without indication of recent or remote memory impairment. Tr. at 21, 288. Further, the CE psychiatric examination showed that Petell's attention and concentration were intact. Tr. at 21, 74. Thus, Petell's allegations were not supported by the mental status examination findings. Tr. at 21. Finally, the ALJ noted Petell had no episodes of decompensation. *Id.*

**\*16** Given the ALJ's specific ratings and findings on each of the four functional areas, which are bolstered by evaluations from medical personnel who evaluated Petell, it cannot be said that the ALJ failed to carry out PRT analysis. *Cf. Kohler,* 546 F.3d at 267 (finding the ALJ failed to include specific findings with respect to each functional area).

Petell next contends that the ALJ's rating of Petell's functional limitations was inconsistent because the ALJ first stated that Petell's mental health imposed mild and moderate restrictions but later concluded that Petell's mental health would impose little or no effect on his ability to work. Tr. at 26. However, as the ALJ expressly explained, the first limitations identified were "used to rate the severity of mental impairments at steps 2 and 3" and were not a RFC assessment for steps four and five. Tr. at 21. The RFC assessment requires consideration of "the combined effect of ... impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. Furthermore, "the functional capacity to perform medium work represents such substantial work capability at even the unskilled level that a finding of disabled is ordinarily not warranted in cases where a severely impaired person retains the functional capacity to perform medium work." 20 C.F.R. Part 404, Subpart P, App'x 2, § 2003.00(b). Accordingly, the ALJ's findings were not inconsistent.

Petell further contends that (1) the ALJ failed to credit Dr. Saleem's conclusions extreme and marked limitations, which are supported by Bowser and (2) the resulting informed listings analysis was flawed because of the alleged failure to apply the PRT. As discussed *supra,* because the ALJ's RFC assessment is supported by substantial evidence and the ALJ did not fail to properly apply the PRT, these arguments are rendered moot.

Finally, Petell contends that RFC assessment does not incorporate the moderate limitations as she determined the IED to have on Petell's ability to work. However, the ALJ incorporated such limitations when she limited Petell's medium work base to occasional contact with supervisors, co-workers, and the public. As such, Petell's contentions with respect to the PRT analysis are without merit.

Accordingly, remand is not necessary and the Commissioner's decision on this issue should be affirmed.

### 5. Use of the Grids

The ALJ then conducted her Step Five analysis. The ALJ may apply the Grids or consult a vocational expert ("VE"). *See Heckler v. Campbell,* 461 U.S. 458, 462 (1983); *Rosa*

*v. Callahan,* 168 F.3d 72, 78 (2d Cir.1999); 20 C.F.R. pt. 404, subpt. P, App. 2 (2003)."For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled."*Pratts v. Chater,* 94 F.3d 34, 38–39 (2d Cir.1996). However, "where the claimant's work capacity is significantly diminished beyond that caused by his [or her] exertional impairment, the application of the grids is inappropriate," as the Grids do not take into account nonexertional impairments. *Bapp v. Bowen,* 802 F.2d 601, 605–06 (2d Cir.1986) (citations omitted). In this case, Petell contends that using the Grids was inappropriate and a vocational expert needed to be called regarding the effects of his migraine headaches and GERD.

**\*17** "[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guideline," rather such is "a case-by-case" determination considering whether the guidelines adequately reflect a claimant's abilities or whether nonexertional impairments constitute such a significantly limiting factor that other testimony is required. *Bapp v. Bowen,* 802 F.2d 601, 603, 605 (2d Cir.1986). As explained *supra,* no further testimony was required. Petell's migraine headaches were documented to have been well controlled, despite his testimony indicating otherwise. Furthermore, the record is devoid of any incident where Petell had an outburst from IED or any episode that affected his ability to work. As noted, the ALJ is entitled to rely on what the record does not say. *Dumas v. Schweiker,* 712 F.2d 1545, 1553 (2d Cir.1983) (citations omitted). These limitations do not constitute a significant diminishment of Petell's capacities so that his non-exertional impairments precluded the ALJ from using the Grids.

Accordingly, while the non-exertional limitations were considerations which the ALJ included in the RFC, further testimony was not required because the impairments did not significantly diminish Petell's abilities to the point where a vocational expert was required.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that the Commissioner's decision denying disability benefits be **AFFIRMED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.***Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: Feb. 28, 2014.

---

Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

2    "Tr." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. Dkt. No. 8.

3    While the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably."*Donato v. Sec'y of Health and Human Servs.,* 721 F.2d 414, 418 n. 3 (2d Cir.1983) (citation omitted).

4    All Social Security Rulings and unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

5    "Gastroesophageal reflux" refers to the "reflux of the stomach and duodenal contents into the esophagus, which may sometimes occur normally ... or as a chronic pathological condition."DORLAND'S ILLUSTRATED MED. DICTIONARY 1439 (28th ed.1994) [hereinafter "DORLAND'S"].

6    Intermittent explosive disorder is a behavioral disorder characterized by repeated episodes of impulsive, aggressive, violent behavior or angry verbal outbursts in which the individual reacts grossly out of proportion to the situation. *Intermittent Explosive Disorder: Definition,*MAYO CLINIC, http://www.mayoclinic.org/he alth/intermittent-explosive-disorder/DS00730 (last visited Feb. 28, 2014).

7    "*Medium work* involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20. C.F.R § 416.967(b).

8      A "syncope" is "a faint or swoon." DORLAND'S at 1622.

9      Nadolol is a beta-blocker that is used to treat chest pains, high blood pressure, and other conditions as determined by a physician. Available at http://www.drugs.com/cdi/nadolol.html (last visited Feb. 27, 2014).

10     "Topamax (topiramate) is a seizure medication ... also used to prevent migraine headaches in adults. It will only prevent migraine headaches or reduce the number of attacks. It will not treat a headache that has already begun."Available at http://www.drugs.com/topamax.html (last visited Feb. 28, 2014).

11     "Bradycardia" is the "slowness of the heartbeat." DORLAND'S at 223.

12     "Valsalva maneuver" refers to "forcible exhalation effort against a closed glottis ... interfer[ing] with venous return to the heart."*Id.* at 985.

13     GAF rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning. A GAF in the range of 61 to 70 indicates "[s]ome mild symptoms (*e.g.,* depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (*e.g.,* occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

       *Zabala v. Astrue,* 595 F.3d 402, 405 (2d Cir.2010) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM–IV"), at 34 (4th ed. rev.2000)).

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 439495

United States District Court,

S.D. New York.

Leonardo REYES, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner
of Social Security, Defendant.

No. 01Civ.4059(LTS)(JCF). | March 9, 2004.

**Synopsis**

**Background:** Commissioner of Social Security denied claimant's application for Supplemental Social Security (SSI) benefits. Claimant petitioned for review.

**Holdings:** On Commissioner's motion for judgment on the pleadings, the District Court, Swain, J., held that:

[1] claimant did not carry his burden of establishing existence of disability;

[2] claimant was not disabled; and

[3] finding by ALJ was supported by substantial evidence.

Motion granted.

West Headnotes (3)

[1]    **Social Security**
        👉 Course and conduct of proceedings
        Supplemental Social Security (SSI) benefits claimant did not carry burden of establishing existence of disability by pointing to specific testimony or evidence which he believed Commissioner of Social Security overlooked, unjustly weighed, or otherwise should have considered, in his petition for review of decision by Commissioner denying his application, where claimant made only conclusory allegations in complaint and he did not file any brief or affidavit. Social Security Act, § 205(g), as amended, 42 U.S.C.A. § 405(g).

12 Cases that cite this headnote

[2]    **Social Security**
        👉 Substantial gainful activity in general

        **Social Security**
        👉 Past or customary work
        Supplemental social security (SSI) benefits claimant was not disabled, although claimant's impairments were severe, claimant had not engaged in substantial gainful activity since his diagnosis with human immunodeficiency virus (HIV), and claimant was unable to perform his past relevant work of shipping clerk. Social Security Act, §§ 223(d)(2)(A), 1614(a)(3), as amended, 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3); 20 C.F.R. §§ 404.1520, 404.1527(d), 416.920.

1 Cases that cite this headnote

[3]    **Social Security**
        👉 Actual availability of employment; ability to compete
        Finding by ALJ, that claimant for Supplemental Social Security (SSI) benefits could perform other jobs existing in significant numbers in national economy, was supported by substantial evidence, although claimant was impaired as result of human immunodeficiency virus (HIV) and could not return to his prior work as shipping clerk; various medical reports, several of which were prepared by physicians who treated claimant over the course of several months, indicated that claimant was not limited in physical movement or in psychological adjustment. Social Security Act, §§ 223(d)(2)(A), 1614(a)(3), as amended, 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3); 20 C.F.R. §§ 404.1520, 404.1527(d), 416.920.

Cases that cite this headnote

***MEMORANDUM OPINION AND ORDER***

SWAIN, J.

**\*1** Pro se plaintiff Leonardo Reyes ("Plaintiff" or "Reyes") brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security to deny Reyes Supplemental Social Security ("SSI") benefits. The Commissioner has moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). The motion, which is unopposed, is granted for the following reasons.

## BACKGROUND

Reyes was born in 1958. (Tr. 40). He is a high school graduate, and worked as a shipping clerk until his termination in 1998. (Tr. 266, 267). He was unemployed from then until the time of the ALJ hearing. (Tr. 267). During the hearing, Reyes testified that, although he had looked for work, he was at that time planning to return to school to study computers. *Id.* Reyes also testified that he lived alone and used public transportation to travel. (Tr. 266). Over the summer before the hearing, Reyes's twelve-year-old daughter had lived with him. (Tr. 271). Reyes had also volunteered in the past at an AIDS center, and was planning to go back to volunteering there two to three times a week. *Id.*

### A. Medical History

Reyes was diagnosed with HIV on February 5, 1998, at the New York University Medical Center. (Tr. 46, 47). From May 1998 to December 1999, Reyes was treated by Dr. George McKenley at St. Luke's Roosevelt Hospital Center. (Tr. 116). Dr. McKenley reported in May 1998 that Reyes had no skin lesions and no thrush in his mouth and pharynx. (Tr. 96). In December 1998, Dr. McKenley reported that Reyes was "doing well on a regimen of COMBIVIR and CRIXIVAN."(Tr. 116). In May 1999, Dr. Grace Minamoto, who had treated Reyes since February 1999, reported that Reyes had no opportunistic infections, AIDS-related diseases or current symptoms. (Tr. 119–124). Dr. Minamoto further reported on the basis of the same examination that Reyes had no limitations in sitting, standing, walking, lifting, carrying or handling of objects, and no limitations in social functioning and adaption. (Tr. 121–124). In another diagnostic examination which took place in April 1999, another physician, Dr. Peter Graham, concluded that Reyes was capable of performing activities such as sitting,

standing, walking, lifting, carrying, and handling objects, though he may be limited by fatigue. (Tr. 131–133).

Dr. Sharff, a state agency physician, performed an assessment of Reyes's capacity to perform work-related activities in June 1999. (Tr. 134–141). Dr. Sharff concluded that Reyes could lift up to twenty-five pounds frequently and fifty pounds occasionally, stand and/or walk for about six hours in an eight-hour day and sit for about six hours in an eight-hour day. (Tr. 135).

In October 1999, Reyes was examined by Dr. Michael Polak. (Tr. 147–149). At this examination, Reyes complained of weakness, fatigue, and intermittent fevers and chills. (Tr. 147). Dr. Polak found Reyes to be well-developed, well-nourished, and in no acute distress, but "mildly impaired for carrying/lifting, pushing/pulling, walking and standing."(Tr. 148–149). However, he also found that Reyes had a normal gait and would have no problems performing activities requiring dexterity, bending or sitting. (Tr. 147–149). Finally, Dr. Polak noted that Reyes lived alone in a sixth floor apartment and cleaned, cooked, and shopped for himself.

**\*2** In July 2000, Dr. Mary Theodore reported that she has been treating Reyes for a generalized anxiety disorder since May 2000. (Tr. 255–261). Dr. Theodore reported that Reyes was alert, oriented, and had no psychotic symptoms. (Tr. 255). She reported that Reyes had mild restrictions in his activities of daily living, mild difficulties in maintaining social functioning, and some difficulty concentrating and focusing on tasks. (Tr. 255–257). Dr. Theodore concluded, however, that Reyes did not have difficulties following through with tasks and could make occupational adjustments. (Tr. 257–258).

### B. Procedural History

On April 19, 1999, plaintiff Reyes applied for SSI benefits, alleging an inability to work since August 28, 1998. (Tr. 40–42). Reyes claimed that he was unable to work due to HIV infection and an anxiety disorder. (Tr. 44K). Reyes's application was denied initially and upon reconsideration. (Tr. 30–31, 33–35). At Reyes's request, a hearing was held before an administrative law judge ("ALJ") on July 28, 2000, at which time Reyes appeared and testified. (Tr. 262–278). On September 8, 2000, the ALJ issued his decision, finding that Reyes was not disabled. (Tr. 8–27). On March 2, 2001, the Appeals Council of the Social Security Administration denied Reyes's request for review, and the ALJ's denial became the Social Security Commissioner's final decision. (Tr. 4–5).

## DISCUSSION

### A. Standard of Review

Under the Social Security Act, the "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In reviewing the Commissioner's decision, this Court will set aside the "decision only where it is based upon legal error or is not supported by substantial evidence." *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998). Substantial evidence is "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "The substantial evidence test also applies to inferences and conclusions drawn from findings on facts." *Levine v. Gardner,* 360 F.2d 727, 730 (2d Cir.1966). Therefore, "the Commissioner's findings of fact and the inferences and conclusions drawn from such findings are conclusive, even if the reviewing court's analysis differs from the analysis of the Commissioner." *Worthy v. Barnhart,* No. 01 Civ. 7907(JSM), 2002 WL 31873463 (S.D.N.Y. Dec.23, 2002). In reviewing the ALJ's decision in light of the record, the district court does not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan,* 949 F.2d 57 (2d Cir.1991). Thus, this Court will grant the Commissioner's motion for judgment if the Commission's finding was based on substantial evidence and was not in legal error.

### B. Lack of Opposition to Motion to Dismiss

**\*3** **[1]** In a proceeding for judicial review of a final decision of the Commissioner denying benefits, the plaintiff bears the burden of establishing the existence of a disability. *See, e.g.,Curry v.. Apfel,* 209 F.3d 117, 122 (2d Cir.2000); *Melville v. Apfel,* 198 F.3d 45, 51 (2d Cir.1999). Plaintiff Reyes, however, has not filed any brief or affidavit opposing the Commissioner's motion for judgment on the pleadings. Thus, Reyes has not pointed to any specific testimony or evidence which he believes the Commissioner has overlooked, unjustly weighed, or otherwise should have considered. The conclusory allegations of Plaintiff's complaint are insufficient to defeat the Commissioner's motion for judgment on the pleadings. *See, e.g.,Jiang v. Barnhart,* No. 03 Civ.0077 LAK AJP, 2003 WL 21526937, \*9 (S.D.N.Y. July 8, 2003); *Alvarez v. Barnhardt,* No. 02 Civ.3121 JSM AJP, 2002 WL 31663570 (S.D.N.Y. Nov.26, 2002); *Morel v. Massanari,* No. 01CIV0186KMWAJP, 2001 WL 776950 (S.D.N.Y. July 11, 2001).

That said, this Court reaches the same conclusion based on an evaluation of the merits of Plaintiff's claim. Reviewing the motion on the basis of the Commissioner's submissions alone in the absence of Reyes's opposition, *seeWorthy v. Barnhart,* No. 01 Div. 7907(JSM). WL 31873463 (S.D.N.Y. Dec.23, 2002), the Court finds that the Commissioner's decision was not in legal error and was supported by substantial evidence.

### C. The Applicable Law

To establish disability within the meaning of the Act, a claimant must prove that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months," and that the existence of such impairments is demonstrated by evidence supported by data obtained by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C.A 1382c(a)(3) (West 2003); *seealso* 42 U.S.C.A. §§ 423(d) (West 2003). The total effect of all the impairments suffered by the person must be so severe that he is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C.A. § 423(d)(2)(A) (West 2003).

The Commission's regulations set forth a five-step procedure for the evaluation of disability claims. 20 C.F.R. §§ 404.1520, 416.920. These five steps are as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has

an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

**\*4** *DeChirico v. Callahan,* 134 F.3d 1117, 1179–1180 (2d Cir.1998). "The burden is on the claimant to prove that he is disabled within the meaning of the Act." *Id.* Once the claimant meets his burden, the burden shifts to the Commissioner to prove that the claimant is capable of working. *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996).

The following factors are also considered in determining whether a claimant is disabled: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's education background, age, and work experience." *Mongeur v. Heckler,* 722 F.2d 1033, 1037 (2d Cir.1983).

Finally, the Commission's regulations provide that "[i]f [the Commission finds] that a treating source's opinion on the issue(s) of the nature and severity of [the applicant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, [the Commission] will give it controlling weight." 20 C.F.R. § 404.1527(d).

### D. The Commissioner's Findings

**[2]** The ALJ used the five-step evaluation process to determine whether Reyes is disabled for the purpose of

receiving SSI benefits. (Tr. 12). First, the ALJ found that Reyes has not engaged in substantial gainful activity since his diagnosis with HIV. *Id.* Second, the ALJ found that Reyes's impairments were severe. (Tr. 13). Third, the ALJ found that these impairments did not fall within one of the impairments listed in Appendix 1, Subpart P of the Regulations. *Id.* Fourth, the ALJ found that because of his impairments, Reyes was unable to perform his past relevant work of a shipping clerk. (Tr. 15). Finally, the ALJ considered Reyes's age, education, and vocationally relevant past work experience in conjunction with the Medical–Vocational Guidelines of Appendix 2 of Subpart P of the Regulations. *Id.* Using Medical–Vocational Rule 204.00, the ALJ determined that Reyes was "not disabled." (Tr. 16). As a result, the ALJ concluded that Reyes was not under a disability for the purpose of receiving SSI payments. *Id.* The Commissioner accepted the ALJ's dcision on March 2, 2001. (Tr. 4–5).

### E. Review of the Commissioner's Finding

**[3]** This Court concludes that the ALJ's decision was not based on legal error or unsupported by substantial evidence. The ALJ applied the appropriate five-step evaluation process, and the ALJ's findings were based on substantial evidence. Reyes's medical history supports the ALJ's findings that he was impaired as a result of HIV and could not return to his prior work as a shipping clerk. However, these impairments do not fall under one of the impairments in Appendix I that would entitle Reyes to SSI benefits without further inquiry. Various medical reports, several of which were prepared by physicians who treated Reyes over the course of several months, indicate that Reyes is not limited in physical movement or in psychological adjustment. Reyes himself admits to living and traveling on his own, and to considering going back to school and volunteering. Thus, the ALJ's finding that Reyes could perform other jobs existing in significant numbers in the national economy thus was supported by substantial evidence.

### CONCLUSION

**\*5** For the reasons stated above, the Commissioner's motion for judgment on the pleadings is granted. The Clerk of the Court shall close the case.

SO ORDERED.

**Parallel Citations**

94 Soc.Sec.Rep.Serv. 483

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5434065
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Misty'Lin WALKER, Plaintiff,
v.
Carolyn W. COLVIN, Defendant.

No. 5:12–cv–483 (GLS/ESH).   |   Sept. 27, 2013.

## Attorneys and Law Firms

Olinsky Law Group, Howard D. Olinsky, Esq., of Counsel, Syracuse, NY, for the Plaintiff.

Hon. Richard S. Hartunian, United States Attorney, Vernon Norwood, Special Assistant U.S. Attorney, of Counsel, Syracuse, NY, Steven P. Conte, Regional Chief Counsel, Social Security Administration, Office of General Counsel, Region II, New York, NY, for the Defendant.

## *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff Misty'Lin Walker challenges defendant Commissioner of Social Security's denial of Disability Insurance Benefits (DIB) and Supplemental Security Income benefits (SSI), seeking review under 42 U.S.C. §§ 405(g) and 1383(c)(3). (Compl., Dkt. No. 1.) In a Report–Recommendation (R & R) filed June 19, 2013, Magistrate Judge Earl S. Hines recommended that the Commissioner's decision be affirmed and Walker's complaint dismissed.[1] (R & R, Dkt. No. 15.)Pending are Walker's objections to the R & R. (Dkt. No. 16.)For the reasons that follow, the court adopts the R & R in its entirety.

### II. *Background*

On October 20, 2008, Walker filed an application for DBI and SSI under the Social Security Act. (Tr.[2] at 38–39, 121–27.) After her application was denied, Walker requested a hearing before an Administrative Law Judge (ALJ), which was held on March 11, 2010. (*Id.* at 9–37, 57–64, 73–74.)On April 1, 2010, the ALJ issued a decision denying the requested benefits, which became the Commissioner's final determination upon the Social Security Administration Appeals Council's denial of review. (*Id.* at 1–6, 40–55.)

Walker commenced the present action by filing a complaint on March 16, 2012, seeking judicial review of the Commissioner's determination. (Compl.) After receiving the parties' briefs, Judge Hines issued an R & R recommending dismissal of Walker's complaint. (*See generally* R & R.)

### III. *Standard of Review*

By statute and rule, district courts are authorized to refer social security appeals to magistrate judges for proposed findings and recommendations as to disposition. *See* 28 U.S.C. § 636(b) (1)(A), (B); N.D.N.Y. L.R. 40.1, 72.3(d); General Order No. 18.Before entering final judgment, this court reviews report and recommendation orders in cases it has referred to a magistrate judge. If a party properly objects to a specific element of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at *3, *5 (N.D.N.Y. Jan.18, 2006). In those cases where no party has filed an objection, only vague or general objections are made, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.* at *4–5.

### IV. *Discussion*

Walker purports to object to the R & R on three grounds. First, she asserts that the court should reject Judge Hines' recommendation that the ALJ's residual functional capacity determination was properly supported by substantial evidence, because the opinion of her treating physician was not given controlling weight. (Dkt. No. 16 at 1–2.)Second, she objects to Judge Hines' finding that the ALJ did not err in determining Walker's credibility.(*Id.* at 3.) Lastly, she objects to the ALJ's step five determination on the basis of its reliance on an allegedly incomplete hypothetical question. (*Id.* at 3–4.)The substance of these arguments, however, was previously raised in Walker's brief and considered and rejected by Judge Hines. (Dkt. No. 10 at 9–16; R & R at 4, 13–22.) Walker's "objections," therefore, are general and do

not warrant *de novo* review. *See Almonte,* 2006 WL 149049, at \*4.

**\*2** However, Walker does specifically object to Judge Hines' failure to address her argument that the ALJ did not consider her treating physician's January 8, 2009 opinion. (Dkt. No. 16 at 2.) Walker asserts that, since this particular opinion is inconsistent with the ALJ's RFC determination, it should have been explicitly considered. (Dkt. No. 10 at 9–13.)This is a specific objection and thus merits *de novo* review.

The essence of Walker's argument is that the failure to explicitly consider the January 8, 2009 opinion of treating physician Dr. Narayana Reddy, (Tr. at 204–05), violated the treating physician rule, and therefore the ALJ's RFC determination was not supported by substantial evidence. (Dkt. No. 10 at 9.)

Medical opinions, regardless of the source, are evaluated by considering several factors outlined in 20 C.F.R. § 404.1527(c). Controlling weight will be given to a treating physician's opinion that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004).

Although Dr. Reddy's January 8, 2009 opinion is not explicitly mentioned in the ALJ's decision, this is not dispositive of Walker's argument, as the ALJ determined that Dr. Reddy's opinions were not entitled to controlling weight because many of them were inconsistent with the evidence of record. (Tr. at 51.) In her January 8, 2009 report, Reddy opined that Walker "cannot read as short-term memory is so poor," and that she was "unable to have sustained concentrations." (*Id.* at 205.)This opinion was inconsistent, however, with other substantial evidence in the record, and the ALJ was therefore justified in assigning it less than controlling weight. *See Roma v. Astrue,* 468 F. App'x 16, 18–19 (2d Cir.2012). Specifically, consultative examiner Dr. Kristen Barry offered an opinion on January 27, 2009 that Walker was "able to follow and understand simple directions and instructions" and "able to maintain her attention and concentration."(Tr. at 247–51.) Moreover, Dr. R. Nobel, state agency physician, opined that Walker had "adequate ability to understand [,] carry out and recall simple instructions" and "could persist at routine repetitive tasks."(*Id.* at 270.)Dr. Nobel therefore concluded that Walker retained the capacity

for entry level work in a setting requiring only minimal contact with others. (*Id.*) For that reason, and the reasons articulated by Judge Hines in the R & R, the ALJ's assignment of less than controlling weight to Dr. Reddy's opinion is free from legal error and supported by substantial evidence. (R & R at 14–17.)

As to the remainder of Walker's objections, the court, having carefully reviewed the record, finds no clear error in the R & R and accepts and adopts it in its entirety.

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**\*3 ORDERED** that Magistrate Judge Earl S. Hines' June 19, 2013 Report–Recommendation and Order (Dkt. No. 15) is **ADOPTED** in its entirety; and it is further

**ORDERED** that the decision of the Commissioner is **AFFIRMED** and Walker's complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

### *REPORT AND RECOMMENDATION*

EARL S. HINES, United States Magistrate Judge.

Misty L. Walker ("Walker") brings this action under 42 U.S.C. § 405(g), seeking review of an adverse decision on her application for disability-based benefits under the Social Security Act. A reviewing court's limited role is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.,* 562 F.3d 503, 507 (2d Cir.2009), *cert. denied,*559 U.S. 962, 130 S.Ct. 1503, 176 L.Ed.2d 152 (2010); *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *see also*42 U.S.C. § 405(g). Reviewing courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for that of the Commissioner when the record contains

substantial support for the decision. *Yancey v. Apfel,* 145 F.3d 106, 111 (2d Cir.1998). Similarly, reviewing courts cannot resolve evidentiary conflicts or appraise the credibility of witnesses, including the claimant. *Aponte v. Secretary, Dep't of Health & Human Servs.,* 728 F.2d 588, 591 (2d Cir.1984). Neither can reviewing courts overturn the Commissioner's administrative rulings because they would have reached a different conclusion had the matter come before them in the first instance. *See Campbell v. Astrue,* 465 Fed. App'x 4, 5 (2d Cir.2012).

## I. Background

Walker claims disability due to mental impairments. Administrative law judge, Barry Peffley ("ALJ Peffley"), conducted an evidentiary hearing, and issued a written decision denying Walker's application. (T. 43–53).[1] After unsuccessfully requesting Appeals Council review, Walker timely instituted this proceeding. (Dkt. No. 1).

## II. Commissioner's Decision

ALJ Peffley utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way for determining disability applications in conformity with the Social Security Act.[2] A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.,* No. 1:05–CV–932, 2008 WL 759076, at *1–2 (N.D.N.Y. Mar. 19, 2008).

ALJ Peffley determined that Walker has severe, but not presumptively disabling mental impairments (schizophrenia, anxiety disorder, depression, and continuing drug dependence). He assessed Walker's residual functional capacity, and found that she can perform a full range of work at all *exertional* levels, but has *nonexertional* limitations emanating from her mental impairments. These limit Walker to performing only simple, routine, repetitive tasks in a work environment free of fast pace production requirements, and work involving only simple work-related decisions with few, if any, workplace changes. Finally, she can tolerate only occasional interaction with the public, co-workers, and supervisors. (T. 47).

**\*4** Significantly for present purposes, ALJ Peffley's residual functional capacity finding reflects that he gave *great weight* to opinions of state consultants (who, respectively, examined Walker and/or reviewed her entire medical record) as to the degree of limitations occasioned by Walker's impairments, but *little weight* to the opinion of a treating psychiatrist. He also considered Walker's subjective testimony regarding intensity, persistence and limiting effects of her symptoms as lacking credibility.

Relying on testimony from a vocational expert, ALJ Peffley found that Walker cannot perform her past relevant work as a cashier, sales attendant, fast food worker and bakery worker. Although that work is unskilled, it requires more contact with the public than Walker's limitations allow. Thus, Walker proved a *prima facie* case of disability and entitlement to benefits[3] unless ALJ Peffley could determine at Step 5 that jobs exist in significant numbers in the national economy that Walker can perform.[4] (T. 52–53).

ALJ Peffley determined that such jobs exist. He elicited and again relied on testimony of a vocational expert who testified that a person with Walker's residual functional capacity and nonexertional limitations can successfully perform work duties of a bakery racker, shipping and receiving weigher and bundles boxes routing clerk.

Based on this testimony and "under the framework of 204.00," ALJ Peffley concluded that Walker is "not disabled." (T. 53).

## III. Points of Error

Walker's brief identifies three "Issues Presented" for review:

- •the ALJ's RFC determination is unsupported by substantial evidence because he failed to follow the treating physician rule;

- the ALJ's credibility finding is unsupported by substantial evidence; and

- the ALJ's Step 5 determination is unsupported by substantial evidence.

(Dkt. No. 10, p. 3). Walker's first two points complain that, when determining residual functional capacity, ALJ Peffley erred by not applying legal principles governing credibility choices. These points argue that had correct principles been

employed, greater weight should have been given to medical opinions of Walker's treating psychiatrist and to Walker's subjective testimony regarding intensity, persistence and limiting effects of her symptoms. [5]

Walker's third point has two prongs. It posits that the vocational expert's testimony does not constitute substantial evidence supporting ALJ Peffley's Step 5 finding because it was given in response to a defective hypothetical question. Further, and in any event, that testimony does not constitute substantial evidence because it was inconsistent with the *Dictionary of Occupational Titles.*

Complying with General Order # 18 (Dkt. No. 3), the parties have briefed the above issues, and have presented their respective arguments thereon. [6]

## IV. Preliminary Discussion

A threshold discussion of relevant legal principles will aid understanding of the Commissioner's decision, Walker's challenges thereto and the ensuing analysis.

### A. Residual Functional Capacity

 **\*5** Before making findings at Steps 4 and 5 of the sequential evaluation process, an administrative law judge must first assess and articulate a claimant's "residual functional capacity" ("RFC"). This term refers to what claimants can still do in a work setting despite physical and/or mental limitations caused by their impairments and any related symptoms, such as pain. *See* 20 C.F.R. §§ 404.1545, 416.945(a); *see also Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (defining RFC). Administrative law judges thus decide whether applicants, notwithstanding their impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. *See* SSR 96–8p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 61 Fed.Reg. 34474, 1996 WL 374184, at \*4 (SSA July 2, 1996). When assessing a claimant's RFC, an administrative law judge must consider "all of the relevant medical and other evidence," including a claimant's subjective complaints of pain. *See* 20 C.F .R. §§ 404.1545(a)(3), 416.945(a)(3).

### B. Credibility Assessments

Administrative law judges must make credibility assessments, that is, decide how much weight to give to various pieces of evidence. Special rules govern credibility assessments of treating physician opinion and subjective testimony of claimants.

### 1. *Treating Source Opinions*

The "treating physician rule" requires administrative law judge's to give controlling weight to opinions of claimants' treating physicians regarding the nature and severity of impairments when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404 .1527(d)(2), 416.927(d)(2); *Sanders v. Commissioner of Soc. Sec.,* No. 11–2630–cv, 2012 WL 6684569, at \*2 (2d Cir. Dec.26, 2012); *Halloran v. Barnhart,* 362 F.3d 28, 31–32 (2d Cir.2004); *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir.2000). But, when treating source opinion swims upstream, contradicting other substantial evidence, such as opinions of other medical experts, it may not be entitled to controlling weight. *See Williams v. Commissioner of Soc. Sec.,* 236 Fed. App'x 641, 643–44 (2d Cir.2007); *see also Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir.2002). A treating physician's opinion may be discounted when it is internally inconsistent. *See Micheli v. Astrue,* No. 11–4756–cv, 2012 WL 5259138, at \*2 (2d Cir. Oct.25, 2012). Similarly, treating source opinion that lacks underlying expertise, [7] or that is brief, conclusory and unsupported by clinical findings, [8] or appears overly sympathetic such that objective impartiality is doubtful and goal-oriented advocacy reasonably is suspected, can be rejected. [9]

When controlling weight is *not* given, an administrative judge must consider certain regulatory factors to determine how much weight, if any, to give such an opinion: (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F .R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Halloran,* 362 F.3d at 32; *Shaw,* 221 F.3d at 134. Treating physician opinion may be discounted or entirely rejected based upon proper consideration of these factors. *Otero v. Colvin,* No. 12–CV–4757, 2013 WL 1148769, at \*5 (E.D.N.Y. Mar.29, 2013).

**\*6** Omission of an explicit six-factor analysis, however, is not a ground for an automatic remand. *See Halloran, 362 F.3d at 31–32.*Administrative law judges need not mechanically recite each factor, but rather must only "appl[y] the substance of the treating physician rule."*Id.* at 32;*see also Petrie v. Astrue,* 412 Fed. App'x 401, 407 (2d Cir.2011) (an administrative law judge need not expressly go through each factor in his decision, so long as it is "clear from the record as a whole that the ALJ properly considered" them).

**2.** *Subjective Testimony*
The best-informed (sometimes only) source of information regarding intensity, persistence and limiting effects of pain and other potentially disabling symptoms is the person who suffers therefrom. Testimony from claimants, therefore, is not only relevant, but desirable. On the other hand, such testimony is subjective and may be colored by a claimant's interest in obtaining a favorable outcome. Hence, subjective symptomatology by itself cannot be the basis for a finding of disability. A claimant must, in addition, present medical evidence or findings that the existence of an underlying condition could reasonably be expected to produce the symptoms alleged. *See* 42 U.S.C. § 1382c(a) (3)(A); 20 C.F.R. §§ 404.1529, 416.929; SSR 96–7p, POLICY INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at \*2 (SSA July 2, 1996); SSR 96–4p, TITLES II AND XVI: SYMPTOMS, MEDICALLY DETERMINABLE PHYSICAL AND MENTAL IMPAIRMENTS, AND EXERTIONAL AND NONEXERTIONAL LIMITATIONS, 61 Fed.Reg. 34488–01, 34489, 1996 WL 362210 (SSA July 2, 1996).

The Commissioner provides explicit guidance for deciding how much weight to give claimants' subjective self-evaluations. First, a formally promulgated regulation requires —once an impairment is identified—consideration of seven objective factors that support or impugn subjective testimony of disabling pain and other symptoms. [10] Not every factor for weighing subjective testimony applies in every case, and "[f]ailure to expressly consider every factor set forth in the regulations is not grounds for remand where the reasons for the administrative law judge's determination of credibility are sufficiently specific to conclude that he considered the entire evidentiary record."*Judelsohn v. Astrue,* No. 11–CV–388S,

2012 WL 2401587, at \*6 (W.D.N.Y. June 25, 2012) (internal quotation marks and citation omitted). [11]

Second, an internal ruling, SSR 96–7p, directs a two-step process:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) ... that could reasonably be expected to produce the individual's pain or other symptoms ....

> Second, ... the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities ....

**\*7** SSR 96–7, 1996 WL 374186, at \*2. This ruling further provides that "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."SSR 96–7, 1996 WL 374186, at \*2.

Governing circuit law generally mirrors the Commissioner's Ruling. When an administrative law judge rejects a claimant's testimony of pain and limitations, he or she must provide explicit reasons for rejecting the testimony. *See Williams v. Bowen,* 859 F.2d 255, 260–61 (2d Cir.1988); *Carroll v. Secretary of Health & Human Servs.,* 705 F.2d 638, 643 (2d Cir.1983).

**C.** *Step 5 Determination*
The burden shifts to the Commissioner to show that "there is work in the national economy that the claimant can do."*Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009); *see also DeChirico v. Callahan,* 134 F.3d 1177, 1180 (2d Cir.1998); *Berry,* 675 F.2d at 467; 20 C.F.R. §§ 404.1566, 416.966. Generally, an administrative judge elicits expert vocational testimony or consults officially-published data [12] to determine when a claimant's residual work skills can be used in other work and specific occupations in which they can be used.

**1.** *Expert Vocational Testimony*
When utilizing a vocational expert, administrative law judges pose hypothetical questions which must reflect the full

extent of the claimant's capabilities and impairments to provide a sound basis for the vocation expert's testimony. See *De Leon v. Secretary of Human Servs.,* 734 F.2d 930, 936 (2d Cir.1984). When a hypothetical question meets that requirement, and is supported by substantial evidence, expert vocational testimony suffices as substantial evidence supporting a Step 5 finding. See *Mancuso v. Astrue,* 361 Fed. App'x 176, 179 (2d Cir.2010); *see also Salmini v. Commissioner of Soc. Sec.,* 371 Fed. App'x 109, 114 (2d Cir.2010); *Butts v. Barnhart,* 388 F.3d 377, 384 (2d Cir.2004).

Conversely, expert vocational testimony given in response to a hypothetical question that does not present the full extent of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, cannot constitute substantial evidence to support a conclusion of no disability. See *Pardee v. Astrue,* 631 F.Supp.2d 200, 211–12 (N.D.N.Y.2009) (citations omitted); *McAuliffe v. Barnhart,* 571 F.Supp.2d 400, 407 (W.D.N.Y.2008).

Further, an administrative judge cannot reflexively rely upon expert vocational testimony when it is inconsistent with the occupational information supplied by the *Dictionary of Occupational Titles.*Rather, an administrative judge must elicit a reasonable explanation for any "apparent unresolved conflict" between vocational expert evidence and the *Dictionary of Occupational Titles,* and explain a resolution of that conflict before relying on vocational expert evidence. See SSR 00–4p, POLICY INTERPRETATION RULING: TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS, 2000 WL 1898704, at *2 (SSA Dec. 4, 2000). [13]

**2. *Grids*and "Framework Analysis"**

 **\*8**  In limited circumstances, an administrative law judge may take administrative notice of disability *vel non* by adopting and applying findings published in the "Medical—Vocational Guidelines" commonly called "the grids." See *Roma v. Astrue,* 468 Fed. App'x 16, 20–21 (2d Cir.2012); *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986); *see also*20 C.F.R. Pt. 404, Subpt. P, App. 2. When only *exertional* impairments are in play, and an administrative law judge's findings of residual functional capacity, age, education, and previous work experience coincide with grids parameters, the Commissioner may directly apply the grids to determine

whether work exists in the national economy which claimants can perform. See *Martin v. Astrue,* 337 Fed. App'x 87, 91 (2d Cir.2009); *Thompson v. Barnhart,* 75 Fed. App'x 842, 844 (2d Cir.2003) (Commissioner can meet Step 5 burden "by resorting to the applicable medical-vocational guidelines (the grids)"); *see also*20 C.F.R. Pt. 404, Subpt. P, App. 2.

When claimants suffer from *nonexertional* impairments (solely or in addition to exertional impairments), administrative law judges may consult and utilize the grids as a "framework" for evaluating whether nonexertional impairments result in disability. [14] Generally, framework analysis involves (a) consulting the grids with respect to the available occupational base given a claimant's exertional capacity, age, education, work experience and transferability of skills, and (b) determining how much that individual's occupational base is further eroded or diminished by nonexertional limitations and/or environmental restrictions. [15]

### V. Application and Analysis

This section addresses Walker's points of error in the order presented to the court.

### A. Alleged Violation of Treating Physician Rule

Dr. Narayana Reddy, M.D. (a psychiatrist at St. Joseph's Hospital), opined that Walker, has poor ability to (1) follow work rules; (2) relate to co-workers; (3) deal with the public; (4) interact with supervisors; (5) deal with work stress; (6) function independently; (7) maintain attention and concentration; (8) understand, remember and carry out detailed instructions; (9) understand, remember, and carry out complex instructions; (10) behave in an emotional stable manner; (11) relate predictably in social situations; an d(12) demonstrate reliability. (T. 306–07).

Although acknowledging that Dr. Reddy was Walker's treating psychiatrist, ALJ Peffley gave little weight to her opinions. He considered those opinions as being not supported by objective medical evidence and as inconsistent with the other evidence of record, including mostly normal mental status examinations, improvement on treatment, and decreased symptoms. (T. 51). Further, ALJ Peffley observed that on a medical assessment of ability to do work-related activities (mental) form Dr. Reddy chose "poor" in response to many categories of her ability to make occupational,

performance and/or social adjustments; however, Dr. Reddy did not check off "none" or "no" abilities in any of these categories. *Id.* He further concluded that Dr. Reddy's opinions regarding Walker's fair ability to perform simple work despite having poor social skills around other people is *not* inconsistent with residual function capacity for simple work with only occasional interactions with others. *Id.*

**\*9** Since ALJ Peffley declined to give Dr. Reddy's opinions controlling weight, he was obliged to determine how much weight those opinions were due by evaluating them in light of the factors outlined in 20 C.F.R. §§ 404.1527(c), 416.927(c). Although ALJ Peffley did not methodically discuss each individual regulatory factor in order, it is clear that he properly applied 20 C.F.R. §§ 404.1527(c), 416.927(c).

First, ALJ Peffley specifically referenced these regulations, thus indicating his awareness of their applicability and his intent to apply them. (T. 47). Next, regarding regulatory factors 1 and 2, it is evident from designation of Dr. Reddy as a treating source that ALJ Peffley considered nature and duration of the treatment relationship. (T. 51). With respect to factor 3 (evidence supporting treating physician's report), ALJ Peffley had nothing to observe. Dr. Reddy submitted no clinical findings to support her opinions. *Id.*

ALJ Peffley devoted primary attention to consistency of treating physician opinion with the record as a whole (factor 4). ALJ Peffley undertook a thorough discussion of voluminous medical evidence from multiple sources indicating that Walker's impairments are less severe than as articulated by Dr. Reddy. (T. 47–52). Specifically, Dr. Kristen Barry, Ph.D., a consultative psychologist, assessed that Walker is a fairly intelligent person who can follow and understand simple directions and instructions as well as maintain attention and concentration. (T. 250). Another psychological consultant, R. Nobel, assessed no significant limitations in understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; and maintaining socially appropriate behavior as well as only moderate limitations in working with co-workers and peers; interacting appropriately with the public; and accepting instructions and appropriately responding to criticism from supervisors. (T. 266–67).

In separate assessments dated August 27, 2008, and September 5, 2008, Dr. John Harkulich and Dr. Garrick Volpin, M.D. (staff psychiatrists at St. Joseph's Hospital) rated Walker a Global Assessment of Functioning score of 70,

which reflects mild symptoms, with some difficulty in social and occupational functioning.[16] (T. 223). Additionally, Dr. Roger Levine, M.D., Dr. Shahil Patel, M.D. (staff psychiatrists at St. Joseph's Hospital), together with Dr. Volpin, observed that Walker's mental status was generally "unremarkable." (T. 197, 212, 238, 242, 337, 339, 341, 343, 345, 347, 349, 351, 353, 355, 357, 359).

Opinions of Dr. Barry and Dr. Nobel were based on a complete review of the medical evidence, and were consistent with the weight of the evidence of record. ALJ Peffley acted within his discretion when affording them greater weight. *See Mongeur v. Heckler,* 722 F.2d 1033, 1039 (2d Cir.1983) ("It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence ... and the report of a consultative physician may constitute such evidence."); *see also Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999) (a treating physician's opinion, as to the nature and severity of claimant's condition is controlling only if it is well supported and is not inconsistent with the other substantial evidence in the record).

**\*10** ALJ Peffley's decision contains no direct or indirect discussion of degree of specialization (factor 5). However, that omission is of no moment. Dr. Reddy is board-certified in psychiatry. But so are doctors Harkulich, Levine, Patel, and Volpin, whose opinions uniformly diverged from those of Dr. Reddy, and which ALJ Peffley found more credible. Thus, this factor was, at best, a wash.

Finally, with respect to any other relevant factors (factor 6), ALJ Peffley found it significant that Walker acknowledged, contrary to Dr. Reddy's opinion, that she has no difficulty following written and/or spoken instructions. (T. 155).

Careful examination discloses no violation of the treating physician rule when determining Walker's RFC. Accordingly, there is no substantial evidence error insofar as this point of error is concerned.

### B. Alleged Error in Determining Credibility of Subjective Testimony

ALJ Peffley found that Walker's credibility in statements concerning intensity, persistence and limiting effects of her symptoms to be "poor." (T. 49). He also determined that "the available evidence of record does not support the degree of symptom severity and/or functional limitation described by the claimant—i.e ., totally debilitating impairments."*Id.*

He explained that Walker's responses while testifying were vague, appeared rehearsed, and lacked specificity that would otherwise have made them more persuasive. *Id.* ALJ Peffley further found that Walker's "activities of daily living do not indicate that she is disabled."(T. 50).

Walker argues that these credibility determinations are not supported by substantial evidence because ALJ Peffley: (1) failed to consider whether Walker's manner of testifying would reasonably result from her mental impairments; and (2) improperly equated activities of daily living as evidence of an ability to work on a regular and continuing basis. (*See id.,* p. 14).

ALJ Peffley evaluated credibility of Walker's subjective symptoms based on the requirements of 20 C.F.R. §§ 404.1529, 416.929. (T. 47–48). This indicates his awareness of correct legal principles and his intention to apply them. *See Britt v. Astrue,* 486 Fed. App'x 161, 164 (2d Cir.2012) (finding explicit mention of 20 C.F.R. § 404.1529 and SSR 96–7p as evidence that the administrative law judge used the proper legal standard in assessing the claimant's credibility).

### 1. *Manner of Speaking*

As for Walker's first argument, one might reasonably speculate abstractly that mental impairments can affect manner of speech. Walker, however, did not testify that her mental impairments affect her ability to speak, and there is no reference to impaired, affected or abnormal speech in the voluminous medical records, including records from treating physician Reddy.[17] Rather, multiple doctors (*e.g.,* Drs. Harkulich, Levine, Patel, and Volpin) observed that Walker's mental status was generally unremarkable. (T. 197, 212, 238, 242, 337, 339, 341, 343, 345, 347, 349, 351, 353, 355, 357, 359). Specifically, her speech was fluent and clear. She had adequate expressive and receptive language skills. (T. 249). She easily engaged in conversation and did not appear overly anxious or depressed. *Id.*

### 2. *Activities of Daily Living*

**\*11** ALJ Peffley found that Walker's "activities of daily living do not indicate that she is disabled."(T. 50). He emphasized that Walker is able to care for her personal needs independently; take care of pets; prepare simple meals; wash dishes; clean her room; go for walks and ride bicycles; shop for groceries, clothing, and household supplies; listen to music, socialize with her boyfriend, and occasionally visit museums. (T. 149–53, 227, 374).

There is nothing amiss about considering activities of daily living when evaluating credibility of a claimant's subjective testimony. Governing regulations (20 C.F.R. §§ 404.1529(c), 416.929(c)) expressly identify such activities as relevant to claimant credibility, and courts affirm reliance on a claimant's activities of daily living as substantial evidence supporting an administrative law judge's credibility determination. *See Rivera v. Harris,* 623 F.2d 212, 216 (2d Cir.1980) (such evidence that plaintiff is capable of engaging in many and varied activities despite allegations of severe pain is supportive of a conclusion that his alleged symptoms are not disabling).

Here, activities of daily living evidence impugns Walker's subjective testimony regarding the disabling extent (*e.g.,* an inability to work on a regular and continuing basis) she alleged. Further, as ALJ Peffley noted, Walker's medication, when taken, effectively controls limiting effects of Walker's symptoms. (T. 20, 25–26, 49–50).

Careful review discloses no evidence that ALJ Peffley reviewed Walker's activities of daily living in an improper context. Because he properly weighed "the objective medical evidence in the record, [Walker's] demeanor, and other indicia of credibility," his credibility assessment is conclusive. *Lewis v. Apfel,* 62 F.Supp.2d 648, 651 (N.D.N.Y.1999) (internal quotation marks and citation omitted). Thus, there is no error in ALJ Peffley's determination that Walker's subjective statements were less than fully credible.

### C. *Alleged Error in Relying on Vocational Expert Testimony*

Walker's final argument is that ALJ Peffley's Step 5 determination is unsupported by substantial evidence because it is based on vocational expert testimony given in response to an incomplete hypothetical question and which, in any event, was inconsistent with ALJ Peffley's RFC determination and the United States Department of Labor's *Dictionary of Occupational Titles.*(*See*Dkt. No. 10, pp. 15–16).

### 1. *Hypothetical Question*

The first prong is a pure bootstrapping argument wholly based on Walker's first two points of error.[18] The premise is that those supposed errors precipitated a higher residual functional capacity rating with fewer limitations than Walker actually proved. Hence, the hypothetical question posed to the

vocational expert based on that erroneous residual functional capacity evaluation was incomplete and defective. This, in turn, rendered the vocational expert's testimony unreliable evidence to support a Step 5 determination that Walker can perform alternative, available work.

**\*12** This argument falls under its own weight. ALJ Peffley's residual functional capacity evaluation was not erroneous in either respect advocated by Walker. Thus, his hypothetical question was not defective simply because it did not factor in more severe limitations opined by Dr. Reddy and urged by Walker. A valid hypothetical question need only incorporate limitations that an administrative law judge finds credible and which are supported by substantial evidence. *See Pertuis v. Apfel,* 152 F.3d 1006, 1007 (8th Cir.1998) ("The ALJ based his hypothetical question upon those limitations which he found to be credible and supported by the evidence. The limitations which the ALJ included in his hypothetical question were proper and supported by the evidence.").

The hypothetical question posed to the expert exactly matched Walker's residual functional capacity as determined by ALJ Peffley. (T. 32–33). It also factored a person of Walker's age, education, and work background. *Id.* That residual functional capacity rating and other factors posed to the expert are supported by substantial evidence. Therefore, ALJ Peffley's use of and reliance on expert vocational testimony was appropriate. *See Mancuso,* 361 Fed. App'x at 179 ("... Commissioner may rely on a vocational expert's testimony ... so long as ... hypothetical is based on substantial evidence."(citation omitted)); *see also Salmini,* 371 Fed. App'x at 114 ("Because we find no error in the ALJ's RFC assessment, we likewise conclude that the ALJ did not err in posing a hypothetical question to the vocational expert that was based on that assessment.").

**2.** *Dictionary of Occupational Titles*
ALJ Peffley's residual functional capacity assessment states that Walker can work only in an environment free of fast pace production requirements. Walker argues that the vocational expert's testimony does not provide substantial evidence supporting ALJ Peffley's Step 5 determination that Walker can perform alternative, available work because the expert testified that Walker can work in jobs that require ability to perform work according to pace. Walker points to the *Dictionary of Occupational Titles,* as providing that rackers and routing clerks must be able to perform repetitive,

or perform continuously the same work, according to set procedures, sequence, or pace. [19] Further, Walker argues that shipping and receiving clerks must have ability to function in situations requiring precise attainment of set limits, tolerances, or standards. [20]

While resourceful, this argument is not persuasive. ALJ Peffley expressly found, pursuant to SSR 00–4p, the vocational expert's testimony to be consistent with the information contained in the *Dictionary of Occupational Titles.*Indeed, none of the *Dictionary of Occupational Titles'* listings of requirements for the above jobs indicates a need to work at a *fast* pace. Consequently, there is no basis for a court to conclude that jobs identified by the vocational expert conflict with Walker's residual functional capacity rating or the *Dictionary of Occupational Titles.*

**\*13** Walker provides no good reason to reverse ALJ Peffley's Step 5 finding for lack of substantial evidence. [21]

## VI. Recommendation

The Commissioner's decision denying disability-based benefits should be **AFFIRMED.**

## VII. Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Graham v. City of New York,* 443 Fed. App'x 657, 658 (2d Cir.2011); *FDIC v. Hillcrest Assocs.,* 66 F.3d 566, 569 (2d Cir.1995); *see also*28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).
Signed on the *19* day of *June* 2013.

Footnotes

1    The clerk is directed to append the R & R to this decision. Familiarity therewith is presumed. (Dkt. No. 15.)

2    Page references preceded by "Tr." are to the Administrative Transcript. (Dkt. No. 8.)

1    "T." followed by a number refers to the page of the administrative record. (Dkt. No. 8).

2    *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 153, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (citing *Heckler v. Campbell,* 461 U.S. 458, 461, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983)).

3    *See Mimms v. Heckler,* 750 F.2d 180, 185 (2d Cir.1984).

4    *See Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009); *see also DeChirico v. Callahan,* 134 F.3d 1177, 1180 (2d Cir.1998); *Berry,* 675 F.2d at 467; 20 C.F.R. §§ 404.1566, 416.966.

5    The logical inference from these two points is that had treating physician opinion and Walker's subjective testimony been credited, Walker's residual functional capacity rating would have been "none" or much more limited.

6    *See* General Order # 18 dated September 23, 2003 (superseding January 24, 2002 and September 19, 2001 general orders). (Dkt. No. 3).

7    *See Terminello v. Astrue,* No. 05–CV–9491, 2009 WL 2365235, at *6–7 (S.D.N.Y. July 31, 2009); *Armstrong v. Commissioner of Soc. Sec.,* No. 05–CV–1285 (GLS/DRH), 2008 WL 2224943, at *11, 13 (N.D.N.Y. May 27, 2008).

8    *See Perez v. Barnhart,* 415 F.3d 457, 466 (5th Cir.2005); *see also Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir.2002); *Alvarado v. Barnhart,* 432 F.Supp.2d 312, 321 (W.D.N.Y.2006).

9    *See Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir.2006); *see also Labonne v. Astrue,* 341 Fed. App'x 220, 225 (7th Cir.2009); *Scott v. Heckler,* 770 F.2d 482, 485 (5th Cir.1985).

10    An administrative law judge must evaluate a claimant's symptoms, including pain, based on the medical evidence and other evidence, including the following factors:

> (i) claimant's daily activities;

> (ii) location, duration frequency, and intensity of claimant's pain or other symptoms;

> (iii) precipitating and aggravating factors;

> (iv) type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate her pain or other symptoms;

> (v) treatment, other than medication, claimant receives or has received for relief of her pain or other symptoms;

> (vi) measures claimant uses or has used to relieve pain or other symptoms; and

> (vii) other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.

> *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

11    *See also Oliphant v. Astrue,* No. 11–CV–2431, 2012 WL 3541820, at *22 (E.D.N.Y. Aug.14, 2012) (stating that the 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) factors are not a rigid, seven-step prerequisite) (citing *Snyder v. Barnhart,* 323 F. Supp .2d 542, 546 (S.D.N.Y.2004))).

12    *See* 20 C.F.R. §§ 404.1566(d) and 416.966(d) (Commissioner will take administrative notice of "reliable job information" available from various publications, including the *Dictionary of Occupational Titles* ); *see also* 20 C.F.R. §§ 404.1566(e) and 416.966(e) (Commissioner uses vocational experts as sources of occupational evidence in certain cases).

13    Social Security Ruling 00–4p provides:

> When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict.

> *See* SSR 00–4p, 2000 WL 1898704, at *2

14    *See* SSR 83–12, TITLES II AND XVI: CAPABILITY TO DO OTHER WORK—THE MEDICAL–VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING EXERTIONAL LIMITATIONS WITHIN A RANGE OF WORK OR BETWEEN RANGES OF WORK, 1983 WL 31253 (SSA 1983); SSR 83–14, TITLES II AND XVI: CAPABILITY TO DO OTHER WORK—THE MEDICAL–VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING A COMBINATION OF EXERTIONAL AND NONEXERTIONAL IMPAIRMENTS, 1983 WL 31254 (SSA 1983); SSR 85–15, TITLES II AND XVI: CAPABILITY TO DO OTHER WORK—THE MEDICAL–VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS, 1985 WL 56857 (SSA 1985).

15    In *Washington v. Astrue,* No. 5:12–cv–39 (GLS), 2012 WL 6044877, at *5 (N.D.N.Y. Dec. 5, 2012), a case involving a claimant with only a nonexertional impairment, this court described the framework analysis as follows:

> Where the claimant suffers solely from a nonexertional impairment, the ALJ must consider: (1) the RFC reflecting such nonexertional impairment and its limiting effects on the availability of other work; and (2) the claimant's age, education, and

work experience. *See* SSR 85–15, 1985 WL 56857, at *2–3 (1985). Those medical and vocational factors must be analyzed under the framework set out in the Medical–Vocational Guidelines § 204.00. *See id.* Although "[t]he assistance of a vocational resource may be helpful" and, in some cases, necessary, SSR 85–15 does not require that the ALJ always call upon the services of a VE. *Id.* at 3. The ultimate inquiry in a case such as this one is whether the claimant can perform unskilled work. *See id.* at *4. Unskilled work requires "the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." *Id.*

16  A GAF score in the range of 61–70 indicates mild symptoms. *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSIS AND STATISTICAL MANUAL OF MENTAL DISORDERS 32–34 (4th ed.2000).

17  The evidence of record contains conflicting and/or inconsistent testimony concerning Walker's alcohol and drug abuse as well as false and/or delusional memories. (T. 22, 196, 212, 214, 214–15, 248). This does not bolster credibility; rather, it can contribute to an adverse credibility finding.

18  Walker claims, for example, the jobs identified by the vocational expert and relied upon by the administrative judge, are inconsistent with the opinion of Dr. Reddy, who noted that Walker is "unable to have sustained concentration." (*See* Dkt. No. 10, p. 15 (citing T. 205)). Walker does not provide any other support for this contention.

19  *See* DICTIONARY OF OCCUPATIONAL TITLES, Code 524.687–018, 1991 WL 674400 (4th ed.1991); *see also* DICTIONARY OF OCCUPATIONAL TITLES, Code 222. 687–022, 1991 WL 672133 (4th ed.1991).

20  *See* DICTIONARY OF OCCUPATIONAL TITLES, Code 222.387–074, 1991 WL 672108 (4th ed.1991).

21  Walker does not complain of ALJ Peffley's use of Medical–Vocational Guideline section 204.00 as a "framework" for determining that Walker is not disabled. ALJ Peffley's decision reflects no erosion-of-occupational-base finding that framework analysis contemplates. That is of no concern, however, as the framework language appears to be unnecessary and meaningless surplusage. ALJ Peffley could and obviously did base his Step 5 finding on expert vocational testimony alone.

---

**End of Document**                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 31873463
United States District Court,
S.D. New York.

Ronald WORTHY, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner
of Social Security, Defendant.

No. 01 Civ. 7907(JSM).  |  Dec. 23, 2002.

Claimant brought action seeking judicial review of denial of his application for Supplemental Security Income (SSI) benefits. Commissioner of Social Security Administration moved for judgment on pleadings. The District Court, Martin, J., held that claimant did not show that he suffered from severe impairment that significantly limited his ability to work by reason of his HIV, back problems, fatigue, depression, or history of substance abuse.

Motion granted.

West Headnotes (1)

[1]     **Social Security**
          ⚷ Particular conditions or impairments in
          general

        **Social Security**
          ⚷ Mental and psychological conditions or
          impairments

        **Social Security**
          ⚷ Remediable conditions or impairments;
          compliance with treatment

        Supplemental Security Income (SSI) claimant did not show that he suffered from severe impairment by reason of his HIV, back problems, fatigue, depression, or history of substance abuse; HIV status had not resulted in any opportunistic infection, claimant had been substance free for several years, claimant was not being treated for back problems, and his claims of depression and memory loss were belied by psychiatric examination and complaints of functional incapacity by evidence of his daily

activities. Social Security Act, § 1 et seq., 42 U.S.C.A. §§ 423(d) 1382(a)(3).

9 Cases that cite this headnote

**Attorneys and Law Firms**

Ronald Worthy, Bronx, NY, pro se Plaintiff.

Susan D. Baird, Assistant United States Attorney, Southern District of New York, New York, NY, for Defendant.

**OPINION AND ORDER**

MARTIN, J.

**\*1** Ronald Worthy ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for an Order and Judgment reversing a final determination of the Commissioner of Social Security (the "Commissioner") finding Plaintiff not disabled between February 17, 1999 and July 22, 2000 and therefore not entitled to Supplementary Security Income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"). The Commissioner now moves for judgment on the pleadings. For the reasons set forth below, the Commissioner's motion is granted.

**PROCEDURAL BACKGROUND**

Plaintiff applied for SSI benefits on February 17, 1999. The application was denied initially and on reconsideration. Plaintiff was granted a hearing on April 14, 2000, before an administrative law judge ("ALJ"). The ALJ considered the case de novo and, on July 22, 2000, found that the Plaintiff was not disabled within the meaning of the Act. The decision became the final decision of the Commissioner on May 22, 2001, when the Appeals Council denied Plaintiff's request for review. On August 23, 2001, Plaintiff appealed the Commissioner's decision in this Court. On May 14, 2002, Commissioner Barnhart filed a motion for judgment on the pleadings to which Plaintiff did not respond. On May 21 and July 12, 2002, the Court ordered Plaintiff to respond to Defendant's motion, indicating in its July 12th order that it would decide the motion on Defendant's submissions alone, if Plaintiff failed to respond. Plaintiff has not responded to Defendant's motion. Thus, this motion will be decided on Defendant's submissions alone.

## FACTS

Plaintiff claimed at his social security hearing and in his application for benefits that he is disabled due to his HIV positive status, a back problem, fatigue, memory loss, depression and a history of substance abuse. The only issue before this Court is whether the evidence substantially supports the Commissioner's decision that Plaintiff was not disabled between February 17, 1999, the date he applied for SSI benefits, and July 22, 2000, the date the ALJ rendered its decision denying Plaintiff those benefits.

Plaintiff was born on August 14, 1952. He attended school through the ninth grade, but has never held a job. He was convicted and imprisoned for three felonies, including robbery and credit card fraud, and was last paroled in 1997. Plaintiff has had a long history of substance abuse, though he claims he no longer uses drugs or alcohol.

Plaintiff has been HIV positive since 1986. He sees a physician once every two months and is taking medication to treat his HIV infection. Although Plaintiff reported on his initial history and physical examination form, dated July 30, 1997, that he had the opportunistic infection PCP in September and December 1996, he stated at his hearing that he has not had any opportunistic infections as a result of HIV. Plaintiff's HIV status was described as stable and the results of his physical examinations as within normal limits by Dr. Shetty, who monitored Plaintiff at the Spellman Clinic from May 1999 to December 1999.

 **\*2**  Plaintiff complains of fatigue and back pain due to his HIV, though he does not take medication for this pain and has not consulted a physician about it. Although Plaintiff does not always have back pain, the pain, when present, can last up to two weeks. Plaintiff also claims he is undergoing treatment for syphilis.

Plaintiff claims he has trouble remembering things and is depressed. He is not, however, receiving treatment from a mental health professional. Plaintiff underwent an initial psychiatric evaluation on August 13, 1997. It was observed at that time that Plaintiff exhibited a normal mood and appropriate effect, was goal-oriented, had no suicidal or homicidal thoughts, and no delusions or hallucinations. Plaintiff was also described as three-dimensionally oriented, in possession of good memory and normal abstract thinking.

Plaintiff generally travels by subway. He attends religious services every Friday, to which he travels alone on the subway. Plaintiff reported in his disability questionnaire that he "tr[ied] to cook every day" and that he "d [id] all the housework alone a little at a time."Plaintiff also shops for himself "a little at a time."

According to Plaintiff, he can walk for approximately fifteen to twenty minutes, sit for approximately 45 minutes at a time, stand for one hour at a time, and lift and carry approximately ten pounds.

Plaintiff was seen and/or treated for various conditions prior to filing his application, including blurred vision on August 18, 1997, a rash on August 19, 1997, and facial cellulitis on November 13, 1997. Plaintiff was also seen and/or treated for a productive cough between February 6th through 11th of 1998, and for wheezing on March 2, 1998. Plaintiff's chest x-ray, however, taken on March 3, 1998, revealed that his heart, lungs, and mediastinum were within normal limits.

Plaintiff had no health related complaints in January and February 1999, the time period immediately preceding the filing of his application for benefits.

On April 28, 1999, after Plaintiff applied for SSI benefits, he was consultatively examined by Dr. Joseph Grossman, who diagnosed the following: that Plaintiff had a history of back and joint pain and skin disorder, was HIV positive, though he didn't exhibit clear signs of AIDS, and had a history of drug abuse in remission. Dr. Grossman also observed that Plaintiff was able to sit, stand, walk, lift, push, pull, climb, bend, stoop, crouch, hear, speak, travel, and use hand and foot controls without impairment. Dr. Grossman observed that Plaintiff, who was 6# 11# and weighed 182 pounds, had a normal gait and station, had full range of motion and adequate muscle strength and could make a fist, squat, and stand on his toes normally.

Dr. Lawrence Lutchen conducted a psychiatric evaluation of Plaintiff on April 28, 1999 and observed that Plaintiff was not depressed, was cognitively intact and appropriately oriented to person, place and time. Dr. Lutchen also tested Plaintiff's memory and found that Plaintiff missed only one item when tested at one, five and ten minute intervals.

 **\*3**  Dr. Ladopolous, a state agency physician, reviewed Plaintiff's medical records on May 25, 1999 and completed

a physical residual functional capacity assessment form. According to his findings, Plaintiff can periodically lift twenty pounds, frequently lift ten pounds, stand or walk about six hours in an eight-hour day, and is not limited in pushing or pulling.

On August 30, 1999, Dr. Imam, another state agency review physician, reviewed Plaintiff's records and determined that the opportunistic infection PCP was not documented in Plaintiff's files. On September 8, 1999, Dr. Imam assessed Plaintiff's residual functional capacity based on a review of his medical records and determined that Plaintiff can occasionally lift fifty pounds, frequently lift twenty-five pounds, stand and walk approximately six hours in an eight-hour workday, and can push and pull without restriction.

## DISCUSSION

### I. Scope of Review
Under the Act, the "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In reviewing the Commissioner's decision, the Court will set aside the "decision only where it is based upon legal error or is not supported by substantial evidence." *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998). Thus, the Court will give conclusive effect to the Commissioner's determination that a person is not entitled to SSI benefits if it finds that the decision was supported by substantial evidence.

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (internal quotation marks and citations omitted). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *See Snell v. Apfel,* 177 F.3d 128, 132 (2d Cir.1999) (quoting *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983) (per curium)).

"The substantial evidence test also applies to inferences and conclusions drawn from findings on facts." *Cruz v. Callahan,* No. 96 Civ. 9016, 1998 WL 142328, at *3 (S.D.N.Y. Mar.27, 1998) (citing *Levine v. Gardner,* 360 F.2d 727, 730 (2d Cir.1966)). Therefore, the Commissioner's findings of fact and the inferences and conclusions drawn from such

findings are conclusive, even if the reviewing court's analysis differs from the analysis of the Commissioner. *See Schauer v. Schweiker,* 675 F.2d 55, 57 (2d Cir.1982). "It is the function of the [Commissioner], not [the courts], to resolve evidentiary conflicts and to appraise the credibility of the witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983) (citations omitted).

### II. Statutory Requirements for Eligibility
**\*4** To establish disability within the meaning of the Act, a claimant must prove: (1) that he is unable to engage in substantial gainful activity by reason of a physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of at least twelve months, and (2) that the existence of such impairment is demonstrated by evidence supported by data obtained by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. §§ 423(d), 1382c(a) (3).[1]

In evaluating a disability claim, the Commissioner follows a five-step process promulgated by the Social Security Administration in 20 C.F.R. §§ 404.1520, 416.920. Courts have interpreted that process as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education; and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have

a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.... [T]he claimant bears the burden of proof as to the first four steps, while the [Commissioner] must prove the final one.

See *DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998) (quoting *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam)). *See also Curry v. Apfel,* 209 F.3d 117, 122 (2d Cir.2000). In addition to following this five-step process, the Commissioner considers the following factors in determining whether a claimant is disabled: "(1) objective medical facts and clinical findings, (2) diagnoses and medical opinions of examining physicians, (3) the claimant's subjective evidence of pain and physical incapacity as testified to by himself and others who observed him, and (4) the claimant's age, educational background, and work history." *Carroll v. Sec'y of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983).

"The burden is on the claimant to prove that he is disabled within the meaning of the Act." *Id.* The burden shifts to the Commissioner to prove that the claimant is capable of working, once the claimant proves the first four steps in the analytical process outlined above. *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996). "Once a disability claimant proves that his severe impairment prevents him from performing his past work, the [Commissioner] then has the burden of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986)

### III. Application of the Legal Standard

**\*5** Here, Plaintiff has not proven that he suffers from a severe impairment significantly limits his physical or mental ability to work, caused by HIV, back problems, fatigue, memory loss, depression and a history of substance abuse.

The ALJ found that Plaintiff's HIV status did not prevent him from performing light, repetitive work. These findings are substantially supported by the evidence. According to Dr. Grossman, Plaintiff did not exhibit any clear signs of AIDS. Dr. Ladopolous found no evidence, upon a review of Plaintiff's medical records, of an opportunistic infection that would meet the requirements of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Dr. Imam also found no documentary evidence, upon a review of Plaintiff's medical records, of the opportunistic infection, PCP. Although PCP was mentioned only in a medical history given by Plaintiff, Plaintiff himself testified at his hearing that he has not suffered from any opportunistic infections. Furthermore, Plaintiff's HIV status, according to Dr. Ladopolous, was asymptomatic as of January 1999. Dr. Shetty also described Plaintiff's HIV status as stable. Finally, evidence of Plaintiff's daily activities demonstrates that he is not severely physically impaired by his HIV positive status.

The ALJ's finding that Plaintiff's purported back pain was not a severe impairment is also supported by the record, which did not reflect treatment for back problems, despite Plaintiff's bimonthly visits to physicians, and by evidence that Plaintiff competently conducted his daily affairs.

The ALJ's finding that Plaintiff's history of substance abuse was not a severe impairment is supported by evidence that Plaintiff has been free of drugs and alcohol since 1997.

The ALJ's finding that Plaintiff was not severely impaired by depression is supported by Dr. Lutchen's determination that Plaintiff was not depressed and did not have a severe mental impairment.

In addition, Plaintiff's complaints of pain and functional limitations rendering him disabled is belied by evidence of his daily activities. Plaintiff uses public transportation, cooks, shops, and cleans without help from others. He can walk for at least fifteen to twenty minutes at a time, can stand for at least an hour, and can lift and carry at least ten pounds. The evidence substantially supports the Commissioner's finding that Plaintiff is not disabled.

Finally, the ALJ's finding that there is work in the national economy that Plaintiff is capable of performing work is substantially supported by evidence of Plaintiff's age, education and experience at the time of his application. Plaintiff is 47, has a ninth grade education and is not severely impaired within the meaning of the Act.

<div style="display: flex;">

**CONCLUSION**

For the foregoing reasons, Commissioner's motion is granted.

SO ORDERED.

**Parallel Citations**

85 Soc.Sec.Rep.Serv. 66

</div>

Footnotes

1    The statutory definitions of "disability" are virtually identical under both the Title II disability insurance and Title XVI SSI programs. *Compare* 42 U.S.C. § 423(d) *with* 42 U.S.C. § 1382c(a)(3). Consequently, "cases under 42 U.S.C. § 423 are cited interchangeably with cases under 42 U.S.C. § 1382c(a)(3)." *Hankerson v. Harris,* 636 F.2d 893, 895 n. 2 (2d Cir.1980) (citation omitted).

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.